**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                             Plaintiff,<br><br>                v.<br><br>EDWARD S. WALCZAK,<br><br>                         Defendant. | Civil Action No. 20-76<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC" or the "Commission") alleges the following against defendant Edward S. Walczak ("Walczak") and demands a jury trial:

## NATURE OF THE ACTION

1.     This enforcement action concerns material misstatements and omissions and breaches of fiduciary duty by an investment adviser (Walczak) to a mutual fund, the Catalyst Hedged Futures Strategy Fund (the "Fund"), the purpose of which was "capital appreciation and capital preservation in all market conditions, with low volatility and low correlation to the US equity market." Walczak fraudulently misrepresented the Fund's risk management procedures. The Fund lost approximately 20% of its net asset value ("NAV") – more than $700 million – during the period December 2016 through February 2017. During this same time period, the Fund's benchmark, the Standard & Poor's 500 Total Return Index ("S&P 500"), rose approximately 8%.

2.     Before becoming associated with Catalyst Capital Advisors, LLC ("Catalyst") in August 2013, Walczak had started and managed a predecessor private fund, trading options on

S&P 500 futures contracts.  After the relaunching of this pooled investment vehicle as sponsored by Catalyst, Walczak managed the Fund using the same investment objectives, policies and guidelines as before.  Upon conversion to a public mutual fund, the Fund held approximately $7 million in assets, but grew to hold more than $4 billion by November 2016.  Walczak's compensation was tied directly to the size of the Fund's assets under management and he was paid tens of millions of dollars – including more than $24 million in 2016 alone.

3.     A core selling point of the Fund was its purported use of "strict risk management procedures" devised to limit the extent of any losses.  Among other things, Walczak and Catalyst told investors that the Fund employed an uncommon risk management strategy involving safeguards designed to prevent losses of more than 8%, such as "aggregate portfolio stop loss measures."

4.     Walczak and Catalyst highlighted this risk management strategy as a distinguishing feature of the Fund in various disclosures to prospective and current investors and their advisers, including in Fund prospectuses, wholesaler talking points, due diligence questionnaires, quarterly investor presentations, and "Open House" conference calls.  The unmistakable message of the collective marketing content was that Walczak, as the Fund's day-to-day manager, proactively monitored for changes in the risk profile of the Fund through the use of sophisticated options analysis software, adjusted investment positions as needed to comply with the Fund's risk metrics and, moreover, adhered to a stop-loss rule of 8%.

5.     Walczak and Catalyst, however, misrepresented the Fund's risk management procedures and failed to manage the Fund consistent with their disclosures: the Fund's so-called "strict" risk parameters were largely discretionary; the Fund's risk was not mitigated by "stops"

or "triggers" that would limit losses to 8%; and Walczak did not otherwise consistently manage the Fund to an 8% loss threshold.

6.      By December 2016, the S&P 500 was trending upwards, and Walczak had positioned the Fund to profit if the S&P 500 dropped (as he expected) – but he had also exposed the Fund to a greater than 8% loss if the market continued to rise.

7.      Over the next few months, the Fund's net asset value often decreased when the S&P 500 increased, and the Fund regularly breached its risk metrics. As early as December 10, 2016, the Fund's assistant portfolio manager proposed that "booking losses" of $167 million could avoid additional losses of $500 million; in other words, a potential loss well above the 8% threshold could be avoided by realizing a loss comfortably below it. Rather than heeding this advice or following the risk management procedures disclosed to investors, Walczak hoped a market downturn would allow him to avoid having to book such substantial losses.

8.      The Fund ultimately lost approximately 20% of its net asset value between December 2016 and February 2017, including more than 15% in February alone. The Fund's total loss of over $700 million was comparable to the $667 million loss forewarned by the Fund's assistant portfolio manager.

9.      Not surprisingly, in the wake of this loss, investors questioned whether Walczak had managed risk as promised (he had not) and pointedly asked Catalyst-affiliated wholesalers: "What happened to the -8% max drawdown figure?" For example, one investment adviser complained that the Fund's losses were "well beyond the 'max monthly drawdown of 8%' that the [portfolio] manager spoke of in September [2016]." Similarly, an investment adviser who had allocated millions of dollars of its clients' assets to the Fund determined that Walczak had

"made a large directional bet that was inconsistent with his investment process as we understood it."

10.     As described more fully below, Walczak knowingly or recklessly made or substantially participated in making misrepresentations and omissions of material fact about the Fund.  Through the knowing or reckless actions of Walczak, the Fund was not managed consistent with its disclosures.  Walczak's conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

11.     As a result of the conduct alleged in this Complaint, Walczak violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; and further violated Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") and Rule 206(4)-8 thereunder [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4), and 17 C.F.R. § 275.206(4)-8] or, in the alternative, aided and abetted Catalyst's violations of Sections 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

12.     Accordingly, the Commission seeks a judgment from the Court:  (i) finding that Walczak committed the violations alleged herein; (ii) permanently enjoining Walczak from further violations of the relevant provisions of the federal securities laws; (iii) requiring Walczak to disgorge his ill-gotten gains with prejudgment interest; and (iv) requiring Walczak to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## JURISDICTION AND VENUE

13.     The Commission brings this action pursuant to the enforcement authority

conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(d)] and Section 209(d)

of the Advisers Act [15 U.S.C. § 80b-9(d)].

14.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and

22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections 209(d), 209(e)

and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14].

15.     The Court has personal jurisdiction over Walczak, and venue is proper in this

District, because, among other things: (i) Walczak is a resident of this District; and (ii) many of

the acts and transactions in which Walczak engaged and that constitute violations of the federal

securities laws occurred in this District.

16.     In connection with the conduct alleged in this Complaint, Walczak has directly

and indirectly made use of the mails and/or means or instrumentalities of transportation or

communication in interstate commerce.

## THE DEFENDANT

17.     Edward Walczak, age 63, is a resident of Madison, Wisconsin.  At all relevant

times, Walczak was the Senior Portfolio Manager of the Fund. Walczak oversaw, and was

actively involved in, the day-to-day operations of the Fund.  Among other things, Walczak was

responsible for directing the Fund's investments and was also involved in the marketing, offer,

and sale of Fund shares.  Walczak worked out of an office in Fitchburg, Wisconsin, his home in

Madison, Wisconsin, and, occasionally, his other homes in San Francisco, California and

Lahaina, Hawaii.

## RELEVANT ENTITIES

18.     Mutual Fund Series Trust ("Trust") is registered with the Commission as an open-end management investment company and consists of dozens of series, one of which is the Fund.

19.     Catalyst Capital Advisors, LLC ("Catalyst") is based in Huntington, New York, and has been registered with the Commission as an investment adviser since June 2006.  Catalyst serves as an investment adviser to the Fund and various other series of the Trust.  As of November 2016, Catalyst had total assets under management of approximately $6 billion, of which more than $4.2 billion were held through the Fund.

## FACTUAL ALLEGATIONS

### A.     ORIGIN OF THE FUND

20.     In or about 2005, Walczak developed an investment strategy involving the trading of options for Harbor Assets, LLC (the "Harbor Fund"), a private fund that he founded and managed.

21.     Shares of the Harbor Fund were offered exclusively through private transactions and only could be purchased by "accredited and sophisticated investors" who satisfied certain "purchaser suitability" requirements, including minimum net worth and initial investment amounts.  Harbor Fund's investors included Walczak, as well friends and family of Walczak.  At its height, the Harbor Fund held approximately $7 million in assets.

22.     In August 2013, the Harbor Fund was reorganized as the Fund when Walczak partnered with Catalyst.  As a result, the Fund became subject to the registration and public reporting requirements of the federal securities laws.  The Fund's prospectus identified Walczak as the Fund's portfolio manager and indicated that the Fund adopted, in all material respects, the same investment objectives, policies, and guidelines that Walczak had used to manage the

Harbor Fund.  At all times after August 2013, the Fund also reported to investors and prospective investors the Harbor Fund's performance figures as part of its historical track record.

23.     On or about August 27, 2013, Catalyst entered into a "Portfolio Manager Agreement" with Walczak pursuant to which Catalyst agreed to pay Walczak 60% of the net advisory fees the Fund paid Catalyst until the Fund's assets reached $20 million, and then 50% of such fees after the Fund's assets exceeded $20 million.  In return, Walczak agreed to provide a "continuous investment program for the Fund," and manage the Fund "in accordance with the … Prospectus."

24.     Reorganizing the Harbor Fund into the Fund provided an attractive financial opportunity for Walczak.  The Fund could be (and was) offered to an exponentially larger universe of potential investors than the Harbor Fund.  In addition, by partnering with Catalyst, Walczak was able to leverage Catalyst's affiliated, nationwide network of "wholesalers" – individuals who marketed Catalyst's mutual funds to investment advisers to encourage those advisers to invest, for their own and their clients' accounts, in Catalyst's mutual funds.  Thus, compared to the Harbor Fund, the Fund was sold to more people, through more channels, and Walczak profited immensely, given his compensation was tied directly to the size of the Fund.

25.     The Fund's assets under management grew from nearly $18 million at the end of 2013 to:  over $500 million at the end of 2014; over $2 billion at the end of 2015; and nearly $4 billion at the end of 2016.  Walczak received tens of millions of dollars in compensation from Catalyst for managing the Fund, including more than $24 million in 2016 and nearly $8 million alone during the period December 2016 through February 2017.

### B.     THE FUND'S INVESTMENT STRATEGY

26.     At all times since 2005, Walczak's investment strategy has been based on collecting premiums from writing (*i.e.*, selling) options and option spreads on stock index futures traded on the Chicago Mercantile Exchange ("CME").

27.     "Futures" are standardized contracts for the purchase and sale of financial instruments (or physical commodities) for future delivery on a specified date or during a specific month.  They are facilitated through a futures exchange (via an electronic trading platform) and are standardized according to quality, quantity, delivery time and place, with the only variable being price.  Exchange traded futures include (but are not limited to) metals, currencies, equity indexes, and interest rate products.

28.     An "option" is a derivative financial instrument that is based on the value of an underlying asset (in this case, S&P 500 futures contracts).  An option is a contract sold by one party (the option writer) to another party (the option holder).  The two general categories of option contracts are call options and put options.

29.     A "call option" gives the holder the right to buy the underlying asset at a stated price (the strike price) on or before the option's expiration date.  The option writer earns a fee (referred to as a premium) for taking on the obligation to sell the underlying asset in the event the option holder decides to exercise the option to buy.  If the price of the underlying asset exceeds the strike price, the writer's risk of loss on a call option is theoretically unlimited because there is no limit on how high the price of the underlying asset can rise, and the writer must purchase that asset at the market price to meet its contractual obligation to sell at the strike price if and when the option is exercised.

30.     A "put option" gives the holder the right to sell the underlying asset at the strike price at any point up to the option's expiration date. The put option writer earns a premium for taking on the obligation to purchase the underlying asset in the event the option holder decides to exercise the option to sell.  The writer's risk of loss on a put option can be substantial depending on how far the price of the underlying asset falls below the strike price.  The potential loss is not unlimited, however, as the price of that asset cannot fall below zero.

31.     The S&P 500 futures options traded by the Fund were available at a variety of strike prices and expiration dates.  Diversifying the positions in an options portfolio across different strike prices and expiration dates decreases the risk that any particular market event will have a significant impact on the portfolio.  In contrast, concentrating positions within certain strike ranges and/or expiration dates increases that risk.

32.     A portfolio manager responsible for investing or hedging the assets of a mutual fund will often utilize different order types.  A "stop order" is an order to buy if the market rises to or above a specified price, or to sell if the market falls to or below a specified price.  Stop orders can be used as part of a risk management strategy to protect gains or limit losses.

C.     **THE FUND'S MARKETING EMPHASIS ON WALCZAK'S RISK MANAGEMENT PROCEDURES**

33.     Walczak and Catalyst marketed the Fund to investors and prospective investors through a variety of written and oral means once it was launched as a public fund in September 2013.  According to the Fund's marketing content, which was based on information provided by Walczak, the Fund allegedly employed a "distinct" risk management strategy whereby Walczak strictly adhered to well-defined risk parameters, proactively monitored for changes in the risk profile of the Fund through the daily use of sophisticated options analysis software, utilized

aggregate portfolio stop loss measures, and managed the Fund to limit losses to approximately 8%.

### Prospectus

34.    The Fund's initial prospectus, and each subsequent prospectus, stated:

> The Fund places a strong focus on risk management intended to provide consistency of returns and to mitigate the extent of losses. Positions are entered on a continuous basis across different option exercise prices and expiration months. Supported by sophisticated options analysis software, the Fund employs strict risk management procedures to adjust portfolio exposure as necessitated by changing market conditions. (Emphasis added.)

35.    Walczak reviewed and approved the portions of the Fund's prospectuses that related to the Fund's investment strategy and his role in managing the Fund.

36.    Beyond just the Fund's prospectus, Walczak and Catalyst made a variety of specific representations to investors and prospective investors regarding the nature of the "strict risk management procedures" allegedly employed by the Fund.

### Talking Points

37.    Catalyst provided written talking points to the affiliated wholesalers who were responsible for selling the Fund.  These talking points explained that a "key feature of the strategy" for the Fund was "Risk Management – Hedges are built into every position when it is initiated, and stop loss trigger points are used to limit drawdowns." (Emphasis added.)

38.    From in or about late 2013 through 2017, wholesalers used these or substantially similar talking points when communicating with investment advisers and, occasionally, with clients of such investment advisers.

### *Due Diligence Questionnaires*

39.     From at least 2015 through at least 2017, Catalyst also provided written due diligence questionnaires ("DDQs") to investment advisers who were considering investing in the Fund for their clients and/or their own accounts.

40.     The DDQs highlighted the Fund's use of "[a] Risk Management Strategy explicitly focused on limiting losses by hedging individual positions at initiation, ongoing adjustment based on well-defined risk parameters, and <u>aggregate portfolio stop loss measures</u>." (Emphasis added.)

41.     In describing the Fund's "downside sell discipline," the DDQs stated: "If a drawdown reaches 8% of overall portfolio risk, there is a <u>trigger</u> to exit position(s)." (Emphasis added.)

42.     The DDQs further included the following question and answer:  "What strategies do you employ to limit the portfolio's downside risk and loss potential?  A strict list of risk parameters are abided by and also reviewed by an Internal Risk Manager.  Such parameters include, but are not limited to: optimized position sizing, overall position limits, margin to AUM ratio, change in NAV percentage (weekly & monthly), trade entry scaling, dynamic hedging of option structures, <u>diversification of time and price exposure</u>, and limiting overall portfolio risk." (Emphasis added.)

### *Quarterly Investor Presentations*

43.     In addition to the above-mentioned DDQs, Catalyst and Walczak also developed and distributed to investors and prospective investors quarterly presentations, which were updated four times per year and, from at least 2015 until early 2017, posted on Catalyst's

website.  Catalyst and its affiliated wholesalers also emailed the quarterly presentations directly to investment advisers.  Walczak reviewed and approved the content of these presentations.

44.     The quarterly investor presentations described Walczak's purported five-step "Daily Investment Process" as:



45.     The quarterly investor presentations included a slide (or page) entitled "Risk Management Is an Imperative Part of the Strategy" (or simply "Risk Management") that stated: "The Fund employs a distinct Risk Management Strategy – In addition to the strategy and tactics we use to earn profits, we use a specific set of rules and tactics focused on limiting losses.  This is not common among public mutual funds."

46.     According to the same slide, the Fund's risk management included:

✓ Optimized position sizing

✓ Trade entry scaling

✓ Diversification of time and price exposure

✓ Dynamic hedging of option structures

✓ Limiting overall portfolio risk

47.     The 2015 and 2016 quarterly investor presentations also included a slide entitled "Key Reasons to Invest," one of which was:  "A Risk Management Strategy explicitly focused on limiting losses by hedging individual positions at initiation, ongoing adjustment based on well-defined risk parameters, and <u>aggregate portfolio stop loss measures</u>." (Emphasis added)

48.     The 2015 and 2016 quarterly investor presentations also stated that the Fund's investment strategy "[d]oes not incorporate a directional bias to generate returns."

### *Open House Calls*

49.     In or around November 2014, Walczak began hosting periodic "Open House" teleconference calls (the "Open House Calls") to provide Fund updates to and answer questions from interested investment advisers.  Wholesalers affiliated with Catalyst emailed investment advisers inviting them to join the Open House Calls.

50.     During the Open House Calls, Walczak repeated and expounded upon the purported loss-limiting attributes of the Fund's risk management strategy, and frequently detailed the specific steps he employed to limit drawdowns, including the daily "stress testing" referenced in the quarterly investor presentations.  He also repeatedly represented that he managed the Fund to limit losses to approximately 8%.

51.     For example, during an Open House Call on November 4, 2014, Walczak stated: "I use risk management to control losses to roughly 8 percent.  That's the number I use in stress testing."  In describing his "stress testing" of the Fund, Walczak further stated:

> <u>I have very sophisticated options pricing models. I plug the portfolio into these models each day</u>. I stress the portfolio for a series of price movements up to 10 percent. I stress the portfolio for volatility movements . . . . So I stress the portfolio for volatility, I stress it for price movement[s], and then I look over five different time frames. A month from today, two months from today and several time frames in between. I'll vary those time frames to match up to different times that are important to options, expiration

for part of the portfolio for example . . . . <u>I identify what's the impact on portfolio value at these stress points. And if the impact is greater than my 8 percent limit, then I'll go in and I'll hedge the portfolio to bring it back in line</u>. (Emphasis added.)

52.     During another Open House Call, held on October 13, 2015, Walczak similarly described how "on a daily basis" he and his team "take a snapshot of our portfolio within our options modeling software and then we stress that portfolio against price, volatility and across time."  With respect to price specifically, Walczak explained:  "[W]e'll stress price moves of plus 5 and plus 10 percent on the S&P and minus 5, minus 10 and minus 15 percent on the S&P. We'll then – we'll have snapshots of the portfolio value at those P&L [profit and loss] basically, at those stress points."  Walczak then further explained how this stress-testing of the portfolio was utilized in furtherance of avoiding losses in excess of 8%, which he described as the Fund's "line in the sand," stating:

> <u>We look at [price and volatility] across five different timeframes and what we're looking for is a drawdown of greater than 8 percent in the portfolio value. If we find that at any one of those price and volatility stress points, we'll identify whether it, for example, it's price or volatility, which are the two major impacts. On the portfolio we'll identify what is it that's causing that potential 8 percent drawdown or greater than 8, I'm sorry, that's our line in the sand, so to speak</u>. We'll identify what is it. Is it price? Is it volatility? We'll then identify what hedging transaction we need to put in place, and normally there's a variety of choices. Via put, via put spread, via call, via call spread, buy back a short call, buy back a short put. Lots and lots of alternatives, but <u>we'll model the most effective alternative to remove that risk excursion and then we'll implement that position on the portfolio</u>. (Emphasis added.)

53.     During the October 13, 2015 Open House Call, Walczak stated that, in addition to daily stress-testing of the portfolio, the Fund's risk management included internal daily reporting of compliance with various metrics, deviation from which was a "red flag":

> Since we've joined Catalyst, Catalyst has a risk officer, based in New York. We report on a daily basis a set of high-level risk

metrics and these risk metrics are designed for a non-options expert. In other words, our risk officer does not need to have options modeling software to evaluate the risk levels that we're taking. We look at things like collateral requirements at our broker, as a percent of our capital and we have a ceiling on those. We have a ceiling on absolute numbers of options positions normalized to our size. So, positions per unit of capital. We have metrics around daily, weekly and monthly price excursions, so that if there's evidence of volatility beyond the norm in the Fund's NAV performance, that's a flag. We have very simple metrics around carrying futures positions overnight. That's not a part of our strategy, so, that if there's a future position that's carried overnight, that's a red flag. If there's a non-S&P position, that's a red flag. So, we have a series of metrics that get reported to New York on a daily basis, that again, are not options technical or modeling type of things, but they're risk parameters that provide us that extra level of oversight from a third party, not a part of the portfolio management team.

54. During a June 7, 2016 Open House Call, Walczak again discussed his risk management procedures and how they operated to limit drawdowns.  In responding to an investment adviser's questions – including "What would be the . . . worst case black swan scenario for the fund? What is the max drawdown you are shooting for given your stress test, the risk parameters?" – Walczak stated:  "So the first thing pure and simple is our metrics are dialed in to limit our drawdown to 8 percent.  There's no guarantees in the world, especially in markets, but that's our goal in everything we do is to keep our drawdown to 8 percent."  Walczak went on to explain:

We're stressing the portfolio using some pretty sophisticated modeling tools, and then, when we find an out-of-bounds situation, so to speak, we then jump right back in . . . . There is never a scenario where we wake up one day, and there's a panic in the market, and we scratch our heads and say, oh, my gosh, we've got to get out of that position. We've got to do something. We try to be a couple of chess moves ahead of that part of the portfolio management because we modeled that scenario a week ago, and we already took steps so that if the market is down 5 percent tomorrow that was part of our model from a week ago, and either it didn't cause us a problem in the model, so we're fine, or it did

cause us a problem, and it's already fixed before it happens. That's
the type of approach we like to take.

55.     During a subsequent September 13, 2016 Open House Call, Walczak fielded the

following question from an investment adviser: "A couple of times you've mentioned that, you

know, you're always worried about capital preservation, and you've mentioned like, an 8 percent

loss – if you hit an 8 percent loss at any point in time, you know, I'm just interested in what

exactly would happen."  In responding to this question, Walczak reiterated that "we do have a

hard stop at 8 percent" and explained the rationale behind this threshold, stating in part:  "We

chose 8 percent by the way expecting that there may be some slippage in the event that we ever

actually had to liquidate the portfolio or even neutralize its exposure to whatever was causing the

risk, there might be some slippage in doing that.  So you might get 8.5 or 9 percent or

thereabouts, but 8 percent is the number to try and least keep it to single digits."

56.     During the September 13, 2016 Open House Call, Walczak further explained that

he did not anticipate needing to be reactive to a loss of 8% because of his purported proactive

approach to risk management, stating:

> We've never really had to liquidate the portfolio or to neutralize it
> because our ongoing hedging techniques – we use hedging
> instruments. That's what we trade in. That's what options are
> really built for. So our hedging techniques allow us to cushion
> price movement and we're never in a situation where we have sort
> of a hard stop loss, and we're sitting just waiting for that 8 percent
> to get trigged and then we get out because we're constantly
> hedging. That's <u>the first thing we do every day is to identify risks
> and tune up our hedges if they're not sufficient</u>. And <u>that allows us
> to avoid that hard stop and still maintain our drawdown discipline</u>.
> (Emphasis added.)

57.     During this Open House Call, Walczak provided reassurance that while he

exercised discretion in initiating investment positions and could "refuse an analytical entry

signal," he would not "refuse any risk exits."

58.     As late as October 25, 2016, during yet another Open House Call, Walczak repeated his promise of proactive risk management backed by an 8% stop-loss rule, which he described as the Fund's "edge."  Among other things, Walczak stated:

> We react to markets to put on positions, but we try to predictively look at risk. We try to say if three weeks from now the market is up 10 percent, are we in trouble or not in trouble, and we've got definitions about what trouble means designed to keep us ultimately from an 8 percent loss. So we look at these things, we identify if we're in trouble, why are we in trouble? Is it price? Is it volatility? Does some time have to pass? And then we take corrective action . . . . All that being said, there are times when we hedge, the market keeps coming, we hedge some more, the market keeps coming. When we hit that draw-down, we will go absolutely neutral. (Emphasis added.)

59.     During the October 25, 2016 Open House Call, Walczak similarly reassured investors that "if we somehow get to 8 percent . . . we will flatten that risk at that level," but "we're not kind of sitting here waiting until we hit 8 percent, and then we jump up and liquidate the fund."

### D.   CHARACTERISTICS OF WALCZAK'S PURPORTED RISK MANAGEMENT PROCEDURES

60.     Given the risks associated with the sale and purchase of call and put options, the Fund's management of risk was important to investors.  Recognizing as much, Walczak gave investors the impression that risk management was paramount to the Fund's strategy.  Walczak directly or indirectly represented to the Fund, investors, and prospective investors that he: (i) employed, and abided by, various risk parameters, including "diversification of time and price exposure"; (ii) additionally monitored and controlled risk through "daily stress testing" of the Fund's portfolio using sophisticated options analysis software; and (iii) utilized "stop loss triggers" and/or "aggregate portfolio stop loss measures" and had a "hard stop at 8 percent."

61.     Walczak's risk metrics (referenced in the DDQs, the quarterly investor presentations, and the Open House Calls) included: (1) "no positions in markets outside of S&P 500 Futures"; (2) "no futures positions open overnight"; (3) "SPAN Margin (exchange minimum) to NAV ratio less than 60%"; (4) "actual margin to NAV ratio less than 80%"; (5) "less than 6% NAV net calls"; (7) "less than 6% NAV net puts value"; (8) "calls should be less than or equal to 50"; (9) "puts should be less than or equal to 60;" (10) "change in NAV per share – week: 5% in 1 week"; (11) "change in NAV per share – month: 8% in 1 month"; and (12) "put ratio must be greater than or equal to 1."

62.     In or around December 2014, Walczak hired a part-time college intern to maintain a spreadsheet that calculated Walczak's risk metrics and tracked the Fund's compliance with those risk metrics.

63.     In or around mid-2016, Walczak engaged a third-party software company to automate the intern's spreadsheet and create a daily "risk report" (the "Daily Risk Report") that was emailed the morning after every trading day to Walczak and others.  If the Fund breached any of its risk metrics, the Daily Risk Report identified a specific "correction action" that Walczak was "required" to take to bring the Fund back into compliance with the metric within 24 hours and, depending on the metric, Walczak was also required to provide a "written explanation" to Catalyst's President and CEO.

64.     These risks metrics, however, were merely retrospective in nature.  They did not incorporate, or function like, forward-looking risk metrics, known as the "Greeks," that are commonly used to evaluate and manage the risk of an options portfolio.

65.     The "Greeks" – Delta, Gamma, Theta, and Vega – allow traders to gauge various relationships between an option and the underlying asset on which it is based.  Delta, for

example, measures the change in an option's price relative to the underlying asset's price. If Delta is positive, then the option's price changes in the same direction as the underlying asset. If Delta is negative, then the option's price changes in the opposite direction as the underlying asset. Thus, if the Fund's portfolio had a delta of +3.0, then the portfolio would be expected to gain approximately 3% for every 1% increase in the S&P 500, and lose approximately 3% for every 1% decrease in the S&P 500. On the other hand, if the Fund's portfolio had a Delta of -3.0, then the portfolio would be expected to lose approximately 3% for every 1% increase in the S&P 500, and gain 3% for every 1% decrease in the S&P 500.

66.    Unlike the Greeks, and Delta more specifically, Walczak's risk metrics did not estimate how the Fund's portfolio might perform in comparison to the S&P 500 (which was the benchmark of the Fund's option strategy) or provide any signals in advance of drawdowns.

67.    Walczak acknowledged during various Open House Calls that sophisticated options analysis software was needed to actually understand the Fund's risk exposure. For example, during the June 7, 2016 Open House Call, Walczak stated:

> We enter [options] trades in different expiration months, different strikes. We end up with a pretty complex portfolio of options positions. They're all entered for many different reasons at different times, but they all comprise a fairly complex portfolio. So even if you're an options guy, if you look at a portfolio statement, you have no chance whatsoever of understanding how that portfolio will behave under different market conditions unless you have fairly sophisticated options modeling software, which, of course, we do.

68.    The options analysis software used by Walczak was called "OptionVue." As Walczak indicated during the Open House Calls, OptionVue could be used to graph the Fund's actual and expected performance and to evaluate its risk profile using the Greeks.

69.    Walczak thus could use OptionVue to see the Fund's portfolio in real-time and stress test it to see how it would potentially perform given the selected variables (*i.e.*, time, price,

and volatility).  For example, Walczak could (and he said he did) use OptionVue to determine how the Fund would perform if the S&P 500 increased by 5% or 10% within a three-week period.

**E.     WALCZAK FAILED TO MANAGE THE FUND AS REPRESENTED AND THE FUND SUFFERED SUBSTANTIAL LOSSES**

70.     In early December 2016, the Fund's risk profile was such that the Fund's net asset value typically would decrease whenever the S&P 500 increased.  This risk manifested on December 7, 2016, when the Fund lost more than 3% of its NAV while the S&P 500 gained approximately 1.3%.

71.     Given their retrospective nature, none of Walczak's risk metrics on the Daily Risk Report were breached in advance of this drawdown.

72.     Had Walczak stress-tested the Fund's portfolio using OptionVue as represented to the Fund, investors, and prospective investors, he would have been alerted to this specific risk of loss in advance of the drawdown.

73.     The next two days, December 8 and 9, 2016, the Fund breached Walczak's risk metrics.  In contravention of the Daily Risk Report's corrective action procedures, Walczak did not bring the Fund back into compliance with the breached risk metrics within 24 hours or provide a written explanation to Catalyst's President and CEO.

74.     By this time, Walczak had built a larger than normal concentration of options positions in the February expiration month, and those positions were concentrated within a relatively narrow range of strike prices.  None of Walczak's risk metrics evaluated the risk related to this concentration of positions.

75.     On December 10, 2016, Catalyst's President and CEO sent an email to Walczak and others affiliated with Catalyst to schedule a conference call "to discuss what we can do to

immediately reduce risk in the [F]und." Walczak was at his home in Hawaii at this time and would remain there until December 18th.

76.     In preparing for the conference call scheduled for later that day on December 10, 2016, the Fund's assistant portfolio manager modeled various scenarios using OptionVue, and discovered that the Fund was facing a potential $667 million loss (approximately 15% of the Fund's value). She then emailed Walczak:

> From what I see, a 1% up market move is equiv[alent] to a 5% decline in NAV.
>
> Scenarios I have looked at deal with reducing risk in [the options expiring in] Feb[ruary]. The below scenario would be booking losses of around $167mm, so 4.2% and does not cap the downside, but at 50 points higher, makes a $500mm difference.
>
> Closing out everything in W3 Feb [Week 3 February expiration]. In EOM Feb [February end-of- month expiration], buying back 3000 at 2255 and 9000 at 2265.
>
> I know what the charts look like. I know what the news says. This is being discussed because there are shareholders involved and there is momentum in the market . . . . Thoughts?

77.     Had Walczak stress-tested the Fund as represented to investors, he would have known at this time that the Fund faced a potential loss of greater than 10% in February 2017. Walczak had repeatedly represented to investors and potential investors that, when faced with such a situation, he would take immediate action to reduce that risk to no greater than an 8% loss. The assistant portfolio manager's recommendation would have done just that by reducing the risk from a potential loss of greater than 10% to a realized loss of approximately 4.2%.

78.     Nevertheless, Walczak rejected the assistant portfolio manager's recommendation. Instead, Walczak chose to gamble that the greater than 10% loss in February 2017 would not materialize.

79.     On December 14, 2016, the assistant portfolio manager emailed Walczak with her thoughts on how to "help stop the bleeding" and noted the possibility of "a big move down yet as the market rises."  Walczak did not place the trades recommended by the assistant portfolio manager.

80.     During the remainder of December 2016, the Fund continued to regularly breach certain of its risk metrics on the Daily Risk Report, yet Walczak did not take the required corrective actions identified in the Daily Risk Reports in response to these breaches.

81.     On January 25, 2017, the Fund lost more than 4% and the S&P 500 gained less than 1%.  That same day, Catalyst's President and CEO sent a text message to Walczak, stating: "I saw [the Fund] was down over 4% today.  What is going on?  I thought we agreed to take the exposure down.  This rally could go way further."  A few minutes later, Catalyst's President and CEO sent another text message to Walczak:  "We need to review the strategy asap.  When can you be in NY?"  Walczak, who was at his home in California at this time, did not send a reply to either text from Catalyst's President and CEO.

82.     The next day, January 26, 2017, Catalyst's President and CEO emailed Walczak expressing concern about the adequacy of Walczak's risk metrics, stating:

> We need to discuss risk management for the fund.  Only looking at #positions/million does not appear to be an adequate way of measuring risk based on our experience, particularly the last two months. The net delta adjusted exposure based on our calculations seem to be around -500%, which explains why the fund was down -5x the market movement on a pretty minor market move. I know you say you do not use this type of risk measure, but recent history seems to show it may be a better measure of risk, or at least worth looking at. Our shareholders just will not tolerate a 4+% drawdown on a day the market moves less than 1%.
>
> We need to consider making adjustments given the current market conditions and shareholder base. We can start with a call but I think an in-person meeting is warranted.

83.     Walczak did not adjust his risk metrics or meet with Catalyst's President and CEO as suggested in the email, at this time or in the following weeks.  Walczak travelled from his home in California to his home in Hawaii on January 30, 2016, and remained there until February 18, 2017.

84.     In late January 2017, Catalyst's Chief Operating Officer for the first time began creating daily "exposure" reports to monitor the risk of the Fund's portfolio (hereinafter, the "Daily Risk Exposure Report").  The Daily Risk Exposure Report analyzed the Fund's portfolio using the Greeks, including Delta.

85.     The Daily Risk Exposure Report showed that the Fund was consistently exposed to a risk of more than an 8% loss.  It also confirmed that Walczak had positioned the Fund to profit if the S&P 500 dropped but could lose hundreds of millions of dollars if the market continued to rise.

86.     On January 30, 2017, Catalyst's COO sent an email to Walczak and others with a Daily Risk Exposure Report attached.  According to the attached Daily Risk Exposure Report, the Fund's portfolio had a Delta of -355%, which means that for every 1% move in the S&P 500, the Fund would move approximately 3.55% in the opposite direction.

87.     Walczak received a Daily Risk Exposure Report each trading day from at least January 31, 2017 through February 13, 2017.

88.     Had Walczak stressed the Fund for a 5% increase in the S&P 500, consistent with his representations to investors, he would have learned that the Fund was exposed to a risk of well more than an 8% loss.  The Daily Risk Exposure Report informed Walczak of the same risk exposure information.

89.     Despite Walczak's repeated representations that he adjusted the Fund's portfolio (such as by hedging positions or taking positions off) to reduce risk whenever stress-testing showed an impact greater than his chosen threshold of 8%, Walczak did not enter a single trade for the Fund during the time period of February 1, 2017 through February 8, 2017.

90.     Rather than "jumping in" to reduce risk – as he promised investors he would – Walczak sat back and hoped for a turnaround, knowingly accepting a risk of loss above 8%. That turnaround never came.

91.     In February 2017, the Fund suffered a drawdown of greater than 8%, yet Walczak did not implement any "stop loss triggers," "aggregate portfolio stop loss measures," or "a hard stop at 8 percent" as he had represented to investors.

92.     Ultimately, the Fund lost approximately 20% of its net asset value between December 2016 and February 2017, including more than 15% in February alone.

93.     As set forth above, Walczak knowingly or recklessly made or substantially participated in making misrepresentations to investors about the Fund's risk management procedures and the existence of stop loss measures and triggers to cap or otherwise limit losses, which were inconsistent with Walczak's actual practices in managing the Fund.

94.     Among other things, and contrary to his representations, Walczak did not use sophisticated options analysis software on a daily basis to stress-test the Fund.  During investigative testimony, Walczak admitted he "didn't use Option View [sic] daily," and did not have a "routine" of using OptionVue "every day or . . . every week," rather he purported to use OptionVue "as needed."

95.     Among other things, and contrary to his representations, Walczak did not adjust the Fund's portfolio to reduce risk when stress testing showed (or would have shown) a potential

loss greater than 8%.  Although he told investors he "use[d] risk management to control losses to roughly 8 percent," during investigative testimony he conceded: "I don't manage specifically to an eight-percent drawdown threshold. So I am not considering whether we're going to cross that threshold or not because, again, it's not something I'm managing to specifically."

96.     Among other things, and contrary to his representations, Walczak did not use stop loss triggers or aggregate portfolio stop loss measures.  Nor did he utilize a "hard stop at 8 percent."  During investigative testimony, Walczak conceded:  "I don't know that . . . there is a way to place a hard limit on losses in a hedged futures strategy."

## FIRST CLAIM FOR RELIEF
### *Violations of Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act*

97.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 96 above.

98.     By reason of the conduct described above, Walczak, in the offer or sale of securities, by the use of the means or instruments of interstate commerce or of the mails, acting intentionally, knowingly or recklessly, directly or indirectly employed devices, schemes and artifices to defraud.

99.     By reason of the conduct described above, Walczak, in the offer or sale of securities, by the use of the means or instruments of interstate commerce or of the mails, acting at least negligently, directly or indirectly:  (i) obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (ii) engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

100.     By reason of the foregoing, Defendant Walczak violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q].

## SECOND CLAIM FOR RELIEF
### *Violation of Sections 206(1) and 206(2) of the Advisers Act*

101.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 96 above.

102.     At all relevant times, Walczak was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)] to the Fund.  Walczak started the Fund independently from Catalyst, he structured his relationship with Catalyst such that he was paid as an independent contractor, receiving at least 50% of the net advisory fees paid to Catalyst in connection with the Fund, and he remained the day-to-day manager of the Fund's trading strategy and risk metrics, which activities he typically conducted from his own office or residence in Wisconsin.

103.     By use of the mails or means or instrumentalities of interstate commerce, Walczak directly or indirectly: (1) employed devices, schemes, and artifices to defraud a client or clients or prospective clients; and (2) engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon a client or clients or prospective clients.

104.     Walczak made misrepresentations of material fact to the Fund and its investors, failed to provide full and fair disclosure of all material facts to the Fund and its investors, and failed to act with reasonable care to avoid misleading the Fund and its investors, regarding the Fund's trading strategy and/or risk.

105.     As a result of the misconduct alleged above, Walczak has violated and, unless enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

### THIRD CLAIM FOR RELIEF

### (In the Alternative to the Second Claim for Relief)

### *Aiding and Abetting Violation of Section 206(2) of the Advisers Act*

106.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 96 above.

107.     At all relevant times, Catalyst was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

108.     Catalyst, in substantial part through Walczak's conduct described above, by use of the mails or means or instrumentalities of interstate commerce, directly or indirectly engaged in transactions, practices, and courses of business which operated as a fraud and deceit upon clients and prospective clients. Catalyst thereby violated Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

109.     By reason of his conduct described above, Walczak knowingly or recklessly aided, abetted, counseled, commanded, induced, or procured Catalyst's violation(s) of Section 206(2) of the Advisers Act, and he is therefore liable for such violation(s) pursuant to Section 209(f) of the Advisers Act [15 U.S.C. §80b-9(f)].

### FOURTH CLAIM FOR RELIEF

### *Violation of Section 206(4) of the Advisers Act and Rule 206(4)-8*

110.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 96 above.

111.     At all relevant times, Walczak was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)] to the Fund.  Walczak started the Fund independently from Catalyst, he structured his relationship with Catalyst such that he was paid as an independent contractor, receiving at least 50% of the net advisory fees paid to

Catalyst in connection with the Fund, and he remained the day-to-day manager of the Fund's

trading strategy and risk metrics, which activities he typically conducted from his own office or

residence in Wisconsin.

112.    While acting as an investment adviser to the Fund, defendant Walczak, by use of

the mails or means or instrumentalities of interstate commerce, directly or indirectly engaged in

acts, practices, and courses of business that were fraudulent, deceptive and manipulative.

113.    The Fund is a "pooled investment vehicle" as defined in Rule 206(4)-8(b) [17

C.F.R. § 275.206(4)-8(b)].

114.    While acting as an investment adviser to the Fund, Walczak:  (a) made untrue

statements of material facts and omitted to state material facts necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading,

to investors or prospective investors in the Fund; and (b) engaged in acts, practices, and courses

of business that were fraudulent, deceptive, and manipulative with respect to investors or

prospective investors in the Fund.

115.    As a result, Walczak has violated and, unless enjoined, will continue to violate

Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17

C.F.R. § 275.206(4)-8].

## FIFTH CLAIM FOR RELIEF

### (In the Alternative to the Fourth Claim for Relief)

### *Aiding and Abetting Violation of Section 206(4) of the Advisers Act and Rule 206(4)-8*

116.    The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 96 above.

117.    While acting as an investment adviser to the Fund, Catalyst, by use of the mails or means or instrumentalities of interstate commerce, directly or indirectly engaged in acts, practices, and courses of business that were fraudulent, deceptive or manipulative.

118.    The Fund is a "pooled investment vehicle" as defined in Rule 206(4)-8(b) [17 C.F.R. § 275.206(4)-8(b)].

119.    While acting as an investment adviser to the Fund, Catalyst:  (a) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors or prospective investors in the Fund; and (b) engaged in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative with respect to investors or prospective investors in the Fund.  Catalyst thereby violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

120.    By reason of his conduct described above, Walczak knowingly or recklessly aided, abetted, counseled, commanded, induced, or procured Catalyst's violation(s) of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder, and he is therefore liable for such violation(s) pursuant to Section 209(f) of the Advisers Act [15 U.S.C. §80b-9(f)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

A.    Permanently enjoining Walczak and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, from violating 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act

and Rule 206(4)-8 thereunder [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4), and 17 C.F.R. § 275.206(4)-8].

      B.     Ordering Walczak to disgorge all ill-gotten gains, with prejudgment interest.

      C.     Ordering Walczak to pay civil monetary penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

      D.     Granting such other and further relief as may be necessary and appropriate.

      E.     Retaining jurisdiction of this action to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

Respectfully submitted,

DATED:  January 27, 2020

s/ Michael D. Foster
Michael D. Foster
   (312) 886-8520 / fostermi@sec.gov
David Benson
   (312) 353-2655 / bensond@sec.gov
Jake Schmidt
   (312) 886-3284 / schmidtj@sec.gov

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois  60604