# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:20-cv-00076 (WMC) |
| EDWARD S. WALCZAK, | ) ) ) | |
| Defendant. | ) ) ) | |

# PLAINTIFF'S MEMORANDUM OF LAW
# IN SUPPORT OF ITS
# <u>MOTION FOR SUMMARY JUDGMENT</u>

Michael D. Foster (fostermi@sec.gov)
Jake Schmidt (schmidtj@sec.gov)
David Benson (bensond@sec.gov)
175 W. Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

Attorneys for Plaintiff
**Securities and Exchange Commission**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

SUMMARY OF UNDISPUTED FACTS ......................................................................... 3

I.      Walczak's Stewardship of the Fund ...................................................... 3

II.     The Fund's Investment Strategy and Related Risks ..................................... 4

III.    The Fund's Prospectus and Investment Presentations Emphasized the Importance of
        Risk Management to the Fund's Investment Objective and Strategy .......................... 6

IV.     During Recurring (and Recorded) "Open House" Conference Calls, Walczak
        Described His Purported Risk Management Process, Including Stress Testing Devised
        to Cap Losses at 8% .................................................................................... 7

V.      Catalyst Raised Concerns Regarding Walczak's Risk Management ........................ 10

VI.     In February 2017, the Fund Lost More than $700 Million, or Approximately 18% .. 11

VII.    Walczak Did Not Stress Test the Fund or Otherwise Manage Risk as Represented .. 12

        A.    Walczak's Admissions ............................................................... 12

        B.    The Commission's Unchallenged Expert Reports ............................... 12

ARGUMENT ...................................................................................................................... 15

I.      The Summary Judgment Standard ................................................................. 15

II.     Walczak Violated Section 206(4) of the Advisers Act and Related Rule 206(4)-8 ... 17

        A.    Walczak Deliberately Made False or Misleading Statements About the Fund's
              Risk Limits and Controls ............................................................... 19

        B.    Walczak's Misrepresentations Were Material ..................................... 24

        C.    Walczak Was an "Investment Adviser" and Used Interstate Commerce ......... 29

III.    Walczak Aided And Abetted Catalyst's Violations of Section 206(4) and Rule
        206(4)-8 ................................................................................................... 31

IV.     Walczak Violated Section 17(a) of the Securities Act ............................... 32

CONCLUSION ..................................................................................................................35

## TABLE OF AUTHORITIES

**CASES**

*Aaron v. SEC,*
    446 U.S. 680 (1980) ............................................................. 32

*Abrahamson v. Fleschner,*
    568 F.2d 862 (2d Cir. 1977) ............................................... 29

*Allen v. Tyson Foods, Inc.,*
    121 F.3d 642 (11th Cir. 1997) ........................................... 16

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds,*
    133 S. Ct. 1184 (2013) ....................................................... 26

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ..................................................... 15, 16

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ........................................................... 26

*Brody v. Transitional Hosps. Corp.,*
    280 F.3d 997 (9th Cir.2002) ............................................. 23

*Cailo v. Citibank, N.A.,*
    295 F.3d 312 (2d Cir. 2002) ......................................... 24, 27

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ........................................................... 15

*CFTC v. Int'l Fin. Servs., Inc.,*
    323 F. Supp. 2d 482 (S.D.N.Y. 2004) ............................... 25

*Edward E. Gillen Co. v. City of Lake Forest,*
    3 F.3d 192 (7th Cir. 1993) ................................................. 16

*Goldwater v. Ginzburg,*
    414 F.2d 324 (2d Cir.1969) ............................................... 23

*Graham v. SEC,*
    222 F.3d 994 (D.C. Cir. 2000) .......................................... 34

*In re Compuware Sec. Litig.,*
    301 F. Supp. 2d 672 (E.D. Mich. 2004) ........................... 33

*In re Lehman Bros. Sec. & ERISA Litig.,*
    799 F. Supp. 2d 258 (S.D.N.Y. 2011) ............................... 27

*Lorenzo v. SEC,*
    139 S. Ct. 1094 (2019) ....................................................... 32

*Lormond v. U.S. Unwired, Inc.*,
 565 F.3d 228 (5th Cir. 2009) ................................................................. 26

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*,
 475 U.S. 574 (1984) ....................................................................... 15-16

*Monetta Fin. Svs. Inc. v. SEC*,
 390 F.3d 952 (7th Cir. 2004) ................................................................. 31

*Robin v. Arthur Young & Co.*,
 915 F.2d 1120 (7th Cir. 1990) ............................................................... 33

*Sanders v. John Nuveen & Co.*,
 552 F.2d 790 (7th Cir. 1977) ................................................................. 33

*SEC v. Ahmed*,
 308 F. Supp. 3d 628 (D. Conn. 2018) .................................................... 23

*SEC v. Battoo*,
 158 F. Supp. 3d 676 (N.D. Ill. 2016) ................................................. 29-30

*SEC v. Blavin*,
 760 F.2d 706 (6th Cir. 1985) ................................................................. 24

*SEC v. Bluepoint Investment Counsel, LLC, Case No.19-cv-809-WMC*,
 2021 WL 719647 (W.D. Wis. Feb. 24, 2021) ................................... 19, 32

*SEC v. Brown*,
 579 F. Supp. 2d 1228 (D. Minn. 2008) .................................................. 24

*SEC v. Capital Gains Research Bureau, Inc.*,
 375 U.S. 180 (1963) .............................................................................. 17

*SEC v. Carriba Air, Inc.*,
 681 F.2d 1318 (11th Cir. 1982) ............................................................. 24

*SEC v. Chester Holdings, Ltd.*,
 41 F. Supp. 2d 505 (D.N.J. 1999) .......................................................... 34

*SEC v. Constantin*,
 939 F. Supp. 2d 288 (S.D.N.Y. 2013) .............................................. 23, 33

*SEC v. Credit Bancorp, Ltd.*,
 738 F. Supp. 2d 376 (S.D.N.Y. 2010) .................................................... 16

*SEC v. Ficken*,
 546 F.3d 45 (1st Cir. 2008) ................................................................... 33

*SEC v. Fife*,
 311 F.3d 1 (1st Cir. 2002) ..................................................................... 24

*SEC v. Genovese*,
   2021 WL 3501421 (S.D.N.Y. Aug. 11, 2021) ........................................................ 24

*SEC v. Haligiannis*,
   470 F. Supp. 2d 373 (S.D.N.Y. 2007) .................................................................. 30

*SEC v. Infinity Grp. Co.*,
   212 F.3d 180 (3d Cir. 2000) ........................................................................ 32-33

*SEC v. Jakubowski*,
   150 F.3d 675 (7th Cir. 1998) ........................................................................... 33

*SEC v. Juno Mother Earth Asset Mgmt., LLC*,
   2012 WL 685302 (S.D.N.Y. Mar. 2, 2012) ........................................................ 30

*SEC v. Kimmes*,
   799 F. Supp. 852 (N.D. Ill. 1992) ...................................................................... 34

*SEC v. Kirch*,
   263 F. Supp. 2d 1144 (N.D. Ill. 2003) .............................................................. 33

*SEC v. Kirkland*,
   521 F. Supp. 2d 1281 (M.D. Fla. 2007) ............................................................. 25

*SEC v. Lek Sec. Corp.*,
   370 F. Supp. 3d 384 (S.D.N.Y. 2019) ............................................................... 13

*SEC v. Lyttle*,
   538 F.3d 601 (7th Cir. 2008) ................................................................... 23-24, 33

*SEC v. Maio*,
   51 F.3d 623 (7th Cir. 1995) ............................................................................. 24

*SEC v. Mannion*,
   789 F. Supp. 2d 1321 (N.D. Ga. 2011) .............................................................. 23

*SEC v. Nutmeg Group, LLC*,
   162 F. Supp. 3d 754 (N.D. Ill. 2016) ............................................................ 18, 19

*SEC v. Persuad*,
   2013 WL 6478800 (M.D. Fla. Dec. 10, 2013) ................................................ 24-25

*SEC v. SeeThruEquity, LLC, 18-CV-10374*,
   2019 WL 1998027(S.D.N.Y Apr. 26, 2019) ....................................................... 32

*SEC v. Sentinel Mgmt. Grp. et al.*,
   No. 07-4684, 2012 WL 1079961 (N.D. Ill. Mar. 30, 2012) ................................ 24

*SEC v. Steadman*,
   967 F.2d 636 (D.C. Cir. 1992) ......................................................................... 19

*SEC v. Stoker,*
    865 F. Supp. 2d 457 (S.D.N.Y. 2012) .................................................. 34

*SEC v. Texas Gulf Sulphur Co.,*
    401 F.2d 833 (2d Cir. 1968) ............................................................... 29

*SEC v. Treadway,*
    430 F. Supp. 2d 293 (S.D.N.Y. 2006) ........................................... 17, 25

*Thomas v. Metro. Life Ins. Co.,*
    631 F.3d 1153 (10th Cir. 2011) ......................................................... 29

*Transamerica Mortg. Advisors, Inc. v. Lewis,*
    444 U.S. 11 (1979) ............................................................................ 33

*TSC Inds., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976) .......................................................................... 24

*U.S. Commodity Futures Trading Comm'n v. Wilson,*
    19 F. Supp. 3d 352 (D. Mass. 2014) ................................................. 31

*United States v. Elliot,*
    62 F.3d 1304 (11th Cir. 1995) ..................................................... 17, 29

*United States v. Gilbert,*
    181 F.3d 152 (1st Cir. 1999) ......................................................... 30-31

*United States v. Naftalin,*
    441 U.S. 768 (1979) .......................................................................... 34

*United States v. Onsa,*
    2013 WL 789182 (E.D.N.Y. Mar. 1, 2013) ....................................... 30

## OTHER AUTHORITIES

*Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles*, SEC Release No. 2576,
    2006 WL 3814994 (December 27, 2006) ........................................... 18

*Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles*, SEC Release No. 2628,
    2007 WL 2239114 (August 3, 2007) ....................................... 17-18, 19

## RULES

17 C.F.R. § 275.206(4)-8, Rule 206(4)-8 under the Investment Advisers Act of 1940 ....... passim

Rule 56(c) of the Federal Rules of Civil Procedure............................................... 15, 16

**STATUTES**

15 U.S.C. § 77q(a), Securities Act of 1933 Section 17(a)................................... 17, 32, 34

15 U.S.C. § 77q(a)(1), Securities Act of 1933 Section 17(a)(1)....................................32

15 U.S.C. § 77q(a)(2), Securities Act of 1933 Section 17(a)(2)...............................32, 34

15 U.S.C. § 77q(a)(3), Securities Act of 1933 Section 17(a)(3)....................................32

15 U.S.C. §80b-2(11), Investment Advisers Act of 1940, Section 202(11) ................................ 18

15 U.S.C. §80b-2(a)(11), Investment Advisers Act of 1940, Section 206(a)(11) ...................... 29

15 U.S.C. §80b-6(1), Investment Advisers Act of 1940, Section 206(1) .................................... 17

15 U.S.C. §80b-6(2), Investment Advisers Act of 1940, Section 206(2) .................................... 17

15 U.S.C. §80b-6(4), Investment Advisers Act of 1940, Section 206(4) ........................ 16, 17, 18

15 U.S.C. §80b-6(4)-8(a), Investment Advisers Act of 1940, Section 206(4)-8(a) ....................18

15 U.S.C. §80b-9(d), Investment Advisers Act of 1940, Section 209(d) ....................................31

15 U.S.C. §80b-9(f), Investment Advisers Act of 1940, Section 209(f)   ........................... 31, 32

## **INTRODUCTION**

This case concerns an investment adviser's risk management of a public mutual fund, the Catalyst Hedged Futures Strategy Fund (the "Fund"), which invested in options on S&P 500 index futures contracts.  More specifically, this case concerns representations made regarding the use of "sophisticated options analysis software" to manage the Fund's risk exposure. While it may sound complex, this case is actually very straightforward.  The investment adviser, Defendant Edward Walczak ("Walczak"), said he did a number of things to mitigate the extent of losses the Fund would suffer under conditions that posed risk for the Fund's strategy.  There is no dispute about what Walczak said—he made these statements on recorded conference calls and in writing.  Moreover, as set forth below, it is undisputed that Walczak did not do the things he said he would do.

Walczak claimed to use a computer program (OptionVue) to "stress" the Fund for risk and control potential losses to 8% of the Fund's net asset value ("NAV"), as part of his daily investment process.  He made this claim over and over again on monthly "Open House" calls with third party money managers and investment representatives, who had either purchased or were considering purchasing shares of the Fund for themselves or clients.  Walczak said that through the use of this computer program, he calculated the projected losses the Fund would suffer if the prices or volatilities of the Fund's options positions changed in certain ways (*e.g.*, price moved up 5%) at different points in time (today, a week from today, etc.). Walczak further said that if any of his stress tests projected losses in excess of 8%, he would make risk-reducing trades to bring the Fund's exposure below his chosen 8% loss threshold.  Walczak also said that if, despite these risk controls, the Fund did suffer an 8% loss, he would "jump in" and "flatten risk" and "go absolutely neutral" by liquidating or hedging positions to contain any further loss.

Walczak did not actually manage risk this way.  He admittedly did not stress test the Fund's options portfolio on a daily basis in OptionVue.  He admittedly did not hedge the Fund against projected losses, identified in the OptionVue program, in excess of 8%. While Walczak did not maintain records of his OptionVue stress tests, it is undisputed that those stress tests can be replicated by loading the Fund's historical trading data into OptionVue.  The Commission retained an options expert who did just that.  His analysis, which is unrebutted, confirms that between November 2016 and February 2017, Walczak knew, or should have known, that the Fund was consistently exposed to a risk of loss in excess of 8% in the scenarios he supposedly modeled.

It is undisputed that for most of this same time-period, the Fund's options positions were concentrated in options with similar strike prices expiring in the month of February 2017, despite other representations by Walczak that he diversified the Fund's portfolio across different months and strikes to reduce risk.  It is also undisputed that for most of this same time-period, the Fund was highly negatively correlated with the S&P 500 index (when the index increased, the Fund's value usually decreased), despite the Fund having an investment objective of "capital appreciation and capital preservation in all market conditions, with low volatility and low correlation to the US equity market."

Unsurprisingly, when the S&P 500 index rose in early to mid-February 2017, the Fund lost hundreds of millions of dollars. From February 1 to February 14, the Fund suffered a 13% drawdown; and for the entire month, lost more than $700 million, or approximately 18%.  In the wake of this loss, investors wanted to know what happened to the Fund's 8% loss threshold and questioned whether Walczak had managed risk as promised—he had not.  In fact, between February 1 and February 8, Walczak (who was in Hawaii at the time) did not trade at all.  When

he eventually did attempt to address the Fund's collapsing share price, it was too late.  All told, between November 2016 and February 2017, the Fund's NAV decreased by roughly a billion dollars.

## SUMMARY OF UNDISPUTED FACTS

The Commission incorporates by reference its separately filed statement of proposed findings of fact (cited to herein as "SOF") and what follows is a summary of those undisputed facts.

### I.    Walczak's Stewardship of the Fund.

Catalyst Capital Advisors, LLC ("Catalyst") is an SEC-registered investment adviser, previously based in New York. (SOF ¶¶ 16-17)  Before becoming associated with Catalyst in August 2013, Walczak had started and managed a predecessor private fund, trading options on S&P 500 futures contracts. (SOF ¶¶ 10-15) After the relaunching of this pooled investment vehicle as a public mutual fund sponsored by Catalyst, Walczak managed the Fund using the same investment objectives, policies and guidelines as before, pursuant to a "Portfolio Manager Agreement" with Catalyst (dated August 27, 2013). (SOF ¶¶ 15, 18-20)  This agreement provided that Catalyst would pay Walczak at least 50% of the net advisory fees the Fund paid Catalyst. (SOF ¶¶ 31-32)  In return, Walczak agreed to provide a "continuous investment program for the Fund," and manage the Fund "in accordance with the … Prospectus … and all other applicable federal and state laws and regulations." (SOF ¶ 20)

As a public mutual fund, the Fund could be (and was) offered to a larger universe of potential investors. (SOF ¶ 13)  Upon conversion to a public mutual fund, the Fund held approximately $7 million in assets, but grew to hold more than $4 billion by November 2016. (SOF ¶¶ 14, 33)  Since Walczak's compensation was tied directly to the size of the Fund's assets

under management, he was paid tens of millions of dollars – including more than $24 million in 2016 alone. (SOF ¶¶ 14, 31-35)

Walczak oversaw, and was actively involved in, the day-to-day operations of the Fund, including directing the Fund's investments. (SOF ¶¶ 2, 15, 18-30)  Walczak worked out of an office in Fitchburg, Wisconsin, his home in Madison, Wisconsin, and, occasionally, other homes he purchased in San Francisco, California and Lahaina, Hawaii. (SOF ¶ 6)

## II.    The Fund's Investment Strategy and Related Risks.

At all relevant times, the Fund held positions in options based on Standard & Poor's ("S&P") 500 index futures contracts.[1] (SOF ¶ 40)  A futures contract is as an agreement to buy or sell a particular commodity or asset at a predetermined price at a specified time in the future. S&P 500 index futures contracts are traded on the Chicago Mercantile Exchange ("CME").  In this contract, the buyer does not buy, and conversely the seller does not sell, the S&P 500 stock index on the delivery date but rather the buyer receives, and the seller makes, a cash payment equal to 250 times the value of the index. The price of this futures contract closely tracks the S&P 500 stock index. (SOF ¶ 42)

Options on futures contracts, often referred to as futures options, are traded on futures exchanges.  S&P 500 futures options, which are based on the S&P 500 index futures contract, trade on the CME. (SOF ¶ 43)  Because the underlying futures price tracks the S&P 500 index, this options contract ultimately is based on the S&P 500 index and provides exposure to changes in the value of that index. (SOF ¶ 44)

There are two kinds of options, call options and put options.  A call option gives the holder the right to buy an underlying financial instrument (such as a futures contract) at a fixed

---

[1] The Fund also held positions in money market funds, short-term notes and bonds, and other low-risk fixed income instruments but the Fund's options positions were responsible for almost all of the Fund's risk. (SOF ¶ 41)

price, called the strike price, either on, or alternatively, on or before, a specified date (the

expiration date).   A put option gives the holder the right to sell the underlying financial

instrument in exchange for the strike price on, or on or before, the expiration date. (SOF ¶ 45)

Changes in the prices of the S&P 500 call and put futures options rise and fall with

changes in the prices of the underlying futures contracts, which in turn follow the S&P 500

index. In addition, the prices of these options depend upon their strike prices, the time remaining

to expiration, the volatility of the underlying futures price, and the risk-free interest rate. (SOF ¶

46)

During the period running from November 1, 2016 through February 28, 2017, the

Fund's options position consisted primarily of call options. (SOF ¶ 47)  The Fund both

purchased and sold call options, most commonly in the form of a trade known as a 1:3 ratio

spread.  In this trade, the Fund purchased call options with a strike price above the current S&P

500 index value and sold call options with a strike price typically 50 points higher than the strike

price of the purchased calls. The Fund often sold three times as many call options as it purchased

(*i.e.*, a 1:3 ratio spread), with the cost of the purchased options offset (in full or substantial part)

by the premium received from the sold options. (SOF ¶ 48)

For example, on November 11, 2016, the Fund purchased 1,000 options based on the

March 2017 S&P 500 futures price expiring on the third Friday of February 2017 (the "February

Week 3 options") with a strike price of 2,230, and sold 3,000 February Week 3 options with a

strike price of 2,280. At the time of the trade the price of the March 2017 S&P 500 futures

contract, the options' underlying financial instrument, was approximately 2,155. (SOF ¶ 49)

The net payoff of such a position is positive when the futures price falls between a given range

(in this example, 2,230 and 2,305), and negative when the futures price moves above that range.

In other words, the net payoff becomes negative when the amount owed on the 3,000 sold options with strike price 2,280 exceeds the amount received from the 1,000 purchased options with a strike price of 2,230. (SOF ¶ 50)  The total profit or loss from the trade is the difference between the net payoff and the initial net cost of the ratio spread, which is the difference between the amount paid for the options with a strike price of 2,230 and the amount received from selling the options with a strike price of 2,280.  In essence, this 1:3 ratio spread is a bet that the futures price will be close to 2,280 on the expiration date of the options. (SOF ¶ 51)

**III.  The Fund's Prospectus and Investment Presentations Emphasized the Importance of Risk Management to the Fund's Investment Objective and Strategy.**

The Fund's stated investment objective was "capital appreciation and capital preservation in all market conditions, with low volatility and low correlation to the US equity market." (SOF ¶¶ 58-59)  The Fund's initial prospectus, and each relevant subsequent prospectus, stated:

> The Fund places a ***strong focus on risk management*** intended to provide consistency of returns and ***to mitigate the extent of losses***.  Positions are entered on a continuous basis across ***different*** option exercise prices and expiration months. Supported by ***sophisticated options analysis software***, the Fund employs ***strict risk management procedures*** to adjust portfolio exposure as necessitated by changing market conditions.

(SOF ¶¶ 64-65 (emphasis added))  Walczak reviewed this language in the prospectuses prior to issuance and understood the prospectus needed to be true, accurate, and complete. (SOF ¶¶ 68-70)

In addition to the Fund's prospectus, Catalyst and Walczak also developed a quarterly "Investor Presentation" which was posted on Catalyst's website and emailed directly to investment advisers by Catalyst wholesalers and, at times, Walczak. (SOF ¶¶ 71-74) The quarterly investor presentations described Walczak's purported five-step "Daily Investment Process," the first step of which was "Stress Fund for Risk." (SOF ¶ 75)  The presentations also included a slide (or page) entitled "Risk Management Is an Imperative Part of the Strategy" (or

6

simply "Risk Management") that stated: "The Fund employs a distinct Risk Management Strategy – In addition to the strategy and tactics we use to earn profits, we use a specific set of rules and tactics focused on limiting losses.  This is not common among public mutual funds." (SOF ¶ 78)  The 2015 and 2016 presentations also included a slide entitled "Key Reasons to Invest," one of which was:  "A Risk Management Strategy explicitly focused on limiting losses by hedging individual positions at initiation, ongoing adjustment based on well-defined risk parameters, and aggregate portfolio stop loss measures." (SOF ¶ 79)

## IV.  During Recurring (and Recorded) "Open House" Conference Calls, Walczak Described His Purported Risk Management Process, Including Stress Testing Devised to Cap Losses at 8%.

Between 2014 and at least March 2017, Walczak participated in a series of telephone conference calls with investment advisers who had invested in the Fund (on behalf of clients) or were considering doing so. (SOF ¶¶ 80-83)  At least one "Open House" call per month took place between September 2015 and March 2017. (SOF ¶ 82)  It was Catalyst's regular practice to record these Open House calls and Walczak was aware the calls were being recorded at the time. (SOF ¶¶ 85-86)

As in the prospectus and quarterly investor presentations, during these conference calls, Walczak emphasized the importance of risk management to the Fund's overall strategy and performance, stating, for example, that risk management was "the key to outperforming as a portfolio manager" and describing risk management as "our edge." (SOF ¶ 90)  Just as the prospectus referenced the Fund's use of "sophisticated options analysis software" in connection with risk management, Walczak repeatedly made similar references during Open House calls. For example, he referred to:  "sophisticated options pricing models" (SOF ¶ 92); "options pricing modeling software" (SOF ¶ 94); "options modeling software" (SOF ¶¶ 101, 130); "option pricing

models" (SOF ¶ 105);  "fairly extensive portfolio stress testing and modeling" (SOF ¶ 114); and "sophisticated options modeling software" (SOF ¶ 119). *See also* SOF ¶ 136 ("options pricing tool that models portfolio value")  All of these were references to the same thing – a computer program called OptionVue, which is the only options modelling software Walczak used. (SOF ¶¶ 240-41, 247-49)

Whereas the prospectus did not explain how the Fund used "sophisticated options analysis software," (SOF ¶¶ 64-67), Walczak explained in detail how he used OptionVue to stress test the Fund during various Open House calls. (SOF ¶¶ 92, 94, 96, 99, 101, 103, 105, 110, 112, 114, 116, 119-20, 123, 125, 128, 130)[2]  According to Walczak, he used OptionVue to assess the risk of the Fund's options positions by calculating the projected losses to the Fund in specific scenarios defined by assumptions about changes in the prices of the S&P 500 index futures contracts, options volatilities, and time horizon. (*Id.*)  Walczak explicitly identified the "stress" scenarios he purportedly modeled in OptionVue, which included 5% and 10% increases in the S&P 500 futures contract price. (*Id.*)  He also said that he stress tested the impact of these scenarios occurring on several different time horizons (up to two months in the future).  For each scenario he considered, Walczak purportedly used OptionVue to calculate whether the scenario resulted in a projected loss of more than 8% of the Fund's NAV. (*Id.*)  If it did, he purportedly hedged (or would hedge) the portfolio (that is, executed options trades) so that after the trades the modeled scenario no longer projected a loss of that magnitude. (*Id.*)

For example, during an October 13, 2015 Open House call, Walczak was asked the question "From a risk management perspective, what are you doing at the portfolio level?"  In

---

[2] Walczak made similar representations in other contexts. (SOF ¶¶ 133-145)

response, he identified the specific price and volatility moves he stressed for on a daily basis and

further explained:

> We look at [price and volatility stress tests] across five different timeframes and what we're looking for is a drawdown of greater than 8 percent in the portfolio value. If we find that at any one of those price and volatility stress points, we'll identify whether it, for example, it's price or volatility, which are the two major impacts. On the portfolio we'll identify what is it that's causing that potential 8 percent drawdown or greater than 8, I'm sorry, that's our line in the sand, so to speak. We'll identify what is it. Is it price? Is it volatility? We'll then identify what hedging transaction we need to put in place, and normally there's a variety of choices. Via put, via put spread, via call, via call spread, buy back a short call, buy back a short put. Lots and lots of alternatives, but we'll model the most effective alternative to remove that risk excursion and then we'll implement that position on the portfolio.

(SOF ¶ 101)  Through this process, Walczak claimed to manage proactively the Fund's risk

exposure to avoid losses greater than 8%. (SOF ¶¶ 92, 94, 96-97, 101, 105, 109, 112, 114, 116,

118-19, 121, 123, 128, 130, 134, 136, 138, 144)[3]  If the Fund did suffer a drawdown of 8%,

Walczak assured Open House call participants that he would take immediate action to prevent

any further losses, stating in one call that there is a "hard stop at 8 percent [and that he] would

flatten the portfolio at roughly 8 percent," and similarly stating in another call that he would "go

absolutely neutral." (SOF ¶¶ 128, 130; *see also* SOF ¶¶ 134 ("If a drawdown reaches 8% of

overall portfolio risk, there is a trigger to exit position(s)"), 136 ("Absolute drawdown of 8%

from high water requires flattening of risk, no discretion allowed."), 138 ("Portfolio 'stop' at 8%

drawdown.").

     During multiple Open House calls, Walczak explained why he chose the stress scenarios

he did, explaining that he stressed the Fund for a wide range of scenarios, including "worst

possible" and "extreme" scenarios. (SOF ¶¶ 94, 105, 114, 116)  For example, during a March 29,

---

[3] As early as November 4, 2014, Walczak stated unequivocally: "I use risk management to control losses to roughly 8 percent.  That's the number I use in stress testing."  (SOF ¶ 92)

2016 Open House call, Walczak stated that he aimed to "front run risk," through stress testing, by considering: "what's the worst possible scenario we might experience and are we sufficiently hedged to limit the drawdown in that scenario to eight percent." (SOF ¶ 114)  During a April 12, 2016 Open House Call, Walczak stated:  "Generally, however, as I mentioned before, our risk management protocols have us modeling out at price and volatility *extremes* and attempting to control any draw down to roughly 8 percent." (SOF ¶ 116)

According to Walczak, his chosen 8% threshold was intended to keep losses below 10% should there be some sort of end-of-days scenario in the market:  "My actual thinking was if I set this thing up to control to 8 percent, if we get a -- just some sort of horrific illiquid, world is ending kind of market, we're probably, from a pure slippage standpoint, we're probably risking another maybe 200 basis points, another two, and I wanted to keep it to single digits. So 8 is designed to keep it under 10 …." (SOF ¶ 130)

During Open House calls, Walczak also represented that he would diversify the Fund's options positions across expiration dates and strike prices. (SOF ¶ 132) For example, during the 5/24/2016 Open House call, Walczak stated that a "very conscious effort" was made "to diversify the fund's positioning across expiration periods and strike prices" such that "any given options expiration period will only introduce volatility to a relatively small part of the fund's portfolio." (SOF ¶ 132)

## V.    Catalyst Raised Concerns Regarding Walczak's Risk Management.

The Fund suffered losses in early December 2016. (SOF ¶ 157) Right after that drawdown, Catalyst (based in New York) expressed concern and asked for an explanation about how Walczak was stress testing the portfolio and/or otherwise measuring for risk. (SOF ¶¶ 16, 160-62) In late January, the Fund suffered another loss. (SOF ¶ 170)  Once again, Catalyst

expressed dismay at the size of the loss; Jerry Szilagyi, Catalyst's president and CEO, sent a text message to Walczak on January 25, 2017 stating: "I saw [the Fund] was down over 4% today. What is going on? I thought we agreed to take the exposure down. This rally could go could way further." (SOF ¶ 171)  In a separate text sent the same day, Szilagyi told Walczak "We need to review the strategy asap" and asked him "When can you be in NY?" (SOF ¶ 172)  In an email sent the next day, Szilagyi stated: "We need to discuss risk management for the fund." (SOF ¶¶ 173-74)  In his email, Szilagyi also commented on the Fund's high negative correlation to the S&P 500, noting that the Fund's investors "just will not tolerate a 4+% drawdown on a day the market moves less than 1%." (*Id.*)  Szilagyi asked for an in-person meeting with Walczak. (*Id.*) Walczak did not fly to New York at that time.  Instead, Walczak flew to his second vacation home in Hawaii. (SOF ¶¶ 169, 175) Soon thereafter, Catalyst began independently monitoring the Fund's risk exposure and sending that risk exposure data to Walczak. (SOF ¶¶ 176-78).

## VI.    In February 2017, the Fund Lost More than $700 Million, or Approximately 18%.

In early February 2017, the Fund's portfolio was heavily concentrated in February expirations. (SOF ¶¶ 181-84). The Fund was also very risky and highly negatively correlated to the market, (SOF ¶¶ 146-50), and Walczak understood that a move as small as a 1% increase in the S&P 500 Index could result in a loss of 5% or more of the Fund. (SOF ¶ 185). Yet, Walczak did not reposition Fund to reduce risk; in fact, did not place single trade between Feb. 1 and Feb. 8. (SOF ¶ 189). As of February 8, the Fund remained highly concentrated in February expirations, and was further concentrated around a narrow range of strike prices. (SOF ¶¶ 191-92). From February 1 to February 14, the Fund suffered a 13% drawdown. For the entire month, the Fund lost more than $700 million, or approximately 18%. (SOF ¶¶ 196, 199).

On an Open House call on February 21, 2017, an investment adviser questioned how Walczak could lose 18% when he claimed that he was managing to an 8% drawdown threshold.

(SOF ¶ 203). Moreover, the caller noted that the Fund entered the month at approximately a 5%

drawdown, giving Walczak only another 3% before reaching his 8% drawdown threshold. (SOF

¶ 203; *see also* SOF ¶ 180). In his response, Walczak never once addressed the concept of his

self-imposed 8% drawdown threshold. (SOF ¶ 203).

During the time-period of November 1, 2016 through February 28, 2017, the Fund's

AUM declined by more than $1 billion. (SOF ¶ 200) Eventually, Catalyst terminated Walczak

and changed the Fund's name. (SOF ¶¶ 204-05)

## VII.   Walczak Did Not Stress Test the Fund or Otherwise Manage Risk as Represented.

### A.   Walczak's Admissions

In stark contrast to his prior representations on Open House calls and otherwise, Walczak

has admitted that he did not stress test the Fund's portfolio on a daily basis for potential

movements in price and volatility and across different time-frames. (SOF ¶¶ 206-12). Walczak

also admitted that he did not use OptionVue on a daily basis. (SOF ¶ 206, 209-12)  In fact,

Walczak testified that he turned off OptionVue within two weeks of an options expiration, (SOF

¶ 212), which would have included the time-period of February 3 to February 17, 2017, (SOF ¶

197). Walczak further admitted that he did not manage the Fund to an 8% drawdown threshold.

(SOF ¶ 213). Finally, Walczak also admitted that, as of February 1, 2017, the vast majority of the

Fund's positions were highly concentrated in February expirations and also highly concentrated

among a narrow range of strike prices within those expirations. (SOF ¶ 181, 201)

### B.   The Commission's Unchallenged Expert Reports

The Commission has retained Professor Neil Pearson as an expert witness in this matter.

(SOF ¶ 216)  Professor Pearson has a Ph.D. in Management (specializing in Finance) and teaches

at the University of Illinois, where he is the Harry A. Brandt Distinguished Professor of

Financial Markets and Options.  His teaching, research, and consulting work involves derivative financial instruments (including options) and techniques to measure financial risks.  Professor Pearson has published more than 30 academic articles among other publications, including a book on risk measurement methods. (SOF ¶ 217) In a recent SEC enforcement matter, he was recognized as an expert in the field of financial derivative instruments and testified at trial. (SOF ¶ 218)[4]

Professor Pearson has evaluated the risks of the futures options held by the Fund during the period running from November 1, 2016 through February 28, 2017, including by replicating the stress tests Walczak purportedly carried out. (SOF ¶¶ 222-39)  Using the very same options modeling software used by Walczak, OptionVue, Professor Pearson calculated the Fund's projected losses in the specific stress scenarios that Walczak represented he considered. (SOF ¶ 222)[5] Professor Pearson's analysis shows there were scenarios for which the projected losses exceeded Walczak's supposed 8% threshold on each of the 72 trading days during the period running from November 1, 2016 to February 14, 2017. (SOF ¶ 222)  Contrary to Walczak's representations that he would hedge the portfolio in those circumstances, Professor Pearson observed that Walczak did not trade on 22 of those 72 days. (SOF ¶ 229)  Professor Pearson further found that on most of the days on which Walczak did trade, his trades had little impact on the Fund's risk, (SOF ¶¶ 230, 236), and Walczak did not act to "flatten" or eliminate risk when the Fund's drawdown reached 8% on February 9, 2017. (SOF ¶ 239)

---

[4] *See also SEC v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 405-406 (S.D.N.Y. 2019) ("Pearson is an expert in the field of derivative financial instruments").

[5] OptionVue includes a historical archive of market prices and a "BackTrader" function that allows the user to "go back" to a past date and time and analyze a portfolio using the market data from that date and time. This capability allowed Professor Pearson to go back in time and see the analyses that OptionVue would have performed between November 1, 2016 and February 28, 2017. (SOF ¶¶ 242-43)

Through his independent analysis of the Fund's trading data, Professor Pearson also determined and concluded that:

- The Fund's options positions were concentrated in the February Week 3 and February end-of-month options throughout December 2016, January 2017, and early February 2017, which contributed to the Fund's risk. (SOF ¶¶ 181-84, 190-92)

- This concentration increased during December 2016 and January 2017 such that on January 31, 2017, more than 91% of the Fund's options positions consisted of options expiring in the second half of February. (SOF ¶¶ 182-84)

- Walczak did not trade between February 1 and February 8.  Thus, the Fund's positions were still concentrated in February call options on February 8, just before the Fund's share price began collapsing on February 9. (SOF ¶¶ 189-93)

- The Fund's sold call options were also concentrated in a limited range of strike prices as of the close of trading on February 8. (SOF ¶ 192)

- The Fund's NAV returns were highly negatively correlated with percentage changes in the S&P 500 index during the period running from December 1, 2016 through February 28, 2017. (SOF ¶¶ 146-47, 150)

- The Fund's returns were much more volatile than those of the S&P 500 index during December 2016, January 2017, and February 2017. (SOF ¶¶ 148-50)

- During these three months, the Fund's returns were 3.35 to 5.25 times more volatile than the returns on the S&P 500 index (meaning the Fund's returns were 3.35 to 5.25 times more volatile than the returns on a diversified stock portfolio). (SOF ¶ 149)

- Such high levels of volatility and negative correlations were inconsistent with the Fund's stated purpose of "capital appreciation and capital preservation in all market conditions, with low volatility and low correlation to the US equity market." (SOF ¶ 151)

- The Fund was very risky, highly volatile, and highly negatively correlated with the S&P 500 index during December 2016, January 2017, and February 2017. (SOF ¶ 150)

The Commission has also retained Professor Arthur Laby. (SOF ¶ 251)  Professor Laby is a Professor of Law at Rutgers Law School in Camden, New Jersey, where he is Co-Director of the Rutgers Center for Corporate Law and Governance. He has taught courses including

14

Securities Regulation, Business Organizations, Fiduciary Law, and Regulation of Securities

Intermediaries, which cover securities markets, investment advisers, fiduciary duties, and related

topics. For more than 25 years, he has been teaching, researching, and practicing securities law,

including the regulation of securities market professionals. (SOF ¶ 252)  Professor Laby has

published academic articles and other publications regarding fiduciary relationships and the

regulation of securities market professionals. (SOF ¶ 253)  The crux of Professor Laby's

opinions is that if an investment adviser makes claims that he will take particular steps to

minimize risk in a fund, then the adviser must follow those steps unless he discloses otherwise.

(SOF ¶ 254)

Defendant retained two individuals as experts. Neither performed any independent

analysis of the Fund's risk exposure, replicated Walczak's claimed stress testing (using

OptionVue or any other model), or issued a rebuttal report to Professor Pearson's report.

Additionally, neither offered any opinions regarding Walczak's fiduciary duties as an investment

adviser, or issued a rebuttal report to Professor Laby's report. And both testified they do not

intend to offer any opinions in response to Professor Pearson's report or Professor Laby's

report.[6]

## **ARGUMENT**

### I.    **The Summary Judgment Standard**

Summary judgment, either full or partial, should be granted when the pleadings,

affidavits, and other supporting papers permitted by Fed. R. Civ. P. 56(c) show "that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[6] The SEC intends to file a *Daubert* motion at an appropriate time to exclude both defense experts as their opinions have no bearing on whether Walczak is liable for the claims at issue in this case and their testimony is otherwise inadmissible.  The Court, however, does not need to reach that issue to grant summary judgment for the SEC, particularly when neither defense expert can rebut the opinions of Professor Pearson and Professor Laby.

law." Fed. R. Civ. P. 56(c); *Celotex Corp*. v. *Catrett*, 477 U.S. 317, 322-23 (1986).  A party

opposing summary judgment has the burden to respond by providing "specific facts showing

there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986); *see*

*also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1984)

("When the moving party has carried its burden under Rule 56(c), its opponent must do more

than simply show that there is some metaphysical doubt as to the material facts."); *Edward E.*

*Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir. 1993) (a party may not avoid

summary judgment "with unsubstantiated assertions").

　　"[T]he mere existence of some alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48.

Rather, only disputes over facts that might affect the outcome of the suit or claim under the

governing law will preclude a grant of summary judgment. *Id.* at 248 ("Factual disputes that are

irrelevant or unnecessary will not be counted.").  The issue for the Court is "whether the

evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it

is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121

F.3d 642, 646 (11th Cir. 1997).  "In an SEC action seeking injunctive relief, the court should not

hesitate to grant a request for summary judgment if the defendant fails to demonstrate that there

is a genuine issue for trial." *SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 392 (S.D.N.Y.

2010) (quoting *SEC v. Dimensional Entm't Corp.*, 493 F. Supp. 1270, 1274 (S.D.N.Y.1980)).

　　Here, the Commission has presented undisputed facts – including through his own

testimony and other admissions – that Walczak knowingly or recklessly, and at a minimum

negligently, made misrepresentations and omissions of material fact about his and the Fund's

risk management procedures.  Through his misconduct, Walczak violated Section 206(4) of the

Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §80b-6(4)] and Rule 206(4)-8

thereunder [17 C.F.R. § 275.206(4)-8] or, in the alternative, aided and abetted Catalyst's

violations of the same provisions.  Walczak further violated Section 17(a) of the Securities Act

of 1933 ("Securities Act") [15 U.S.C. § 77q(a)].

## II.    Walczak Violated Section 206(4) of the Advisers Act and Related Rule 206(4)-8.

Congress created Section 206 of the Advisers Act to prevent fraudulent practices by

investment advisers.  *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963). To

accomplish this goal, the "extent of conduct subject to liability under the Advisers Act is broad."

*SEC v. Treadway*, 430 F. Supp. 2d 293, 338 (S.D.N.Y. 2006).  Sections 206(1) and 206(2) of the

Advisers Act make it unlawful for an investment adviser, by use of the mails or any means of

interstate commerce, to employ any device, scheme or artifice to defraud, or to engage in any act,

transaction, practice or course of business that operates as a fraud upon, "any client or

prospective client." *See* 15 U.S.C. § 80b-6(1), (2).  Similarly, Section 206(4) makes it unlawful

for an investment adviser to "engage in any act, practice, or course of business which is

fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(4). Unlike Sections 206(1) and (2),

however, Section 206(4) is not limited to conduct aimed at "clients or prospective clients." *See*

*U.S. v. Elliot*, 62 F.3d 1304, 1311-12 (11th Cir. 1995) ("Lacking any reference to clients,

subsection (4) appears to be a general prohibition against certain conduct by an investment

adviser," and the provision's legislative history "indicates an intent to prohibit fraudulent

practices or conduct, without regard to whether the victim is in an adviser-client relationship

with the investment adviser.").

Pursuant to authority granted to the Commission in Section 206(4), the Commission

adopted Rule 206-4(8) to "clarif[y] that an adviser's duty to refrain from fraudulent conduct

under the federal securities laws extends to the relationship with ultimate investors" in a pooled

investment vehicle (such as a mutual fund), even if the vehicle is considered the adviser's client.

*See* Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles, SEC Release No.

2628, 2007 WL 2239114, at *1-3 (August 3, 2007) (Release adopting rule codified at 17 C.F.R.

§ 275.206(4)–8).[7]  Rule 206(4)-8 prohibits investment advisers to public and private funds (and

other pooled investment vehicles) from (i) making materially false or misleading statements to

fund investors (or prospective investors), or (ii) otherwise defrauding them. 17 C.F.R. §

275.206(4)-8.[8]  The Rule prohibits, for example, "false or misleading statements regarding

investment strategies the pooled investment vehicle will pursue, the experience and credentials

of the adviser (or its associated persons), the risks associated with an investment in the pool, the

performance of the pool or other funds advised by the adviser, the valuation of the pool or

investor accounts in it, and practices the adviser follows in the operation of its advisory business

such as how the adviser allocates investment opportunities." SEC Release No. 2628, 2007 WL

2239114, at *4.

Section 206(4) and Rule 206(4)-8 apply to "any investment adviser" whether registered

with the SEC or not. *See* 15 U.S.C. § 80b-2(11) (defining investment adviser); *SEC v. Nutmeg*

---

[7] *See also* Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles, SEC Release No. 2576, 2006 WL 3814994, at *3 (December 27, 2006) (Release proposing rule later codified at 17 C.F.R. § 275.206(4)–8) ("The Advisers Act is intended to protect investors whose assets are managed by investment advisers in pools as well as those who rely on advisers to manage their individual portfolios or to otherwise provide them with investment advice.").

[8] Specifically, Rule 206(4)-8(a) provides that "[i]t shall constitute a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of section 206(4) of the Act (15 U.S.C. 80b–6(4)) for any investment adviser to a pooled investment vehicle to:

(1) Make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; or

(2) Otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

18

*Group, LLC,* 162 F. Supp. 3d 754, 774-75, 780 (N.D. Ill. 2016); SEC Release No. 2628, 2007 WL 2239114, at *3 (Rule "applies to both registered and unregistered investment advisers"). Violations of these provisions do not require a showing of scienter. *SEC v. Bluepoint Investment Counsel, LLC,* Case No.19-cv-809-WMC, 2021 WL 719647, at *14 (W.D. Wis. Feb. 24, 2021); *SEC v. Steadman*, 967 F.2d 636, 647 (D.C. Cir. 1992); *Nutmeg Group*, 162 F. Supp. 3d at 775; SEC Release No. 2628, 2007 WL 2239114, at *5.  Thus, these provisions reach conduct that is deliberately or recklessly deceptive, as well as conduct that is negligently deceptive.

Walczak's conduct is precisely the kind of conduct that the Advisers Act is intended to prevent.  Because he engaged in a multi-year campaign of misinformation about the Fund's risk management procedures, which culminated in the Fund suffering substantial losses in February 2017, he violated Section 206(4) of the Advisers Act.  Because his false statements were made to investors or prospective investors in the Fund, which was a pooled investment vehicle, he violated Rule 206(4)-8.

### A. Walczak Deliberately Made False or Misleading Statements About the Fund's Risk Limits and Controls.

"A representation or omission must be either false or misleading to be actionable." *Bluepoint Investment Counsel, LLC*, 2021 WL 719647, at *16. "Even a statement which is literally true, if susceptible to quite another interpretation by a reasonable investor, may properly be considered misleading." *Id.* (internal quotations omitted).

As set forth above, Walczak represented to investors (over and over again) that he had certain processes in place and took certain steps (on a daily basis) designed to keep any losses from exceeding 8% of the Fund's NAV.  Specifically, he said that he used options modeling software (OptionVue) to stress test the Fund's portfolio on a daily basis – which he explained involved using that software to estimate possible losses to the Fund in certain scenarios. He

further represented that when OptionVue projected that one or more of the scenarios would result in a loss of more than 8%, he would hedge the Fund's portfolio (execute options trades) to reduce the Fund's projected exposure in that scenario below his self-chosen 8% threshold. Walczak further claimed that if, in spite of these efforts, the Fund nonetheless suffered an 8% drawdown, he would immediately take action by liquidating positions or executing hedge trades to neutralize the Fund's risk and avoid further losses.  Walczak also represented that he reduced risk in other ways, including by diversifying the Fund's options positions across expiration dates and strike prices.

Walczak fraudulently misrepresented the Fund's risk management procedures.  The documents and testimony in this case conclusively show that during the crucial time-period between November 2016 and February 2017, when the Fund had "risk to the upside" and was in the midst of market conditions Walczak knew were the most challenging for his strategy (SOF ¶¶ 53-54):

- Walczak did not stress test daily;

- Walczak did not proactively hedge 8% risk exposure;

- Walczak did not flatten or neutralize risk after an 8% drawdown;

- the Fund's options portfolio was not diversified; and

- the Fund was highly negatively correlated with the S&P 500.

Perhaps most telling, in late January 2017, when the Fund's risk exposure and share price volatility were raising alarm in Catalyst's New York office, what did Walczak do?  He travelled from his vacation home in California to his other vacation home in Hawaii and did not trade for a week.  When Walczak did eventually "jump in" (or wade in), it was too late.  By the end of

February, the Fund lost more than 18% (or more than $700 million).  His metaphorical "line in the sand" (8%) washed away just as easily as a real one.

In other words, Walczak's so-called "strict risk management" was a façade.  No reasonable jury could reach a different conclusion.  Walczak has admitted he did not stress the Fund's options portfolio on a daily basis. Walczak has admitted he did not hedge 8% risk exposure based on scenarios modeled in OptionVue, unless he deemed those scenarios (which he preselected) sufficiently probable (which was never). Walczak has admitted the Fund was concentrated in February options with the same or similar strike prices.  Walczak has admitted this concentration was a primary factor behind the losses suffered by the Fund.  Based on Walczak's admissions alone, summary judgment is appropriate.

But as an additional basis for liability, the uncontroverted expert opinions of Professor Pearson—who has significant expertise in options risk measurement and management through teaching, studying, consulting, and serving as an expert witness—confirm "[t]he Fund was very risky, highly volatile, and highly negatively correlated with the S&P 500 index during December 2016, January 2017, and February 2017," (SOF ¶ 150), and Walczak failed to manage risk as promised.  According to Professor Pearson, the OptionVue analyses Walczak represented he carried out would have projected losses exceeding 8% of the Fund's NAV on every day during the period running from November 1, 2016 through February 14, 2017. On most of those days, there were scenarios in which the projected losses were far in excess of 8%.  Over most of this same period, the Fund became increasingly concentrated in month of February options.[9]

---

[9] Professor Pearson's analysis is consistent with other evidence.  For example, Kimberly Rios, who at times assisted Walczak in managing the Fund, sent an email to Walczak on Saturday, December 10, 2016, stating that a 1% increase in the S&P 500 would cause the Fund to lose 5% of its NAV. (SOF ¶¶ 163-64)  Michael Schoonover, who managed other Funds for Catalyst, repeatedly emailed similar risk exposure information to Walczak, beginning on January 31, 2017 and into February 2017. (SOF ¶¶ 176-78)

21

Thus, based on his representations, Walczak should have been executing options trades to mitigate the possibility of an 8% loss on every day during the period running from November 1, 2016 through February 14, 2017. He did not. In fact, Walczak did not trade on 22 of the 72 trading days during the period running from November 1, 2016 through February 14, 2017. Further, Professor Pearson found that when Walczak *did* trade, his trades did not reduce risk and often increased the losses projected in OptionVue. Through his analysis of Walczak's trading, Professor Pearson found that risk-reducing trades took place sparingly and only *after* the Fund's investors had already suffered significant losses.[10]  In Professor Pearson's expert opinion, the risk management approach Walczak *claimed* to follow would have made a loss greater than 8% highly unlikely, and had Walczak *actually* followed this approach, the Fund's investors would not have suffered the losses they did. (SOF ¶ 237)

Walczak has identified two experts, but neither performed any stress testing or risk analysis of the Fund's options portfolio, even though Walczak himself has admitted one could replicate his stress tests in OptionVue.  Nor did they issue a rebuttal report to challenge any of Professor Pearson's analysis. The undisputed evidence therefore demonstrates Walczak knew or should have known the Fund's risk exposure routinely exceeded his supposed 8% threshold and, contrary to his representations, he did nothing about it.

Walczak may argue that he disclosed the risks of his options strategy and told investors there were "no guarantees" he could limit losses to 8%. This is beside the point.  Walczak did not merely say 8% was a target or goal; he went much further.  He described the specific steps he

---

[10] There were only two periods when Mr. Walczak executed trades that significantly reduced the Fund's risk, December 9-14, 2016 and February 13-15, 2017. Both of these periods were shortly after the Fund suffered significant loses. Thus, these trades were not executed proactively in anticipation of avoiding those losses. (SOF ¶¶ 157-59, 189, 193-94)

took on a daily basis to achieve this goal.  Whatever he might say now about the disclosed risks of his strategy, it is undisputed that Walczak did not actually do the things he repeatedly said he did *to manage risk*.

Walczak's representations concerning his efforts to control risk of loss to 8% through diversification and daily stress testing and proactive hedging of the portfolio (to eliminate projected losses of that magnitude in his model) "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir.2002).  While any one of these false or misleading statements is actionable securities fraud, the collection of them, the scope of the misrepresentations they encompass, and the duration of time over which they were made, incontrovertibly prove that Walczak was disregarding the truth when he repeatedly made them to investors and prospective investors. *SEC v. Constantin*, 939 F. Supp. 2d 288, 308 (S.D.N.Y. 2013) ("Representing information as true while knowing it is not. . . [is a] circumstance[] sufficient to support a conclusion of scienter.").

Given the compelling evidence that Walczak acted knowingly, or recklessly, Walczak was—at a minimum—negligent and thus violated Section 206(4) and Rule 206(4)-8. *Goldwater v. Ginzburg*, 414 F.2d 324, 343 (2d Cir.1969) ("Recklessness is, after all, only negligence raised to a higher power."); *SEC v. Ahmed*, 308 F. Supp. 3d 628, 655 (D. Conn. 2018) ("The record contains ample evidence of Defendant's scienter, making a negligence determination unnecessary."); *SEC v. Mannion*, 789 F. Supp. 2d 1321, 1340 (N.D. Ga. 2011) (noting that, in the context of a claim under Section 206(2) of the Investment Advisers Act, "allegations of intentional deception will ... support a claim .... [T]he actions must at least be negligent."); *see also SEC v. Lyttle*, 538 F.3d 601, 602-605 (7th Cir. 2008) (where there is overwhelming

evidence of severe recklessness and the defendants fail to bring forward countervailing evidence, summary judgment for the plaintiff can be appropriate in securities fraud cases); *SEC v. Brown*, 579 F. Supp. 2d 1228, 1236 (D. Minn. 2008).

### B.    Walczak's Misrepresentations Were Material.

"Information is material if a substantial likelihood exists that a reasonable investor would find it significant in deciding whether to buy or sell a security, and on what terms to buy or sell." *SEC v. Maio*, 51 F.3d 623, 637 (7th Cir. 1995) (internal quotations omitted); *see also, e.g., SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1323 (11th Cir. 1982) ("The test for determining materiality is whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action.").   "Materiality is an "objective standard" that is "analytically distinct [from the] element of reliance." *Cailo v. Citibank, N.A.*, 295 F.3d 312, 329 (2d Cir. 2002).[11]   If representations and omissions are "so obviously important to an investor that reasonable minds cannot differ on the question of materiality," summary judgment is appropriate. *TSC Inds., Inc. v. Northway, Inc*., 426 U.S. 438, 450 (1976); *SEC v. Sentinel Mgmt. Grp. et al.*, No. 07-4684, 2012 WL 1079961, at *5 (N.D. Ill. Mar. 30, 2012).

Here, the misinformation Walczak conveyed to investors during Open House calls, and in other contexts, about his risk controls was unquestionably material. *SEC v. Fife*, 311 F.3d 1, 10 (1st Cir. 2002) ("misrepresentations and omissions were material because a reasonable investor would want to know the risks involved" in making investment); *SEC v. Persuad*, 2013 WL 6478800, at *5 (M.D. Fla. Dec. 10, 2013) ("There is a substantial likelihood that a reasonable

---

[11] Reliance is not an element of the Commission's case. *See, e.g., SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985) ("Unlike private litigants seeking damages, the Commission is not required to prove that any investor actually relied on the misrepresentations or that the misrepresentations caused any investor to lose money."); *SEC v. Genovese*, 2021 WL 3501421, at *11 (S.D.N.Y. Aug. 11, 2021) ("The SEC is not required to demonstrate reliance when bringing the enforcement claims at issue here, unlike plaintiffs in private causes of action.").

investor would find that [defendant]'s disclosure of his true trading strategies, the use of the investment funds, and the risk of the investment would significantly alter the total mix of information made available."); *SEC v. Kirkland*, 521 F. Supp. 2d 1281, 1303 (M.D. Fla. 2007) (information was material to potential investors because it was "directly tied to the level of risk associated with the investment"); *Treadway*, 430 F. Supp. 2d at 330 ("[A] reasonable investor would want to know of any risks or potential harms associated with his or her investment"); *CFTC v. Int'l Fin. Servs., Inc.*, 323 F. Supp. 2d 482, 501 (S.D.N.Y. 2004) ("misrepresentations concerning profit and risk go to the heart of a customer's investment decision and are therefore material as a matter of law") (internal quotations omitted).

Indeed, at nearly every opportunity, Catalyst and Walczak emphasized how important risk management was to the Fund's overall strategy and investment objective (capital appreciation and *preservation*). This was an essential element of Catalyst's and Walczak's marketing pitch to investors. The Fund's prospectus stated that the Fund "place[d] a strong focus on risk management" and "employ[ed] strict risk management procedures to adjust portfolio exposure as necessitated by changing market conditions." (SOF ¶¶ 64-65) The quarterly investor presentations available on Catalyst's website stated that risk management was "an imperative part" of the Fund's strategy and a "key reason" to invest. (SOF ¶¶ 78-79) During Open House calls, Walczak reiterated this message. For example, he stated on the June 7, 2016 Open House call: "[R]isk management, in my mind, is the key to outperforming as a portfolio manager, as opposed to really chasing returns. Managing risk is the secret, so I'm always very happy to talk about that." (SOF ¶ 118) He made a similar comment on the October 25, 2016 Open House call: "[W]here a lot of the brain power comes in is to manage the risk. I've said that before, I think that's our edge." (SOF ¶ 130)

Walczak may argue that because participants on the House Calls were investment professionals, he should be held to a different standard of materiality (or accuracy) because this audience would have considered his statements in context with risk disclosures and disclaimers in the prospectus, and /or would have understood he had "discretion" to deviate from his stated risk methodology.  Potential investors' sophistication, however, does not change the standard of materiality away from the objective standard of a "reasonable investor."  The Supreme Court has held that "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information" and noted there is "no authority in the statute, the legislative history, or [its] previous decisions, for varying the standard of materiality depending on" whether the information at issue was given to a sophisticated insider or to the general public, or otherwise based on the characteristics of the recipient.  *Basic Inc. v. Levinson*, 485 U.S. 224, 240 and n.18 (1988); *see also Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1191 (2013) ("In no event will the individual circumstances of particular class members bear on the [materiality] inquiry.").

Moreover, neither the credentials of House Call participants nor the contents of the prospectus negate the demonstrable falsity of Walczak's statements about his risk management process or minimize the obvious importance of this information to an evaluation by an investor (or his/her adviser) of the risk of investing in the Fund. *See Lormond v. U.S. Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009) ("The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action.").  After all, this was the very information financial professionals (making decisions to invest for themselves and/or clients) wanted to know:  How is risk managed and how much can we reasonably expect to lose given those risk mitigation

tactics?  That information was not contained anywhere in the prospectus, yet was a frequent topic of the Open House calls.

Any defense that Walczak's specific, detailed representations about daily stress testing, hedging of 8% risk exposure and diversification were, somehow, qualified implicitly by portfolio manager "discretion" has no basis in law or fact.  Walczak did not have discretion to lie or mislead.  Investors must be told the truth.  If his actual practice was (or became) to stress test the Fund merely on occasion, to hedge 8% risk exposure only when he judged such risk sufficiently probable, or to heavily concentrate the Fund's positions in a given month and strike price (thereby increasing risk), then he had a duty to disclose that information. *See Cailo*, 295 F.3d at 331 ("[U]pon choosing to speak, one must speak truthfully about material issues.  Once [defendant] chose to discuss its hedging strategy, it had a duty to be both accurate and complete."); *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 283 (S.D.N.Y. 2011) ("a statement regarding a company's hedging strategy obliges it to disclose when it alters or suspends that strategy"); *see also Lehman Bros.*, 799 F. Supp. 2d at 285 ("it would be materially misleading for a company to claim that it 'enforce[d] adherence' to its risk management policies while failing to disclose that it 'routinely' alters them").

Instead, Walczak repeatedly espoused the importance of daily stress testing and persistent hedging of 8% risk, as well as diversification, to the Fund's strategy.  For example, during an Open House call on September 13, 2016, Walczak stated: "So our hedging techniques allow us to cushion price movement and we're never in a situation where we have sort of a hard stop loss, and we're sitting just waiting for that 8 percent to get trigged and then we get out[,] because we're *constantly* hedging. That's the first thing we do *every day* is to identify risks and tune up

27

our hedges if they're not sufficient." (SOF ¶ 128 (emphasis added)) Three months earlier, during a June 7, 2016 Open House call, Walczak similarly stated:

> There is never a scenario where we wake up one day, and there's a panic in the market, and we scratch our heads and say, oh, my gosh, we've got to get out of that position. We've got to do something. We try to be a couple of chess moves ahead of that part of the portfolio management because we modeled that scenario a week ago, and we already took steps so that if the market is down 5 percent tomorrow that was part of our model from a week ago, and either it didn't cause us a problem in the model, so we're fine, or it did cause us a problem, and it's already fixed before it happens. That's the type of approach we like to take.

(SOF ¶ 120)  Walczak also assured investors that he was stressing and hedging "worst possible," "extreme" and "world is ending" scenarios, not simply probable scenarios, and that "any given options expiration period will only introduce volatility to a relatively small part of the fund's portfolio." (SOF ¶¶ 94, 105, 114, 116, 130)

If Walczak had intended to convey merely that he stress tested and hedged 8% risk exposure as he saw fit, he could have easily said so.  The words he said (repeatedly) were very different.  In nearly every document printed and every breath spoken about the Fund, Catalyst and Walczak assured investors that sophisticated options modeling software was part of the engine that drove the Fund and steered it clear of trouble.  The notion that a reasonable investor would have necessarily understood "daily" stress testing to mean "occasional," and "constant" hedging of projected 8% losses to mean "as needed" (in Walczak's subjective view), is pure revisionist history.  Walczak cannot escape liability by changing the words of, or inserting new words into, past misrepresentations, particularly when those misrepresentations were (1) recorded and (2) repeated time and again.

That Walczak did not actually follow his oft-described risk management process, including by reducing risk when his options modeling software projected losses in excess of 8%, is information that any reasonable investor (professional or not) would want to know in deciding

28

whether to buy, sell, or hold shares in the Fund.  *See SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir. 1968) (A fact is material if it "affect[s] the probable future of the company and [] may affect the desire of investors to buy, sell, or hold the company's securities.").  Thus, no reasonable jury could find Walczak's misrepresentations about risk mitigation, through stress testing and otherwise, were not material.

### C.   Walczak Was an "Investment Adviser" and Used Interstate Commerce.

The undisputed facts establish that Walczak was acting as an investment adviser within the meaning of the Advisers Act, which defines an "investment adviser" to include "any person who, for compensation, engages in the business of advising others, … as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(a)(11).  This is a broad definition. *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1164 (10th Cir. 2011) ("[I]f a person receives an economic benefit from a business that includes the giving of investment advice, that person falls within the initial, broad definition of 'investment adviser.'");  *Abrahamson v. Fleschner,* 568 F.2d 862, 870 (2d Cir. 1977) (persons who manage the funds of others for compensation are "investment advisers" within the meaning of the statute).

Walczak's activities meet this broad definition.  *See U.S. v. Elliot*, 62 F.3d 1304, 1310-11 (11th Cir. 1995) (defendants who "were responsible for selecting, purchasing, and selling the underlying investments for [investment vehicles]" met definition of "investment adviser"), *amended on other grounds*, 82 F.3d 989 (11th Cir. 1996); *Abrahamson*, 568 F.2d at 871 ("These provisions [of the Advisers Act] reflect the fact that many investment advisers 'advise' their customers by exercising control over what purchases and sales are made with their clients' funds."); *SEC v. Battoo*, 158 F. Supp. 3d 676, 698 (N.D. Ill. 2016) ("Making investment

29

recommendations and controlling clients' investments qualify as providing investment advice under the Advisers Act."); *U.S. v. Onsa*, 2013 WL 789182, at * 4 (E.D.N.Y. Mar. 1, 2013) (finding hedge fund portfolio manager was an investment adviser); *SEC v. Juno Mother Earth Asset Mgmt., LLC,* 2012 WL 685302, at *6 (S.D.N.Y. Mar. 2, 2012) (holding that allegations that portfolio manager of hedge fund and others received incentive fees "clearly establish that the individual defendants managed the funds of others for compensation and hence qualify as investment advisers under the Advisers Act"); *SEC v. Haligiannis,* 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007) (holding that hedge fund manager with control of investment decisions was investment adviser).

Walczak started the Fund independently from Catalyst using options trading and risk management strategies that he developed.  He then implemented and directed these same strategies after the conversion of his predecessor fund to a public mutual fund.  The Fund's quarterly investor presentations stated that "[t]he Fund's trading instruments, strategy, and objectives, have remained the same before and after this conversion," and the Fund had been "[m]anaged by Edward Walczak since inception." (SOF ¶ 255)  Additionally, he was obligated, pursuant to his Portfolio Manager Agreement with Catalyst, to provide a "continuous investment program for the Fund." (SOF ¶ 20)  Walczak also held himself out as the person "responsible for the day-to-day management of the Fund's portfolio." (SOF ¶¶ 80-89)  Walczak has conceded that he was an "investment fiduciary." (SOF ¶ 3)  And he structured his relationship with Catalyst such that he received, pursuant to the Portfolio Manager Agreement, 50% of the net advisory fees paid to Catalyst in connection with the Fund for rendering portfolio management services to the Fund.

Finally, Walczak (while located in Wisconsin, California and Hawaii) knowingly used the means of interstate commerce, including via telephone and email. (SOF ¶ 7)  *See United States v. Gilbert,* 181 F.3d 152, 157-58 (1st Cir. 1999) (interstate telephone calls satisfy jurisdictional element); *U.S. Commodity Futures Trading Comm'n v. Wilson*, 19 F. Supp. 3d 352, 363 (D. Mass. 2014) ("[i]t is also undisputed that he used means of interstate commerce to do so (email)"), *aff'd*, 812 F.3d 98 (1st Cir. 2016).

## III.    Walczak Aided And Abetted Catalyst's Violations of Section 206(4) and Rule 206(4)-8.

Under Sections 209(d) and 209(f) of the Advisers Act, the Commission has the authority to bring an action in district court against any person for aiding and abetting another's violation of the Advisers Act. For example, Section 209(f) provides that "any person that knowingly or recklessly has aided, abetted, counseled, commanded, induced, or procured a violation of any provision of [the Advisers Act], or of any rule, regulation, or order hereunder, shall be deemed to be in violation of such provision, rule, regulation, or order to the same extent as the person that committed such violation." 15 U.S.C. § 80b-9(f).  To establish aiding and abetting liability, the Commission must prove that: "(1) there is 'a primary violation'; (2) the aider and abettor generally was aware or knew that his or her actions were part of an overall course of conduct that was improper or illegal; and (3) the aider and abettor substantially assisted the primary violation."  *Monetta Fin. Svs. Inc. v. SEC*, 390 F.3d 952, 956 (7th Cir. 2004).

While Walczak meets the elements of an investment adviser and therefore should be liable directly under the Advisers Act, in the alternative, he is liable for aiding and abetting Catalyst's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder. Catalyst, in substantial part through Walczak's conduct described above, engaged in a practice or

course of business which was fraudulent, deceptive, or manipulative, including by making false or misleading statements to investors or prospective investors in the Fund.

Because Walczak knowingly or recklessly aided and abetted Catalyst's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder, he is liable for such violations pursuant to Section 209 of the Advisers Act.

## IV.   Walczak Violated Section 17(a) of the Securities Act.

By virtue of the same misconduct addressed above, Walczak violated Section 17(a) of the Securities Act, which prohibits, "in the offer or sale of securities," by the use of interstate commerce or the mails, directly or indirectly: (1) employing "any device, scheme, or artifice to defraud;" (2) obtaining "money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;" and (3) engaging in "any transaction, practice or  course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. §77q(a).  Fraudulent conduct, including misstatements, can violate more than one subsection of Section 17(a). *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1100-02 (2019) (disseminating false statement to investors with intent to deceive can violate Section 17(a)(1)); *SEC v. SeeThruEquity*, LLC, 18-CV-10374, 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019) (defendants could be liable under Section 17(a)(3), based on the SEC's allegations that "defendants repeatedly made false or misleading statements.").

Proof of scienter is required for Section 17(a)(1), whereas negligence is sufficient to establish violations of Sections 17(a)(2) and 17(a)(3). *Aaron v. SEC*, 446 U.S. 680, 691 & 697 (1980).  Scienter "is the mental state requirement embracing an 'intent to deceive, manipulate, or defraud' *or* to act in "reckless disregard of the truth." *Bluepoint Investment Counsel*, 2021 WL

719647, at *21 (quoting *SEC v. Bauer*, 723 F.3d 758, 775 (7th Cir. 2013)).  Scienter can be shown through knowing or reckless conduct.  *See SEC v. Infinity Grp. Co.*, 212 F.3d 180, 191 (3d Cir. 2000); *Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1126 (7th Cir. 1990); *Sanders v. John Nuveen & Co.*, 552 F.2d 790, 792 (7th Cir. 1977).  The SEC can satisfy a scienter requirement on summary judgment.  *See SEC v. Lyttle*, 538 F.3d 601, 603-604 (7th Cir. 2008) ("Even when a party's subjective beliefs are critical to liability, it is not always true that the case cannot be decided on summary judgment"); *SEC v. Ficken*, 546 F.3d 45, 51–52 (1st Cir. 2008); *SEC v. Jakubowski*, 150 F.3d 675, 681-682 (7th Cir. 1998); *SEC v. Kirch*, 263 F. Supp. 2d 1144, 1149-51 (N.D. Ill. 2003).

No reasonable trier of fact could find that Walczak acted without an intent to deceive or at a minimum, without an extreme departure from the standard of ordinary care.  "Representing information as true while knowing it is not. . . [is a] circumstance[] sufficient to support a conclusion of scienter." *SEC v. Constantin*, 939 F. Supp. 2d 288, 308 (S.D.N.Y. 2013).  Particularly where, as here, the misrepresentations were repeated over and over again, and Walczak, as an investment adviser, had a fiduciary duty to disclose all material facts and use reasonable care to avoid misleading clients. *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979). Moreover, when Walczak spoke to investors about his risk management, he had a duty to speak truthfully and disclose all facts necessary to make the information not misleading. *In re Compuware Sec. Litig.,* 301 F. Supp. 2d 672, 682 (E.D. Mich. 2004) ("a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects … a company may choose silence or speech elaborated by the factual basis as then known – but it may not choose half truths").  Walczak, because he had

33

access at all times to the Fund's positions, as well as OptionVue, knew (or was reckless in not knowing) that he managed the Fund's risk differently than he had represented to investors.

Walczak's false and misleading statements in Open House calls regarding how he managed risk were made "in the offer or sale" of securities because the Open House calls were an integral and regular part of the selling process of Fund shares and were part of the information that potential investors considered when evaluating whether to invest in the Fund. For much of the time-period at issue, the calls were held at least once a month and investors received information about the Fund's risk management that was not included in the Fund's prospectus. Further, Catalyst wholesalers emailed recordings of the House Calls, as well the quarterly investor presentations, to interested investors.  Section 17(a) is not limited to fraud in registration statements and offering documents and does not require that "injury occur to a purchaser" (though here it did). *United States v. Naftalin*, 441 U.S. 768, 773, 777-78 (1979) (§17(a) covers "any fraudulent scheme in an offer or sale of securities, whether in the course of an initial distribution or in the course of ordinary market trading"); *Graham v. SEC*, 222 F.3d 994, 1002 (D.C. Cir. 2000); *SEC v. Chester Holdings, Ltd.*, 41 F. Supp. 2d 505, 518 (D.N.J. 1999) (construing §17(a) broadly "to encompass a wide range of conduct" in light of its purpose to "promote ethical standards of honesty and fair dealing"); *SEC v. Kimmes*, 799 F. Supp. 852, 858 (N.D. Ill. 1992) (§17(a) "is given broad scope and flexible interpretation in order to encompass all of the ingenious variations of securities fraud that may arise.").

Finally, as Section 17(a)(2) requires, Walczak "obtain[ed] money or property" by means of the subject misstatements to investors in the Fund, as Walczak earned 50% of the net advisory fees that these investors paid—including more than $24 million in 2016 alone. *See, e.g., SEC v. Stoker*, 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012) ("it is sufficient under Section 17(a)(2) for the

SEC to allege that [the defendant] obtained money or property for his employer while acting as its agent, or, alternatively, for the SEC to allege that [the defendant] personally obtained money indirectly from the fraud").

## **CONCLUSION**

For all of the foregoing reasons, the Commission respectfully requests that the Court enter summary judgment against Defendant Walczak on the Commission's First, Fourth and Fifth Claims for Relief in the Complaint, and allow briefing and a hearing on appropriate remedies, including entry of a permanent injunction against future securities law violations, disgorgement, civil monetary penalties, and such further relief as the Court deems just.


Dated:  November 15, 2021

Respectfully submitted,

/s/ Michael D. Foster

Michael D. Foster (fostermi@sec.gov)
Jake Schmidt (schmidtj@sec.gov)
David Benson (bensond@sec.gov)
175 W. Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390
Attorneys for Plaintiff
Securities and Exchange Commission

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2021, I served a true and correct copy of the

foregoing filing on all counsel of record through the Court's ECF filing system.


<u>/s/ Michael D. Foster</u>

Michael D. Foster