Page 326

1 THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2
3 In the Matter of:              )
4                                ) File No. C-08400-A
5 CATALYST HEDGED FUTURES        )
6 STRATEGY FUND                  )
7
8 WITNESS:  Edward S. Walczak
9 PAGES:    326 through 767
10 PLACE:   Securities and Exchange Commission
11          175 West Jackson Boulevard,
12          Chicago, Illinois
13 DATE:    Wednesday, April 4, 2018
14
15    The above entitled matter came on for hearing,
16 pursuant to notice, at 8:31 a.m.
17
18
19
20
21
22
23
24       Diversified Reporting Services, Inc.
25            (202) 467-9200

Page 327

1 APPEARANCES:
2
3 On behalf of the Securities and Exchange Commission:
4    JASON SCHMIDT, ESQ.
5    DAVID BENSON, ESQ.
6    TERRY MORAN, SSE
7    JEFFREY SHANK, ESQ.
8    Securities and Exchange Commission
9    Division of Enforcement
10   175 W. Jackson, Suite 1450
11   Chicago, IL 60604
12
13 On behalf of the Commodity Futures Trading
14 Commission:
15   SAM WASSERMAN, ESQ.
16   MICHAEL CAZAKOFF (via telephone)
17   Commodity Futures Trading Commission
18   140 Broadway
19   New York, NY 10005
20
21
22
23
24
25

Page 328

1 APPEARANCES (CONT.):
2
3 On behalf of the Witness:
4    ZACHARY J. ZILIAK, ESQ.
5    STEVEN BYLINA, ESQ.
6    Ziliak Law, LLC
7    141 West Jackson Boulevard, Suite 4048
8    Chicago, IL 60604

Page 329

C O N T E N T S

| WITNESS: | | EXAMINATION |
|---|---|---|
| Edward S. Walczak | | 332 |

SEC EXHIBITS

| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 22 | E-mail chain | 696 |
| 25 | Prin. Invest. Strat. | 703 |
| 32 | 12-9-16 e-mail | 529 |
| 34 | 3-15-17 e-mail | 414 |
| 39 | 12-9-16 e-mail | 543 |
| 40 | E-mail | 548 |
| 44 | Risk Report | 547 |
| 46 | 12-10-16 e-mail | 583 |
| 48 | Risk Report 12-12-16 | 587 |
| 49 | Risk Report 12-13-16 | 593 |
| 50 | Risk Report 12-14-16 | 594 |
| 54 | 1-30-17 e-mail | 599 |
| 66 | 2-15-17 e-mail | 680 |
| 67 | Commentary, rough | 683 |
| 70 | Commentary | 685 |
| 79 | E-mail | 713 |
| 93 | 10-9-15 e-mail | 370 |
| 94 | 10-20-15 e-mail | 377 |

Page 330

C O N T E N T S (CONT.)

SEC EXHIBITS

| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 116 | 8-5-16 e-mail | 449 |
| 117 | 7-22-16 e-mail | 446 |
| 126 | E-mail | 717 |
| 142 | 10-30-14 e-mail | 343 |
| 143 | 11-16-14 e-mail | 367 |
| 144 | 3-16-16 e-mail | 392 |
| 146 | 6-29-16 e-mail | 444 |
| 152 | Wayback Machine | 492 |
| 153 | Presentation | 514 |
| 154 | Slip Sheet | 515 |
| 155 | 3-23-16 email | 689 |

Page 331

C O N T E N T S (CONT.)

CFTC EXHIBITS

| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 2 | Daily HFXAX Prices | 603 |
| 3 | Daily S&P Prices | 603 |
| 4A | E-mail | 605 |
| 4B | Attachment | 605 |
| 5A | 1-30-17 e-mail | 610 |
| 5B | Spreadsheet | 610 |
| 6A | 2-9-17 e-mail | 612 |
| 6B | Confirm | 612 |
| 7 | Trade confirm | 613 |
| 8 | Catalyst 0050194445 | 613 |
| 9 | Catalyst 0050197444 | 613 |
| 10 | Spreadsheet | 619 |
| 11A | E-mail | 620 |
| 11B | Attachment | 621 |
| 12 | Exposure summary | 664 |

[4/4/2018 8:31 AM] WALCZAK_EDWARD_20180404

Page 332

P R O C E E D I N G S

MR. SCHMIDT: So we are back on the record 8:31 a.m. on April 4th.

Whereupon,

EDWARD S. WALCZAK

was recalled as a witness and, having previously first duly sworn, was examined and testified further as follows:

EXAMINATION

BY MR. SCHMIDT:

Q   Good morning, Mr. Walczak.

A   Good morning.

MR. SCHMIDT: Good morning, Counsel.

MR. ZILIAK: Good morning.

BY MR. SCHMIDT:

Q   For the record, between the breaks that we've had and the testimony from yesterday to today, you haven't had any substantive discussions with staff of the SEC or the CFTC; is that correct?

A   That's correct.

Q   Okay.  And I mentioned before we went on record, you have SEC Exhibit 1, CFTC Exhibit 1, and a copy of the SEC's formal order in front

Page 333

of you, right?

A   Yes, I do.

Q   Okay.  Any questions about those documents occur to you overnight --

A   No.

Q   -- you want to ask?  Everything all right?

A   Um-hum.

Q   Okay.  So what I want to start talking about this morning is the concept of a soft close.  Okay?  So this is something that was discussed at Catalyst at the futures fund; is that correct?

A   Yes.

Q   Okay.

MR. WASSERMAN: I'm sorry to interrupt, but we forgot to dial in.

MR. SCHMIDT: Yeah, we did.  Can we go off the record please?

(A brief recess was taken.)

BY MR. SCHMIDT:

Q   We are back on the record at 8:33 a.m.

The concept of a soft close.

Okay.  So this was something that was discussed internally at Catalyst and with you at

Page 346

1  that, if you can't enter into relationships with
2  new FCMs or get current FCMs to increase the
3  amount of margin they are going to give you,
4  that could cause a constraint on your ability to
5  execute the strategy?
6     A   That's correct.
7     Q   Okay.  And that was a concern back in
8  October of 2014?
9     A   Correct.
10    Q   And so if -- if you couldn't establish
11 these new FCM relationships or could not
12 convince them to increase the margin available
13 to the futures fund, that was a risk of being
14 able to properly execute the strategy from that
15 point forward?
16    A   That's correct.
17    Q   Okay.  So did you talk about that risk
18 to Mr. Szilagyi at Catalyst?
19    A   I believe I did.  As I said, I don't
20 remember the specific discussion, but I do
21 remember from these agenda items the general
22 nature.
23    Q   Okay.  And what was Mr. Szilagyi's
24 response to this capacity issue FCM risk that
25 you discussed with him?

Page 347

1     A   I don't recall specifically in this
2  discussion.
3        I do recall he was -- he was open to
4  discussing and understanding the constraint.
5     Q   Did he ever say:  I don't believe you;
6  like, I don't think this is a problem; forget
7  about it?
8     A   I don't recall that, no.
9     Q   Okay.  And, in fact, this was a --
10 this is an issue that didn't go away, right?
11       The capacity issue was something that
12 you continued to look at, continued to discuss
13 with Mr. Szilagyi for years?
14    A   Yes.  Not frequently.  But you're
15 correct that the discussions continued.
16    Q   Okay.  And in those discussions, he
17 never said:  Why are we still talking about
18 this?  I told you it's not a problem?
19    A   No, he did not.
20    Q   Okay.  Do you remember what the
21 outcome is of this call?
22    A   I don't.
23    Q   And this is before Ms. Rios has joined
24 you, correct?
25    A   Correct.

Page 348

1     Q   Okay.
2        MR. WASSERMAN:  I just have quick
3  questions on that, if that's okay.
4        MR. SCHMIDT:  Yep.
5        BY MR. WASSERMAN:
6     Q   On the line that reads, HFXAX
7  capacity, comma, close options, am I reading
8  that right?  Is it close option or close
9  options?
10    A   Close options.
11    Q   What does that mean?
12    A   I think it means that I intended and
13 probably did discuss:  All right, if we run into
14 a constraint, what can we do?
15       Again, I am still relatively at this
16 point unfamiliar with '40 Act vehicles.
17       And so my discussion was:  I'm
18 concerned about FCM capacity; if it becomes a
19 problem, what can we do about that?
20    Q   Excuse me.  So when you say close
21 options, you're referring to cutting off inflows
22 to the fund?
23    A   That's correct.
24    Q   In May 2014, do you recall how big
25 the -- how -- excuse me.

Page 349

1        Do you recall what the AUM of the fund
2  was?
3     A   No, I don't.
4     Q   Do you recall how much money you made
5  in 2014?
6     A   No, I don't.
7     Q   Can you me a ballpark how much money
8  you made in 2014?
9     A   Not really.  It was small.
10    Q   You make -- under the terms of your
11 contract, you make approximately $8 million per
12 billion dollars of AUM, right?
13    A   Yes.  That's correct.
14    Q   Did you make --
15    A   Gross.
16    Q   Did you make under $8 million or over
17 $8 million in 2014?
18    A   Under 8 million.
19    Q   So the fund was probably under a
20 billion dollars in -- at the end of 2014?
21    A   Well -- and, again, the reason for my
22 response is that selling commissions in the
23 first year or two of the fund were significant.
24       They were greater than my portion of
25 the advisory fees for some period of time.

Page 366

1  I don't believe so. But, again, my
2 memory is not complete on that.
3   Q   So for purposes of this -- I'm sorry.
4 It's called SugarSync?
5   A   Yes.
6   Q   Is that one word?
7   A   Yes.
8   Q   Just how it sounds, S-y-n-c?
9   A   Yes.
10  Q   Okay. Are you the administrator of
11 the shared drive?
12  A   I don't know that I have a title
13 connected with the shared drive. I bought the
14 software, and I use it.
15  Q   Well, generally, with a software
16 program, the person that controls access is
17 deemed the administrator.
18      I'm not looking for a formal title,
19 but like in the terms of software programs,
20 that's what it's called.
21  A   Okay.
22  Q   Do you know if you have administrator
23 privileges for that program?
24  A   For certain folders that I control.
25 I -- I'm not certain if any of the others in the

Page 367

1 group of people we talked about have downloaded
2 their own copy of SugarSync and thereby control
3 files.
4   Q   Okay. All right. I'm going to show
5 you what's been marked as Exhibit 143.
6           (SEC Exhibit No. 143 was
7           marked for identification.)
8      BY MR. SCHMIDT:
9   Q   For the record, this is an e-mail
10 dated November 6th, 2014. Could you take a
11 minute, let me know if you recognize this
12 document.
13  A   It looks like an e-mail from me to --
14 I'm not sure who, but it's an e-mail from me.
15  Q   Okay. So, for the record, it's --
16 it's an e-mail address hoopss4@aol.com, right?
17  A   Yes.
18  Q   And looking through the e-mails, it
19 look like that person might have the first name
20 Jeff, right?
21  A   Yes.
22  Q   You can't imagine who Jeff might have
23 been in November of 2014 that you were
24 e-mailing?
25      Oh, it's Jeff Berkowitz. Does that

Page 368

1 ring a bell?
2   A   Yeah. I still don't remember who he
3 is, but that name somehow sounds familiar.
4   Q   Okay. It looks to me like this e-mail
5 is after your conversation with Mr. Szilagyi
6 that was referenced in the e-mail seven days
7 earlier. Is that fair?
8   A   Sure.
9   Q   Okay. If you read through this, does
10 this refresh your recollection or give you any
11 insight into what was discussed with Mr.
12 Szilagyi regarding capacity issues and any
13 outcomes that may have come from those
14 discussions?
15  A   No. It looks like I talked about soft
16 close at a billion, which I didn't recall
17 earlier, but clearly I wrote it here. So that
18 must be our discussion.
19  Q   So in the fall of 2014, the capacity
20 discussions, the status was you were discussing
21 with Mr. Szilagyi a soft close at a billion
22 dollars?
23  A   Yes.
24  Q   Okay. And do you have any doubt that,
25 when you say, "My discussions with Catalyst,"

Page 369

1 refers to a discussion with Mr. Szilagyi?
2   A   No. That's what it would refer to.
3   Q   Okay. So -- and it also looks like if
4 we -- if we go down to your e-mail of July 30th,
5 which is at the bottom of the first page, it
6 looks like, at that point, we could guess AUM is
7 not up to half a billion yet, right?
8   A   Correct.
9   Q   Okay. So at some point in the fall of
10 2014, you're some point between half a billion
11 and a billion dollars? Is that a fair
12 assumption?
13  A   Yes.
14  Q   Okay. Was there a soft close at a
15 billion dollars?
16  A   I recall that Catalyst attempted a
17 soft close at some point in time, but I honestly
18 don't remember when or what assets that was
19 done.
20  Q   Okay. So we'll -- we'll get to that.
21      I think there was a soft close
22 attempted in the fall of 2015. Does that sound
23 right?
24  A   I don't recall.
25  Q   Okay. All right. Do you remember any

Page 394

1  A   I don't know. I wasn't on the call.
2      MR. BENSON: Right. But you received
3  Exhibit 144. Do you recall ever talking to
4  anyone about a soft close in February 2016?
5      THE WITNESS: Again, that's my
6  testimony. I honestly don't remember a second
7  attempt at a soft close. I don't know whether
8  that was -- I don't remember discussing a second
9  attempt.
10     I didn't remember that there was any
11 resolution to the reasons for the failure of the
12 first one.
13     BY MR. SCHMIDT:
14 Q   Okay. So fair to say this doesn't
15 refresh your recollection at all as to whether
16 you had any discussions about a potential soft
17 close in the first quarter of 2016?
18 A   No.
19 Q   Okay. There's a rather dramatic
20 statement in here that somebody at ML, perhaps
21 Merrill Lynch, told Mr. Szilagyi the fund is
22 going to, quote, blow up. This rattled him a
23 bit.
24 A   Yes.
25 Q   Do you see that?

Page 395

1  A   I do.
2  Q   Do you remember any discussion about
3  whether the fund might blow up?
4  A   I do remember that because it's a --
5  it's a phrase that can be misinterpreted, and I
6  do remember talking to Ms. Rios about that.
7  Q   What do you remember?
8  A   What I remember is that Jerry had been
9  told that the fund assets might accelerate in
10 growth, meaning blow up in terms of sales at
11 Merrill Lynch and other places.
12 Q   And that rattled him quite a bit?
13 A   Apparently -- that was Ms. Rios's
14 interpretation, apparently, from this e-mail.
15 Q   And that would make sense if capacity
16 is an ongoing concern, right?
17 A   Yes.
18 Q   Okay. So did you have any discussions
19 with Mr. Szilagyi about his concern that the
20 assets under management of the futures fund
21 might blow up and accelerate too quickly?
22 A   I don't remember any out of the
23 ordinary.
24     As I've testified, we had periodic
25 discussions about capacity.

Page 396

1  I don't remember a specific
2  conversation related to the fund blowing up at
3  Merrill Lynch.
4  Q   Okay.
5      BY MR. WASSERMAN: I have a few
6  questions on this.
7      MR. SCHMIDT: Yeah.
8      BY MR. WASSERMAN:
9  Q   First, how could somebody misinterpret
10 the phrase "blow up"?
11 A   Well, it -- I mean, I'll give you my
12 personal opinion.
13     When I see something like that, it
14 suggests that something about the fund is going
15 to end its life.
16 Q   In other words, somebody could
17 interpret the phrase to mean the fund is going
18 to collapse?
19 A   In some way, yes.
20 Q   And you're certain that -- but when
21 Ms. Rios wrote "blow up," that she meant
22 acceleration in the increase in AUM and not
23 collapse?
24 A   I -- I am not certain of anything on
25 this e-mail. I'm giving you my best

Page 397

1  recollection.
2  Q   Okay. I want to draw your attention
3  to -- to one other part of the e-mail. It's the
4  second -- quote, question to ponder, end quote,
5  where Ms. Rios writes, "Have you felt a sweet
6  spot when trading through all the different AUM
7  levels where everything went fairly smooth such
8  as at 2B," which I assume means $2 billion.
9  A   (Nodding head.)
10 Q   Parenthesis, November. I assume she's
11 referring to November 2015?
12 A   I'm sorry. I lost you now.
13     Which line are you referring to when
14 you talk about "November"?
15 Q   I'm in the second dash under
16 "questions to ponder."
17 A   Okay. Okay. I see it. And -- so I'm
18 sorry. What was your question?
19 Q   November -- N-o-v refers to November
20 2015? Is that your understanding?
21 A   I don't know which November.
22 Apparently that was a November when the fund was
23 at $2 billion.
24     So, again, I don't have asset levels
25 in my head about when the fund was a

Page 398

1  particular --
2    Q   Well, we discussed before about how in
3  2014 -- May 2014 the fund was under 500 million,
4  right?
5    A   Yes.
6    Q   So she must be talking about November
7  2015, correct?
8    A   I mean -- oh, sure.  Actually -- sure,
9  now that I -- I recall now the date of the
10 e-mail to be March of 2016.  So certainly that's
11 likely, yes.
12   Q   Okay.  So she says, "Have you felt a
13 sweet spot when trading through all the
14 different AUM levels where everything went
15 fairly smooth, such as at 2 billion in November
16 was it comfortable without any constraints?"
17       In March of 2016 -- this is my
18 question now.  I'm not reading from the
19 document.
20   A   Okay.
21   Q   In March of 2016, the execution issues
22 had actually manifested themselves, correct?
23   A   Not that I recall, no.
24   Q   Well, so why would she say -- why
25 would she suggest that there were some times

Page 399

1  prior to that when execution -- I'm sorry --
2  when trading had been smooth and times when
3  trading hadn't been smooth?
4    A   I don't know.
5        My -- my response to her and -- in any
6  of these types of discussions were at any
7  moment, if I felt like execution was constrained
8  by capacity, I would raise that issue and --
9    Q   Well, it's not -- it's not binary,
10 right?  It's not like all of a sudden you can't
11 trade, right?
12   A   Correct.
13   Q   As the fund increases in size, the
14 traders in the pit become more and more aware of
15 your positions, correct?
16   A   I don't know if their awareness of
17 my -- I don't know how their awareness of my
18 positions is or is not determined, to be honest.
19   Q   Jeremy has communicated to you that
20 the traders in the pit know your -- what your
21 positions are, right?
22   A   From time to time, he said that, yes.
23   Q   Do you --
24       MR. SCHMIDT:  Do you have --
25       MR. WASSERMAN:  Sorry.  Go ahead.

Page 400

1        MR. SCHMIDT:  Do you have any reason
2  to believe that Mr. O'Keefe wouldn't be telling
3  you the truth when he said that?
4        THE WITNESS:  No.
5        MR. SCHMIDT:  Okay.
6        BY MR. WASSERMAN:
7    Q   And as we were discussing before, the
8  concern specifically is that, when a trader
9  knows -- a trader in the pit knows that you want
10 to get into or get out of a position, in a large
11 volume, that he make -- may make you pay a
12 higher price for that, correct?
13   A   I don't have any way of knowing that
14 other than observation.
15   Q   That's the concern, as you
16 articulated --
17   A   That's the concern.  Absolutely.
18   Q   And that concern --
19   A   Let -- let me amend my answer, that
20 the concern is not so much around the trader's
21 knowledge of who the counterparty is but more
22 about simply the size of the trade.
23       And, in fact, that's how we managed
24 trades as -- as we grew in size, was to cut our
25 trade size down.

Page 401

1    Q   Right.  But it's related to the -- the
2  knowledge of your positions because if, as
3  expiry approaches, a trader in a pit knows that
4  you have a large position you need to get out
5  of, that's significant, correct?
6    A   It could be.
7    Q   Okay.  And that's part of the concern
8  that you have about execution quality, correct?
9    A   At this -- at this moment in time,
10 certainly I -- my main concern was on the entry
11 side:  Could I consistently enter trades at a
12 fair price?
13   Q   And by March of 2015 -- I'm sorry.
14       By March of 2016, there had been times
15 when that entry had been smooth, and there had
16 been times when that entry hadn't been smooth,
17 right?
18   A   That is also true for time frames
19 prior to September of 2013 and post-September of
20 2013 and throughout 2014.  That statement is
21 correct.
22   Q   Okay.  So the answer to my question is
23 yes, that prior to March of 2016, there had been
24 times when entry into a trade was smooth and
25 times when entry into a trade wasn't smooth?

Page 402

1    A    That is always correct, independent of
2  size.
3    Q    And, more specifically, there were
4  times when you tried to enter into a trade and
5  you got exactly the price that you wanted and
6  other times when you tried to enter into a trade
7  and you didn't get exactly the price that you
8  wanted, right?
9    A    Correct.
10   Q    And as the fund got bigger and bigger,
11 from 2014 to 2016 to early 2016, the frequency
12 with which you didn't get the price that you
13 wanted increased; is that --
14   A    I did not notice that, no.
15   Q    You didn't notice that at all?
16   A    I did not.
17   Q    So why does Ms. Rios say here -- or
18 I'm sorry.
19        Why does Ms. Rios suggest here that
20 there are times when trading was smooth and
21 times when trading was not smooth?
22   A    Because, as I just testified, that is
23 always the case.
24   Q    And -- and the ease with which you're
25 able to execute trades did not change at all as

Page 403

1  the fund grew from 500 million to 2 billion?
2    A    As you -- as you suggested earlier,
3  it's not binary. It's -- it's subjective.
4        So my judgment was that, over a
5  reasonable time frame, there continued to be
6  times when I got the price I liked and times
7  when I didn't get the price I liked, and I could
8  not discern any pattern to that trade related
9  to -- to size.
10   Q    Okay. Was there -- is it your
11 testimony that it did not become increasingly
12 more difficult to get the price you wanted as
13 the fund grew from 500 million to 2 billion?
14   A    That is correct.
15   Q    That it didn't -- it in no way became
16 increasingly difficult to execute your trades as
17 the fund grew from 500 million to 2 billion?
18   A    I did not perceive any -- what's the
19 right word?
20        I didn't perceive any sustained
21 difficulty. I perceived simply the normal back
22 and forth of trading. Some days you get good
23 prices. Some days you don't? That's -- I never
24 perceived anything different.
25   Q    And, in your mind, that was the same

Page 404

1  in mid 2016 -- I'm sorry.
2        In your mind, that was the same in mid
3  2014 as that was in March of 2016?
4    A    Again, my -- it's not a binary
5  situation. So I relied on my judgment --
6    Q    I'm not asking you -- I am not -- I'm
7  not asking you whether it was binary or not.
8        I'm asking you whether there was a
9  difference in the ease with which you were able
10 to execute trades between 2014 and March 2016.
11   A    And I've responded to that question
12 so -- but I'll respond again by saying I did not
13 notice any systemic, sustained difference in
14 execution.
15        I noticed only the normal fluctuation
16 in execution quality across days, weeks, and
17 months.
18   Q    When you want to execute a trade, you
19 call J.J. in the pit?
20   A    That's correct.
21   Q    And J.J. tells you what kind of prices
22 he can get for that trade, right?
23   A    That is correct.
24   Q    And sometimes he tells you the price
25 is exactly what you want, and sometimes he tells

Page 405

1  you that the price is not exactly what you want,
2  right?
3    A    Correct.
4    Q    Okay. In 2016 did he tell you with
5  more frequency than in 2014 that you couldn't
6  get the prices that you want?
7    A    Again, I've responded to this, and
8  I'll respond again, that it's not binary. It's
9  not, to my mind, at least, quantifiable, but --
10 so using my judgment in terms of interpreting
11 that frequency, I did not notice a difference.
12   Q    There was no difference between 2014
13 and 2016?
14   A    Again, it's not quantifiable or
15 binary.
16        I did not notice a significant
17 sustained difference in execution quality.
18   Q    I'm not asking you whether you noticed
19 a significant sustained difference.
20        I'm asking you whether you noticed any
21 difference between 2016, when the fund was at $2
22 billion, and 2014, when it was at 500 million?
23   A    And I'm not able to answer about
24 noticing any difference because there are
25 differences every day.

Page 426
1 inflows, what would the fund look like?
2     And it's a typical analysis
3 methodology. Once you establish that baseline,
4 you can then look and say: How much money can
5 we allow to come in based on the analysis that's
6 been done?
7     And I do recall that was one of the
8 assumptions I instructed her to take going
9 forward.
10    Q    Okay. Did you instruct her to take
11 these other assumptions, too, for this analysis?
12    A    Sure. We certainly reviewed them,
13 yes.
14    Q    And the end result of that is that the
15 fund would not -- of that analysis or projection
16 is that the fund would not approach $5 billion
17 until 2021, correct?
18    A    Let me take a look. I don't recall
19 off of the top of my head.
20    Q    It's on the next page.
21    A    Yes. That looks like the conclusion
22 of the spreadsheet.
23    Q    And the assets under management
24 actually were vastly accelerated from that
25 projection, the actual ones?

Page 427
1    A    Again, as I said before, I don't have
2 in my head levels of "actual" over a particular
3 time frame.
4    Q    Before the drawdown that occurred in
5 late '16 and early 2017, the fund was over $4
6 billion, correct?
7    A    Yes. That I know. Yes.
8    Q    If you look at volume consideration,
9 which is the next slide, it says that there are
10 only three banks that acted -- act as market
11 makers?
12    A    I think what it says is we are aware
13 of three banks.
14    Q    Okay.
15    A    There may be more.
16    Q    All right.
17    A    Okay.
18    Q    If any of them exited, that would have
19 a significant negative impact on the fund
20 strategy, correct?
21    A    It could, which is the conclusion, but
22 we're not sure.
23    Q    Okay. So if any of them were to
24 leave, there's a risk of a significant negative
25 impact on the fund strategy?

Page 428
1    A    That was Ms. Rios's conclusion, yes.
2    Q    Did you agree with that conclusion?
3    A    I agreed that there was a possibility.
4 I agreed with the "could."
5    Q    That's what it says; so do you agree
6 or not agree?
7    A    I agree.
8    Q    Okay. Thank you.
9        It says that there also could be a
10 reduction in the amount of daily contracts that
11 could be traded.
12       Would that be a risk to the fund
13 strategy?
14    A    That would be a risk to the fund
15 strategy, yes.
16    Q    Okay. It also says the fund is in
17 the, "top five of volume each month," and,
18 "likely in the top three."
19       Do you see that?
20    A    I see that.
21    Q    Why is that important?
22    A    I think it's important to demonstrate
23 that, while we are certainly not the largest
24 participant in the market, we are potentially in
25 the top five so that we are a large participant

Page 429
1 in the marketplace.
2    Q    And does that relate to the same
3 concern regarding increase in size and execution
4 quality that you talked about before?
5    A    Yes.
6    Q    Okay. And that would also relate to
7 the fourth bullet point which is, "When one
8 other large individual floor pit trader was on
9 vacation, the futures fund percentage of pit
10 value nearly doubled"?
11    A    Correct.
12    Q    Right?
13       Okay. So that just sort of -- when
14 the -- when the other guy is on vacation, this
15 concern is magnified?
16    A    The concern is magnified, however, we
17 also noticed that, despite his absence, there
18 was no perceived difference in execution
19 quality.
20    Q    Where does it say that?
21    A    It doesn't say that here. That was my
22 recollection -- my recollection of that period
23 of time.
24    Q    So you did an actual analysis of the
25 period of time that the other guy was on

Page 506

1  "hard," to me means written down, quantifiable,
2  and objective, not subjective.
3      Q   Right. Okay. In fact, if you look at
4  Exhibit 152 under question -- in response to
5  Question 15, you say -- and if -- if you
6  didn't -- if you write this, let me know.
7          "We trade options on the S&P 500
8  futures contract. We manage risk aggressively.
9  We build hedges into every trade. We monitor
10 total portfolio risks with advanced options
11 simulations software. We use control charting
12 of key risk factors with absolute adjustment
13 rules. We have an hard exit/adjust rule based
14 on total portfolio dollar exposure."
15         You wrote this, right?
16     A   Yes.
17     Q   Okay. So what did you mean, when you
18 wrote "We have a hard exit/adjust rule based on
19 total portfolio dollar exposure"?
20     A   That -- that refers to the open option
21 premium metric in our risk framework.
22         25
23         BY MR. WASSERMAN:
24     Q   But the open option premium metric
25 doesn't measure exposure, right?

Page 507

1      A   I think it does.
2      Q   Well, the open option premium metric
3  is a measurement of -- of the aggregate value of
4  the options in your portfolio, right?
5      A   Yes.
6      Q   What does that have to do with dollar
7  exposure?
8      A   The open option premium -- and, again,
9  I -- I certainly may have gotten it wrong, but
10 that's what I meant in this statement.
11     Q   What did you mean in this statement?
12     A   My statement that says, "We have a
13 hard exit/adjust rule based on total portfolio
14 dollar exposure." My meaning was "hard," in the
15 sense of written down and quantified.
16 Adjust/exit rule means a trigger to suggest that
17 we evaluate and potentially perform one of the
18 adjustment or exit transactions I've testified
19 to previously.
20         And based on total portfolio dollar
21 exposure, my meaning was, what is the short
22 option premium in the portfolio because that
23 typically represents -- to me, again, in running
24 the strategy, that's an exposure measure.
25         BY MR. BENSON:

Page 508

1      Q   So before we go back, because I don't
2  want have to revisit any documents, going back
3  to Exhibit 34, the three presentations about
4  capacity constraints.
5      A   Yes.
6      Q   They are dated May 2016 through
7  November 2016, right?
8      A   Correct.
9      Q   And we talked about how the purpose of
10 these documents, among others, was to apprise
11 Catalyst of a potential risk that they could
12 take whatever action they wanted to, correct?
13     A   Correct.
14     Q   During the period May 2016 through
15 November 2016, am I correct that you
16 participated in -- I believe they're called
17 "open house calls" or "weekly calls with
18 wholesalers"?
19     A   I don't remember exactly when they
20 started, but that became a regular practice at
21 some point.
22     Q   Okay. And do you have any belief that
23 they -- that they were not going on, at least --
24 if not weekly, at least monthly, during the
25 period May 2016 through November 2016?

Page 509

1      A   Again, I honestly don't remember when
2  we started doing that.
3      Q   Okay. And we can establish that, you
4  know, date range specifically.
5          But, more generally, do you remember
6  during those calls with wholesalers, ever
7  advising the wholesalers of this potential
8  capacity issue?
9          MR. WASSERMAN: But to clarify, the
10 "open house calls" aren't for wholesalers;
11 they're for advisors, right?
12         THE WITNESS: Both. But yes, advisors
13 are the intended audience. Sure.
14         BY MR. BENSON:
15     Q   I'm sorry. Thank you. That's
16 important. So strike that line of questions.
17         You participated in open house calls
18 that were attended by both financial advisors
19 and internal and/or external wholesalers from
20 time to time, correct?
21     A   Correct.
22     Q   Do you -- do you have any knowledge as
23 to when you started participating in those open
24 house calls?
25     A   No.

Page 514

1  and saw if I could find an e-mail. So I just
2  want to show you what's been marked as Exhibit
3  153.
4          (SEC Exhibit No. 153 was
5          marked for identification.)
6      BY MR. SCHMIDT:
7  Q   And I just have the cover e-mail.
8  A   Um-hum.
9  Q   The presentation is an attachment,
10 which is part of the exhibit that your client
11 has.
12     MR. ZILIAK: I'm sorry. What is the
13 exhibit number, please? Okay. 153. Thank you.
14     BY MR. SCHMIDT:
15 Q   So all I want to establish is that
16 this presentation, which is the one we talked
17 about in November of 2016, if you want to flip
18 to it, was sent by Ms. Rios to Mr. Szilagyi and
19 Mr. Amhrein who worked at Catalyst in New York.
20 And it looks like it was sent specifically in
21 reference to a call that you guys were going to
22 have on November 2nd, 2016; is that correct?
23 A   That is correct.
24 Q   Okay. The only other question is: Do
25 you remember anything about this call other than

Page 515

1  what you've already testified to this morning?
2  A   No.
3  Q   Okay.
4      BY MR. WASSERMAN:
5  Q   Okay. Mr. Walczak, we're going to
6  mark as --
7      MR. BENSON: I'm handing you a
8  document that's been marked as SEC Exhibit 154.
9          (SEC Exhibit No. 154 was
10         marked for identification.)
11     BY MR. WASSERMAN:
12 Q   And this is a slip sheet to a document
13 that was produced in native form.
14     It specifically -- actually it's not
15 the document.
16     It's an audio file that was produced
17 in native form.
18     The Bate stamp of this slip sheet is
19 Catalyst 00357978?
20 A   I'm sorry. If I could ask, what does
21 that mean "produced in native format"?
22 Q   It means in the form in which it
23 originally existed.
24     So, for example, you know, when Excel
25 sheets are produced, instead of being produced

Page 516

1  as images, they are produced as native Excel
2  spreadsheets that actually --
3  A   Okay.
4  Q   -- open a --
5  A   All right.
6  Q   In this case, it's an audio file. But
7  as a placeholder, we got a Bates stamp image
8  with the note as it reflects "produced in native
9  format."
10 A   Okay.
11 Q   Does that answer your question?
12 A   Yes. Thank you.
13 Q   The audio file, the native audio file,
14 as it's been produced to us, indicates that it
15 is the National Open House HFX/CFH call from
16 June 7th of 2016.
17     I'm going to play portions of that
18 call for you or one main portion of that call
19 for you.
20     But before I do, just to confirm,
21 you're familiar with these national open house
22 calls, correct?
23 A   I am.
24 Q   And the general format of the calls is
25 that somebody introduces you and Kim. You do a

Page 517

1  spiel about HFX. She does a spiel about CFH,
2  and then you take questions, right?
3  A   Correct.
4      MR. BYLINA: Can you give me that date
5  one more time? I'm sorry.
6  A   Sure. June 7th, 2016.
7      MR. BYLINA: Thank you.
8      MR. WASSERMAN: And to confirm, the
9  transcript is going to reflect the audio of the
10 call.
11     BY MR. WASSERMAN:
12 Q   This is from the beginning.
13     (Audio played.)
14     "Welcome everyone. And thank you for
15 your attending our bi-monthly Catalyst funds
16 portfolio managers open house conference call."
17     BY MR. WASSERMAN:
18 Q   Do you recognize that voice?
19 A   I'm not sure.
20 Q   Who typically is the MC, so to speak,
21 of these calls?
22 A   There's been at least three.
23 Q   Who are the three?
24 A   One is Brian something. I don't know
25 these guys. So I don't know names.

Page 518

1  Q  You just show up?
2  A  Absolutely.
3  Q  Okay. Fair enough.
4      (Audio played.)
5      "Before we begin, I'd like to remind
6  everyone today's call may include
7  forward-looking statements. These statements
8  represent the firm's belief regarding future
9  events that, by their nature, are uncertain and
10 outside of the firm's control. The firm's
11 actual results and financial condition, it may
12 differ, possibly materially from what is
13 indicated in those forward-looking statements."
14     BY MR. WASSERMAN:
15 Q  Okay. And this is a normal preamble
16 that he gives at the beginning of the calls,
17 right?
18 A  Yes.
19 Q  Okay. I'm going to jump forward to
20 Minute 22 in the call. And if you'll give me a
21 moment just to make sure I get exactly there.
22     (Audio played.)
23     "It's star, then five, and put
24 yourself in the cue.
25     The last question revolves -- and this

Page 519

1  is from Axa Tima in New York.
2      BY MR. WASSERMAN:
3  Q  This is the same voice at the
4  beginning of the call, correct?
5  A  Sounds that way to me, yes.
6      (Audio.)
7  Q  "To the -- it is surrounded around the
8  stress testing and drawdown, and it goes as --
9  as follows: What would be the, of course, worst
10 case black-swan scenario for the fund? What is
11 the max drawdown you are shooting for given your
12 stress test, the risk parameters, and if you
13 could speak a little bit more to if you see a
14 significant drawdown when you're doing the
15 stress test; if like, for example, there was a
16 ten percent drawdown or move up in the market
17 which caused the fund to fall out of your --
18 your -- your four to six percent drawdown
19 parameters, how do you -- how do you change the
20 portfolio to mitigate that -- that potential
21 risk in the fund?"
22     "Yeah. Those are all great questions
23 because as I" --
24     BY MR. WASSERMAN:
25 Q  The voice just changed, correct?

Page 520

1  A  Yes.
2  Q  And the voice now speaking, is that
3  your voice?
4  A  It is.
5  Q  "Attention to forward management, in
6  my mind is the key."
7      I'm going to move it back ten seconds
8  to the beginning of when you start speaking.
9      MR. BENSON: For the record, it's 23
10 minutes, 10 seconds in the file. 22:57 sorry.
11     BY MR. WASSERMAN:
12 Q  I'm moving it back to 22:57.
13     "To mitigate that -- that potential
14 risk in the fund."
15     "Yeah. Those are all great questions
16 because, as I mentioned before risk management,
17 in my mind, is the key to outperforming as a --
18 as a portfolio manager as opposed to really
19 chasing returns. Managing risk is the secret.
20 So I'm anxious -- I'm always very happy to talk
21 about that.
22     So the first thing, pure and simple,
23 is our -- our -- our metrics are dialed in to
24 limit our drawdowns to eight percent. And
25 there's no guarantees in the world especially in

Page 521

1  markets. But -- but that's our goal in
2  everything we do, is keep our drawdown to eight
3  percent, and since we established these metrics,
4  they are basically -- in their current form,
5  were established in mid-2007 after we had a
6  drawdown. When the fund was in its private
7  form, we had a large drawdown that I felt was
8  unacceptable. And so did a lot of work on risk
9  management at that point, and what factors
10 contributed to the drawdown as a risk, and came
11 up with the structure of stress testing that we
12 use today. The goal being to limit a drawdown
13 to eight percent."
14     So far is everything that you've said
15 on the call accurate?
16 A  Yes.
17 Q  "Subsequent to that time, we have been
18 successful in doing that.
19     I think our largest is actually a
20 shade over eight percent but less than nine.
21     And that actually occurred in 2014, in
22 the fourth quarter.
23     So that's our -- that's our metric.
24     Our -- our methodology is to look at
25 stresses on the portfolio.

Page 550

1  You're not on that e-mail, right?
2  A  I see that.
3  Q  Okay. And in that e-mail, Mr.
4  Schoonover says, "Hi, Kimberly. Thanks for time
5  on the call today. We spoke after the call
6  about trying to propose something. Are you able
7  to send us some screen shots, slash, raw data,
8  slash, explanation of anything you used to
9  stress test, slash, measure the risk.
10      I think the biggest thing we can do to
11  make sure that the strategy risk and business
12  risk are properly aligned is to make sure we
13  understand how the fund measures risks and
14  reacts to adverse events."
15      Do you see that?
16  A  Yes.
17  Q  Okay. Do you recall participating on
18  the call that Mr. Schoonover references in his
19  e-mail to Ms. Rios as reflected in Exhibit 40?
20  A  Again, I recall a number of calls in
21  that time frame, and I participated, to the best
22  of my knowledge, on most of them.
23  Q  Okay.
24  A  Again, if -- if there was a call that
25  was held without my knowledge, I wasn't invited

Page 551

1  to, I can't say anything about that.
2  Q  So what was George Amhrein's position
3  at Catalyst as of Friday, December 9th, 2016?
4  Do you remember?
5  A  He was -- I think he was called a risk
6  advisor.
7  Q  Maybe chief risk officer?
8  A  I don't know if he was given that
9  exact title.
10 Q  Okay. He was -- was he the person at
11 Catalyst Capital Advisors who was responsible
12 for monitoring risk of the futures funds?
13 A  Yes.
14 Q  No one else, right?
15 A  I don't know whether anyone assisted
16 him.
17     In fact, I think probably Mike
18 Schoonover may have.
19     So he may have had some other people
20 assisting him, but he was the point of contact.
21 Q  Okay. And in terms of having the
22 official -- official responsibility, it was Mr.
23 Amhrein who had that responsibility?
24 A  I think that's correct, although I
25 will tell you that Catalyst is not good with

Page 552

1  organizational charts. And I did not make it a
2  point to stay up with different
3  responsibilities.
4  Q  Okay.
5  A  That said, Mr. Amhrein was my point of
6  contact for risk control.
7  Q  Okay. And so looking at this e-mail
8  from Mr. Schoonover to Ms. Rios, is it -- do you
9  think it's peculiar or odd that Mr. Schoonover
10 is e-mailing Ms. Rios to -- with the sentence,
11 "I think the biggest thing we can do to make
12 sure the strategy risk and business risk are
13 properly aligned is to make sure we understand
14 how the fund measures risks and reacts to
15 adverse events"?
16     Isn't it peculiar that he's sending
17 that to a portfolio manager as opposed to, let's
18 say, someone responsible for monitoring the risk
19 of that fund?
20 A  I'm -- I'm going to guess here. I'll
21 say two things. One is I have no idea what
22 conversation on the phone call may have
23 precipitated this e-mail or discussion.
24 Q  Okay.
25 A  So first and foremost, I don't really

Page 553

1  know what he's talking about.
2  Q  Okay. And anything besides first and
3  foremost?
4  A  My best understanding of this would be
5  he's asking to understand how, at the portfolio
6  level, we view and manage risk.
7  Q  Okay. And Kimberly, in response to
8  that request, she forwards -- she forwards the
9  e-mail to you, right?
10 A  (Nodding head.)
11 Q  And that's reflected also in Exhibit
12 40. And she forwards it to you on Friday,
13 December 9th, 2016, at 4:56 p.m.
14     "Ed, see below. How in depth do you
15 want to get with things, (charts, OptionVue, et
16 cetera), with NY or just have us come up with
17 adjustments for them to review."
18     Do you see that?
19 A  Yes.
20 Q  Do you remember receiving that e-mail?
21 A  Not specifically. But --
22 Q  Do you remember if you responded to
23 this e-mail?
24 A  That I definitely don't know.
25 Q  Do you remember having a conversation

Page 618

1  Q   Looking back at Exhibit -- excuse
2  me -- 4B, does that reflect -- refresh your
3  recollection as to whether the fund had any
4  positions in April?
5  A   4B?
6  Q   Whether on February -- as of February
7  10th the fund had any positions in April expiry
8  options?
9  A   Right. So which exhibit did you --
10 Q   I'm on 4B.
11 A   4B. That was my question.
12 Q   And, again, my question is: Does
13 Exhibit 4B refresh your recollection as to
14 whether as of February 10th, which is the date
15 you received 4B, the fund had any positions in
16 April expiry options?
17 A   There are none on the sheet. So
18 apparently at that point we did not.
19 Q   Okay. Is it -- what's your memory
20 on -- on or about February 10th of whether you
21 had April expiry options?
22 A   Well, again, the reason I raise that
23 question is my memory tells me that at some
24 point in February we did put on April positions.
25 Q   Okay. But the vast majority of your

Page 619

1  positions at the beginning of February were in
2  the February expiries, correct?
3  A   Yes.
4  Q   Okay. And on February -- I'm sorry.
5  On -- sorry. Strike that.
6      Do you recall whether the fund engaged
7  in any trading between February 1st and February
8  8th?
9  A   I do recall, in fact, from prior
10 testimony months ago that there was a period of
11 time no trading occurred.
12 Q   Do you recall specifically what that
13 period was?
14 A   It was early in February.
15 Q   Approximately the first week in
16 February?
17 A   Somewhere in that time frame, right.
18 Q   CFTC Exhibit 10 which I believe we
19 also showed you back in October is the trade
20 blotter from February.
21         (CFTC Exhibit No. 10 was
22         marked for identification.)
23         BY MR. WASSERMAN:
24 Q   And this spreadsheet does not reflect
25 any trading prior to February 29th, 2017,

Page 620

1  correct?
2  A   Correct.
3      MR. SCHMIDT: Can I ask one question,
4  Sam?
5      MR. WASSERMAN: Sure.
6      BY MR. SCHMIDT:
7  Q   When we had asked before about your
8  trading in December, and you said you'd have to
9  go back and check?
10 A   Yes.
11 Q   Obviously this is February, but is
12 this the document that you would go back and
13 check except for December 2016?
14 A   Yes.
15 Q   These are the ones you have saved --
16 A   Yes.
17 Q   -- locally?
18 A   Yes.
19     BY MR. WASSERMAN:
20 Q   The document I'm handing you now is
21 marked CFTC 11A.
22        (CFTC Exhibit Nos. 11A was
23        marked for identification.)
24     BY MR. WASSERMAN:
25 Q   It's Bates stamped Catalyst

Page 621

1  0050189486. And 11B, which is the attachment to
2  that e-mail, Bates stamp Catalyst 0050189487.
3         (CFTC Exhibit No. 11B was
4         marked for identification.)
5      THE WITNESS: If there is a point that
6  is better for you, I'm happy to take a restroom
7  break.
8      MR. WASSERMAN: We can take five
9  minutes now.
10     Jake controls the record so if it's
11 okay with Jake.
12     MR. SCHMIDT: That's totally fine.
13     We are off the record at 3:38 p.m.
14     (A brief recess was taken.)
15     MR. SCHMIDT: We are back on the
16 record at 3:45 p.m.
17     Mr. Walczak, during the break, no
18 substantive discussions with the staff of the
19 SEC or CFTC; is that correct?
20     THE WITNESS: That's correct.
21     MR. SCHMIDT: Okay.
22     BY MR. WASSERMAN:
23 Q   Mr. Walczak, turning your attention to
24 Exhibit 11A and 11B.
25 A   Okay.

Page 622

1  Q   These are -- this is the exposure
2  summary that Michael Schoonover sent you on
3  February 10th, correct?
4  A   Yes.
5  Q   In the morning of February 10th?
6  A   Yes.
7  Q   And it was his practice -- starting on
8  January 30th, it was his practice to do this on
9  a daily basis, right?
10  A   That's correct.
11  Q   And as reflected in the trade blotter,
12  from February 1st to February 8th, you did not
13  enter into any trades for the fund, right?
14  A   Correct.
15  Q   On -- in those first days of February,
16  you are noticing the delta exposure of the --
17  sorry -- the delta of the portfolio increasing,
18  correct?
19  A   During those first days of trading, I
20  noticed the delta of the portfolio to fluctuate
21  from day to day.  And recall the context in
22  which this delta is being used.
23      It's being recorded to provide some
24  familiarity for me and others about how the fund
25  behaves relative to that delta calculation.  So

Page 623

1  we are not currently using it as a risk metric,
2  simply as a -- on a trial observation basis --
3  Q   Yeah.  I'm not asking how you're using
4  it.
5      I'm just asking -- well, I first ask
6  you to confirm that from January 31st through
7  February 10 that that delta number is steadily
8  increasing, not fluctuating, right?
9  A   Well, I would characterize the delta
10  as going from 355 down to 330, holding at 330,
11  rising slightly to 337, and then beginning to
12  climb.
13  Q   I'm sorry.  I wasn't -- I wasn't
14  precise enough.
15      From February 1st through February
16  6th, the delta is increasing, correct, from 330
17  to -- from negative 330 to negative 470,
18  correct?
19  A   It is -- it is higher on February 6th
20  than it was on January 31st.  In between it was
21  lower.
22  Q   And then on February 7th, it declined
23  slightly to negative 442, right?
24  A   Correct.
25  Q   And then it increases again to 468 on

Page 624

1  February 8th and for 97 on February 9th,
2  correct?
3  A   Correct.
4  Q   So there's a pretty dramatic increase
5  from the February 1st level to the February 9th
6  level, correct?
7  A   That is correct, and the other thing
8  to notice relative to my previous testimony on
9  what delta means is the funds performance was
10  fairly widely divergent from what would have
11  been predicted by the delta number during that
12  period of time.
13      That was my observation as we started
14  to get accustomed to what it should do.
15  Q   The -- this exposure summary that you
16  received every -- every day starting on January
17  30th from Michael Schoonover also fills in on
18  the left-hand side the expected return based on
19  the delta number?
20  A   Yes.
21  Q   And the actual return, correct?
22  A   Yes.
23  Q   And, for example, on February 3rd, the
24  expected return is -- of the fund is negative
25  2.45, and the actual return is negative 2.36.

Page 625

1      Would you characterize that as wildly
2  divergent?
3  A   On that particular day --
4  Q   Just -- I'm sorry.  Go ahead.
5  A   On that particular day, they line up.
6  On other days, they are actually directionally
7  opposite so that the delta number, for example,
8  on February 1st suggests that the fund should
9  lose money when, in fact, it gained almost 40
10  basis points.  That's what I was referring to.
11  Q   On -- on February 6th, the expected
12  return for the portfolio is one percent and the
13  actual return is 1.45, right?
14  A   Correct.  So roughly 45 percent
15  difference in expected versus actual return.
16  Q   .45 percent --
17  A   But --
18  Q   -- portfolio value?
19  A   Half is much greater than what's
20  predicted.
21  Q   And on February 9, the prediction is
22  negative 2.86 percent and -- I'm sorry.  The --
23  and the actual return is negative 3.44, right?
24  A   Yes.
25  Q   So there are circumstances in which

Page 626

1  the -- so -- so -- so -- in which the expected
2  return is not wildly divergent from the actual
3  return?
4     A   Well, as I said, in each of these
5  cases, if you look at the magnitude, you're --
6  you're talking about 20, 30, 50 percent
7  different expected return versus actual.
8         In other words, the difference, for
9  example, between an 8 percent drawdown and a 12
10 percent drawdown.
11    Q   During this time period, specifically
12 February 1st to February 8th, you're also
13 looking at OptionVue, right?
14    A   Correct.
15    Q   And OptionVue is the software that
16 you're referring to on the call we played before
17 where you can model how changes in the
18 underlying S&P index will affect the portfolio,
19 right?
20    A   Yes.
21    Q   And as you stated on the call we
22 played before, you would model out what would
23 happen to the portfolio if the S&P were up five
24 percent and if the S&P were down five percent
25 over various time frames, right?

Page 627

1     A   Yes.
2     Q   What was OptionVue showing you about
3  how the movements in the S&P would affect the
4  portfolio in this February 1st to February 8th
5  time period?
6     A   Well, if you recall also from my
7  previous testimony, I suggested that essentially
8  I turn OptionVue off as we come into roughly a
9  two-week window around expiration period and
10 by -- excuse me -- by turning it off, what I
11 mean is the five and ten percent intervals tend
12 not to be appropriate to evaluate very, very
13 nearby options movement simply because they
14 don't -- they don't have the time to experience
15 a five or ten percent move.
16        For example, in that time frame in
17 February, a -- in fact, what actually occurred
18 during this week was a three-sigma move, and it
19 was two and a half percent.
20        So -- so during that period of time, I
21 will look at OptionVue, but I'm essentially
22 looking at the expiration graph and making my
23 decisions on a very short term day-to-day time
24 frame on nearby expiring options.
25    Q   So were you not looking at OptionVue

Page 628

1  from February 1st to February 8?
2     A   I looked at it, not every day, and I
3  think that's also in my prior testimony because
4  there's really no need to look.  The expiration
5  graph doesn't change, and that's what I'm
6  looking at.
7         As you pointed out, the bulk of the
8  fund's positions were in very nearby
9  expirations.
10    Q   But you looked at OptionVue at least
11 once --
12    A   Yes.
13    Q   -- from February 1st to February 8th?
14    A   Yes.
15    Q   Would you say you looked at it at
16 least three times?
17    A   Probably three times, sure.
18    Q   Any more than that?
19    A   I don't -- I can't recall exactly, but
20 I would tell you, again, the expiration graph
21 doesn't change.  So there's not a lot of need to
22 look at the same information.
23    Q   And what do you recall of those three
24 times you looked at OptionVue during that
25 period?

Page 629

1     A   I recall noticing where my breakeven
2  point was on those expiring options, and if I
3  recall correctly, I used that as kind of a
4  trigger point in addition to the risk management
5  metrics in terms of when I would need to adjust
6  those positions.
7     Q   Okay.  What was OptionVue telling you
8  during that period about what would happen to
9  the value of the portfolio -- strike that.
10        OptionVue would -- part of the
11 OptionVue graph would tell you -- sorry.  Let me
12 take a third stab at this.
13        The X axis of the OptionVue graph is
14 movement in the S&P, right?
15    A   Yes.
16    Q   And so in the middle of that X axis
17 is -- represents a zero percent move in the S&P,
18 correct?
19    A   Well, it's not necessarily centered
20 there, but current market price.
21    Q   Current market price is -- is in the
22 middle of the X axis?
23    A   Again, not always.  That's why I just
24 say it's current market price.
25    Q   And -- and then the X axis -- the

Page 638

1   And the metrics I use -- and they have
2 a foundation in statistical process control. I
3 recall from my testimony prior that the eight
4 percent number is not a stop loss. It's a
5 process output based on managing --
6   Q   That's not relative to my question.
7   I'm just asking whether you tried to
8 manage the fund to limit drawdowns to eight
9 percent.
10   A   And I think it's very relevant, and so
11 if -- I'll finish my response.
12   The way I did that was to use the
13 existing risk framework in -- under the
14 principles of statistical process control by
15 which I managed the process parameters, and the
16 output ends up being what I want it to be, and
17 that has been proven over years of history.
18   So as a result, we are trying out a
19 delta situation.
20   I'm sticking to the risk metrics that
21 I know have been successful for me, managing
22 against those, managing the portfolio against an
23 expiration time horizon, as I always have, so
24 being consistent in applying my process both on
25 a risk side and a portfolio management side and

Page 639

1 expecting that I will get the results I have in
2 the past.
3   Q   On the call we listened to earlier,
4 you told the advisors that the goal in
5 everything you do is to keep your drawdown to
6 eight percent, right?
7   A   That is correct.
8   Q   And in describing how you actually do
9 that, you described OptionVue, correct?
10   A   Yes.
11   Q   Okay. So --
12   A   Well, let me -- let me --
13   Q   Were you not --
14   A   On that call I described OptionVue as
15 a tool I use to make projections on how market
16 moves, volatility, I mentioned on the call, how
17 new positions, position adjustments, how they
18 all impact the potential future performance of
19 the fund. That's how I use OptionVue.
20   Q   You explained your use of OptionVue to
21 advisors as a way to explain to them how you try
22 to limit losses to eight percent, right?
23   A   Yes. It's the primary tool I use to
24 be forward looking about what sort of
25 circumstances might create an unacceptable loss.

Page 640

1   Q   Okay. And as you said on the call,
2 the unacceptable loss would be something greater
3 than eight percent?
4   A   Yes.
5   Q   And so were you paying attention to
6 that -- what that primary tool was telling you
7 on February 8th of 2017?
8   A   As I mentioned, the way my process
9 works in managing the portfolio is once we get
10 near to expiration, I manage the options against
11 their expiration curve, so to speak, coming into
12 expiration, as I have always done.
13   Q   Were you paying attention to what
14 OptionVue, your primary tool, was telling you on
15 February 8th?
16   A   Yes. It told me the breakeven point
17 for the options that were coming into
18 expiration, and that's the information I need to
19 then make an assessment and a judgment about
20 when and how to adjust, supplemented by the risk
21 parameters which, if go -- if they go counter to
22 my adjustment or my judgment, they alert me to
23 make -- to take action.
24   Q   Was OptionVue capable of telling you
25 what would happen to the fund's portfolio if the

Page 641

1 S&P rose one percent on February 9th?
2   A   Yes.
3   Q   Were you paying attention to what
4 OptionVue was telling you in that regard?
5   A   On February 9th, I don't recall if
6 that's a day I looked at it.
7   As I said, repeatedly, coming into
8 expiration, I looked at the expiration graph.
9 That has always been the process. And in this
10 case I knew where the breakeven was for the
11 February positions.
12   Q   But OptionVue would be the primary
13 tool that would tell you what would happen to
14 the fund if the S&P went up one percent?
15   A   Yes.
16   Q   I want to turn your attention to
17 Exhibit 6A and 6B. In particular 6B.
18   A   Okay.
19   Q   This is the trade confirm for your
20 trades on February 9th, correct?
21   A   Yes.
22   Q   These calls that are at -- and it only
23 reflects trading calls that are at strikes of
24 2340, 2345, and 2350, right?
25   A   Yes.

Page 662

1   Q   You looked at the OptionVue breakeven
2  graph for particular options?
3   A   For the nearby expiration series.
4   Q   Okay. But your -- your February third
5  week call options were already out of the money,
6  right?
7   A   Some call options were in the money.
8  Some were out of the money.
9   Q   So some of them were past breakeven,
10 right?
11  A   Well, again, I looked at the entire
12 expiration series, in other words, the sum total
13 of options expiring the third week of February.
14  Q   Okay. And so did that -- did
15 looking -- but the breakeven for a particular
16 series of options does not tell you what's going
17 to happen to the overall portfolio, right?
18  A   No.
19  Q   Okay. So my question is: What steps
20 were you taking to make sure the overall
21 portfolio didn't decrease several more
22 percentage points?
23  A   So in -- in -- I mean, the short
24 answer is just to refer to CFTC Exhibit 7.
25  Q   Okay.

Page 663

1   A   The trades I did on -- on February
2  10th were, in my judgment, the appropriate
3  actions to take, looking at all the indicators
4  that I look at, nearby expiration, risk metrics,
5  my current informed market view, or my judgment
6  informed by my market view. These are the
7  actions that I felt were appropriate. And,
8  again, consistency is the most important thing,
9  consistent with judgments I made in the past in
10 similar situations.
11  Q   Okay. On February 10th, do you recall
12 looking at an OptionVue graph that represented
13 the performance of the whole portfolio?
14  A   I don't recall if I did or did not
15 that day.
16  Q   If you had looked at an OptionVue
17 graph representing the performance of the
18 overall portfolio on February 10th and that
19 graph showed you that a one-percent move up in
20 the S&P would lead to greater than a
21 three-percent decline in the portfolio, what
22 would you have done?
23  A   I can't speculate on what -- what I
24 would have done. I just know that I don't
25 recall looking at it.

Page 664

1   Q   You don't recall looking at a picture
2  that represented the performance of the whole
3  portfolio on February 10th?
4   A   On that particular day, I don't recall
5  if I did or didn't.
6   Q   Was there any other tool available to
7  you besides OptionVue that would have -- that
8  could have evaluated the portfolio performance
9  relative to the performance of the underlying
10 S&P?
11  A   None that I was comfortable using,
12 which goes to my concern with consistency over
13 time. In other words, I am reluctant to abandon
14 successful operating procedures and -- and
15 successful metrics in favor of things I was
16 unfamiliar with.
17      So the short answer is OptionVue is
18 what I would use. In this case, I understood
19 what it was telling me. Didn't need to look at
20 it every day.
21  Q   I'm going to give you a document
22 marked CFTC Exhibit 12?
23         (CFTC Exhibit No. 12 was
24         marked for identification.)
25  BY MR. WASSERMAN:

Page 665

1   Q   Mr. Walczak, do you recognize the
2  document marked CFTC Exhibit 12?
3   A   Yes.
4   Q   It's an exposure summary from Mike
5  Schoonover, correct?
6   A   Yes.
7   Q   And more specifically, it appears to
8  be from February 13th, 2017, correct?
9   A   Yes.
10  Q   And you'll -- you'll see that it
11 reflects that, on February 10th, the actual
12 decline -- or sorry -- the predicted decline to
13 the fund based on the delta of -- of negative
14 625 was negative 2.23, right?
15  A   Yes.
16  Q   And that the actual decline in the
17 fund on February 10th was negative 2.48, right?
18  A   Yes.
19  Q   So sitting here today -- well, one
20 more question before I ask that.
21      And on February 10th, the delta
22 reflected on -- on this exhibit is negative
23 6.61, correct?
24  A   Yes.
25  Q   Higher than it had been the previous

Page 678

1  on market action and my judgment about the
2  portfolio's position.
3       Q    Okay.  When do you start to take --
4  at -- at what level of drawdown do you start to
5  get more aggressive in managing risk?
6       A    There isn't a specific level other
7  than those annotated in the risk matric --
8  matrix.  Other than that, it's simply my judgment
9  about -- but again, we're -- we're trying to
10 manage a process that naturally oscillates and
11 oscillates -- oscillations are reflected by
12 drawdowns.  It naturally oscillates within,
13 hopefully, a control band of eight percent so
14 that I use judgment about where we are in that
15 band, being careful not to violate the process
16 control tenants that I use.
17      Q    And just to clarify one piece of your
18 answer, you referred to the risk metrics.  Are
19 you specifically referring to the risk metric --
20 the -- the --
21           MR. WASSERMAN:  Jake, what exhibit is
22 that?
23           MR. SCHMIDT:  This one?
24           MR. WASSERMAN:  No.  The one sitting
25 on top of your pile.

Page 679

1            MR. SCHMIDT:  41.
2            THE WITNESS:  Yes.
3            BY MR. WASSERMAN:
4       Q    Specifically, to the change in NAV per
5  share month risk metric?
6       A    That's the only one that reflects a
7  risk metric around drawdowns.
8       Q    Okay.  And so according -- so is it
9  your testimony that you start to get more
10 aggressive in managing risk when that risk
11 metric is triggered?
12      A    When any of the risk metrics are
13 triggered, we naturally -- I naturally get very
14 aggressive in -- in managing the risk.
15      Q    Is there any other risk metric that
16 you look at besides the ones in Exhibit -- in
17 CFTC Exhibit 41 that cause you to become more
18 aggressive in managing risk?
19      A    There are times when I look at the
20 OptionVue portfolio and decide that even though
21 no risk metric is triggered that I should make
22 a -- an adjustment of some sort.
23      Q    Finally, Mr. Walczak, taking you back
24 to -- to the period in early February of 2017
25 and, specifically, the February 1st to February

Page 680

1  10th time frame.  At any point in that time
2  frame, did you believe that a one-percent
3  increase in the S&P was likely to result in the
4  fund crossing that eight-percent drawdown
5  threshold?
6       A    Again, I don't manage specifically to
7  an eight-percent drawdown threshold.  So I am
8  not considering whether we're going to cross
9  that threshold or not because, again, it's not
10 something I'm managing to specifically.
11           What I'm managing to is the process
12 control parameters that over a very long period
13 of time have demonstrated their ability to
14 control drawdowns to roughly eight percent.
15           MR. WASSERMAN:  Okay.  Thank you.  And
16 thank you again for your testimony.
17           THE WITNESS:  Sure.  Thank you.
18           BY MR. SCHMIDT:
19      Q    Okay.  I'm handing you what's been
20 marked as SEC Exhibit 66.  So this is February
21 15, 2017, correct?
22           (SEC Exhibit No. 66 was
23            marked for identification.)
24           BY MR. SCHMIDT:
25      Q    Mr. Walczak?

Page 681

1       A    Yes.
2       Q    Sorry.  It's just got to be audible
3  for her to take it down.
4       A    Yes.  Sorry.
5       Q    And this is after some significant
6  declines in the fund, correct?
7       A    Yes.
8       Q    Okay.  And so I'm particularly
9  interested in your e-mail which you say, "We are
10 propping the market up.  In addition to J.J.'s
11 color from the floor, I am receiving texts
12 saying, 'You are all over Twitter today as the
13 reason this market keeps moving higher.'  We'll
14 need to revisit our risk mitigation strategy on
15 our call this afternoon.  I asked J.J. to join
16 the call to provide some color on execution."
17           Do you see that?
18      A    Yes.
19      Q    Okay.  What do you mean -- what did
20 you mean when you said, "We are propping the
21 market up"?
22      A    Best I can recall, I -- I felt as
23 though the publicity that had surrounded this
24 particular week -- there were some articles
25 that -- I think it was a Wall Street Journal

Page 682

1  article -- there was some publicity that
2  suggested a large fund was buying back calls.
3  And by doing that, there's a -- there's a
4  potential for -- although, actually, I think
5  J.J. told us that afternoon that -- that it was
6  a temporary phenomenon around a particular
7  execution, but I -- we were concerned about the
8  attention we were getting and whether or not
9  that was influencing market behavior.
10     Q   Specifically, you were worried about
11 whether it was having a negative impact on
12 execution quality, correct?
13     A   Yes, that's correct.
14     Q   Okay.  And that's the reference to
15 asking J.J. to provide some more color on
16 execution?
17     A   Yes.
18     Q   Okay.  And the reason being, I think,
19 is what you alluded to much, much earlier, which
20 is that, if people know that a large player has
21 to get out of certain positions, they could use
22 that information to demand higher prices,
23 knowing that you have to get out, if you have to
24 get out and you have to pay whatever they're
25 going to demand you pay?

Page 683

1   A   Yes.
2   Q   Right?  That's the concern?
3   A   Yes.
4   Q   Okay.  All right.
5       MR. BENSON:  Mr. Szilagyi, we talked
6  about --
7       THE WITNESS:  Wow.
8       MR. BENSON:  I'm sorry.
9       THE WITNESS:  Wow.
10      MR. BENSON:  I'm sorry.  I was reading
11 a document called -- we aren't going that long.
12 Sorry.
13      THE WITNESS:  Man.  Did I -- did I --
14 maybe I must have done something --
15      MR. ZILIAK:  In the next interview.
16      MR. BENSON:  No.  We're -- you'll see
17 that I'm reading it out of the -- Mr. Szilagyi.
18 I don't have anything for Mr. Szilagyi today.
19      You go, Jake.  Sorry.
20      BY MR. SCHMIDT:
21  Q   Okay.  I'm showing you what's been
22 marked now as 67.
23         (SEC Exhibit No. 67 was
24         marked for identification.)
25      BY MR. SCHMIDT:

Page 684

1   Q   Do you recognize this document?
2   A   This was a -- I was asked to provide a
3  commentary on the fund's performance during this
4  period of time, and this was my first draft.
5   Q   Okay.  So the answer to the question
6  is you do recognize it?
7   A   Yes.  I'm sorry.  Yes.
8   Q   It's okay.  It's just a lawyer thing.
9  I need to know that you know what you're talking
10 about?
11  A   Yes, yes.
12  Q   Okay.  So you were asked to provide
13 this written commentary.  You did.  You sent it
14 to Catalyst New York, correct?
15  A   Yes.
16  Q   Including Mr. Schoonover and Mr.
17 Szilagyi?
18  A   Yes.
19  Q   Okay.  So at some point, this document
20 was edited by people in New York and then sent
21 out?
22  A   That's correct.
23  Q   Okay.  And SEC 70 is what was actually
24 sent out, correct?
25         (SEC Exhibit No. 70 was

Page 685

1          marked for identification.)
2       BY MR. SCHMIDT:
3   Q   You can see there's a whole list of
4  financial advisors that get --
5   A   Sure.  So.  Right.
6   Q   So really, it's the -- let's see, 1,
7  2, 3 -- the fourth page of Exhibit 70 that
8  starts with a Catalyst fund logo at the top, and
9  the title is, "Catalyst Hedged Futures Strategy
10 Fund Update: February 14, 2017"?
11  A   Yes.
12  Q   Which is basically your e-mail or the
13 start of your e-mail.  That's what it
14 corresponds to?
15  A   Yes.
16  Q   Do you agree with me?
17  A   Oh, you're -- you're asking if it
18 corresponds to --
19  Q   Yeah.  I'm asking if your draft,
20 right, or whatever e-mail your -- your language
21 you're sending, some form of it eventually ends
22 up in this communication that's sent out to
23 investment advisors?
24  A   Yes.
25  Q   Okay.  So look back --