# Claimant's Exhibit 1

Edward Walczak v. Catalyst Capital Advisors, LLC

EXHIBIT
43

SEC-WalczakE-E-0004024

**PORTFOLIO MANAGER AGREEMENT**

THIS PORTFOLIO MANAGEMENT AGREEMENT ("Agreement"), dated as of August 27, 2013, is made by and between **Catalyst Capital Advisors LLC**, a New York limited liability company (the "Adviser"), and **Edward S. Walczak**, an individual (the "Portfolio Manager").

**RECITALS**

WHEREAS, the Adviser is registered with the Securities and Exchange Commission (the "SEC") as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Adviser acts as an investment adviser to multiple series of the Mutual Fund Series Trust, an Ohio business trust (the "Trust"), pursuant to a Management Agreement dated as of July 31, 2006 as amended (the "Management Agreement");

WHEREAS, the Trust is an open-end management investment company registered under the Investment Company Act 0f 1940, as amended (the "1940 Act");

WHEREAS, the Portfolio Manager is a member of Harbor Financial, LLC., which acts as the managing member to Harbor Assets, LLC, a commodity pool (the "Commodity Pool");

WHEREAS, the Adviser and the Portfolio Manager desire to convert existing investors in the Commodity Pool into new investors in the **Catalyst Hedged Futures Strategy Fund** (the "Fund") a new series of shares of beneficial interest of the Trust, which is described in Schedule A, attached hereto and made a part hereof;

WHEREAS, the Adviser desires to retain the Portfolio Manager to render portfolio management services to the Fund, and the Portfolio Manager is willing to render such services: and

WHEREAS, the Portfolio Manager will be subject to and will adhere to and abide by all of the Adviser's applicable code of ethics, compliance and supervisory policies, including those policies set forth in any compliance handbooks and other related Adviser policies and procedures as may be in effect from time to time.

NOW, THEREFORE, in consideration of the premises and mutual agreements hereinafter set forth, the parties hereto agree as follows.

SEC-WalczakE-E-0004025

**AGREEMENT**

1.   <u>Appointment and Status of Portfolio Manager</u>.  The Adviser hereby appoints the Portfolio Manager to provide portfolio management services to the Fund for the period and on the terms set forth in this Agreement.  The Portfolio Manager accepts such appointment and agrees to render the services herein set forth, for the compensation herein provided.

   The Portfolio Manager shall for all purposes herein be deemed to be an independent contractor of the Adviser and shall, unless otherwise expressly provided herein or authorized by the Adviser or the Board of Trustees of the Trust (the "<u>Board</u>") from time to time, have no authority to act for or represent the Adviser or the Trust in any way or otherwise be deemed an agent of the Adviser or the Trust.

2.   <u>Portfolio Manager Duties</u>.  Subject to the general supervision of the Adviser and the Board, the Portfolio Manager shall, employing its discretion, manage the investment operations of the Fund and the composition of the portfolio of securities and investments (including cash) belonging to the Fund, including the purchase, retention and disposition thereof and the execution of agreements relating thereto, in accordance with the Fund's investment objective, policies and restrictions as stated in the Fund's then-current Prospectus and Statement of Additional Information (together, the "<u>Prospectus</u>") and subject to the following understandings:

   (A)   The Portfolio Manager shall furnish a continuous investment program for the Fund and determine from time to time what investments or securities will be purchased, retained or sold by the Fund and what portion of the assets belonging to the Fund will be invested or held uninvested as cash;

   (B)   The Portfolio Manager shall use its best judgment in the performance of its duties under this Agreement;

   (C)   The Portfolio Manager, in the performance of its duties and obligations under this Agreement for the Fund, shall act in conformity with the Trust's declaration of trust, its by-laws and the Prospectus and with the reasonable instructions and directions of the Adviser and the Board, and will conform to and comply with the requirements of the 1940 Act and all other applicable federal and state laws and regulations;

   (D)   The Portfolio Manager shall determine the securities to be purchased or sold by the Fund and will place portfolio transactions pursuant to its determinations either directly with the issuer or with any broker and/or dealer in such securities, subject to paragraph heading "*Execution of Purchase and Sale Orders*" below;

2

SEC-WalczakE-E-0004026

(E)     The Portfolio Manager shall maintain books and records with respect to the securities transactions of the Fund and shall render to the Adviser and the Board such periodic and special reports as the Adviser or the Board may reasonably request;

(F)     The Portfolio Manager shall provide the Trust's custodian and fund accountant on each business day with information about the Funds' securities transactions, and with such other information relating to the Trust as may be required under the terms of the then-current custody agreement between the Trust and the custodian;

(G)     The Portfolio Manager shall respond promptly to any request from the Adviser or the Funds' fund accountant for assistance in obtaining price sources for securities held by the Fund or determining a price when a price source is not available, and promptly review the prices used by the Funds' fund accountant to determine net asset value and advise the Fund's fund accountant promptly if any price appears to be incorrect;

(H)     The Portfolio Manager shall be subject to the Adviser's proxy voting policies and be responsible for: (1) directing the manner in which proxies solicited by issuers of securities beneficially owned by the Fund shall be voted, and (2) making any elections relative to any mergers, acquisitions, tender offers, bankruptcy proceedings or other type events pertaining to the securities held by the Fund;

(I)     The Portfolio Manager hereby represents that it will be subject to the Adviser's and the Fund's codes of ethics under the Advisers Act and 1940 Act respectively;

(J)     The Portfolio Manager hereby represents that it will be subject to the Advisers' supervision and compliance procedures under the Advisers Act.

Prior to the commencement of the Portfolio Manager's services hereunder, the Adviser shall provide the Portfolio Manager with current copies of the Fund's Prospectus. The Adviser undertakes to provide the Portfolio Manager with copies or other written notice of any amendment, modifications or supplements to the Fund's Prospectus and the Portfolio Manager will not need to comply until a copy has been provided to the Portfolio Manager.

3.      <u>Custodian</u>.  The assets of the Fund shall be held by an independent custodian, and not by the Adviser or the Portfolio Manager. The Portfolio Manager is authorized to give instructions to the custodian with respect to all investment decisions regarding the Fund and the custodian is authorized and directed to effect transactions for the Fund and otherwise take such actions as the Portfolio Manager shall reasonably direct in connection with the performance of the Portfolio Manager's obligations in respect of the Fund.

3

SEC-WalczakE-E-0004027

4.      Risk Acknowledgment.  The Adviser acknowledges that the Portfolio Manager does not guarantee the future performance of the Fund or any specific level of performance, nor the success of the Portfolio Manager's overall management of the Fund.  Accordingly, the Adviser acknowledges and agrees that the Portfolio Manager shall not have any legal or financial responsibility for performance or losses unless directly attributable to (1) the gross negligence or willful misconduct of the Portfolio Manager, (2) the Portfolio Manager's failure to adhere to any investment policies and restrictions as described in the Prospectus or (3) trading errors of the Portfolio Manager that result in a loss that the Adviser reimburses to the Fund.

5.      Directions to the Portfolio Manager.  The Adviser will be responsible for forwarding the Board and/or Adviser directions, notices and instructions to Portfolio Manager, in writing, which shall be effective upon receipt by the Portfolio Manager.  The Portfolio Manager shall be fully protected in relying upon any such direction, notice, or instruction until the Portfolio Manager has been duly advised in writing of changes therein.

6.      Execution of Purchase and Sale Orders.  In connection with purchases or sales of portfolio securities for the account of the Fund, subject always to the terms of the Prospectus and the Adviser's and Fund's codes of ethics, the Portfolio Manager will arrange for the placing of all orders for the purchase and sale of portfolio securities for the account with brokers or dealers selected by the Portfolio Manager, subject to review of this selection by the Board from time to time.  The Portfolio Manager will be responsible for the negotiation and the allocation of principal business and portfolio brokerage.  In the selection of such brokers or dealers and the placing of such orders, the Portfolio Manager will at all times seek for the Fund the best qualitative execution, taking into account such factors as price (including the applicable brokerage commission or dealer spread), the execution capability, financial responsibility and responsiveness of the broker or dealer and the brokerage and research services provided by the broker or dealer.

The Portfolio Manager should generally seek favorable prices and commission rates that are reasonable in relation to the benefits received; provided, however, that in no event shall the Portfolio Manager be under any duty to obtain the lowest commission or best net price for the Fund on any particular transaction.  In seeking best qualitative execution, the Portfolio Manager is authorized to select brokers or dealers who also provide brokerage and research services to the Funds and/or the other accounts over which it exercises investment discretion.  The Portfolio Manager is not under any duty to execute transactions for the Fund before or after transactions for other like accounts managed by the Portfolio Manager, however the Portfolio Manager is required to fairly allocate trades among all accounts managed by the Portfolio Manager consistent with the Adviser's and the Fund's codes of ethics.  The Portfolio Manager may aggregate sales and purchase order of securities or derivatives held in the

SEC-WalczakE-E-0004028

Fund with similar orders being made simultaneously for other portfolios managed by the Portfolio Manager if, in the Portfolio Manager's reasonable judgment, such aggregation shall result in an overall economic benefit to the Fund. The Adviser understands and agrees that when such aggregation does occur the actual prices obtained will be averaged and the Fund will be deemed to have purchased or sole its proportionate share of the securities involved at such average price.

The Portfolio Manager is authorized to pay a broker or dealer who provides such brokerage and research services a commission for executing a Fund portfolio transaction that is in excess of the amount of commission another broker or dealer would have charged for effecting that transaction if the Portfolio Manager determines in good faith that the amount of the commission is reasonable in relation to the value of the brokerage and research services provided by the executing broker or dealer. The determination may be viewed in terms of either a particular transaction or the Portfolio Manager's overall responsibilities with respect to the Fund and to accounts over which the Portfolio Manager exercises investment discretion. The Adviser and the Portfolio Manager understand and acknowledge that, although the information may be useful to the Fund and the Portfolio Manager, it is not possible to place a dollar value on such information. The Board shall periodically review the commissions paid by the Fund to determine if the commissions paid over representative periods of time were reasonable in relation to the benefits to the Fund. The Portfolio Manager may not give consideration to sales of shares of the Fund as a factor in the selection of brokers and dealers to execute Fund portfolio transactions.

The Portfolio Manager's services to the Fund pursuant to this Agreement are not to be deemed to be exclusive and it is understood that the Portfolio Manager may render investment advice, management and other services to others, including other registered investment companies.

7.  <u>Books and Records</u>.  The Portfolio Manager shall maintain the Fund's books and records required to be maintained by it pursuant to Section 2(E) of this Agreement. The Portfolio Manager agrees that all records that it maintains for the Fund are the property of the Adviser and it will promptly surrender any of such records to the Adviser upon the Adviser's request. The Portfolio Manager further agrees to preserve for the periods prescribed by Rule 31a-2 under the 1940 Act any such records as are required to be maintained by the Portfolio Manager with respect to the Fund by Rule 31a-1 under the 1940 Act.

8.  <u>Expenses of the Portfolio Manager</u>.  During the term of this Agreement, the Adviser will pay all expenses (including without limitation the compensation of all trustees or officers of the Trust, if any, who are "interested persons" of the Adviser, as defined in the 1940 Act) incurred by it in connection with its activities under this Agreement, except as set forth otherwise herein and on <u>Schedule B, attached hereto and made a part hereof.</u>

5

9.  **Compensation of the Portfolio Manager**.  For the services provided pursuant to this Agreement, the Adviser will pay to the Portfolio Manager as full compensation therefore the compensation set forth on Schedule B

10. **Liability**.  The Portfolio Manager shall not be liable for any error of judgment or mistake of law or for any loss suffered by the Fund in connection with the matters to which this Agreement relates except (1) a loss resulting from a breach of fiduciary duty with respect to the receipt of compensation for services (in which case any award of damages shall be limited to the period and the amount set forth in Section 36(b)(3) of the 1940 Act), (2) a loss resulting from willful misfeasance, bad faith or gross negligence on its part in the performance of its duties or from reckless disregard by it of its obligations and duties under this Agreement, (3) the Portfolio Manager's failure to adhere to any investment policies and restrictions as described in the Prospectus or (4) from trading errors of the Portfolio Manager that result in a loss that the Adviser reimburses to the Fund.

11. **Duration and Termination**.  The term of this Agreement shall begin on the date of this Agreement and shall continue in effect for a period of two (2) years from the date of this Agreement.  This Agreement shall continue in effect from year to year thereafter, subject to termination as hereinafter.  The Portfolio Manager shall furnish to the Adviser, promptly upon its request, such information as may reasonably be necessary to evaluate the terms of this Agreement or any extension, renewal or amendment thereof.

This Agreement may be terminated at any time on at least 60 day's prior written notice to the Portfolio Manager, without the payment of any penalty by the Adviser. The Portfolio Manager may terminate this Agreement at any time, without the payment of any penalty, on at least 60 days' prior written notice to the Adviser. Termination of this Agreement and/or the services of the Portfolio Manager will not affect (i) the validity of any action previously taken by the Portfolio Manager under this Agreement; (ii) liabilities or obligations of the parties for transactions initiated before termination of this Agreement; or (iii) the Fund's obligation to pay Advisory fees to Adviser.  If this Agreement is terminated by the Adviser or the Portfolio Manager, the Portfolio Manager will have no further obligation to take any action subsequent to termination with respect to the Fund except as may be reasonably required pursuant to the notice of termination and in furtherance of its role as a fiduciary in order to facilitate an orderly transition of the portfolio management of the Fund.

The Adviser further agrees that should the Adviser, or Board of the Trust, terminate the Portfolio Manager without cause, Net Advisory Fees shall continue to accrue as stipulated in Schedule B to the Portfolio Manager as long as the Fund continues in operation, is managed by the Adviser and maintains the cusip number as initially assigned to it. Portfolio Manager can be terminated as portfolio manager without any further Net Advisory Fee obligation with cause for a willful breach in the

SEC-WalczakE-E-0004030

Portfolio Manager's fiduciary responsibility, bad faith, gross negligence, the commitment of fraud or other illegal acts against the Fund or Adviser, violation of regulatory laws and rules that the Fund and Adviser are subject to, any circumstances that would prohibit Portfolio Manager from acting as portfolio manager for the Fund, breach of any terms of this Agreement that are not cured within 15 days after notice of such breach or investment performance in the bottom quartile of the Morningstar Fund category for three years in a row.

12.  Non-Exclusive Management.  The Portfolio Manager may have or take the same or similar positions in specific investments for his own accounts, or for the accounts of other clients, as the Portfolio Manager does for the Fund.  The Adviser expressly acknowledges and understands that Portfolio Manager shall be free to render investment advice to others and that the Portfolio Manager does not make its investment management services available exclusively to the Adviser or the Fund.  Nothing in this Agreement shall impose upon the Portfolio Manager any obligation to purchase or sell, or to recommend for purchase or sale, for the Fund any security which the Portfolio Manager and his affiliates may purchase or sell for their own accounts or for the account of any other client, if in the reasonable opinion of the Portfolio Manager such investment would be unsuitable for the Fund or if the Portfolio Manager determines in the best interest of the Fund such purchase or sale would be impractical.

13.  Good Standing.  The Adviser hereby warrants and represents that it is an investment adviser in good standing, that its regulatory filings are current and accurately reflect its advisory operations, and that it is in compliance with applicable state and federal rules and regulations pertaining to investment advisers.  In addition, the Adviser further warrants and represents that it is (nor any of their respective Associated Persons are) subject to any statutory disqualification set forth in Sections 203(e) and 203(f) of the Investment Advisers Act of 1940 (or any successor Advisers Act sections or rules), nor is it currently the subject of any investigation or proceeding which could result in statutory disqualification.  The Adviser acknowledges that its obligations to advise the Portfolio Manager with respect to these representations shall be continuing and ongoing, and should any representation change for any reason, the Adviser warrants to advise the Portfolio Manager immediately, together with providing the corresponding pertinent facts and circumstances.

14.  Entire Agreement.  This Agreement, including any exhibits and schedules hereto, contains the entire agreement and understanding between the parties hereto, and supersedes any and all prior agreements, arrangements and understandings, relating to the subject matter hereof.  There are no written or oral agreements, understandings, representations or warranties between the parties other than those set forth or referred to in this Agreement.  No supplement, alteration, modification or waiver of this Agreement shall be binding unless consented to in writing by both the Adviser and Portfolio Manager.

SEC-WalczakE-E-0004031

15.     Amendment.  This Agreement may be amended by mutual consent of the Adviser and the Portfolio Manager.  Any such amendment to this Agreement shall be in writing and shall be signed by each party hereto.

16.     Privacy Notice/Confidentiality.  The Portfolio Manager acknowledges prior receipt of the Fund's *Privacy Notice* and *Policy*.  The Portfolio Manager agrees to safeguard all information pertaining to the Fund consistent with the requirements of applicable state and federal privacy statutes pertaining to registered investment advisers.  The Adviser acknowledges that it will have access to and become acquainted with various proprietary and confidential information of the Portfolio Manager.  The Adviser for itself and its shareholders, members, officers, directors, managers, employees, agents, contractors, control persons or affiliates of any thereof, agrees that it will not disclose or publish any of such proprietary and confidential information, directly or indirectly or use them in any way, directly or indirectly, either during or after the term of this Agreement.

17.     Notice.  Any notice, approval, request, authorization, direction or other communication under this Agreement will be given in writing and will be deemed to have been delivered and given for all purposes (i) on the delivery date if delivered personally to the party to whom the same is directed or delivered by facsimile to the appropriate numbers furnished by the parties to each other; (ii) one business day after deposit with a commercial overnight carrier, with written verification of receipt; or (iii) five business days after the mailing date, whether or not actually received, if sent by certified mail, return receipt requested, postage and charges prepaid, to the address of the party to whom the same is directed, as furnished by the parties to each other.

17.     Arbitration.  Subject to the conditions and exceptions noted below, and to the extent not inconsistent with applicable law, in the event of any dispute pertaining to this Agreement, the Portfolio Manager and the Adviser agree to submit the dispute to arbitration in accordance with the auspices and rules of the American Arbitration Association ("AAA"), provided, however, that the AAA accepts jurisdiction.  The Portfolio Manager and the Adviser understand that such arbitration shall be final and binding, and that by agreeing to arbitration, the Adviser and the Portfolio Manager are waiving their respective rights to seek remedies in court, including the right to a jury trial.

18.     Indemnification.  Each party (an "Indemnifying Party") agrees to indemnify and hold harmless the other party (an "Indemnified Party") against any and all loss, liability, claim, damage and expense whatsoever (including reasonable attorneys' and accountants' fees and including the costs of investigating any event related to any action or proceeding between the parties or otherwise) brought by or claimed by any third party arising out of or based upon the other party's bad faith, gross negligence, willful misconduct or material breach of this Agreement.  The foregoing indemnity will be applicable only to such claims as have been reduced to final non-appealable judgment or settled with the written consent of the Indemnifying Party (such consent

SEC-WalczakE-E-0004032

not to be unreasonably conditioned, withheld or delayed).  In claiming any indemnification hereunder, the Indemnified Party will promptly provide the Indemnifying Party with written notice of any claim which the then Indemnified Party believes falls within the scope of this Section; <u>provided</u>, <u>however</u>, that the failure to promptly notify the Indemnifying Party hereunder will not affect the Indemnifying Party's right to indemnification hereunder if such delay did not materially prejudice the defense of such claim.  The Indemnified Party may, at its own expenses, assist and participate in the defense if it so chooses; <u>provided</u>, <u>however</u>, that the Indemnifying Party will control such defense and all negotiations relative the settlement of any such claim; and <u>further</u> <u>provided</u>, <u>however</u>, that any settlement intended to bind the Indemnified Party may not be entered into without the Indemnified Party's prior written consent, which will not be unreasonably conditioned, withheld or delayed.

20.  <u>Governing Law</u>.  (a) This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of laws principles thereof, and (b) any question of interpretation of any term or provision of this Agreement having a counterpart in or otherwise derived from a term or provision of the 1940 Act, shall be resolved by reference to such term or provision of the 1940 Act and to interpretation thereof, if any, by the United States courts or in the absence of any controlling decision of any such court, by rules, regulations or orders of the SEC issued pursuant to said 1940 Act.  In addition, where the effect of a requirement of the Act reflected in any provision of this Agreement is revised by rule, regulation or order of the SEC, such provision shall be deemed to incorporate the effect of such rule, regulation or order.

21.  <u>Severability</u>.  In the event any provision of this Agreement is determined to be void or unenforceable, such determination shall not affect the remainder of this Agreement, which shall continue to be in force.

22.  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

23.  <u>Binding Effect</u>.  Each of the parties hereto expressly warrants and represents that the person signing this Agreement has the full power and authority to sign this Agreement on behalf of the party indicated and that such person's signature will operate to bind the party indicated to the foregoing terms.

24.  <u>Captions</u>.  The captions in this Agreement are included for convenience of reference only and in no way define or limit any of the provisions hereto or otherwise affect their construction or effect.

25.  <u>Change of Control</u>.  The Adviser shall notify the Portfolio Manager and the Trust in writing at least 60 days in advance of any change of control, as defined in Section

9

2(a)(9) of the 1940 Act, as will enable the Trust to consider whether an assignment of the Management Agreement, as defined in Section 2(a)(4) of the 1940 Act, would occur.

26.   Other Business.   Except as set forth above, nothing in this Agreement shall limit or restrict the right of the Portfolio Manager to engage in any other business or to devote the Portfolio Manager's time and attention in part to the management or other aspects of any business, whether of a similar or a dissimilar nature, nor limit or restrict the Portfolio Manager's right to engage in any other business or to render services of any kind to any other corporation, firm, individual or association.

IN WITNESS WHEREOF, the parties hereto have duly caused this Agreement to be executed as of the day and year first above written.

Catalyst Capital Advisors, LLC

By: _____[signature]_____           _____[signature]_____
     Jerry Szilagyi, CEO                  Edward S. Walczak

SEC-WalczakE-E-0004034

Schedule A

**FUND STRUCTURE**

Fund Creation

The Fund will be set up as a new series of shares of beneficial interest of the Trust through a filing with the SEC of a post-effective amendment to Form N1-A. The targeted effective date of the Fund is August 29, 2013. The Fund will be launched through the conversion of the Harbor Assets, LLC commodity pool into the Fund on or about September 3, 2013.

Share Classes

The Fund will initially include "A", "C" and "I" classes of shares. The Adviser and the Portfolio Manager shall mutually agree in writing on the addition of any new classes of shares.

Fee Structure

The Fund will be charged a 1.75% Advisory Fee, calculated based on the Fund's average daily net assets and payable monthly. The Fund will have a Rule 12b-1 distribution plan. The distribution plan will include a 0.25% and 1.00% distribution and service fee for the "A" and "C" classes of shares, respectively.

Sales Charges

The "A" class of shares will have a maximum front-end sales charge of 5.75% with sales charge breakpoints starting at purchase amounts of $50,000. The "C" class of shares will have no front-end sales charge but will have a 1.00% contingent deferred sales charge imposed on redemptions within the first year after purchase. The Fund's distributor will pay selling brokers a 1.00% commission on purchases of "C" class of shares as well as the 1.00% annual rate Rule 12-b-1 fee starting in the 13th month after the purchase. The Rule 12b-1 fees will be paid quarterly.

Expense Caps

The Fund will have a contractual expense cap equal to 2.74%, 3.00% and 3.75% for "I", "A" and "C" classes of shares, respectively, excluding brokerage, interest, taxes, acquired fund fees and expenses, and extraordinary expenses such as litigation. The initial term of such expense cap agreement shall be approximately one year.

Distributions

The Fund intends to pay dividends and capital gains distributions annually, as appropriate.

SEC-WalczakE-E-0004035

**SERVICE PROVIDERS**

Distributor
**Northern Lights Distributors, LLC** will serve as the distributor for the Fund under its contractual arrangement with the Trust.

Administrator
**Gemini Fund Services, LLC** will serve as the administrator, transfer agent and fund accountant for the Fund under its current contractual arrangement with the Trust.

Servicer
**MFund Services LLC**, an affiliate of the Adviser, will provide the Fund with various management services under its current contractual arrangement with the Trust.

Custodian
**Huntington National Bank** will serve as the Fund's custodian under its current contractual arrangement with the Trust.

Auditor
**BBD, LLP** will serve as an independent auditor for the Fund.

12

SEC-WalczakE-E-0004036

Schedule B

**COMPENSATION OF THE PORTFOLIO MANAGER**

Portfolio Manager Fees
The Portfolio Manager will receive one hundred percent (100%) of the Net Advisory Fees paid to the Adviser with respect to the assets transferred from Harbor Assets, LLC, a commodity pool.

The Portfolio Manager will receive sixty percent (60%) of the Net Advisory Fees paid to the Adviser with respect to all assets in the Fund (except for the assets transferred from Harbor Assets, LLC as set forth above) until the Fund's net assets reach $20 million. The Portfolio Manager will receive fifty percent (50%) of the Net Advisory Fees paid to the Adviser with respect to all assets in the Fund (except for the assets transferred from Harbor Assets, LLC as set forth above) after the Fund reaches $20 million in net assets.

"Net Advisory Fees" means gross Advisory Fees collected by the Adviser from the Fund (net of fee waivers due to the expense caps) less any revenue sharing, administration or sub-transfer agency fees, account-based and asset-based fees paid to brokerage firms or custodians with respect to assets in the Fund.

Net Advisory Fees will be paid by the Fund on a monthly basis.

Portfolio Manager Expenses
The Portfolio Manager shall be responsible for paying his expenses related to performing the services to the Fund under this Agreement including but not limited to expenses related to maintaining the Portfolio Manager's office including rent and utilities, compensation of analysts and other staff assisting the Portfolio Manager and all expenses unrelated to servicing the Fund.

Start-up and operating expenses
The Advisor will pay for start-up expenses with respect to registering the Fund with the SEC.  Start-up expenses may include, without limitation, legal and registration fees.  The estimate startup expenses are $10,000.

The Portfolio Manager will pay the short-fall of operating expenses (intended to be covered by the expense cap) during the first year of Fund operation or until the Fund reaches breakeven, whichever is earlier.  If the Fund does not reach breakeven during the first year, the Portfolio Manager and the Adviser will then each pay fifty percent (50%) of the short-fall of the operating expenses until the Fund reaches breakeven.

SEC-WalczakE-E-0004037

"Breakeven" means the Fund is able to support its own expenses under the expense cap without a short-fall contribution.

Commissions
The Portfolio Manager and the Adviser will each pay fifty percent (50%) of the up-front commissions paid to brokerage firms with respect to the sale of "C" class shares of the Fund.

The Portfolio Manager and the Adviser will each receive fifty percent (50%) of the Rule 12b-1 fees paid during the first year and Contingent Deferred Sales Charge ("CDSC") payments with respect to the sale of "C" class shares of the Fund.

The Portfolio Manager will pay sixty percent (60%) of the up-front commissions and marketing fees paid to wholesalers and marketing representatives as compensation for shares of the Fund until the Fund reaches $20 million in net assets. The Portfolio Manager and the Adviser will each pay fifty percent (50%) of the up-front commissions and marketing fees paid to wholesalers and marketing representatives as compensation for shares of the Fund after the Fund reaches $20 million in net assets.

Security Deposit
The Portfolio Manager will be required to provide the Board with a security deposit in the amount of $25,000. The security deposit will be invested in the Fund and will be subject to a security and control agreement, which will afford the Board to access such security deposit to pay expenses should the Portfolio Manager fail to do so.

SEC-WalczakE-E-0004038