# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES SECURITIES<br>AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>EDWARD S. WALCZAK,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) Case No. 3:20-cv-00076 (WMC)<br>)<br>)<br>)<br>) |

## DEFENDANT'S RESPONSE TO
## PLAINTIFF'S STATEMENT OF PROPOSED FINDINGS OF FACT

Defendant Edward S. Walczak, in response to Plaintiff Securities and Exchange Commission's ("SEC" or "Commission") Statement of Proposed Findings of Fact in support of Plaintiff's Motion for Summary Judgment, states as follows.

## I.      Identity of the Parties

1.      The SEC is a federal agency responsible for enforcing the federal securities laws, which include, but are not limited to, the Securities Act of 1933 ("Securities Act"), the Investment Advisers Act of 1940 ("Advisers Act"), and the rules thereunder. (15 U.S.C. § 77t; 15 U.S.C. § 80b-9.)

**RESPONSE:** Undisputed for purposes of this motion.

2.      During the time period of at least January 1, 2015 through at least March 1, 2017, Defendant Edward Walczak was the Senior Portfolio Manager for the Catalyst Hedged Futures Strategy Fund (the "Fund"). (Plaintiff's Appendix of Exhibits, ("PX-1") SEC Complaint (Dkt. #1) at ¶ 17; PX-2, Walczak Answer (Dkt. # 13) at ¶ 17; PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 27, 34-36.)

1

**RESPONSE:** Undisputed.

3.      At all times relevant to the Complaint, Walczak was an investment fiduciary.(PX-2, Walczak Answer (Dkt. # 13) at Affirmative Defense #8.)

**RESPONSE:** Undisputed for purposes of this motion.

## II.    Jurisdiction

4.      Walczak is a resident of Wisconsin. (PX-2, Walczak Answer (Dkt. # 13) at ¶ 15.)

**RESPONSE:** Undisputed.

5.      Walczak is a resident of this District. (PX-2, Walczak Answer (Dkt. # 13) at 15.)

**RESPONSE:** Undisputed.

6.      As Senior Portfolio Manager of the Fund, Walczak worked out of an office in Fitchburg, Wisconsin, his home in Madison, Wisconsin, and, occasionally, his other homes in San Francisco, California and Lahaina, Hawaii. (PX-2, Walczak Answer (Dkt. # 13) at ¶ 17.)

**RESPONSE:** Undisputed.

7.      Walczak knowingly used the means of interstate commerce, including via telephone and email, to engage in communications regarding the Fund. (*See*, *e.g.*, PX-10, Defendant's Responses to Plaintiff's First Set of Requests to Admit ("Defendant's Admissions") at ¶¶ 1, 5, 9, 13, 15, 18, 21, 25, 27, 32, and 35 (Walczak spoke on multiple conference calls about the Fund); PX-10, Defendant's Admissions at ¶¶ 38-39; *see also* PX-20, Edward Walczak (Apr. 4, 2018 Test.) at 509, 516-520.)

**RESPONSE:** Undisputed that Mr. Walczak used means of interstate commerce, including via telephone and email, to engage in communications regarding the Fund and spoke on multiple conference calls about the Fund.  Further responding, Mr. Walczak disputes any further characterizations contained in Paragraph 7.

8.      The SEC brought this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act and Section 209(d) of the Advisers Act. (15 U.S.C. § 77t(d); 15 U.S.C. § 80b-9(d).)

**RESPONSE:** Objection. This is not a fact and not supported in violation of Rule 56.

9.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act and Sections 209(d), 209(e) and 214 of the Advisers Act. (15 U.S.C. §§ 77t(b), 77t(d) and 77v(a); 15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14.)

**RESPONSE:** Objection. This is not a fact and not supported in violation of Rule 56.

**III.    Walczak's Stewardship of the Fund**

Origin as the Harbor Fund

10.      From approximately December 2005 to approximately August 2013, Walczak was the Portfolio Manager for Harbor Assets, LLC (the "Harbor Fund"). (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 26-27.)

**RESPONSE:** Undisputed.

11.      In or about 2013, Walczak was approached by Catalyst Capital Advisors LLC ("Catalyst") and asked whether he would be interested in converting the Harbor Fund to a public

mutual fund. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 68.)

     **RESPONSE:** Undisputed.

     12.     In or about August 2013, the Harbor Fund was converted into a public mutual fund named the Catalyst Hedged Futures Strategy Fund (previously defined herein as the "Fund"). (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 26.)

     **RESPONSE:** Undisputed.

     13.     As a public mutual fund, the Fund could be (and was) offered to a larger universe of potential investors. (PX-67, Expert Report of Arthur Laby dated 8/31/21 ("Laby Expert Report") at 5-6 ("The key difference between public and private funds is that public funds can be sold to any member of the public; investors do not have minimum wealth requirements or any other conditions.").)

     **RESPONSE:** Defendant does not dispute the first sentence of Paragraph 13. The sentence quoted from Prof. Laby is not supported and comprises opinion testimony, thus violating Rule 56, for which reason Defendant objects to that quotation.

     14.     The Fund started with approximately $7 million in assets under management ("AUM"). (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 287.)

     **RESPONSE:** Undisputed.

     15.     Walczak managed the Fund using the same investment objectives, policies and guidelines as before. (PX-3, Inv. Test. Ex. 133 (Fund's Prospectus dated August 29, 2013 (the "August 2013 Prospectus")) at MFST00002908-09 ("The Fund has been managed in the same style

and by the same portfolio manager since the predecessor limited liability company's inception in December, 2005. The Fund's investment goals, policies and guidelines are, in all material respects, equivalent to the predecessor limited liability company's investment goals,policies and guidelines.").)

**RESPONSE:** Walczak admits that the quote from the August 13, 2013 Prospectus is accurate and that he managed the Fund in the same style as he had the Harbor Fund.  Naturally consistent policies and guidelines led to different trading decisions in different market conditions, for which reason the Fund's specific performance did not necessarily match that of the Harbor Fund at all times.  Furthermore, Walczak continually learned from the market and adjusted details of his trading strategy in response; whether such changes amounted to a change in a "policy" or "guideline" is not susceptible of objective determination, and Paragraph 15 is hence denied. During the lifetime of the Fund, trigger levels for various risk metrics evolved, and Catalyst imposed additional risk controls on the Fund, thereby further altering details of the Fund's trading practices.  As it is not clear how to answer whether such incremental changes ever amounted to a change in policy or guideline, Walczak again disputes the allegations in Paragraph 15.

16.     Since at least 2013, Jerry Szilagyi has been CEO of Catalyst. Catalyst, at least until April 9, 2018, was based in Huntington, New York. (PX-21, Jerry Szilagyi (Apr. 9, 2018 Test.) at 26.)

**RESPONSE:** Undisputed.

17.     Since June 2006, Catalyst has been registered with the Commission as an investment adviser. (PX-2, Walczak Answer (Dkt. # 13) at ¶ 19; PX-3, August 2013 Prospectus at MFST00002924.)

**RESPONSE:** Undisputed.

The Portfolio Manager Agreement

18.     In connection with the conversion of the Harbor Fund into the Fund, Walczak and

Catalyst entered into a Portfolio Manager Agreement dated as of August 27, 2013. (PX-32, Edward

Walczak (Mar. 19, 2021 Arb. Dep.) at 53 and PX-33, Arbitration Ex. #1.)

**RESPONSE:** Undisputed.

19.     The Portfolio Manager Agreement sets forth Walczak's "duties" as the Fund's

Portfolio Manager, which included that he "shall act in conformity with the [Mutual Fund Series

Trust's] declaration of trust, its by-laws and the Prospectus and with the reasonable instructions and

directions of the Adviser and the Board, and will conform to and comply with the requirements of

the [Investment Company Act of 1940] and all other applicable federal and state laws and

regulations." (PX-33, Arbitration Ex. #1 at page SEC-WalczakE-E-0004025; PX-32, Edward

Walczak (Mar. 19, 2021 Arb. Dep.) at 56-58.)

**RESPONSE:** Objection. Calls for a legal conclusion. Subject to the objection, Walczak

disputes Paragraph 19 on the grounds that it fails fully and accurately to set forth the terms of the

Portfolio Manager Agreement ("PMA"), which must be read in their entirety.  The PMA does not

*only* set forth "Walczak's 'duties,'" and consideration of specific provisions in isolation is

misleading.  *See generally* PX 33 (PMA).  Subject to those reservations, Defendant does not

dispute Paragraph 19.

20.     Pursuant to the Portfolio Manager Agreement, Walczak also agreed to provide a

6

"continuous investment program for the Fund," and to manage the Fund "in accordance with the … Prospectus." (PX-33, Arbitration Ex. #1 at page 0004026; PX-32, Edward Walczak (Mar. 19, 2021 Arb. Dep.) at 56-58.)

      **RESPONSE:**  Objection. Calls for a legal conclusion. Subject to the objection, Paragraph 20 is undisputed for the purposes of this motion.

      21.     Walczak was responsible for ultimate determination of trades, position adjustments, the core portfolio management responsibilities. (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 34-36, 235-36.)

      **RESPONSE:** Disputed.  First, Paragraph 21 specifies no time frame for its assertion, and it is certainly not true for all time.  Second, Paragraph 21 does not specify *which entity's* trades, position adjustments, or portfolio management allegedly fell to Walczak, and Walczak does not thus control *all* trading.  Third, the source cited does not support the contention in Paragraph 21, for Walczak stated within that same document that he was *responsible* for making investment decisions, but not necessarily *solely* responsible. PX 19 (Walczak Apr. 3, 2018 Testimony) at 263:23 to 264:15.  Indeed, fourth, Jerry Szilagyi was also authorized to trade on behalf of the Fund throughout Walczak's time with Catalyst.  Ex. DX 40 (June 7, 2021 Transcript from *Walczak v. Catalyst Capital Advisors, LLC*, AAA Case No. 01-20-0003-8157 ("Arbitration Day 1")) at 149:19 to 150:4 (testimony of Mr. Szilagyi); *see also* PX 33 (Portfolio Manager Agreement) §§ 2, 5 (Walczak was subject to the general supervision of Catalyst and the Board); DX 37 (April 3, 2018 Investigative Testimony of Edward S. Walczak ("Walczak Testimony II")) at 37:15-20 ("[W]hen certain of our risk triggers were activated, particularly in December of 2016, then a Catalyst risk committee was convened, and reactions to the determination of the best measures to take to alleviate the -- the risk condition were made jointly.").

22.      During the period of August 2013 to at least April 1, 2017, Walczak did not need anyone else's approval to make trades for the Fund. (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 36-38.)

**RESPONSE:**  Undisputed as to 2013 through 2015.  Beginning in 2016, when certain risk metrics were triggered, Walczak's management of the Fund was subject to the approval of Catalyst's risk committee.  *E.g.*, DX 37. Walczak Testimony II, at 37:15-20.

23.      In or about December 2014, Kimberly Rios was hired to assist Walczak. (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 33; *see* PX-11, Kimberly Rios (Apr. 20, 2021 Dep.) at 201; PX-35, Kimberly Rios Declaration dated 9/20/2021 ("Rios Declaration") at ¶ 1.)

**RESPONSE:** Undisputed.

24.      Walczak was the sole portfolio manager of the Fund from approximately August 2013 until at least the hiring of Rios. (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 299.)

**RESPONSE:** Undisputed.

25.      At some point after she was hired, Rios became the Assistant Portfolio Manager for the Fund. (PX-12, Kimberly Rios (Apr. 21, 2021 Dep.) at 89; PX-35, Rios Declaration at ¶ 1.)

**RESPONSE:** Undisputed.

26.      At any point that Rios was the Assistant Portfolio Manager for the Fund, Walczak was the Senior Portfolio Manager for the Fund. (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 27, 34; *see* PX-12, Kimberly Rios (Apr. 21, 2021 Dep.) at 110.)

**RESPONSE:**  Undisputed from 2013 through March 2018.  Neither source cited by Plaintiff (PX 19 at 27, 34 or PX 12 at 110) supports the claim in Paragraph 26 beyond March 2018, and Walczak denies the same.

27.     As Assistant Portfolio Manager, Rios was responsible for analyzing markets, positions, suggesting trades, and responding to Walczak's requests for information. (PX-19,Edward Walczak (Apr. 3, 2018 Test.) at 34-36.)

**RESPONSE:**  Undisputed that Rios bore such duties, but these were not Rios's only responsibilities on behalf of the Fund.  *E.g.*, DX 37, Walczak Testimony II, at 35:4-9.

28.     At some point, Rios had increased responsibility for the fixed income portion of the Fund's portfolio. (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 34-36.)

**RESPONSE:** Undisputed.

29.     Although the goal was that Rios would someday participate directly in the trading of the Fund, that did not happen, not even with respect to the fixed income portion of the Fund's portfolio. (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 34-36.)

**RESPONSE:** Disputed. DX 37, Walczak Testimony II, at 36:3-8.

30.     From her date of hire through at least February 2017, Rios reported to Walczak, and Walczak, not Rios, had the final say on what actions to take with respect to the Fund. (PX- 12, Kimberly Rios (Apr. 21, 2021 Dep.) at 110; PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 34-36 ("Q: So at all times you have the final say on what the Fund is doing? A: Correct.").)

**RESPONSE:** Disputed. DX 30 (Investigative Testimony of Kim Rios, February 23, 2018 ("Rios Testimony I")) at 56. Furthermore, Jerry Szilagyi was also authorized to trade on behalf of the Fund throughout Walczak's time with Catalyst.  Ex. DX 40, Arbitration Day 1, at 149:19 to 150:4 (testimony of Mr. Szilagyi); *see also* PX 33 (Portfolio Manager Agreement) §§ 2, 5 (Walczak was subject to the general supervision of Catalyst and the Board); DX 37, Walczak Testimony II, at 37:15-20 ("[W]hen certain of our risk triggers were activated, particularly in December of 2016, then a Catalyst risk committee was convened, and reactions to the determination of the best measures to take to alleviate the -- the risk condition were made jointly.").

Walczak's Compensation

31.     The Portfolio Manager Agreement, at Schedule B, set forth Walczak's compensation as the Portfolio Manager of the Fund. (PX-33, Arbitration Ex. #1 at page SEC-WalczakE-E-0004037; PX-32, Edward Walczak (Mar. 19, 2021 Arb. Dep.) at 64.)

**RESPONSE:** Undisputed that Schedule B of the PMA set forth the formula by which Walczak was to be compensated by Catalyst.  The source cited by Plaintiff (PX 32 at 64) does not support the contention that Catalyst in fact paid Walczak according to that formula, and Walczak denies the same.

32.     Walczak received 60% of the Net Advisory Fees paid to Catalyst with respect to all assets in the Fund until the Fund's net assets reached $20 million, and then 50% of such fees after the Fund's net assets exceeded $20 million. (PX-33, Arbitration Ex. #1 at page SEC-WalczakE-E-0004037; PX-32, Edward Walczak (Mar. 19, 2021 Arb. Dep.) at 64.)

**RESPONSE:** Disputed.  The sources plaintiff cites in support of Paragraph 32 (PX 33 and PX 32 at 64) stand solely for the contention that Walczak *was to be paid* amounts set by a particular formula, not that he actually received such payments, and Walczak denies that he was paid in keeping with the PMA's formula.  Furthermore, Paragraph 32 misstates the formula by ignoring the assets transferred from Harbor Assets, LLC, and Walczak accordingly denies that the formula set forth in Paragraph 32 is correct as stated.  PX 33 Schedule B.  In addition, Paragraph 32 proposes a compensation formula based on "Net Advisory Fees" without setting forth the definition of that term as provided in the PMA, and for any definition other than that provided by the PMA, Walczak denies that this is the correct formula.  *See* PX 33 Schedule B.

33.     The Fund's assets under management grew from nearly $18 million at the end of 2013 to: over $500 million at the end of 2014; over $2 billion at the end of 2015; and approximately $4 billion at the end of 2016. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 194; PX-20, Edward Walczak (Apr. 4, 2018 Test.) at 369, 397-98, 405, 427; PX-32, Edward Walczak (Mar. 19, 2021 Arb. Dep.) at 78 ("Q: And is it accurate the fund grew from 6 million in 2013 to 4 billion by November 2016? A: Yeah. I don't know the numbers. Sounds roughly correct.").)

**RESPONSE:** Undisputed.

34.     Walczak was paid for his work on the Fund at a rate of approximately $8 million per $1 billion of Fund AUM. (PX-20, Edward Walczak (Apr. 4, 2018 Test.) at 349.)

**RESPONSE:**  Disputed, in so much as Paragraph 34 does not (as it claims) set forth a *rate*, providing no indication of the time period over which the indicated amount was to be paid.  The source cited by Plaintiff in support of Paragraph 34 (PX 20 at 349) likewise provides no evidence for the time period over which Walczak was to receive such payments and hence the intended *rate*

of his compensation. *See* DX 38 (April 4, 2018 Investigative Testimony of Edward S. Walczak ("Walczak Testimony III")) at 349.

35.     Walczak was compensated in excess of $24 million in 2016 alone pursuant to the Portfolio Manager Agreement. (PX-2, Walczak Answer (Dkt. #13) at ¶ 2.)

**RESPONSE:** Undisputed.

36.     Walczak set Rios's compensation. (PX-17, Kimberly Rios (Feb. 23, 2018 Test.) at 83.)

**RESPONSE:** Undisputed.

37.     In 2016, Rios was paid for her work on the Fund at a rate of approximately $100,000 for every $1 billion of Fund AUM. (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 313-15.)

**RESPONSE:** Disputed, in so much as Paragraph 37 does not (as it claims) set forth a *rate*, providing no indication of the time period over which the indicated amount was to be paid. The source cited by Plaintiff in support of Paragraph 37 (PX 19 at 313-15) likewise provides no evidence for the time period over which Rios was to receive $100,000 in compensation for each $1 billion in Fund AUM and hence the intended *rate* of her compensation. *See* DX 37. Walczak Testimony II, at 313-15.

38.     At the end of 2015, when the Fund's AUM was approximately $2 billion, Rios was paid for her work on the Fund at a rate of approximately $200,000/year. (PX-20, Edward Walczak (Apr. 4, 2018 Test.) at 397-98, 405; PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 313-15.)

**RESPONSE:** Disputed that "[a]t the end of 2015 … the Fund's AUM was approximately $2 billion," as the evidence cited by Plaintiff in support of this contention (PX 20 at 397-98, 405 and PX 19 to 313-15) speaks only of the Fund's AUM in November 2015, not the end of the year, and the phrase "approximately $2 billion" is inherently insusceptible of clear determination as true or false, in so much as the range that would qualify as "approximately $2 billion" has not been defined.  Furthermore, disputed that Rios was paid for her work on the Fund at the indicated rate at the end of 2015, as the sources cited by Plaintiff do not discuss Rios's compensation in that period at all.  *See* PX 20 at 397-98, 405; PX 19 at 313-15.

39.     At the end of 2016, when the Fund's AUM was approximately $4 billion, Rios was paid for her work on the Fund at a rate of approximately $400,000/year. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 194; PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 313-15.)

**RESPONSE:** Disputed that Rios was paid for her work on the Fund at the indicated rate at the end of 2016, as the sources cited by Plaintiff do not discuss Rios's compensation in that period at all.  *See* PX 16 at 194 (mentioning Fund AUM but not Rios's compensation); PX 19 at 313-15 (discussing Rios's compensation in 2018, not the end of 2016).

IV.     **The Fund's Investment Strategy and Related Risks**

40.     At all relevant times, the Fund held positions in options based on Standard & Poor's ("S&P") 500 index futures contracts. (PX-68, Expert Report of Neil D. Pearson dated August 31, 2021 ("Pearson Expert Report") at ¶ 11.)

**RESPONSE:** Undisputed.

41.     The Fund also held positions in money market funds, short-term notes and bonds,

and other low-risk fixed income instruments but the Fund's options positions were responsible for almost all of the Fund's risk. (PX-68, Pearson Expert Report at ¶ 11.)

**RESPONSE:** Undisputed.

42.     A futures contract is as an agreement to buy or sell a particular commodity or asset at a predetermined price at a specified time in the future. S&P 500 index futures contracts are traded on the Chicago Mercantile Exchange ("CME"). In this contract, the buyer does not buy, and conversely the seller does not sell, the S&P 500 stock index on the delivery date but rather the buyer receives, and the seller makes, a cash payment equal to 250 times the value of the index. The price of this futures contract closely tracks the S&P 500 stock index. (PX-68, Pearson Expert Report at ¶¶ 17-18.)

**RESPONSE:** Disputed that the buyer receives, and the seller makes, the full cash payment as set forth in Paragraph 42, as such futures contracts are in practice traded on margin and often through a broker, so that the actual payments per contract are smaller than suggested in Paragraph 42.  Otherwise, Paragraph 42 is undisputed.

43.     Options on futures contracts, often referred to as futures options, are traded on futures exchanges. S&P 500 futures options, which are based on the S&P 500 index futures contract, trade on the CME. (PX-68, Pearson Expert Report at ¶¶ 21, 23.)

**RESPONSE:** Undisputed.

44.     Because the underlying futures price tracks the S&P 500 index, this options contract ultimately is based on the S&P 500 index and provides exposure to changes in the value of that index. (PX-68, Pearson Expert Report at ¶ 23.)

**RESPONSE:** Undisputed.

45.     There are two kinds of options, call options and put options.  A call option gives the holder the right to buy an underlying financial instrument (such as a futures contract) at a fixed price, called the strike price, either on, or alternatively, on or before, a specified date (the expiration date). A put option gives the holder the right to sell the underlying financial instrument in exchange for the strike price on, or on or before, the expiration date. (PX-68, Pearson Expert Report at ¶ 19.)

**RESPONSE:**  Undisputed that calls and puts are classes of options; disputed that they are the only possible categories of options; consider, for instance, foreign exchange options that are simultaneously calls on one currency and puts on another currency, or convertible bonds or swaptions that contain embedded options to trade one asset or series of cash flows for another, rather than immediately trading a fixed amount of currency versus a financial instrument.  Disputed that all calls and puts involve fixed strike prices; consider, for instance, options on bonds, in which carried interest is calculated at the time of option exercise and affects the price at which the bond trade is consummated.  But Walczak does not dispute that there exist call and put options with the characteristics set forth in Paragraph 45.

46.     Changes in the prices of the S&P 500 call and put futures options rise and fall with changes in the prices of the underlying futures contracts, which in turn follow the S&P 500 index. In addition, the prices of these options depend upon their strike prices, the time remaining to expiration, the volatility of the underlying futures price, and the risk-free interest rate. (PX-68, Pearson Expert Report at ¶ 24.)

**RESPONSE:**  Undisputed that the prices of S&P 500 call and put futures options are affected by their strike prices, the time remaining to expiration, the perceived volatility of the

underlying futures price, and the risk-free interest rate, as well as the prices of the underlying S&P 500 futures contracts.  Disputed that the prices of such options predictably rise and fall with changes in the prices of the underlying futures contracts, as such changes in the underlying futures contracts necessarily occur in conjunction with decreases in the time remaining to expiration and typically occur in conjunction with changes in the perceived volatility of the underlying futures prices, with such changes to time and volatility altering and potentially reversing the effect on the price of an option that might be expected based on an instantaneous change to the underlying futures price in the absence of changes to any other market variable.  Also disputed to the extent that Paragraph 46 suggests that option prices depend on realized volatility as opposed to anticipation of future volatility, or that option prices for all strikes depend solely on the market's best estimate of the likely future volatility of the underlying price.  Disputed to the extent that Paragraph 46 implies that the listed market variables are the *only* ones that affect the prices of S&P 500 futures options.  Disputed to the extent that Paragraph 46 implies that that volatility and the risk-fee rate are scalar values, equivalent for all expirations, or known with certainty in advance.

47.     During the period running from November 1, 2016 through February 28, 2017, the Fund's options position consisted primarily of call options. (PX-68, Pearson Expert Report at ¶ 31.)

**RESPONSE:** Undisputed.

48.     During the period running from November 1, 2016 through February 28, 2017, the Fund both purchased and sold call options, most commonly in the form of a trade known as a 1:3 ratio spread. In this trade, the Fund purchased call options with a strike price above the current S&P 500 index value and sold call options with a strike price typically 50 points higher than the strike price of the purchased calls. The Fund often sold three times as many call options as it

purchased (i.e., a 1:3 ratio spread), with the cost of the purchased options offset (in full or substantial part) by the premium received from the sold options. (PX-68, Pearson Expert Report at ¶ 31.)

**RESPONSE:** Undisputed that during the period running from November 1, 2016 through February 28, 2017, the Fund both purchased and sold call options. Undisputed that some of these trades were in the form of 1:3 ratio spreads. Disputed that the Fund "most commonly" traded in that fashion during the indicated period, as several trades instead involved rolling options to later expirations or buying back short options. *See generally* DX 48 to DX 69 (trade logs). Undisputed that the Fund's 1:3 ratio spread trades involved two strikes, both commonly above the current S&P 500 index value, with three times the size on the high strike as compared to the low strike. Disputed that 1:3 ratio spread trades necessarily involve buying the low-strike call and selling the high-strike call, as the Fund sometimes entered into the opposite trade to reduce risk or realize a profit. Undisputed that the Fund's 1:3 ratio spreads often had the high strike 50 points above the low strike during the indicated period, but this was not always the case. *See id.* Undisputed that when the Fund entered 1:3 ratio spreads, the proceeds from selling the high-strike call offset, in full or in substantial part, the premium for the low-strike call.

49.     For example, on November 11, 2016, the Fund purchased 1,000 options based on the March 2017 S&P 500 futures price expiring on the third Friday of February 2017 (the "February Week 3 options") with a strike price of 2,230, and sold 3,000 February Week 3 options with a strike price of 2,280. At the time of the trade the price of the March 2017 S&P 500 futures, the options' underlying financial instrument, was approximately 2,155. (PX-68, Pearson Expert Report at ¶ 31.)

**RESPONSE:** Disputed. The Fund traded no February Week 3 options with a strike price

of 2,230 or 2,280 on November 11, 2016.  DX 52 (Fund trade log for November 2016) at Rows 64 to 70.  Undisputed that the price of the March 2017 S&P 500 futures was approximately 2,155 for part of November 11, 2016.

50.     The net payoff of such a position is positive when the futures price falls between a given range (in this example, 2,230 and 2,305), and negative when the futures price moves above that range. In other words, the net payoff becomes negative when the amount owed on the 3,000 sold options with strike price 2,280 exceeds the amount received from the 1,000 purchased options with a strike price of 2,230. (PX-68, Pearson Expert Report at ¶ 32 & Ex. 4.)

**RESPONSE:** Disputed on the ground that, as noted in response to Paragraph 49, the Fund made no such trades on November 11, 2016, so that there were in particular no "3,000 sold options with strike price 2,280" or "1,000 purchased options with a strike price of 2,230."  DX 52 (Fund trade log for November 2016) at Rows 64 to 70.  The first sentence is disputed in so much as it does not specify *when* the futures price must fall within these ranges to have the indicated effect. Furthermore, the first sentence is disputed as it ignores the effect of potential hedging trades and other adjustments to the position that can be implemented between trade entry and expiration.

51.     The total profit or loss from the trade is the difference between the net payoff and the initial net cost of the ratio spread, which is the difference between the amount paid for the options with a strike price of 2,230 and the amount received from selling the options with a strike price of 2,280.  In essence, this 1:3 ratio spread is a bet that the futures price will be close to 2,280 on the expiration date of the options. (PX-68, Pearson Expert Report at ¶ 33.)

**RESPONSE:** Disputed on the ground that, as noted in response to Paragraph 49, the Fund made no such trades on November 11, 2016, so that there was in particular no "amount paid for the

options with a strike price of 2,230" or "amount received from selling the options with a strike price of 2,280." DX 52 (Fund trade log for November 2016) at Rows 64 to 70. The first sentence is disputed as it ignores the effect of potential hedging trades and other adjustments to the position that can be implemented between trade entry and expiration. Disputed that the hypothetical 1:3 ratio spread under discussion in Paragraph 51 would constitute a "bet" on the futures price on the expiration date of the options, as this again ignores Walczak's ability to trade around the position between trade entry and option expiration so as to change the profit potential for the Fund's portfolio as a whole. Disputed that the profitability of the hypothetical ratio spread is based on having the futures price be "close to 2,280 on the expiration date," both because "close to" is ill-defined and because Plaintiff's own alleged range of profitable futures prices, as set forth in Paragraph 50, runs from 2,230 to 2,305 and is thus centered at 2,267.50, not 2,280.

52.     The Fund held positions in a number of ratio spreads on most days during the period running from November 1, 2016 through February 28, 2017, and often held other positions in calls. (PX-68, Pearson Expert Report at ¶ 35.)

**RESPONSE:** Undisputed.

53.     Between November 2016 and February 2017, the Fund faced market conditions that Walczak said are "normally unfavorable" to the strategy, "i.e.[,] a rapid upside move in extremely low volatility conditions." (PX-25, Inv. Test. Ex. 67 (2/14/17 Email from E. Walczak to M. Schooner); PX-20, Edward Walczak (Apr. 4, 2018 Test.) at 684 ("This was a – I was asked to provide a commentary on the fund's performance during this period of time, and this was my first draft.").)

**RESPONSE:** Undisputed.

54.     Walczak acknowledged that these conditions tended to be "less favorable" than other market conditions.  (PX-15, Edward Walczak (7/27/21 Dep.) at 254.).

**RESPONSE:** Undisputed.

## V.     The Fund's Prospectus and Investment Presentations Emphasized the Importance of Risk Managmeent to the Fund's Investment Objective and Strategy.

55.     The August 2013 Prospectus was the Fund's initial prospectus. (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 115-116; PX-3, Inv. Test. Ex. 133 at MFST00002903).)

**RESPONSE:** Undisputed.

56.     From time to time, the Fund's prospectus was amended and reissued. (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 126.) For instance, prospectuses for the Fund were filed ith the Commission dated November 1, 2014, November 1, 2015, November 1, 2016, and April 6, 2017. (PX-4, Mutual Fund Series Trust, SEC Form N-1A (Nov. 1, 2014) ("November 2014 Prospectus"), available at https://www.sec.gov/Archives/edgar/data/1355064/ 000091047214004753/catalyst485b.htm (last visited 11/15/2021); PX-6, Mutual Fund Series Trust, SEC Form N-1A (Nov. 1, 2015) ("November 2015 Prospectus"), available at https://www.sec.gov/Archives/edgar/data/1355064/000158064215004879/catalyst485b.htm (last visited 11/15/2021); PX-7, Mutual Fund Series Trust, SEC Form N-1A (Nov. 1, 2016) ("November 2016 Prospectus"), available at https://www.sec.gov/Archives/edgar/data/1355064/ 000158064216011739/catalysthedged485b.htm (last visited 11/15/2021); PX-8, Mutual Fund Series Trust, SEC Form N-1A (Apr. 6, 2017) ("April 2017 Prospectus"), available at https://www.sec.gov/Archives/edgar/data/1355064/000158064217002187/hedgedincome_485b.h tm (last visited 11/15/2021).)

**RESPONSE:** Undisputed.

57.     Walczak is identified as the Fund's sole Portfolio Manager in the Fund's August 2013 Prospectus, November 2014 Prospectus, November 2015 Prospectus, November 2016 Prospectus, or April 2017 Prospectus. (PX-3, Inv. Test. Ex. 133 at MFST00002910 (identifying Waclzak as the Fund's sole Portfolio Manager); PX-4, November 2014 Prospectus at 45 (same); PX-6, November 2015 Prospectus at 47 (same); PX-7, November 2016 Prospectus at 25 (same); PX-8, April 2017 Prospectus at 19 (same).)

**RESPONSE:** Undisputed.

58.     The August 2013 Prospectus discloses the Fund's investment objective asfollows: "The Fund's goal is capital appreciation and capital preservation in all market conditions, with low volatility and low correlation to the US equity market." (PX-19, EdwardWalczak (Apr. 3, 2018 Test.) at 139-140; PX-3, Inv. Test. Ex. 133 at MFST00002905.)

**RESPONSE:** Undisputed.

59.     The same investment objective (quoted in Paragraph 58, above) also is contained in the November 2014 Prospectus, November 2015 Prospectus, November 2016 Prospectus, and April 2017 Prospectus. (PX-4, November 2014 Prospectus at 40; PX-6, November 2015 Prospectus at 42; PX-7, November 2016 Prospectus at 20; PX-8, April 2017 Prospectus at 14; *see also* PX-32, Edward Walczak (Mar. 19, 2021 Arb. Dep.) at 82-83 (testifying as to the Fund's investment objective as disclosed in the November 2016 Prospectus).)

**RESPONSE:** Undisputed.

60.     To help prepare the August 2013 Prospectus, Walczak provided Catalyst with a copy of the Harbor Fund's Private Placement Memorandum ("PPM"). (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 118.)

**RESPONSE:** Undisputed that Walczak provided Catalyst with a copy of the Harbor Fund's Private Placement Memorandum.  Dispute that he did so exclusively "[t]o help prepare the August 2013 Prospectus." *See* PX 19 at 118 (providing no indication of such exclusivity).

61.     Walczak had the ultimate responsibility to determine whether the Harbor Fund PPM was truthful, accurate, and complete. (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 112.)

**RESPONSE:** Undisputed, provided this statement relates to responsibilities *as of the release date of such PPM*.  Walczak expressly disclaimed responsibility for maintaining the veracity of such PPM after its release date.  *See* PX 28; DX 1; DX 2.

62.     The Harbor Fund's PPM contained the following statement about riskmanagement:

> Once trades are entered, the Manager employs strict risk management procedures that are triggered by total portfolio exposure rather than individual position value. Supported by sophisticated options analysis software and many years of options trading experience, the Manager determines the correct portfolio adjustment.

(PX-28, CFTC Ex. 2 at 28; *see also* PX-22, George Amrhein (Apr. 11, 2018 Test.) at 83.)

**RESPONSE:** Undisputed that the Harbor PPM presented as PX 28 includes the quoted language.  Answering further, Walczak states that the Harbor PPM must be read in its entirety to provide appropriate context for assertions that Plaintiff presents here in isolation.

63.     The Harbor Fund's PPM did not contain any detailed explanation about how the Manager used "sophisticated options analysis software." (*See* PX-28, CFTC Ex. 2 at 28 (using

words "sophisticated options analysis software" without further explanation).)

      **RESPONSE:** Undisputed.

      64.    The "Principal Investment Strategies" section of the August 2013 Prospectus contains the following representation about risk management:

> The Fund places a strong focus on risk management that is intended to provide consistency of returns and to mitigate the extent of losses. Positions are entered on a continuous basis across different option exerciseprices and expiration months. Supported by sophisticated options analysis software, the Fund employs strict risk management procedures to adjust portfolio exposure as necessitated by changing market conditions.

(PX-3, Inv. Test. Ex. 133 at MFST00002906.)

      **RESPONSE:** Undisputed that the August 2013 Prospectus for the Fun includes the quoted language.  Answering further, Walczak states that the Fund Prospectus must be read in its entirety to provide appropriate context for assertions that Plaintiff presents here in isolation.

      65.    This same language is used for the "Principal Investment Strategies" section of the 'November 2014 Prospectus, November 2015 Prospectus, and November 2016 Prospectus. (PX-4, November 2014 Prospectus at 41; PX-6, November 2015 Prospectus at 43; PX-7, November 2016 Prospectus at 21.)

      **RESPONSE:** Undisputed.

      66.    The August 2013 Prospectus does not contain any detailed explanation about how the Fund or its portfolio manager uses the "sophisticated options analysis software." (PX-3, Inv. Test. Ex. 133 at MFST00002906 (using words "sophisticated options analysis software" without further explanation).)

**RESPONSE:** Undisputed.

67.    The November 2014 Prospectus, November 2015 Prospectus, and November 2016 Prospectus also do not contain any detailed explanation about how the Fund or its portfolio manager uses the "sophisticated options analysis software." (PX-4, November 2014 Prospectus at 41; PX-6, November 2015 Prospectus at 43; PX-7, November 2016 Prospectus at 21.)

**RESPONSE:** Undisputed.

68.    Walczak reviewed the "Principal Investment Strategies" section of the August 2013 Prospectus before it was finalized and issued. (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 120-122.)

**RESPONSE:** Disputed.  In the source cited (PX 19 at 120-22), Walczak states that he received "a portion" of the August 2013 Prospectus, but he does not state that the portion included the entirety of the Principal Investment Strategies section.  PX 19 at 121:13-19.  He states that he was asked to comment on "the parts that I could — that I was qualified to comment on," but he again does not suggest that such parts encompassed the entirety of the Principal Investment Strategies section.  PX 19 at 120:22 to 121:19 ("[D]oes this accurately describe what you do."); *compare* PX 3 at 2-3 (discussing the Internal Revenue Code of 1986 and the Investment Company Act of 1940 within the Principal Investment Strategies section).

69.    Walczak reviewed the "Principal Investment Strategies" sections of the Fund's revised prospectuses. (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 126, 130.)

**RESPONSE:** Disputed.  As discussed in response to Paragraph 68, Walczak's testimony in PX 19 shows only that he reviewed *parts* of the Principal Investment Strategies sections of some

Fund prospectuses, not necessarily all of those sections. *Accord* PX 19 at 126:19-22 ("I recall being asked, subsequent to the initial prospectus, to take a look again at the investment strategy and make sure it correctly reflected what I was doing."). Moreover, the source cited provides no evidence that Walczak conducted this review on *all* of the Fund's revised prospectuses, and indeed he clarifies, "I'm relatively certain that what reviews I did were earlier rather than later in the life of the fund." PX 19 at 130:18-20.

70.    Walczak understood that a prospectus has to be true, accurate, and complete. (PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 131.)

**RESPONSE:** Undisputed.

71.    Catalyst and Walczak also developed a quarterly "Investor Presentation," which was posted on Catalyst's website. (PX-52, CFTC3_00033220 (4/6/14 email from E. Walczak to M. Schoonover); PX-55, SEC_04_0371036 (5/14/14 email from E. Walczak to M. Schoonover).)

**RESPONSE:**  Undisputed that Catalyst developed quarterly Investor Presentations. Disputed that Walczak did so. Indeed, of the two sources cited by Plaintiff for this proposition, PX 52 shows Catalyst asking Walczak for help with its own project, and PX 55 has Walczak emphasizing that Catalyst employee Michael Schoonover was "the keeper of the … Investor presentation."

72.    Catalyst and the Catalyst wholesalers also emailed the quarterly "Investor Presentation" directly to investment advisers. (*E.g.,* PX-56, SEC_04_0370869 (6/2/14 email from E. Walczak to R. Bomberg); PX-54, CFTC3_00033148 (4/16/14 email from E. Walczak to R. Bomberg); PX-59, CFTC3_00028255 (8/25/14 email from J. Szilagyi to E. Ford).) Walczak was

sent emails reflecting this practice. (*Id.*)

**RESPONSE:**  Undisputed.

73.     Walczak sent the "Investor Presentation" to investment advisers directly (PX-51, SEC_04_0371241 (1/30/14 email from E. Walczak to K. Boll) and also requested that others send the "Investor Presentation" to investment advisers. (PX-53, CFTC3_00033203 (4/7/14 email from E. Walczak to M. Schoonover).)

**RESPONSE:**  Undisputed that Walczak sent the Investment Presentation to investment advisers.  Undisputed that Walczak asked Michael Schoonover to send "the most current approved marketing material on the Fund" to an investment adviser, but the sources cited by Plaintiff in support of Paragraph 73 do not indicate that Walczak explicitly asked for anyone to send the "Investor Presentation" in particular to anyone, and accordingly Defendant disputes that contention.

74.     Walczak was responsible for the substantive content of the Fund's quarterly "Investor Presentation." (PX-52, CFTC3_00033220 (4/6/14 email from E. Walczak to M. Schoonover reflecting Walczak's review and edit of Q1 2014 Investor Presentation); PX-19, Edward Walczak (Apr. 3, 2018 Test.) at 186-88) (discussing investor presentation and testifying, "But for the most part[,] I'll say that I developed or authored much of this."); *see also id.* (PX- 19) at 190; 195 ("[A]s I said, most of this [presentation] is my authorship."))

**RESPONSE:** Disputed.  The presentations were approved in New York.  DX 30, Rios Testimony I, at 178; *see also* DX 37, Walczak Testimony II, at 188:22-24 ("Some of the graphics were done by others.  Some of the wording looks a little different than I remember."); *id* at 189:16-

25 (suggesting that the initial language came from "some combination of myself and Ms. Rios").

Further, Walczak disputes Paragraph 74's contention that he "was responsible for the substantive

content" of the Investor Presentation, as the allegation does not specify the period or periods in

which he supposedly bore such responsibility, and none of the sources cited by Plaintiff in support

of Paragraph 74 mention the phrase "substantive content."

75.    The Fund's quarterly "Investor Presentation" for the second quarter of 2016 (the

"Q2 2016 Investor Presentation") and the second quarter of 2015 (the "Q2 2015 Investor

Presentation") both state that part of the Fund's "Daily Investment Process" is to "Stress Fund for

Risk" and "Make Adjustments if Needed" and include this graphic:



(PX-27, Inv. Test. Ex. 85 (Q2 2016 Investor Presentation) at 6; PX-23, Inv. Test. Ex. 22 (Q2 2015

Investor Presentation) at 7 (page 11 of 37 of the PDF).)

**RESPONSE:** Undisputed that the indicated documents include the indicated graphic.

Disputed that they state further, outside of the graphic, that the Fund's "Daily Investment Process"

necessarily includes the indicated steps.  *See generally* PX 27 (providing no such assertion); PX 23

(same).  Answering further, Walczak states that the Investor Presentations must be read in their

entirety to provide appropriate context for assertions that Plaintiff presents here in isolation.

76.     Neither the Q2 2016 Investor Presentation nor the Q2 2015 Investor Presentation contains any detailed explanation about how the Fund is stressed for risk on a daily basis, as there is no narrative accompanying the "Daily Investment Process" graphic. (PX-27, Inv. Test. Ex. 85 (Q2 2016 Investor Presentation) at 6; PX-23, Inv. Test. Ex. 22 (Q2 2015 Investor Presentation) at 7 (page 11 of 37 of the PDF).)

    **RESPONSE:** Undisputed.

77.     Neither the Q2 2016 Investor Presentation nor the Q2 2015 Investor Presentation contains any detailed explanation about what criteria are used to determine whether adjustments are needed, as there is no narrative accompanying the "Daily Investment Process" graphic. (PX-27, Inv. Test. Ex. 85 (Q2 2016 Investor Presentation) at 6; PX-23, Inv. Test. Ex. 22 (Q2 2015 Investor Presentation) at 7 (page 11 of 37 of the PDF).)

    **RESPONSE:** Undisputed.

78.     The 2015 and 2016 presentations also included a slide (or page) entitled "Risk Management Is an Imperative Part of the Strategy" (or simply "Risk Management") that stated: "The Fund employs a distinct Risk Management Strategy – In addition to the strategy and tactics we use to earn profits, we use a specific set of rules and tactics focused on limiting losses. This is not common among public mutual funds." (PX-27, Inv. Test. Ex. 85 (Q2 2016 Investor Presentation) at 8; PX-23, Inv. Test. Ex. 22 (Q2 2015 Investor Presentation) at 9 (page 13 of 37 of the PDF).)

    **RESPONSE:** Undisputed that the indicated documents include the indicated language,

albeit with slight changes between PX 23 and PX 27.  Answering further, Walczak states that the Investor Presentations must be read in their entirety to provide appropriate context for assertions that Plaintiff presents here in isolation.

79.     The 2015 and 2016 presentations also included a slide entitled "Key Reasons to Invest," one of which was: "A Risk Management Strategy explicitly focused on limiting lossesby hedging individual positions at initiation, ongoing adjustment based on well-defined risk parameters, and aggregate portfolio stop loss measures." (PX-27, Inv. Test. Ex. 85 (Q2 2016 Investor Presentation) at 11; PX-23, Inv. Test. Ex. 22 (Q2 2015 Investor Presentation) at 11 (page 15 of 37 of the PDF).)

**RESPONSE:**  Undisputed that the indicated documents include the indicated language. Answering further, Walczak states that the Investor Presentations must be read in their entirety to provide appropriate context for assertions that Plaintiff presents here in isolation.

**VI.     During Recurring (and Recorded) "Open House" Conference Calls, Walczak Described His Purported Risk Management Process, Including Stress Testing Devised to Cap Losses at 8%.**

80.     From at least late 2014 through early 2017, Walczak spoke on multiple occasions about the Fund on conference calls with investment advisers. (*See* PX-10, Defendant's Admissions at ¶¶ 1, 5, 9, 13, 15, 18, 21, 25, 27, 32, and 35; PX-20, Edward Walczak (Apr. 4, 2018 Test.) at 509, 516-520; PX-34, Declaration of Records Custodian Michael Schoonover dated 11/11/2021 ("Schoonover Declaration") at ¶¶ 2, 4.).)

**RESPONSE:**  Undisputed.

81.     The calls referenced in Paragraph 80 above were referred to as "Open House"

calls. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 305-306; PX-20, Edward Walczak (Apr.4, 2018 Test.) at 508-509.)

**RESPONSE:** Undisputed.

82.     During the time period of September 2015 and March 2017, there was at least one Open House call per month. (PX-34, Schoonover Declaration at ¶ 2.)

**RESPONSE:** Undisputed.

83.     Walczak understood that at least some of the investment advisers who participated in the Open House had discretion to invest on behalf of their clients. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 306 (Q: Who is on the receiving end of these calls by you? A: These would be financial advisers. Q: And is it your understanding that at least some ofthese financial advisers have discretion over their clients' portfolios? A: Sure, I think so.").)

**RESPONSE:** Disputed. Misstates the testimony cited, as Walczak was not asked whether he understood, at the time of the Open House calls or later, that some of the participating investment advisers "had discretion to invest on behalf of their clients." *See* PX 16 at 306 (discussing whether such advisers "have discretion over their clients' portfolios" without clarifying that this meant the advisers could invest without client approval); *see also* PX 15 (dkt. 29) (July 27, 2021 Deposition of Edward Walczak ("Walczak Testimony VI")) at 50:25-51:12 ("Honestly, I don't know very much about the financial advisor community. I don't know [who's] got discretionary authority or what….I don't know what they did with client money or what -- what might be going on behind the scenes.").

84.     The purpose of the Open House calls was to be transparent and to convey accurate

information to the participants. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 305-06 ("I mean, this whole thing is about transparency and telling people like it is, so that's what we are trying to do here.").)

**RESPONSE:** Disputed. While the Catalyst representatives on the Open House calls, including Walczak, of course endeavored to "convey accurate information to the participants," the cited source does not indicate that the *purpose* of the Open Houes calls "was to be transparent," and Walczak accordingly disputes that contention. *See* PX 15, Walczak Testimony VI, at 50 ("Catalyst asked me to get on calls."); *id.* at 135 (calls were intended to provide "a kind of a general overview" of the Fund's strategy).

85.     Catalyst's regular practice was to record the Open House calls in their entirety, from beginning to end, at the time they took place. (PX-34, Schoonover Declaration at ¶¶ 2, 5.)

**RESPONSE:** Undisputed.

86.     Walczak was aware that the Open House calls were recorded. (*E.g.*, PX-62, CFTC3_00018646 (9/23/15 email from M. Zufall to various recipients, including Walczak); PX-63, SEC_04_0106647 (6/28/16 email from M. Zufall to various recipients, including Walczak).)

**RESPONSE:**  Walczak objects to the extent that Paragraph 86 suggests that the allegedly supporting exhibits (PX-62 and 63) somehow confirm that Walczak "was aware that the Open House calls were recorded."  Further answering, Walczak does not dispute that the emails reference "recording."

87.     During the time period of at least September 2015 through at least March 1, 2017, Walczak was identified on the Open House calls as the person "responsible for the day-to-day

management of the [Fund]." (*E.g.*, PX-38, 9/15/2015 Open House call Tr. at 2-3; PX-42, 1/19/2016

Open House call Tr. at 3; PX-44, 6/28/2016 Open House call Tr. at 3; PX-47, 10/25/2016 Open

House call Tr. at 3; PX-49, 2/21/2017 Open House call Tr. at 3.)

**RESPONSE:** Undisputed that the indicated language was used in the Open House calls

cited in Paragraph 87. Answering further, Walczak states that he was not solely responsible for

such day-to-day management of the Fund. *See, e.g.*, DX 29 (July 9, 2021 Deposition of David

Miller ("Miller Dep.")) at 175-76 (Jerry Szilagyi had the authority and the ability to enter trades in

the Fund); PX 11 (dkt. 27) (April 20, 2021 Deposition of Kimberly Rios ("Rios Testimony II")) at

50 (whole team of people tasked with deciding on risk management together); DX 31 (Mar. 2,

2018 Investigative Testimony of Michael Schoonover ("Schoonover Testimony I")) at 218 (same).

88.     Walczak was free to speak honestly and fully during the Open House calls. (PX-

16, Edward Walczak (Oct. 27, 2017 Test.) at 305-06.)

**RESPONSE:** Undisputed.

89.     Walczak never objected to being identified on the Open House calls as being the

person "responsible for the day-to-day management of the [Fund]," nor did he ever state that he

was not the person "responsible for the day-to-day management of the [Fund]" despite being so

identified. (*E.g.*, PX-38, 9/15/2015 Open House call Tr. at 2-3; PX-42, 1/19/2016 Open House call

Tr. at 3; PX-44, 6/28/2016 Open House call Tr. at 3; PX-47, 10/25/2016 Open House call Tr. at 3;

PX-49, 2/21/2017 Open House call Tr. at 3.)

**RESPONSE:** Undisputed as to the first sentence.  As to the second sentence, Walczak

agrees that he did not use the quoted words but states that he and others did at times indicate on

Open House calls some roles that Rios and Catalyst played in managing the Fund.

90.     On the Open House calls, Walczak repeatedly explained the importance of risk management to the Fund's overall strategy and performance, stating, for example, that risk management was "the key to outperforming as a portfolio manager" and describing risk management as "our edge." (*See, e.g.,* PX-10, Defendant's Admissions ¶¶ 20, 29, 37.)

**RESPONSE:**  Mr. Walczak admits that in some Open House calls, he offered commentary that explained portions of the Fund's overall strategy and performance, including stating at times that risk management was "the key to outperforming as a portfolio manager" and describing risk management as "our edge."  Further responding, Mr. Walczak disputes the characterization and use of "repeatedly" and "importance" in Paragraph 90 as not supported by the cited sources. Answering further, Mr. Walczak states that Open House call transcripts must be read in their entirety to provide context for the statements in Paragraph 90 that Plaintiff presents in isolation.

91.     Walczak participated in an Open House call on November 4, 2014 (the "11/4/2014 Open House call"). (PX-10, Defendant's Admissions ¶ 1.)

**RESPONSE:** Undisputed.

92.     During the 11/4/2014 Open House call, Walczak made the following statements in response to a question or suggestion that he discuss "[h]ow [Walczak] do[es] [his] stress testing to keep the volatility low within the fund and keep those variances within a low volatility range?"

> **I use risk management to control losses to roughly 8 percent. That's the number I use in stress testing.** It is larger than the largest drawdown the fund has had in the last seven years.  And that's been the period of time over which the risk management system I use now has been in place. The largest drawdown was a little over 7 percent.  **As I said, I control it to 8. Eight percent is not a hard number, simply because of slippage**

**and so forth in execution. But that's the number I control to when I do stress the portfolio.**

And I do the following things. First of all, I use a few basic options spreads over and over and over again. And what that means is, I'm not reinventing the wheel every day. The strategy I use and the models I use generate signals. And I -- I react to those signals with basically two different types of options spreads.

* * *

Second, once I put on positions, and I do -- obviously within a mutual fund portfolio I put on positions every day, pretty soon I accumulate relatively complicated options positions or an options portfolio, so that even if you understand options fairly well, if you look at a portfolio listing for the fund it will be difficult for you to understand where do these things come from and what are they designed to do and how will they be affected by the market?

So, the good news is, **I have very sophisticated options pricing models. I plug the portfolio into these models each day. I stress the portfolio for a series of price movements up to 10 percent. I stress the portfolio for volatility movements.** Remember that volatility is the most important component of options pricing. **So I have to understand what will happen to the portfolio if one day you see the VIX go from 14 to 25 or 20 to 40 or something like that. So I stress the portfolio for volatility, I stress it for price movement, and then I look over five different time frames. A month from today, two months from today and several time frames in between. I'll vary those time frames to match up to different times and important options, expiration for part of the portfolio for example.**

**So I stress the portfolio. I identify what's the impact on portfolio value at these stress points. And if the impact is greater than my 8 percent limit, then I'll go in and I'll hedge the portfolio to bring it back in line. So I spend a lot of time on this. And I think it's important.** Because again, an options portfolio is not intuitive like perhaps a portfolio of individual stocks might be, where you can understand that if you're long a basket of stocks, if the market is going to go down 10 percent, you're probably going to lose a lot of money. If the market is going up 10 percent you're going to make a lot of money. Options are nowhere near that simple and it takes some modeling tools to use them. **It takes fairly expensive models to understand and to manage the risk. And I spend a great deal of time doing that.**

(Emphases added.) (PX-10, Defendant's Admissions ¶¶ 3-4.)

**RESPONSE:**  Walczak admits that Plaintiff has accurately quoted PX 36, which in turn approximates the words he used in the November 4, 2014 Open House call.  Walczak disputes the accuracy of the description of the question and the completeness of the quote.  Walczak therefore denies that Paragraph 92 accurately reflects what he stated on the indicated Open House call. *See* PX 36 (Nov. 4, 2014 Open House Call) at 14:25 – 19:10.  Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide context for the statements in Paragraph 92 that Plaintiff presents in isolation.

93.     Walczak participated in an Open House call on March 18, 2015 (the "3/18/2015 Open House call"). (PX-37, 3/18/2015 Open House call Tr. at 2-4.)

**RESPONSE:** Undisputed.

94.     During the 3/18/2015 Open House call, Walczak was asked the following question, and he responded with the following answer:

> [Question] A couple months ago -- or I should say, I guess, end of last year, the fund had six or seven percent drawdown. **And I remember you saying on the last call that you stress test for about an eight percent drawdown**. And I'm -- so, I'm curious if -- if your --if your risk management kicked in there to -- to control that drawdown.  **And then, can you just briefly discuss your stress test -- stress-testing process** and what type of implementation, whether that's reducing position size, you know, cutting the size down total positions or adding additional hedge options, or what process you use to control drawdown?

> [Answer] Sure.  Well, the simple answer to almost everything you said is yes.

> \* \* \*

> Let me -- now, let me elaborate a little bit. **So, yes, when I stress test and model risk on the portfolio, my goal is eight percent. Now, that's -- there's no guarantee that that's the case, but I have been able to stay within those bounds for many years now. And that is what I -- what I stress test to.**

35

**And so, when I talk about a stress test, what I will do is, I describe at some length lots of different options, positions, calls, puts, different strike prices, different months.** So, all of this, and given the complexity of how options are priced and how they behave in the market, you can't eyeball this thing.

**So -- so, all of these things are loaded in options pricing modeling software.** And the first thing I'll say, whenever you talk about modeling software, you said, "Oh, my gosh. What if the model doesn't work?" Well, it worked in 2008. That was a pretty good test of whether it works in a fairly violent market environment.

And the reason they work is because people that make mar -- everyone uses the same models. Black and Shoals won a Nobel Prize for modeling option pricing. Everybody in the world uses some sort of variation of a Black Shoals model.  So, it's a self-fulfilling prophecy.

People use models to actually bid and offer options prices. Hence, when you use models to predict what will happen to options pricing, they work. So, I model the entire fund's portfolio.

All of these very diverse positions go into a single hopper, so to speak, a bucket. And it spits out a portfolio value across a range of -- any range I choose of several factors, most importantly, S&P price.

**So, I model basically a plus and minus 10 percent move in the market, underlying price. I then model a volatility extremes, and the -- and I use actually, historical volatility levels, meaning, from a simple standpoint, if you use the VIX as your measure of volatility, 30 on the VIX is actually a level that is a typical stopping point when the VIX spikes during some kind of downturn or panic. So, I will model wherever the -- wherever the volatility is today, I'll model, "What happens to the portfolio if the VIX goes to 30 tomorrow?"**

**The next typical stopping point for the VIX is 45. I will not typically model al the way to 45, unless I have a particular concern about volatility sensitivity. If I see something in modeling a VIX to 30 that I don't like, then I'll model to 45 to understand.**

**In a -- in a true extreme, 45 is a place where we stop when U.S. debt was downgraded in 2011. So, I'll model volatility. I'll model price. And then, the third factor that's important in options is time. So, when I look at these models, I'm actually looking at five different curves on a graph, each curve representing a different timeframe, which I can also change.  So, I might look a week out, a month out, two months out, three months out. I can see all these things, so that if**

36

**we -- if I'm modeling a 10 percent move in price, if that occurs tomorrow, I'll get a result that's different than if that 10 percent price move occurs between now and a month from now. And it's different because options are time sensitive.**

**So, I'm doing these stress tests, which amounts to stressing price, in stressing volatility, and then also looking at the timeframe. And when I see that this will have an adverse impact on the fund's portfolio, which is outside my parameters, the next thing I do is model, "What's the best, most economical, and the best way to bring that risk back into line?"**

And you mentioned, Jesse, a couple of ways to do that. One is, you can simply take off positions. That's usually the least preferable thing to do. The good news is that all of my positions in the instrument I trade are options contracts, and they are designed as risk management vehicles.  So, for example, if you have downside risk in an equity portfolio, you -- the simplest thing to do is buy put options.

**So, if I stress my portfolio, even though they're all composed of options to begin with, I stress and discover that a 10 percent downward price move is going to cause me problems, then one method of reducing that risk is to buy additional put options. Sometimes that's buying back ones that are short.  Sometimes it's simply buying additional options to hedge that price risk.**

**Similarly, if my risk is based on volatility, I can construct positions using S&P options that will --you know, if -- if I have a short volatility risk, I can buy volatility. If I have a long volatility risk, in some way, then I can sell volatility. So, I can use options contracts to perform whatever hedging I need to hedge to remove the source of the risk.**

**So, in a nutshell, I'm stressing price. I'm stressing volatility. I'm looking at different timeframes.  I'm identifying where my risk comes -- comes from, "Is it a price risk? Is it a volatility risk? Is it even a time risk?" When I'm long options, I have a risk that the clock is ticking and I'm losing money. So, I identify, "Where is the source of my risk?" and then, I identify, model, and choose whatever strategy is best appropriate to bring that risk back in line.**

(Emphases added.) (PX-37, 3/18/2015 Open House call Tr. at 41-45; audio file for 3/18/2015 Open House Call (KR 20210601 000012) starting at approximately 50:45) (audio file authenticated by PX-35, Rios Declaration at ¶ 3).)

**RESPONSE:**  Walczak admits that Plaintiff has accurately quoted PX 37, which in turn

approximates the words he used in the March 18, 2015 Open House call.  Walczak disputes the

accuracy of the description of the question and the completeness of the quote.  Walczak therefore

denies that Paragraph 94 accurately reflects what he stated on the indicated Open House call. *See*

PX 37 (Transcript, Mar. 18, 2015 Open House Call) at 41-45.  Answering further, Walczak states

that Open House call transcripts must be read in their entirety to provide context for the statements

in Paragraph 94 that Plaintiff presents in isolation.

95.　　Walczak participated in an Open House call on September 15, 2015 (the "9/15/2015

Open House call"). (PX-10, Defendant's Admissions ¶ 5.)

**RESPONSE:**  Undisputed.

96.　　During the 9/15/2015 Open House call, Walczak made the following statements in

response to a question or suggestion by Mike Zufall that Walczak discuss his "stress testing on the

portfolio":

> **I'll go quickly, Mike, to your point about risk-stressing. What
> we do with the fund on a daily basis is we have lots and lots of
> diverse options positions on -- based on our strategy.  We
> stress, we aggregate all those in the models we use to predict
> what will happen with the portfolio value under different
> scenarios. And the specific scenarios we stress the portfolio
> value against plus five percent, plus 10 percent price movement
> in the S&P, minus 5, minus 10 and minus 15. And in the
> current volatility environment I have added a minus 20
> percent price excursion on the S&P to that stress. So we stress
> those price movements.**
>
> **And because options are so sensitive to volatility we also stress
> volatility movements. With the VIX now already elevated, our
> normal stress is a 40 VIX and 45 VIX. When the VIX is at 40 we
> will stress VIX not only at 45 but all the way up to 60.**
>
> **So we stress those. We look across five different time frames
> and we bury those time frames looking for portfolio values that
> will exceed our eight percent draw down limit. And when we**

**find that that happens that they'll go in and make position adjustments to bring that potential draw down back into line with our 8 percent guideline which is what we try to hold a draw down to.** We did those things for example last, in the portfolio last year, which is our most recent draw down. And we did all of those things, and although the draw down was luckily 8 percent, that's what was predicted, what was expected, what we controlled to. **So the risk parameters that we used were effective and we expect them to continue to be effective going forward.**

(Emphases added.) (PX-10, Defendant's Admissions ¶ 7.)

**RESPONSE:**  Walczak admits that Plaintiff has accurately quoted PX 38, which in turn approximates the words he used in the September 15, 2015 Open House call.  Walczak disputes the accuracy of the description of the question and the completeness of the quote.  Walczak therefore denies that Paragraph 96 accurately reflects what he stated on the indicated Open House call. *See* PX 38 (Transcript, Sept. 15, 2015 Open House Call) at 11-15.  Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide context for the statements in Paragraph 96 that Plaintiff presents in isolation.

97.     Later, in that same 9/15/2015 Open House call, Walczak made the following statements in response to a question: "I was just wondering, you said you shoot for not going over the 8 percent draw down, but from what point is that? From the beginning of the year, thehighest point, or what's that 8 percent off of?":

> That's, in the technical way to measure a draw down, peak to valley. So a timeframe is not important but a high water mark, I guess, I'm sorry -- a high water mark is left over from our private placement days, but peak to valley draw down.

(PX-10, Defendant's Admissions ¶ 8.)

**RESPONSE:**  Undisputed that Walczak stated the indicated words.  Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide context for

the statements in Paragraph 97 that Plaintiff presents in isolation.

98.     Walczak participated in an Open House call on October 6, 2015 (the "10/6/2015 Open House call"). (PX-39, 10/6/2015 Open House call Tr. at 2-4.)

**RESPONSE:** Undisputed.

99.     During the 10/6/2015 Open House call, Walczak was asked whether the stress testing for the new hedged commodity fund would be similar to the stress testing he does for the Fund (referred to during the call as "hedged futures"), and he responded in the following manner:

> **So when we talk stress tests, we'll do the same stress tests that we do today.  And what we do today is actually very similar**.
>
> * * *
>
> **Again, when we do our risks, stresses on the portfolio, we put those, again, we put those together and we say, what happens if price goes up 5, 10, 15 percent?  What happens if price is down 5, 10, 15 percent? What happens if volatility spikes? So we would be doing the same types of consolidated risk stresses on the new fund as we do on the old fund.**
>
> * * *
>
> [W]e'll apply them just like we do in the existing fund. We'll aggregate them and we'll identify the overall (inaudible) and connect across the new fund, just like we do on the existing fund, and **try to obtain that same draw down limitation as we do on the existing fund as we run through those tests**.

(Emphases added.) (PX-39, 10/6/2015 Open House call Tr. at 14-15; audio file for 10/6/2015 Open House call (CFTC3_00000531) starting at approximately 17:31; (audio file authenticated by PX-34, Schoonover Declaration (dated 11/11/21) at ¶¶ 2-5).)

**RESPONSE:**  Walczak admits that Plaintiff has accurately quoted PX 39, which in turn approximates the words he used in the October 6, 2015 Open House call.  Walczak disputes the accuracy of the description of the question and the completeness of the quote.  Walczak therefore

denies that Paragraph 99 accurately reflects what he stated on the indicated Open House call. *See* PX 39 (Transcript, Oct. 6, 2015 Open House Call ("Oct. 6, 2015 Call")) at 13-15.  Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide context for the statements in Paragraph 99 that Plaintiff presents in isolation.

100.    Walczak participated in an Open House call on October 13, 2015 (the "10/13/2015 Open House call"). (PX-10, Defendant's Admissions ¶ 9.)

**RESPONSE:** Undisputed.

101.    During the 10/13/2015 Open House call, Walczak made the following statements in response to the questions: "From a risk management perspective, what are you doing at the portfolio level?" and "[I]s there any input from the team at Catalyst or independent risk management type of oversight on either of these?"

> We've got them in all the expiration months, puts, calls, longs, shorts, et cetera.  So, what we do is we aggregate all those positions.  **In other words, we take a snapshot of our portfolio within our options modeling software and then we stress that portfolio against price, volatility and across time, because obviously time is an important element to a wasting asset like an option. So, we're on a daily basis, we'll -- the portfolio in aggregate is plugged into our options modeling software and we'll stress price moves of plus 5 and plus 10 percent on the S&P and minus 5, minus 10 and minus 15 percent on the S&P.**
>
> **We'll then -- we'll have snapshots of the portfolio value at those P&L basically, at those stress points. We will then stress volatility in the current environment where we've got a sub 20 VIX.  We stress the volatility to a 30 and to a 45. In those environments where VIX is already above 30, we'll stress an additional level up to 60.**
>
> **So, we now have price and volatility stresses on the portfolio. We look at that across five different timeframes and what we're looking for is a drawdown of greater than 8 percent in the portfolio value. If we find that at any one of those price and volatility stress points, we'll identify whether it, for example, it's price or volatility, which are the two major impacts. On the portfolio we'll identify what is it that's causing that**

**potential 8 percent drawdown or greater than 8, I'm sorry, that's our
line in the sand, so to speak.**

**We'll identify what is it. Is it price?  Is it volatility?  We'll then
identify what hedging transaction we need to put in place, and
normally there's a variety of choices.**  Via put, via put spread, via call,
via call spread, buy back a short call, buy back a short put. Lots and lots of
alternatives, but **we'll model the most effective alternative to remove
that risk excursion and then we'll implement that position on the
portfolio.**

So, that's what we do internally to manage the portfolio.  We've done that
basically since I've run the Fund.  So, over its entire life.

Since we've joined Catalyst, Catalyst has a risk officer, based in New
York. We report on a daily basis a set of high-level risk metrics and these
risk metrics are designed for a non-options expert. In other words, our risk
officer does not need to have options modeling software to evaluate the risk
levels that we're taking.

\* \* \*

So, we have a series of metrics that get reported to New York on a daily
basis, that again, are not options technical or modeling type of things, but
they're risk parameters that provide us that extra level of oversight from a
third party, not a part of the portfolio management team. So, that's what
we're doing around risk.

(Emphases added.) (PX-10, Defendant's Admissions ¶ 11.)

**RESPONSE:**  Walczak admits that Plaintiff has accurately quoted DX 12, which in turn

approximates the words he used in the October 13, 2015 Open House call.  Walczak disputes the

accuracy of the description of the question and the completeness of the quote.  Walczak therefore

denies that Paragraph 101 accurately reflects what he stated on the indicated Open House call. *See*

DX 12 (Transcript, Oct. 13, 2015 Open House Call ("Oct. 13, 2015 Call")) at 13-18.  Answering

further, Walczak states that Open House call transcripts must be read in their entirety to provide

context for the statements in Paragraph 101 that Plaintiff presents in isolation.

102.     Walczak participated in an Open House call on November 10, 2015 (the

"11/10/2015 Open House call"). (PX-40, 11/10/2015 Open House call Tr. at 2-4.)

**RESPONSE:** Undisputed.

103.   During the 11/10/2015 Open House call, Walczak represented: "we stress the fund for risk every day." (PX-40, 11/10/2015 Open House call Tr. at 18; audio file for 11/10/2015 Open House call (CFTC3_00002413) starting at approximately 23:51; (audio file authenticated by PX-34, Schoonover Declaration (dated 11/11/21) at ¶¶ 2-5).)

**RESPONSE:** Walczak admits that Plaintiff has accurately quoted PX 40, which in turn approximates the words he used in the November 10, 2015 Open House call. Walczak disputes the accuracy of the description of the question and the completeness of the quote. Walczak therefore denies that Paragraph 103 accurately reflects what he stated on the indicated Open House call. *See* PX 40 (Transcript, Nov. 10, 2015 Call ("Nov. 10, 2015 Call")) at 17-18. Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide context for the statements in Paragraph 103 that Plaintiff presents in isolation.

104.   Walczak participated in an Open House call on December 1, 2015 (the "12/1/2015 Open House call"). (PX-41, 12/1/2015 Open House call Tr. at 2-4.)

**RESPONSE:** Undisputed.

105.   During the 12/1/2015 Open House call, Walczak made the following statements in response to a question, or suggestion, from Mike Zufall that Walczak highlight how he "stress[es] the portfolio":

> **[T]he basic stressing methodology is to look at the portfolio, and using our options pricing models, identify what would happen to the portfolio value should markets move by extreme amounts.**
>
> **[I]n the S&P fund, we stress plus and minus 5 percent, plus and minus 10 percent, and a minus 15 percent.** In the commodity markets, we're

going actually a more symmetrical stress. We'll stress those same levels plus or minus 5, 10 and 15 from a price basis.

**And then, as we do in both funds, we'll stress volatility movements.** And the volatility movements, I like to sort of take those to the VIX because that's something everyone can observe.

\* \* \*

And so we stress those volatility on incremental levels up to the maximum volatility that we've observed. And doing that we identify what would happen to the portfolio.

\* \* \*

**But again the point of a risk stress is to identify that highly unlikely event and to ensure that should the lightening bolt strike in your front yard, for example, that you're not standing underneath it when it happens. Meaning, we're going to stress the worst case, even though across three markets it's highly unlikely that it occurs in each of those markets simultaneously, but that's how we stress it. And once again, we are holding to our eight percent draw-down, which we do in the existing fund and which we are carrying forward into our risk analysis on the new fund.**

(Emphases added.) (PX-41, 12/1/2015 Open House call Tr. at 15-16; audio file for 12/1/2015 Open House call (SEC_01_0034081) starting at approximately 17:45; (audio file authenticated by PX-34, Schoonover Declaration (dated 11/11/21) at ¶¶ 2-5).)

**RESPONSE:** Walczak admits that Plaintiff has accurately quoted PX 41, which in turn approximates the words he used in the December 1, 2015 Open House call. Walczak disputes the accuracy of the description of the question and the completeness of the quote. Walczak therefore denies that Paragraph 105 accurately reflects what he stated on the indicated Open House call. *See* PX 41 (Transcript, Dec. 1, 2015 Call) at 14-17. Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide context for the statements in Paragraph 105 that Plaintiff presents in isolation.

106.     Walczak participated in an Open House call on January 19, 2016 (the "1/19/2016

Open House call"). (PX-42, 1/19/2016 Open House call Tr. at 2-4.)

      **RESPONSE:** Undisputed.

      107.     During the 1/19/2016 Open House call, Walczak made the following statements in response to the question "I want to make sure, so there is no -- your worst-case scenario you're pretty much hedged every way; there's the black swan type of scenario that doesn't exist for this strategy?":

> We have never seen a 20 up day. I cannot imagine a scenario under which that would occur. So, that's the black swan for us is to the upside. And again, you know, we've chosen based on how real-world markets have behaved throughout time to choose that that upside risk over downside risk because, you know, options tend to be priced for random occurrences and we like to think that we can separate what actually happens in the world from how options are priced. And so, we take that upside we take that upside risk. Our experience has been that's the one you can manage. It's difficult to manage a 20 percent down day almost no matter what you're doing unless you're in cash. **A 20 percent up day doesn't happen, six or seven percent up days do on very rare occasions we can manage those.**

(Emphasis added.) (PX-42, 1/19/2016 Open House call Tr. at 34; audio file for 1/19/2016 Open House call (CFTC3_00008046) starting at approximately 45:11; (audio file authenticated by PX-34, Schoonover Declaration (dated 11/11/21) at ¶¶ 2-5).)

      **RESPONSE:**  Walczak admits that Plaintiff has accurately quoted PX 42, which in turn approximates the words he used in the January 19, 2016 Open House call.  Walczak disputes the accuracy of the description of the question and the completeness of the quote.  Walczak therefore denies that Paragraph 107 accurately reflects what he stated on the indicated Open House call. *See* PX 42 (Transcript, Jan. 19, 2016 Open House Call ("Jan. 19, 2016 Call")) at 33-34.  Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide context for the statements in Paragraph 107 that Plaintiff presents in isolation.

108.    Walczak participated in an Open House call on February 2, 2016 (the "2/2/2016 Open House call"). (PX-10, Defendant's Admissions ¶ 12.)

**RESPONSE:** Undisputed.

109.    During the 2/2/2016 Open House call, Walczak represented, "Again, the goal in the commodity fund is to maintain draw downs at a maximum of 8 percent, similar to the goal in the S&P fund." (PX-43, 2/2/2016 Open House call Tr. at 17; audio file for 2/2/2016 Open House call (SEC_01_0041353) starting at approximately 23:08; (audio file authenticated by PX-34, Schoonover Declaration (dated 11/11/21) at ¶¶ 2-5).)

**RESPONSE:**  Walczak admits that Plaintiff has accurately quoted PX 43, which in turn approximates the words he used in the February 2, 2016 Open House call.  Walczak disputes the accuracy of the description of the question and the completeness of the quote.  Walczak therefore denies that Paragraph 109 accurately reflects what he stated on the indicated Open House call. *See* PX 43 (Transcript, Feb. 2, 2016 Open House Call ("Feb. 2, 2016 Call")) at 1-20.  Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide context for the statements in Paragraph 109 that Plaintiff presents in isolation.

110.    Also during the 2/2/2016 Open House call, Walczak made the following statements in response to a question, or suggestion, from Mike Zufall that Walczak discuss "stress tests":

> For the S&P fund, a reminder that we do stress market moves of plus 5, plus 10, minus 5, minus 10 and minus 15 percent on a price standpoint. And then we also stress volatility because that, as I have repeated many times, volatility is the most important factor in options pricing. So we are very careful also to stress volatility movement in the fund as well.

(PX-10, Defendant's Admissions ¶ 14.)

46

**RESPONSE:**  Walczak admits that Plaintiff has accurately quoted PX 43, which in turn approximates the words he used in the February 2, 2016 Open House call.  Walczak disputes the accuracy of the description of the question and the completeness of the quote.  Walczak therefore denies that Paragraph 110 accurately reflects what he stated on the indicated Open House call. *See* PX 43, Feb. 2, 2016 Call, at 20-23.  Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide context for the statements in Paragraph 110 that Plaintiff presents in isolation.

111.    Walczak participated in an Open House call on March 1, 2016 (the "3/1/2016 Open House call"). (PX-10, Defendant's Admissions ¶ 15.)

**RESPONSE:** Undisputed.

112.    During the 3/1/2016 Open House call, Walczak made the following statements in response to a question: "[D]o you have specific risk metrics where you'll ease up in certain environments and manage to some volatility threshold with upside downside capture ratios?"

> We collect -- I've described the different options strategies we use. And options are non-linear instruments. In other words, try as you might, you cannot look at an options value and on the back of an envelope describe what's going to happen to it. A lot of people look at options expiration and you can do some things there, but between now and expiration **without a good model you have no hope of understanding how price or time or volatility will affect that options price.**
>
> So what we do is we use volatility analytics to enter, as I described, put or call positions. We're in different expiration months at multiple different strikes. **From a risk perspective, we're not looking at individual positions, whether they're profitable, how they were entered, where they were entered. We look at the entire portfolio.  So we aggregate all of these positions in our options pricing models and then we stress the portfolios for what I would call risk events. And typically the risk events are an expansion or rapid change let me say, but typically the expansion in volatility or a rapid price movement.**
>
> So we're looking at model of the portfolio. We don't look at for example

the delta of the portfolio. Because again that's one of those back of the envelope things that can be very, very misleading. Delta is not the most important factor in an options price.

So we look at an options model which takes into account everything that affects options pricing. Delta, gamma, theta, vega, rho. And I could go on with more Greeks that no one has ever heard of but the model has. So we model the portfolio. **We stress price, meaning we look in the model and we draw a graph of the portfolio value and what would happen to the portfolio if the market is up 5 percent or 10 percent. We look to the downside, what would happen to the portfolio if the S&P is down 5 percent, 10 percent or 15 percent. And then in turn we can also at those price stress points say all right, now what will happen if at those price points, volatility declines by 5 percent, increases by 10 percent, increases by 15 percent.**

**So we have a collection of stress points. And what we are looking for at each of those stress points is an 8 percent draw down in the value of the fund.** Again, this does not mean there's a hard stop or a guarantee of an 8 percent loss containment. But what we're doing is we're actually looking in the future. **We look across at least five different time frames as well as these different price and volatility conditions, and we're looking for a set of conditions that could possibly cause the fund to lose more than 8 percent.**

Why 8 percent? 8 percent is the threshold rate of return that we believe is reasonably possible over the course of a year. So our risk management philosophy is that we don't want any draw down in the fund to put a shareholder under water for longer than a year. So that if you entered the fund at exactly the wrong time and experienced an 8 percent draw down in the fund, our goal would be to recover that money within a year. And so that's why we use an 8 percent number.

And over -- that's at least the genesis of the 8 percent number. Over time -- again, in any risk management protocol you can -- the goal is to be in the right place on the risk-return tradeoff. Meaning if you set your risk control too tight -- if I said we are not going to tolerate more than a 1 percent draw down, well it would be very difficult to make any money.

(Inaudible) said, look, we'll take a 20 percent draw down, well that's beyond the risk tolerance of most investors and it's beyond my personal risk tolerance in running the fund. So the 8 percent number is one which we originally set in order to recover draw downs within a year, and over time has proven to be, to allow us enough room to still earn satisfactory returns and stick to our philosophy of maintaining a recovery time of a year or less.

**So, that's what we do. We stress the portfolio across a number of different dimensions. We look for where, what conditions might cause a greater than 8 percent draw down. We then model hedging**

**techniques, meaning the purchase and sale of additional options contracts, either ones we already hold -- taking positions off is one thing we model, adding additional positions as hedges is another thing that we model and that's our most common adjustment. We'll model adjustments; we'll chose the most economical and effective adjustment to bring us back in bounds so that we can no longer find a stress point that will result in greater than an 8 percent draw down.**

So using these tactics, we have limited -- our largest draw down since these were put in place in '07 has been about 8 and a half percent, so we've been effective with them, and that's how we deal with risk in the fund.

(Emphasis added.) (PX-10, Defendant's Admissions ¶ 17.)

**RESPONSE:**  Disputed.  The actual question reads, "And for risk management, and downside protection with thresholds, I think I looked at one of your reports.  And your, your maximum loss was I think 10 percent or so.  I mean, so do you have specific risk metrics where you'll ease up in certain environments and manage to some volatility threshold with upside downside capture ratios, or?"  DX 13 (Transcript, Mar. 1, 2016 Open House Call ("Mar. 1, 2016 Call")) at 26:3-9.  Walczak therefore disputes the accuracy of the question as quoted and thus the context provided for his response.  *See id.* at 26-30.  Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide context for the statements in Paragraph 112 that Plaintiff presents in isolation.

113.    Walczak participated in an Open House call on March 29, 2016 (the "3/29/2016 Open House call"). (PX-10, Defendant's Admissions ¶ 18.)

**RESPONSE:** Undisputed.

114.    During the 3/29/2016 Open House call, Walczak made the following statements in response to a question: [W]hat is the max drawdown of any one month?"

Many of you on the phone have heard my description of our risk management. **Our risk management is designed to control our drawdowns to eight percent.** And in fact, our largest drawdown since 2007, has been a little bit higher than eight percent. I want to say it might have been 8.5. **But that's what we control to, and we do that with fairly extensive portfolio stress testing and modeling. Meaning, we'll stress the impact on a portfolio on a daily basis, for five, 10, 15, and sometimes 20 percent price moves, for volatility moves, as high as a VIX of 45 and we do that across many time frames.** And our intention is to, in this case, **we do like to front run risk and that is to anticipate if -- what's the worst possible scenario we might experience and are we sufficiently hedged to limit the drawdown in that scenario to eight percent.**

(Emphases added.) (PX-10, Defendant's Admissions ¶ 20.)

**RESPONSE:**  Walczak admits that Plaintiff has accurately quoted DX 14, which in turn approximates the words he used in the March 29, 2016 Open House call.  Walczak disputes the accuracy of the description of the question and the completeness of the quote.  Walczak therefore denies that Paragraph 114 accurately reflects what he stated on the indicated Open House call. *See* DX 14 (Transcript, Mar. 29, 2016 Open House Call ("Mar. 29, 2016 Call")) at 17-20.  Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide context for the statements in Paragraph 114 that Plaintiff presents in isolation.

115.    Walczak participated in an Open House call on April 12, 2016 (the "4/12/2016 Open House call"). (PX-10, Defendant's Admissions ¶ 21.)

**RESPONSE:** Undisputed.

116.    During the 4/12/2016 Open House call, Walczak made the following statement: "Generally, however, as I have mentioned before, our risk management protocols have us modeling out at price and volatility extremes and attempting to control any draw down to roughly 8 percent." (PX-10, Defendant's Admissions ¶ 23.)

**RESPONSE:**  Walczak admits that Paragraph 116 correctly quotes a portion of his statements from the April 12, 2016 Open House call.  Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide context for the statements in Paragraph 116 that Plaintiff presents in isolation, and accordingly he disputes that Paragraph 116 fully and accurately reflects his full and complete statements.  *See* DX 74 (Transcript, April 12, 2016 Open House Call) at 25-28.

117.    Walczak participated in an Open House call on June 7, 2016 (the "6/7/2016 Open House call"). (PX-10, Defendant's Admissions ¶ 27.)

**RESPONSE:** Undisputed.

118.    During the 6/7/2016 Open House call, Walczak made the following statements regarding risk management of the Fund:

> [A]s I've mentioned before, **risk management, in my mind, is the key to outperforming as a portfolio manager**, as opposed to really chasing returns. Managing risk is the secret, so I'm always very happy to talk about that. So the first thing pure and simple is **our metrics are dialed in to limit our drawdown to 8 percent**.  There's no guarantees in the world, especially in markets, but that's our goal in everything we do is to keep our drawdown to 8 percent.

(Emphases added.) (PX-10, Defendant's Admissions ¶ 29.)

**RESPONSE:**  Walczak admits that Plaintiff has accurately quoted DX 16, which in turn approximates the words he used in the June 7, 2016 Open House call.  Walczak disputes the accuracy of the description of the question and the completeness of the quote.  Walczak therefore denies that Paragraph 118 accurately reflects what he stated on the indicated Open House call. *See* DX 16 (Transcript, June 7, 2016 Open House Call ("June 7, 2016 Call")) at 17-23.  Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide

context for the statements in Paragraph 118 that Plaintiff presents in isolation.

119.     During the 6/7/2016 Open House call, Walczak also made the following statements regarding risk management of the Fund:

> **Our methodology is to look at stresses on the portfolio.**  So we enter put trades when volatility does certain things. We enter call trades when volatility does certain things. We enter those trades in different expiration months, different strikes. We end up with a pretty complex portfolio of options positions. They're all entered for many different reasons at different times, but they all comprise a fairly complex portfolio.
>
> **So even if you're an options guy, if you look at a portfolio statement, you have no chance whatsoever of understanding how that portfolio will behave under different market conditions unless you have fairly sophisticated options modeling software, which, of course, we do.**
>
> **So in that software, we have our portfolio built, and we can then take stresses and say what if, and we do lots of what ifs,** and we do it graphically, meaning instead of, sort of, throwing darts at the wall and saying what if the S&P goes to 2150 next week, and we figure that out, and then what if it goes to 1900 at the end of the month, we do it graphically so we can see an overview, meaning we look at a graph, and along the bottom of that graph is the price of the S&P, and along the vertical axis of the graph is the value of the portfolio.
>
> So we can see a curve that says here's how the portfolio is going to behave as the market moves back and forth in price. **Now, for us in options, we have two other very important variables to consider. One is volatility, and one is time, and neither of those are factors if, for example, you were looking at an equity portfolio, but for us it's very important**.
>
> **So as we look at that graphic we actually see -- in a base case, we see five different lines on that graph of what the portfolio value would look like, and those five lines are five different points in time. So we can now see what happens if the S&P goes up 25 points tomorrow, if it's up 25 points at the end of the month, if it's up 60 points three weeks from now**.
>
> And again, without having to consider so much data that you can't manage it we can see it graphically in terms of the curves at different points in time. And then, of course, enters the most important variable in options pricing, and that is volatility. So it's actually less important about where the price of the S&P is than where volatility or the simplest form is the VIX.

**So fortunately, within our options software not only does the software automatically anticipate based on past behavior what will happen to volatility -- in other words, the software knows that if the market's down 10 percent volatility is going to be higher, and it uses historical data to project how much higher it will be, and that's reflected in the portfolio value of these options that we look at. And similarly to the upside we know that volatility is likely to decline**.

So the model is very sophisticated. It lets us look at portfolio values under a wide variety of scenarios, and it does it continuously so we don't have to pick random points. **However, we do pick stress points, and what we look at is a plus or minus side and 10 percent price excursion and also a minus 15 percent excursion because we all know that downside moves can be larger and more rapid, generally speaking, than upside moves.**

**So we look at all these stress points on those curves across time for places in which the portfolio values would cause us an unacceptable drawdown. And so when we identified that there's an unacceptable risk against our 8 percent parameter, we now use that same modeling software to figure out what to do about it.**

Part of the question, I think, Mike, was, all right, you find some risk. How do you mitigate that risk? Well, the good news is, as I mentioned earlier in the overview, is options contracts are risk management tools in essence. Many people use them to speculate, but they are risk management tools, meaning put options were invented to protect an equity -- an individual equity or equity portfolio from decline. If have you a stock and you're worried about it declining, you buy a put option.

So if we see, for example, that a large market decline -- this would be very rare, by the way, because in our portfolio we try to avoid downside risk, but if, for example, we saw that a 10 percent market decline would throw the portfolio into a 12 percent drawdown, well, the first thing we would look at is let's buy some puts. And maybe we're short some puts somewhere that we can repurchase and take off the table, or maybe we can buy two puts and sell one put to help us pay for the ones we bought, for example.

So we then go in, and, in fact, most of the time we're using the same structures that we already have in place in the portfolio -- call ratios, spreads, put diagonals -- but we can vary strikes and ratios. **And so we go in and we model what do we need to do to take this risk off the table, and so we spend a lot of time on that, actually, because, as I said, risk management contributes more to return, I believe, than does the actual return strategy itself.**

(Emphases added.) (PX-10, Defendant's Admissions ¶¶ 29-30.)

**RESPONSE:** Walczak admits that Plaintiff has accurately quoted DX 16, which in turn approximates the words he used in the June 7, 2016 Open House call. Walczak disputes the accuracy of the description of the question and the completeness of the quote. Walczak therefore denies that Paragraph 119 accurately reflects what he stated on the indicated Open House call. *See* DX 16, June 7, 2016 Call, at 17-23. Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide context for the statements in Paragraph 119 that Plaintiff presents in isolation.

120.    During the 6/7/2016 Open House call, Walczak made the following additional statements regarding risk management of the Fund:

> **We're stressing the portfolio using some pretty sophisticated modeling tools, and then, when we find an out-of-bounds situation, so to speak, we then jump right back in.** We have a whole tool set of risk management antidotes, so to speak, in the form of option contracts and positions we already use to try and make some money. **So we jump in and we move our strikes around, and we buy and sell different put options until that risk goes away. And so that's what we do as kind of a risk management overview**.

> So we like to be in a position and, in fact, we are -- I can't remember since 2007 that we were not in this position. **There is never a scenario where we wake up one day, and there's a panic in the market, and we scratch our heads and say, oh, my gosh, we've got to get out of that position. We've got to do something.**

> **We try to be a couple of chess moves ahead of that part of the portfolio management because we modeled that scenario a week ago, and we already took steps so that if the market is down 5 percent tomorrow that was part of our model from a week ago, and either it didn't cause us a problem in the model, so we're fine, or it did cause us a problem, and it's already fixed before it happens. That's the type of approach we like to take**.

(Emphases added.) (PX-10, Defendant's Admissions ¶¶ 29-30.)

**RESPONSE:** Walczak admits that Plaintiff has accurately quoted DX 16, which in turn approximates the words he used in the June 7, 2016 Open House call. Walczak disputes the accuracy of the description of the question and the completeness of the quote. Walczak therefore denies that Paragraph 120 accurately reflects what he stated on the indicated Open House call. *See* DX 16. June 7, 2016 Call, at 17-23. Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide context for the statements in Paragraph 120 that Plaintiff presents in isolation.

121.    During the 6/7/2016 Open House call, Walczak made the following statements in response to the questions "When you reference that max drawdown of about 8 percent, what's, like, your time frame on that? Is that just a max drawdown of 8 period, or is that over the course of a month or three months?":

> Well, when we talk about a drawdown -- yeah. When we talk about a drawdown, Mike, **the standard way of defining a drawdown is peak to valley over any time frame; in other words, an 8 percent drawdown from the highest level the fund has achieved until the lowest it ever achieves before it sets a new high. That's the standard industry definition of a drawdown, and that's what we use**.
>
> So it's not a situation where we're down 8 percent, start over, and we lose another 8 percent next month. No. The goal is to never be more than 8 percent in the hole from your highest ever value, and we've been successful in that since 2007.

(Emphasis added.) (PX-10, Defendant's Admissions ¶ 31.)

**RESPONSE:** Walczak admits that Plaintiff has accurately quoted DX 16, which in turn approximates the words he used in the June 7, 2016 Open House call. Walczak disputes the accuracy of the description of the question and the completeness of the quote. Walczak therefore denies that Paragraph 121 accurately reflects what he stated on the indicated Open House call. *See* DX 16, June 7, 2016 Call, at 17-23. Answering further, Walczak states that Open House call

transcripts must be read in their entirety to provide context for the statements in Paragraph 121 that

Plaintiff presents in isolation.

122.     Walczak participated in an Open House call on June 28, 2016 (the "6/28/2016

Open House call"). (PX-44, 6/28/2016 Open House call Tr. at 2-4.)

**RESPONSE:** Undisputed.

123.     During the 6/28/2016 Open House call, Walczak made the following statements in

response to a question:

> CALLER #2:  Okay, thanks, Ed.  Ed, a couple calls ago, you said that you, kind
> of, modeled the S&P Fund to really no greater than an eight percent draw down, if
> I heard that correctly.
>
> MR. WALCZAK:  Correct.
>
> CALLER #2: Is that -- is that a similar strategy with the Commodity Fund?
>
> MR. WALCZAK: It is. We have the same set of risk parameters, the difference
> being, in the S&P we can aggregate the entire portfolio to the single market. And
> we can -- we do -- we do our risk management, by the way, by stressing the
> portfolio. We basically, on the S&P Fund, aggregate all our put positions, call
> positions, different strikes, different expirations, all the stuff into our pricing
> model.
>
> We then, stress the portfolio across what happens in the market is down 10
> percent tomorrow? What happens if the VIX goes from 15 to 40 tomorrow? We
> do those kind of stresses and we do lots of what if modeling. And that's [how]
> we're able to understand, oops, if the market does X, we're at risk of exceeding
> our eight percent drawdown. We need to go in and make a portfolio adjustment.
> That's a high level of how the risk management works.

(PX-44, 6/28/2016 Open House call Tr. at 25-26; audio file for 6/28/2016 Open House call

(SEC_01_0059353) starting at approximately 32:00; (audio file authenticated by PX-34,

Schoonover Declaration (dated 11/11/21) at ¶¶ 2-5).)

**RESPONSE:**  Walczak admits that Plaintiff has accurately quoted PX 44, which in turn

approximates the words he used in the June 28, 2016 Open House call.  Walczak disputes the

accuracy of the description of the question and the completeness of the quote.  Walczak therefore

denies that Paragraph 123 accurately reflects what he stated on the indicated Open House call. *See*

PX 44 (Transcript, June 28, 2016 Open House Call ("June 28, 2016 Call")) at 25-29.  Answering

further, Walczak states that Open House call transcripts must be read in their entirety to provide

context for the statements in Paragraph 123 that Plaintiff presents in isolation.

124.    Walczak participated in an Open House call on July 12, 2016 (the "7/12/2016

Open House call"). (PX-45, 7/12/2016 Open House call Tr. at 2-4.)

**RESPONSE:** Undisputed.

125.    During the 7/12/2016 Open House call, Walczak made the following statements in

response to a question regarding how he mitigates risk to the upside:

> So, even when we butterfly a position, we do that because it makes our --
> those of you on the call have heard me describe, **we'll look at a portfolio
> value curve and be able to tell, what if the market's up five percent
> next week. What does that do to our portfolio value. And that's how
> we manage risk, we say, oh, too much of drawdown.  I don't like.**
>
> **What do we do?**  We go in and butterfly some of these positions and that
> -- and then, we remodel them. We say, okay, **we've taking some of that
> extreme upside off the table. We're now back in bounds. We're good.**
> However, at the same time, we also limit our upside uncovered call
> exposure and we don't call or count those butterfly positions as risk -- as
> mitigating that risk.

(Emphases added.) (PX-45, 7/12/2016 Open House call Tr. at 27-28; audio file for 7/12/2016

Open House call (SEC_01_0060790) starting at approximately 34:40; (audio file authenticated

by PX-34, Schoonover Declaration (dated 11/11/21) at ¶¶ 2-5).).

**RESPONSE:**  Walczak admits that Plaintiff has accurately quoted PX 45, which in turn

approximates the words he used in the July 12, 2016 Open House call.  Walczak disputes the

accuracy of the description of the question and the completeness of the quote.  Walczak therefore

denies that Paragraph 125 accurately reflects what he stated on the indicated Open House call. *See*

PX 45 (Transcript, July 12, 2016 Open House Call ("July 12, 2016 Call")) at 27-28.  Answering

further, Walczak states that Open House call transcripts must be read in their entirety to provide

context for the statements in Paragraph 125 that Plaintiff presents in isolation.

126.    Walczak participated in an Open House call on September 13, 2016 (the

"9/13/2016 Open House call"). (PX-10, Defendant's Admissions ¶ 32.)

**RESPONSE:** Undisputed.

127.    During the 9/13/2016 Open House call, Walczak made the following statements:

> We've elected from a discretionary standpoint -- there's a couple things we
> do discretionary. We have all our stuff is driven analytically, but we use
> discretion in terms of we can refuse an analytical entry signal. We don't
> refuse any risk exits.

(PX-46, 9/13/2016 Open House call Tr. at 32-33; audio file for 9/13/2016 Open House call

(SEC_01_0066166) starting at approximately 40:32; (audio file authenticated by PX-34,

Schoonover Declaration (dated 11/11/21) at ¶¶ 2-5).)

**RESPONSE:**  Walczak admits that Plaintiff has accurately quoted PX 46, which in turn

approximates the words he used in the September 13, 2016 Open House call.  Walczak disputes the

accuracy of the description of the question and the completeness of the quote.  Walczak therefore

denies that Paragraph 127 accurately reflects what he stated on the indicated Open House call. *See*

PX 46 (Transcript, Sept. 13, 2016 Open House Call ("Sept. 13, 2016 Call")) at 30-33.  Answering

further, Walczak states that Open House call transcripts must be read in their entirety to provide

context for the statements in Paragraph 127 that Plaintiff presents in isolation.

128.     During the 9/13/2016 Open House call, Walczak also made the following

statements in response to the question "A couple of times you've mentioned that, you know, you're

always worried about capital preservation, and you've mentioned like, an 8 percent loss --if you hit

an 8 percent loss at any point in time, you know, I'm just interested in what exactly would

happen":

> **Yeah, what we generally do is we model our exposure. We stress both portfolios looking out at various price points and volatility changes up and down in -- certainly in the S&Ps and then each of the commodity markets that we trade in with the goal of holding that loss to 8 percent.**
>
> **And we do that by identifying where -- you know, that's the one predictive thing we do it's on the risk side.** We continue to talk about how we react to markets in terms of entering positions and adjusting positions.
>
> **We do try to anticipate market moves in terms of the risk presented to the portfolio.  And what that amounts to is we do have a hard stop at 8 percent.  We would flatten the portfolio roughly at 8 percent.**
>
> **We chose 8 percent by the way expecting that there may be some slippage in the event that we ever actually had to liquidate the portfolio or even neutralize its exposure to whatever was causing the risk, there might be some slippage in doing that.**
>
> **So you might get 8.5 or 9 percent or thereabouts, but 8 percent is the number to try and least keep it to single digits.**
>
> The number by the way is reflective of what we feel like we can earn in a year, so that risk metric was originally developed long ago to say, look, we never want to have somebody underwater in this fund for longer than a year.
>
> And so if we can very comfortably in any given year even under not ideal conditions earn an 8 percent return, then we better not have a drawdown of greater than 8 percent.
>
> So it started out in somewhat of an arbitrary way.  But with both real-time experience and back-testing, that 8 percent number is a pretty good number. In other words, it doesn't inhibit our -- by controlling to that

number, it does not inhibit our potential for returns.

And yet at the same time, it does meet our goal to limit drawdowns in terms of severity and also in terms of duration.

**But the bottom line is as we look ahead and stress the portfolio and we identify a condition that is out of bounds, we will hedge that right now. And so as a result -- so you say, what happens if the market moves 10 percent -- whatever market it is -- and if that gives us an uncomfortably large loss, we'll go in and hedge that thing.**

**Now that 10 percent move might never occur, but if we get even 3 percent in that direction, then automatically we have that additional cushioning.**

**And in that circumstance, then we'd look again at the model and we'd say, oops, we still have a problem. We'll hedge some more.**

So it's a very gradual type of hedging scenario. We've never really had to liquidate the portfolio or to neutralize it because our ongoing hedging techniques -- we use hedging instruments.  That's what we trade in.  That's what options are really built for.

**So our hedging techniques allow us to cushion price movement and we're never in a situation where we have sort of a hard stop loss, and we're sitting just waiting for that 8 percent to get trigged and then we get out because we're constantly hedging.**

**That's the first thing we do every day is to identify risks and tune up our hedges if they're not sufficient.**

**And that allows us to avoid that hard stop and still maintain our drawdown discipline.**

(Emphases added.) (PX-10, Defendant's Admissions ¶ 34.)


    **RESPONSE:** Undisputed.


129.    Walczak participated in an Open House call on October 25, 2016 (the "10/25/2016

Open House call"). (PX-10, Defendant's Admissions ¶ 35.)


    **RESPONSE:** Undisputed.

130.    During the 10/25/2016 Open House call, Walczak made the following statements in response to the question "It's my understanding that as a goal you shoot for about a maximum draw-down of 8 percent. Specifically what happens to the fund if that were to occur?":

> So -- and you're correct, that is the goal of our risk management process and protocols. And let me describe a little bit about how that works. **So we're not using a standard sort of stop-loss, although if we somehow get to 8 percent -- and we have been there actually in the fourth quarter of 2014 -- we will flatten that risk at that level. And there's always some slippage to be very honest**.
>
> When I instituted -- when I was the only guy involved -- instituted this risk, this particular set of risk rules that's been around. I did it in the middle of 2007.  My actual thinking was if I set this thing up to control to 8 percent, if we get a -- just some sort of horrific illiquid, world is ending kind of market, we're probably, from a pure slippage standpoint, we're probably risking another maybe 200 basis points, another two, and I wanted to keep it to single digits. So 8 is designed to keep it under 10, but we've been successful in actually keeping it -- I think our worst draw-down, that 2014 draw-down, might have been about 8 and a half percent. And so we're happy, I'm happy with the performance of that system over time. **But let me tell you a little bit of how we do it. In other words, we're not kind of sitting here waiting until we hit 8 percent, and then we jump up and liquidate the fund.**
>
> **We consistently model the fund's portfolio.**  So there's a lot of different -- I talk all about term structure, about volatility and price ranges, and fundamental and technical guesses at where the market's going to go, and on and on.  And what that does, it leads us into a pretty diverse collection of options positions in the portfolio. It's a little rare right now that we're only in calls, but so be it. But at any given moment, we have this portfolio that's got options all over the place. And so, although we entered each of these positions for different reasons at the time, we aggregate that into an overall portfolio, and in fact this is really one of the most important things we do, the entry is fairly mechanical, and **where a lot of the brain power comes in is to manage the risk. I've said that before, I think that's our edge**.
>
> So we aggregate all these options positions into a portfolio, and if you look at the portfolio, even those of you who are somewhat familiar with options and you can do kind of back of the envelope, expiration, here's what's going to happen kind of things, **I guarantee you if you look at this portfolio, you have no chance of getting your head around it without some pretty decent options modeling software. So good news, we've got it, and what we do is we look at the portfolio and we**

**actually graph the change in value of the portfolio over whatever price range we want to choose, and we generally choose a downside look of 15 percent and an upside look of 10 percent. And we will actually, when markets get volatile, which is you lead to the downside, we'll typically extend that downside look to 20 percent**.

So imagine you're looking at a graph and the graph on the X axis has the value of the portfolio, and the graph on the Y axis is the price of the S&P, and so you can immediately see on a continuous basis what's happening to your portfolio value. **And we can go in there with our -- with the tools in the software and peg a minus-8 percent, a minus-10, a minus-5, et cetera, and see those levels. We also, because options are time-based, we look across five different timeframes. We'll typically start at the furthest expiration, which right now is out in February, and the software by default will divide, between now and February, into five chunks of time. So it will say -- I don't even know off the top of my head what that is. It's probably 120 days, so call it -- it'll give us 25-day intervals or something.  So we'll see five lines on this graph at each timeframe and they'll be different.**

**So we then analyze this and say, "Where do we get in trouble?" and in trouble like -- as you correctly said, is -- trouble is down 8 percent. So we now look, where are we down 8 percent, and then we make -- we look where we're down 8 percent and look to see what does it take -- first of all, do we need to take action, is it -- and we have some rules around this -- are we down 8 percent if the market moves 1 percent next week? Well that would be a big problem. We would jump in right away and adjust the portfolio to whatever extent we had to take that off the table. In other words, the first thing we do is why are we down 8 percent.** Oh, we're down 8 percent because the market is up. How do we protect against an up market? We buy call options. That's what call options do. If you're somehow being hurt by an upside market move, buy calls. In our case, we're short some calls out there, we'll probably buy them back. But -- so we look at all these parameters, and when they're out of bounds according to our rules, then we identify why are they out of bounds. Maybe they're out of bounds because we're not hedged against a spike in volatility, for example. Maybe we look fine on price but we know that when price declines the VIX is going to pop. We go into our mode and we say what does this curve look like if we increase the VIX from 15 to 25, and at 15 we look fine, at 25 we don't look so good, we say, "Oops, we have a volatility exposure." How do you solve that? Well you can solve a volatility exposure a lot of different ways. One way is to simply buy a bunch of put options.

Normally we don't have to worry about that because we're always long puts -- whenever we have anything on down there.  But an any rate, so this just gives you some qualitative sense for what we do. **We're always looking forward. This is the only predictive thing we do. We react to**

**markets to put on positions, but we try to predictively look at risk. We try to say if three weeks from now the market is up 10 percent, are we in trouble or not in trouble, and we've got definitions about what trouble means designed to keep us ultimately from an 8 percent loss.** So we look at these things, we identify if we're in trouble, why are we in trouble? Is it price? Is it volatility? Does some time have to pass? And then we take corrective action, and once again, we have a serious advantage, as I said, by simply using options because they're risk limited no matter what we're doing with them. The second thing to know about options is essentially options are hedging tools.

So the very thing we trade in that does sometimes give us risk is actually the same thing we have to go out and use to hedge when we discover we have too much risk. So we're -- the option -- we believe that the options contract's a beautiful thing. When we find a problem based on our portfolio model, we can almost always solve it.  In fact, we spend a lot of time on figuring out how best to solve it.

**We can use straight option purchases, we can use options spreads, we can use all sorts of combinations to give us just the right hedging exposure to bring that portfolio back in line where we take that 8 percent risk off the table. All that being said, there are times when we hedge, the market keeps coming, we hedge some more, the market keeps coming.  When we hit that draw-down, we will go absolutely neutral**. It doesn't always mean cash, but it typically means that -- a neutral exposure, where whatever the market does, we're not going any lower, and that's -- nothing in the business is guaranteed but that's our goal, that's kind of how we approach it.

(Emphases added.) (PX-10, Defendant's Admissions ¶ 37.)

RESPONSE:  Undisputed that Walczak used the words quoted.  Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide context for the statements in Paragraph 130 that Plaintiff presents in isolation.

131.    Walczak participated in an Open House call on May 24, 2016 (the "5/24/2016 Open House call"). (PX-10, Defendant's Admissions ¶ 24.)

**RESPONSE:** Undisputed.

132.    During the 5/24/2016 Open House call, Walczak made the following statements in response to a question, "[H]ow do you react to the market changes as you get closer to those option expirations?":

> [W]e have six different expiration periods. So we make a very conscious effort to diversify the fund's positioning across expiration periods and strike prices. So we don't have the entire fund's portfolio, for example, in June options at 2100 strike. We have 2100 strikes in June, we have 2110 at the end of June, we have 2120 in July, we have 2140 at the end of July, and it goes on like that.
>
> So what happens in practice with the fund's portfolio is any given options expiration period will only introduce volatility to a relatively small part of the fund's portfolio, and then only if it happens to be near the strike prices of those particular options. So as I said, for both risk and return opportunity reasons, we are fairly well diversified in our positioning across many different expiration months and many different strike prices to try and take that volatility out.
>
> But the basic -- just getting back to the real basic, simple question, does options expiration introduce volatility?  Yes -- in terms of the fund's value, yes, it does. However, we diversify a lot of that away and, secondarily, not every options expirations period will have the market near the strikes, which is what really introduces the volatility.

(PX-10, Defendant's Admissions ¶ 26.)

**RESPONSE:**  Walczak admits that Plaintiff has accurately quoted DX 15, which in turn approximates the words he used in the May 24, 2016 Open House call.  Walczak disputes the accuracy of the description of the question and the completeness of the quote.  Walczak therefore denies that Paragraph 132 accurately reflects what he stated on the indicated Open House call. *See* DX 15 (Transcript, May 24, 2016 Open House Call ("May 24, 2016 Call")) at 23-26.  Answering further, Walczak states that Open House call transcripts must be read in their entirety to provide context for the statements in Paragraph 132 that Plaintiff presents in isolation.

**VII.    Walczak Other Representations Regarding His Purported Risk Management Process, Including Stress Testing Devised to Cap Losses at 8%.**

133.     Walczak and Rios collaborated to respond to a due diligence questionnaire from Hudock Moyer Wealth Resources (the "Hudock DDQ Response"). (PX-12, Kimberly Rios (Apr. 21, 2021 Dep.) at 35-39; PX-14, K. Rios Dep. Ex. KR0027.)

**RESPONSE:** Disputed.  The e-mail cited by Plaintiff in support of Paragraph 133 (PX 14) shows a Catalyst representative asking Walczak and Rios for input on a DDQ response.  The testimony cited by Plaintiff in support of Paragraph 13 (PX 12 at 35-39) shows Rios explaining that DDQs would be sent to New York (not to her and Walczak), and that she and Walczak would "[i]nfrequently" be asked to "fill out certain portions" of Catalyst's response, after which they would send materials to Catalyst in New York, and "what New York did with them after that, I do not know."  PX 12 at 36:11-16, 39:5-6.  Nothing in the cited sources indicates that Rios and Walczak "respond[ed] to a due diligence questionnaire from Hudock Moyer Wealth Resources," and Walczak disputes this allegation.

134.     In response to a request for a description of the Fund's "downside sell discipline" the Hudock DDQ Response states: "If a drawdown reaches 8% of overall portfolio risk, there is a trigger to exit position(s)." (PX-13, K. Rios Dep. Ex. KR0026; PX-12, Kimberly Rios (Apr. 21, 2021 Dep.) at 49.)

**RESPONSE:** Undisputed.

135.     In August 2014, Erina Ford (who was affiliated with Raymond James at the time) asked the following question about the Fund via email:

> On our call with Ed, he mentioned an 8% maximum drawdown limit that is carefully monitored. Can you provide more details on the nature of this risk mitigating tool and illustrate how it would perform in various market environments?

(PX-10, Defendant's Admissions ¶ 38.)

**RESPONSE:** Undisputed.

136.    Walczak answered Erina Ford's question that is set forth above in Paragraph 135 as follows:

> Individual position risks are identified (time, price, volatility) and hedged with counterbalancing options at entry. **Individual positions are aggregated to an options pricing tool that models portfolio value stressed by +5%, +10%, -5%, -10%, -20% price excursion, VIX +10, +20, across 5 time horizons extending to the Portfolio's longest dated options expiration. Absolute drawdown of 8% from high water requires flattening of risk, no discretion allowed.** Performance in various market environments is illustrated by the Fund's monthly return history.

(Emphasis added.) (PX-10, Defendant's Admissions ¶ 39.)

**RESPONSE:** Undisputed.

137.    In August 2014, Vann Taylor (who was affiliated with Shepherd Kaplan LLC at the time) asked several questions about the Fund via email, including the following:

> "Specifically, we need to understand:
>
> • Risk management structure. Maximum loss, worst case scenarios, and the structure around trading."

(PX-57, CFTC3_00032463 (8/24/14 email from E. Walczak to C. Hano); PX-58, SEC-CCA-E-0000846 at 848 (8/25/14 email from C. Hano to E. Walczak).)

**RESPONSE:**    Undisputed that Plaintiff has correctly quoted a portion of the August 2014 e-mail.  Further responding, Walczak states that the e-mail must be read in its entirety for full context.

138.    In August 2014, Walczak answered Taylor's question that is set forth in Paragraph

137 above as follows:

> Each position risk are identified and hedged at entry. **Portfolio risk
> stressed daily for price excursion +5%, +10%, -5%, -10%, -20%,
> volatility excursion VIX =10, =20, =30, time horizons inclusive of
> longest dated position expiration. Portfolio "stop" at 8% drawdown.**
> More detail if needed on a call.

(Emphasis added.) (PX-57, CFTC3_00032463 (8/24/14 email from E. Walczak to C. Hano); PX-

58, SEC-CCA-E-0000846 at 848 (8/25/14 email from C. Hano to E. Walczak).)

**RESPONSE:**  Undisputed that Walczak wrote most of the language set forth in Paragraph

138, although he wrote "risks" instead of "risk" as the third word.  *See* PX 58.  Disputed that

Walczak "answered Taylor's question," as PX 58 shows that Walczak responded to an e-mail from

Chris Hano, not from Vann Taylor, with no indication that Walczak ever had direct contact with

Vann Taylor.  *See generally id.*  Answering further, Walczak states that his commentary in PX 58

must be read in its entirety for full context.

139.    In August 2014, in the same email referenced in Paragraph 137 above, Vann

Taylor made the following statement: "In general, understanding the economic rational to why it

should work, and the likelihood or scenario where large amounts of money is lost." (PX-57,

CFTC3_00032463 (8/24/14 email from E. Walczak to C. Hano); PX-58, SEC-CCA-E-0000846 at

848 (8/25/14 email from C. Hano to E. Walczak).)

**RESPONSE:**  Undisputed that Vann Taylor's e-mail quoted in PX 58 contains the words

set forth in Paragraph 139. Answering further, Walczak states that the e-mail presented as PX 58

must be read in its entirety for full context.

140.    In August 2014, Walczak responded to Taylor's statement that is set forth above in

Paragraph 139 above as follows:

> Rational: options are constructed to be **risk limited**. That's what works. What I do is figure out how large amounts of money could be lost and then hedge/remove those risks or avoid those trades all together.  Returns are secondary.

(Emphasis in original.) (PX-57, CFTC3_00032463 (8/24/14 email from E. Walczak to C. Hano);

PX-58, SEC-CCA-E-0000846 at 848 (8/25/14 email from C. Hano to E. Walczak).)

   **RESPONSE:**  Undisputed that Walczak wrote the language set forth in Paragraph 140.

Disputed that Walczak "responded to Taylor's statement," both because the excerpt of Vann

Taylor's e-mail quoted in Paragraph 139 does not constitute a "statement" and because PX 58

shows that Walczak responded to an e-mail from Chris Hano, not from Vann Taylor, with no

indication that Walczak ever had direct contact with Vann Taylor.  *See generally* PX 58.

Answering further, Walczak states that his commentary in PX 58 must be read in its entirety for

full context.


   141.    In June 2015, Alex Bergelson (who was affiliated with BNP Paribas at the time)

asked the following question about the Fund via email:

> On our call Edward Walczak, the PM, described in details a daily risk report, based on which the fund is managed to max 8% loss from the worst scenario from the report.
>
> Specifically this is a stress report with (-15% / -10% / -5% / +5% / +10%) stresses – please explain that this is what we are looking for, along with fund positions for the same day.

(PX-60, CFTC3_00030988 (6/12/15 email from E. Walczak to K. Rios & P. Rieger).)


   **RESPONSE:**  Undisputed.


   142.    In June 2015, Walczak answered Bergelson's question that is set forth in Paragraph

141 above as follows:

> **Each day I graphically view the stress points referred below[1] in combination with volatility stresses of VIX = 20, 30 and 45. I do that across 5 time frames. This represents 75 combinations of market parameters.** I have not found it a value add exercise to generate a document with these numbers when it can be scanned visually in a fraction of the time. Perhaps the best document of the effectiveness of risk control would be the audited performance capsule which represents real time risk management results over the past 9+ years.  On this basis I suspect the Fund compares favorably to BNP's existing client universe although its likely that most have more impressive sets of risk documents.
>
> If this does not suffice, then you may politely thank BNP for their interest and we will move on to a new clearing partner candidate.

(PX-60, CFTC3_00030988 (6/12/15 email from E. Walczak to K. Rios & P. Rieger).)

  **RESPONSE:**  Undisputed that Walczak wrote most of the language set forth in Paragraph 142, although he wrote "referred to below" instead of "referred below."  *See* PX 60.  Undisputed that the "stress points referred to below" referred to the percentages set forth in Plaintiff's footnote to Paragraph 142.  Disputed that Walczak "answered Bergelson's question," as PX 60 shows that Walczak responded to an e-mail from Paul Rieger, not from Alex Bergelson, with no indication that Walczak ever had direct contact with Alex Bergelson.  *See generally* PX 60.  Indeed, the "you" in Walczak's statement in Paragraph 142 that "you may politely thank BNP for their interest" referred not to Alex Bergelson, but to Paul Rieger.  *Id.*

  143. Mutual Fund Series Trust filed an Annual Report for the period ending June 30, 2015 with the Commission on September 9, 2015 (the "Annual Report"). (PX-5, Mutual Fund Series Trust, SEC Form N-CSR (Sept. 9, 2015), available at https://www.sec.gov/Archives/ edgar/data/1355064/000158064215004144/catalystncsr.htm (last visited 11/15/2021).)

---

[1] The "stress points referred below" are the stress points set out in Bergelson's email quoted at Paragraph 141 above (i.e., the "-15% / -10% / -5% / +5% / +10% stresses").

**RESPONSE:** Undisputed.

144. The Annual Report include includes a letter to Fund shareholders, which states, in part:

> Unfortunately, the mean reversion of volatility that followed October's spike was accompanied by not just a "normal" price rebound but a parabolic advance covering more than 10% in the space of 5 weeks. For perspective, this represents an annualized compound return of more than 160%. Because the Fund is consciously positioned to accept upside risk in exchange for eliminating most downside exposure, this is the worst scenario for our strategy. The Fund suffered a drawdown of more than 8% during this time. While disappointing, there were two positives to this period. **One, the Fund's risk controls were successful in limiting the drawdown to roughly 8% which is the number they are designed to control to.** Second, the extreme nature of the price advance provided a real time stress test to our position management protocols. From that experience we were able to make some modifications that I believe can improve performance in future, like environments.
>
> * * *
>
> Edward S. Walczak
> Senior Portfolio Manager

(Emphasis added.) (PX-5, Annual Report at 26.)

**RESPONSE:** Undisputed that Paragraph 144 correctly quotes a portion of a letter to Fund shareholders that was included with the September 9, 2015 Annual Report.  Responding further, Walczak states that the Annual Report and letter to Shareholders must be read in their entirety for proper context.

145. Walczak drafted the letter to Fund shareholders that appears in the June 30, 2015 Annual Report. (PX-61, CFTC3_00030427 (7/22/15 email from E. Walczak to H. Mujeeb, which states "I have updated the narrative but NOT dates, performance or footnoting" and attaches document entitled "HFXAX Shareholder Letter072015.docx" which includes language quoted

above).)

        **RESPONSE:** Undisputed.

**VIII.   Catalyst Raised Concerns Regarding Walczak's Risk Management.**

        146.    During the time period December 1, 2016 through February 28, 2017, the Fund's

portfolio was highly negatively correlated with the US equity market. (PX-68, Pearson Expert

Report at ¶¶ 16(h), 119-21, 124-27, 136(h) & Exs. 22 and 24.)

        **RESPONSE:** Undisputed that in the narrow time frame Prof. Pearson studied, returns on

the Fund's portfolio were negatively correlated with returns on the S&P 500 index.  Disputed that

"the Fund's portfolio" was negatively correlated with "the US equity market," both because the

evidence cited addresses only the S&P 500 index, not "the US equity market," and because there is

no unique way to check whether or how a portfolio (as opposed to its returns) is "correlated with" a

market (as opposed to returns on the same).  Dispute that any observed correlation was "high" on

the grounds that this description is inherently vague and not susceptible of clear determination as

true or false.  Answering further, Walczak notes that correlation of returns is by definition

measured over some period of time, and Prof. Pearson pointedly refused to analyze the correlation

between Fund returns and S&P 500 returns over other periods.  DX 78 (Oct. 19, 2021 Deposition

of Neil D. Pearson ("Pearson Dep.")) at 177:23 to 178:1,  And in fact, correlation between Fund

returns and S&P 500 returns was commonly much lower than in the period discussed in Paragraph

146.  *E.g.*, DX 75 (study by Daniel Saffrin) (indicating negative correlation of smaller magnitude

for holding periods up to "year to date," positive and smaller correlation for a one-year holding

period, and zero correlation for 2018 and 2019 combined).  Furthermore, Prof. Pearson stated that

the correlation between the Fund's returns and the returns on the S&P 500 would predictably be

negative in situations such as the Fund faced in February 2017 but predictably positive in other

situations.  DX 78, Pearson Dep., at 183:17 to 185:22.

147.     The Fund had a significant directional bias starting in early December 2016, as changes in the Fund's per-share value moved inversely with changes in the S&P 500. (PX-68, Pearson Expert Report at ¶ 120; *see also* PX-68, Pearson Report at ¶¶ 16(h), 119-21, 124-27, 136(h) & Exs. 22 and 24.)

**RESPONSE:**  Disputed that the Fund displayed a global "directional bias" in early December 2016.  Prof. Pearson's study looked at realized S&P 500 index moves, and in the small range studied, there was indeed a negative correlation between Fund returns and S&P 500 returns. But Prof. Pearson did not analyze how the Fund's returns would have responded to larger decreases in the S&P 500 index, and Prof. Pearson has indicated that as the S&P 500 decreased, the Fund stood to gain at first, then give back some of those gains if the S&P 500 fell far enough, and finally flatten out without further gains or losses below a certain S&P 500 level, a scenario that is not in keeping with uniform "directional bias," which would instead suggest consistent gains from movements in the S&P 500 in one direction and consistent losses from movements in the S&P 500 in the opposite direction.  DX 78, Pearson Dep., at 183:17 to 185:22.  Furthermore, Paragraph 147 defines neither "bias" nor "significant," and Walczak accordingly objects to the use of those loaded and ill-defined terms.  Undisputed that the Fund's per share value moved in the opposite direction from changes in the S&P 500 on some days in early December 2016, but Walczak disputes the implication that this was true for *all* days in that period.  *Compare* DX 8 (Fund prices) *with* DX 79 (S&P 500 prices).

148.     During the time period December 1, 2016 through February 28, 2017, the Fund's returns were highly volatile. (PX-68, Pearson Expert Report at ¶¶ 16(h), 122-23, 136(h) & Ex.

23.)

**RESPONSE:** Disputed, on the grounds that "highly volatile" is not defined, so as to thwart determination of its truth or falsity.  Answering further, Walczak notes that volatility of returns is by definition measured over some period of time, and Prof. Pearson pointedly refused to present analysis of the volatility of Fund returns over other periods.  DX 78, Pearson Dep, at 180:3 to 183:10.  Indeed, the Fund generally exhibited low volatility, as compared to the S&P 500.  *See, e.g.*, DX 75 (indicating "SD" or standard deviation as measure of volatility that is smaller for the Fund than for the S&P 500 for each of six holding periods studied).

149.     During the time period December 1, 2016 through February 28, 2017, the Fund's returns were 3.35 to 5.25 times more volatile than the returns on the S&P 500 index (meaning the Fund's returns were 3.35 to 5.25 times more volatile than the returns on a diversified stock portfolio. (PX-68, Pearson Expert Report at ¶ 123; *see also* PX-68, Pearson Report at ¶¶ 16(h), 122-23, 136(h) & Ex. 23.)

**RESPONSE:** Undisputed that the Fund's returns were more volatile than the returns on the S&P 500 index in the narrow time frame discussed in Paragraph 149.  Disputed that this necessarily implies a similar multiple of the Fund's returns' volatility over the volatility of returns on "a diversified stock portfolio," as the characteristics of a diversified stock portfolio are not well defined and not explained in Paragraph 149 or the sources cited therein.  Answering further, Walczak notes that volatility of returns is by definition measured over some period of time, and Prof. Pearson pointedly refused to present analysis of the volatility of Fund returns over other periods.  DX 78, Pearson Dep, at 180:3 to 183:10.  Indeed, the Fund generally exhibited low volatility, as compared to the S&P 500.  *See, e.g.*, DX 75 (indicating volatility of S&P 500 returns at 1.7 to 3.9 times as large as volatility of returns on the Fund).

150.     The Fund was very risky, highly volatile, and highly negatively correlated with the S&P 500 index during December 2016, January 2017, and February 2017. (PX-68, Pearson Expert Report at ¶ 123; *see also* PX-68, Pearson Report at ¶¶ 16(h), 119-237, 136(h) & Exs. 22,23, 24.)

**RESPONSE:** Disputed on the grounds that "very risky," "highly volatile," and "highly negatively correlated" are not defined, so as to thwart determination of their truth or falsity. Walczak further disputes the assertions in this summary paragraph for the same reasons as he did the assertions in its supporting paragraphs, Paragraphs 146, 148, and 149.

151.     The Fund's high levels of volatility and negative correlations during the time period of December 1, 2016 through February 28, 2017 were inconsistent with the Fund's stated purpose of "capital appreciation and capital preservation in all market conditions, with low volatility and low correlation to the US equity market. (PX-68, Pearson Expert Report at ¶ 123.)

**RESPONSE:** Disputed.  Neither Paragraph 151 nor the source it cites indicates where, if anywhere, the Fund's prospectus or other materials indicated how "capital appreciation," "capital preservation," "low volatility," or "low correlation to the US equity market" were to be measured. In particular, with both volatility and correlation varying over time and according to the duration of the holding period over which they are calculated, those metrics are ill-defined without clarification of the holding period and what percentage of the time their values should be "low."  Prof. Pearson also fails to specify what levels of volatility or correlation would satisfy the Fund's stated investment objective.  For all of these reasons, Walczak disputes the assertions in Paragraph 151. Walczak further disputes Paragraph 151 on the ground that the source cited does not demonstrate that the Fund had a stated "purpose" as alleged.

152.     During the time period of December 1, 2016 to December 18, 2016, Walczak was

in Hawaii. (PX-50, List of Walczak's Physical Locations From Dec. 2016 through Feb. 2017.)

**RESPONSE:** Undisputed.

153.     The stress tests described by Walczak applied to the Fund's portfolio as of

December 7, 2016 result in projected losses greater than 8%. (PX-68, Pearson Expert Report at

¶ 76 & Ex. 9.)

**RESPONSE:** Disputed.  "The stress tests described by Walczak" is ill-defined, as Walczak

described different stress tests at different times, in response to market conditions.  Walczak's

stress tests also never "projected losses," as they made no assertion as to the direction the S&P 500

index or its volatility would take in the future.

154.     A stress test of a 5% increase in the S&P 500 index applied to the Fund's portfolio

as of December 7, 2016 results in a projected loss greater than 20%. (PX-68, Pearson Expert Report

at ¶ 76 & Ex. 9.)

**RESPONSE:** Undisputed that "a" stress test of this kind may indicate such potential

losses, but Walczak disputes that this is true for the stress tests he ran.  Paragraph 154 does not

specify the time period over which the movement in the S&P 500 was assumed to occur or the

changes in other market variables that were likely to occur in response to a 5% rise in S&P 500

index levels.  Paragraph 154 also disregards Walczak's ability to conduct trading during the period

over which the proposed move is hypothesized to arrive, so as to change the resulting losses or

gains by the conclusion of such move.  Walczak further disputes Paragraph 154 as failing to

indicate which pricing model and other inputs the stress test used in reaching these numbers, and he

notes that no assertion is made that Walczak made the same assumptions regarding pricing models or inputs when running his own stress tests.

155.     A stress test of a 5% increase in the S&P 500 index applied to the Fund's portfolio as of December 7, 2016 results in a projected loss greater than 8% regardless of whether that stress test is analyzed over a time period of 0 days (*i.e.*, an immediate movement on 12/7/16), one week, two weeks, or three weeks. (PX-68, Pearson Expert Report at ¶¶ 50, 76 & Ex. 9 (at 5% stress test on S&P 500 index, all time frames result in projected losses of more than $840 million; applied to Fund's NAV of $4,268 million equals losses of more than 19%).)

**RESPONSE:**  Undisputed that "a" stress test of this kind may indicate such potential losses, but Walczak disputes that this is true for the stress tests he ran.  Paragraph 155 does not specify the changes in other market variables that were likely to occur in response to a 5% rise in S&P 500 index levels in the time periods indicated.  Paragraph 155 also disregards Walczak's ability to conduct trading during the period over which the proposed move is hypothesized to arrive, so as to change the resulting losses or gains by the conclusion of such move.  Walczak further disputes Paragraph 155 as failing to indicate which pricing model and other inputs the stress test used in reaching these numbers, and he notes that no assertion is made that Walczak made the same assumptions regarding pricing models or inputs when running his own stress tests.

156.     A stress test of a 10% increase in the S&P 500 index applied to the Fund's portfolio as of December 7, 2016 results in a projected loss greater than 60%. (PX-68, Pearson Expert Report at ¶ 76.)

**RESPONSE:**  Undisputed that "a" stress test of this kind may have indicated such projected losses, but Walczak disputes that this is true for the stress tests he ran.  Paragraph 156

does not specify the time period over which the movement in the S&P 500 was assumed to occur or the changes in other market variables that were likely to occur in response to a 10% rise in S&P 500 index levels.  Paragraph 156 also disregards Walczak's ability to conduct trading during the period over which the proposed move is hypothesized to arrive, so as to change the resulting losses or gains by the conclusion of such move.  Walczak further disputes Paragraph 156 as failing to indicate which pricing model and other inputs the stress test used in reaching these numbers, and he notes that no assertion is made that Walczak made the same assumptions regarding pricing models or inputs when running his own stress tests.

157.    In December 2016, the Fund's per-share net-asset value ("NAV") dropped from more than $12 on December 6th to less than $11.25 on December 9th. (PX-68, Pearson Expert Report at ¶¶ 76, 111 & Ex. 18.)

**RESPONSE:** Undisputed.

158.    Walczak did not make risk-reducing trades on December 6th, 7th, or 8th. (PX-68, Pearson Expert Report at ¶ 111 & Ex. 18.)

**RESPONSE:** Disputed.  Exhibit 1 to Michael De Laval's expert report indicates risk-reducing trades implemented by Walczak on behalf of the Fund during the period described in Paragraph 158.  DX 43 (Expert Report of Michael De Laval) ex. 1.

159.    Walczak made risk-reducing trades on December 9, 2016, after the drawdown referenced in Paragraph 157 above was well underway. (PX-68, Pearson Expert Report at ¶¶ 111, 136(c) & Ex. 18.)

**RESPONSE:** Undisputed that Walczak also made risk-reducing trades on December 9,

2016.

160.    On December 9, 2016, Rios received an email from Schoonover with the subject line "Risk Analysis / Understanding of Stress Testing," which she then forwarded to Walczak (hereinafter the "12/9/16 Stress Testing Email"). (PX-24, Inv. Test. Ex. 40; PX-29, CFTC Ex. 8; PX-18, Michael Schoonover (Mar. 2, 2018 Test.) at 267; PX-17, Kimberly Rios (Feb. 23, 2018 Test.) at 323; PX-20, Edward Walczak (Apr. 4, 2018 Test.) at 553.)

**RESPONSE:** Undisputed.

161.    In the 12/9/16 Stress Testing Email, Schoonover asked Rios the following:

> Hi Kimberly,
>
> Thanks for the time on the call today. We spoke after the call about trying to propose something. Are you able to send us some screenshots/raw data/explanation of anything you use to stress test/measure the risk? I think the biggest thing we can do to make sure that the strategy risk and business risk are properly aligned is to make sure we understand how the fund measures risks and reacts to adverse events.

(PX-24, Inv. Test. Ex. 40; PX-29, CFTC Ex. 8; PX-18, Michael Schoonover (Mar. 2, 2018 Test.) at 267; PX-17, Kimberly Rios (Feb. 23, 2018 Test.) at 323; PX-20, Edward Walczak (Apr. 4, 2018 Test.) at 553.)

**RESPONSE:** Undisputed.

162.    In the 12/9/16 Stress Testing Email, Rios asked Walczak "Ed, See below. How in depth do you want to get with things (charts, optionvue, etc…) with NY, or just have us come up with adjustments for them to review?" (PX-24, Inv. Test. Ex. 40 (ellipses in original); PX-17, Kimberly Rios (Feb. 23, 2018 Test.) at 323; PX-20, Edward Walczak (Apr. 4, 2018 Test.) at 553.)

**RESPONSE:** Undisputed.

163.   On December 10, 2016, Walczak received an email from Kimberly Rios with the subject line "Booking losses phone call" (hereinafter the "12/10/16 Rios Email"). (PX-10, Defendant's Admissions ¶ 44.)

**RESPONSE:** Undisputed.

164.   The 12/10/16 Rios Email states the following:

> Ed,
>
> Paul called. Said that the phone call today is to discuss how to take risk off.
>
> The Fund is at $3.94B
> YTD return is 1.93%
>
> From what I see, a 1% up market move is equiv to a 5% decline in NAV.
>
> Scenarios I have looked at deal with reducing risk in Feb. The below scenario would be booking losses of around $167mm, so 4.2% and does not cap the downside, but at 50 bps higher, makes a $500mm difference.
>
> I know what the charts look like. I know what the news says. This is being discussed because there are shareholders involved and there is momentum in the market.
> Two factors working that can't be ignored are that it's December, and there is an FOMC meeting this week.
>
> Thoughts?

(PX-64, Catalyst_005_0118107 (12/10/16 email from K. Rios to E. Walczak); *see also* PX-10, Defendant's Admissions ¶ 45.)

**RESPONSE:** Undisputed.

165.   On December 14, 2016, Walczak received an email from Kimberly Rios with the

subject line "thoughts" (hereinafter the "12/14/16 Rios Email"). (PX-10, Defendant's

Admissions ¶ 46.)

**RESPONSE:** Undisputed.

166.   The 12/14/16 Rios Email is bates numbered Catalyst_005_0123959 and says:

Ed,
For the pain tolerance level of clients, it seems that buying calls closer to
the market will get us closer to putting a cap on the bottom, rather than
being out at the 2300 level. I know it is not ideal, but buying something
like eom dec 2280 in a substantial amount would maybe help stop the
bleeding. If the market is up then, we could maybe roll them. It just seems
that 2300 still gives us a big move down yet as the market rises.

[T]he outflows are large and we have the distribution this week. Whatever
we make back as the market declines, it will be an even faster comeback
from a smaller base.

Just some thoughts.

(PX-65, Catalyst_005_0123959 (12/14/16 email from K. Rios to E. Walczak); *see also* PX-10,

Defendant's Admissions ¶ 47.)

**RESPONSE:** Undisputed.

167.   During the time period of December 19, 2016 to December 28, 2016, Walczak was

in Wisconsin. (PX-50, List of Walczak's Physical Locations From Dec. 2016 through Feb. 2017.)

**RESPONSE:** Undisputed.

168.   During the time period of December 29, 2016 to January 19, 2017, Walczak was in

Hawaii. (PX-50, List of Walczak's Physical Locations From Dec. 2016 through Feb. 2017.)

**RESPONSE:** Undisputed.

169.    During the time period of January 20, 2017 to January 29, 2017, Walczak was in California. (PX-50, List of Walczak's Physical Locations From Dec. 2016 through Feb. 2017.)

**RESPONSE:** Undisputed.

170.    On or about January 25, 2017, the Fund lost approximately $0.50 per share. (PX-68, Pearson Expert Report at Ex. 18.)

**RESPONSE:** Disputed.  On January 25, 2017, the Fund lost $0.46 per share, before gaining that full amount and more back over the next four business days.  DX. 8 (Fund prices).

171.    On or about January 25, 2017, Walczak received the following text message from Jerry Szilagyi: "I saw HFX was down over 4% today. What is going on? I thought we agreed to take the exposure down. This rally could go way further." (PX-10, Defendant's Admissions ¶ 48.)

**RESPONSE:** Undisputed.

172.    On or about January 25, 2017, Walczak received the following text message from Jerry Szilagyi: "We need to review the strategy asap. When can you be in NY?" (PX-10, Defendant's Admissions ¶ 49.)

**RESPONSE:** Undisputed.

173.    On January 26, 2017, Walczak received an email from Jerry Szilagyi with the subject line "RE: Strategy" (hereinafter the "1/26/17 Szilagyi Email"). (PX-10, Defendant's Admissions ¶ 50.)

**RESPONSE:** Undisputed.

174.    The 1/26/17 Szylagyi Email is bates numbered Catalyst_003_00237 and says:

Ed,

We need to discuss risk management for the fund. Only looking at #positions/million does not appear to be an adequate way of measuring risk based on our experience, particularly the last two months. The net delta adjusted exposure based on our calculations seems to be around –500%, which explains better why the fund was down -5x the market movement on a pretty minor market move. I know you say you do not use this type of risk measure, but recent history seems to show it may be a better measure of risk, or at least worth looking at. Our shareholders just will not tolerate a 4+% drawdown on a day the market moves less than 1%.

We need to consider making adjustments given the current market conditions and shareholder base. We can start with a call but I think an in-person meeting is warranted.

Thanks,
Jerry

(PX-66, Catalyst_003_00237 (1/27/17 email from E. Walczak to J. Szilagyi); *see also* PX-10, Defendant's Admissions ¶ 51.)

**RESPONSE:**  Undisputed.

175.    During the time period of January 30, 2017 to February 18, 2017, Walczak was in Hawaii. (PX-50, List of Walczak's Physical Locations From Dec. 2016 through Feb. 2017.)

**RESPONSE:**  Undisputed.

176.    Delta measures the amount by which the value of an option's position will change given a change in the price of the option's underlying financial instrument. (PX-68, Pearson Expert Report at ¶ 28.)

**RESPONSE:**  Disputed.  Delta is a measure of the *rate* at which the value of an option's

position, *as measured by some fallible model*, is *predicted* to change, given *infinitesimal* changes in the price of the option's underlying financial instrument, on the counterfactual assumption that no other market variables change at all while the underlying price is thus moving.  Delta is a partial derivative of one particular pricing model's value with respect to one input to the model, but it does not attempt to predict, on its own, changes in option value for macroscopic movements in the price of an option's underlying financial instrument; nor can there be any guarantee that the observed value of an option's position will in fact change in response to a change in the price of the option's underlying financial instrument as Delta implies.  *See generally* DX 78, Pearson Dep., at 61-64, 98-99.

177.    On or about January 31, 2017, Schoonover began calculating on a daily basis the delta of the Fund's portfolio. (PX-18, Michael Schoonover (Mar. 2, 2018 Test.) at 320-21; PX-30, CFTC Ex. 10.)

**RESPONSE:** Undisputed that at or around the time period indicated, Schoonover began routinely calculating Delta for the Fund's portfolio.  But he calculated two particular variants of Delta, when multiple ways of calculating that metric exist.  Furthermore, he calculated many other risk metrics at the same time, not limiting his calculations to Delta.  Also, he calculated these figures only on trading days, not on every day.  *See* DX 9 (Schoonover table).

178.    During the period of January 31, 2017 to at least February 15, 2017, Schoonover emailed to Walczak on a daily basis his calculations of delta and other metrics for the Fund's portfolio. (PX-18, Michael Schoonover (Mar. 2, 2018 Test.) 344-45; PX-31, CFTC Ex. 12.)

**RESPONSE:** Undisputed.

179.     Schoonover was a portfolio manager for a different Catalyst Fund. (PX-18, Michael Schoonover (Mar. 2, 2018 Test.) at 40.)

**RESPONSE:** Undisputed that this was true at some time.  Disputed in so much as Paragraph 179 provides no time frame for its assertion.

180.     As of the close of trading on January 31, 2017, the Fund was down more than 4% from the Fund's high-water mark. (PX-68, Pearson Expert Report at ¶ 88.)

**RESPONSE:** Undisputed.

## IX.     In February 2017, the Fund Lost More than $700 Million, or Approximately 18%.

181.     As of February 1, 2017, the vast majority of the Fund's positions were in February 2017 expiries. (PX-20, Edward Walczak (Apr. 4, 2018 Test.) at 618-19; PX-68, Pearson Expert Report at ¶ 112 & Ex. 19.)

**RESPONSE:** Undisputed that the majority of the Fund's option positions as of February 1, 2017 were in February 2017 expiries.  Disputed that this was true for all of the Fund's positions as a whole, as neither source cited in Paragraph 181 for support considers the percentage of the Fund's holdings that were in instruments other than options.  Walczak further disputes Paragraph 181 on the grounds that "vast" is inherently ambiguous and not susceptible of objective determination as to truth or falsity.  *See* DX 77 (Catalyst Form N-Q of Sept. 30, 2015) at 13 (94.3% of Fund AUM held in Short-Term Investments).

182.     As of November 30, 2016, 49.0% of the Fund's options positions were in February 2017 expiries. (PX-68, Pearson Expert Report at ¶ 112 and Ex. 19 (*i.e.*, 28.3% in Feb.2017 Week 3 call options, 18.2% in February 2017 end-of-month call options, and 2.5% in February 2017 end-

of-month put options).)

**RESPONSE:** Undisputed.

183.    As of December 30, 2016, 52.7% of the Fund's options positions were in February 2017 expiries. (PX-68, Pearson Expert Report at ¶ 112 & Ex. 19 (*i.e.*, 33.6% in Feb. 2017 Week 3 call options, 16.8% in February 2017 end-of-month call options, and 2.3% in February 2017 end-of-month put options).)

**RESPONSE:** Undisputed.

184.    As of January 31, 2017, 91.5% of the Fund's options positions were in February 2017 expiries. (PX-68, Pearson Expert Report at ¶ 112 & Ex. 19 (*i.e.*, 46.8% in Feb. 2017 Week 3 call options, 41.8% in February 2017 end-of-month call options, and 2.9% in February 2017 end-of-month put options).)

**RESPONSE:** Undisputed.

185.    On February 1, 2017, Walczak looked at the Fund's risk profile and understood that a 1% increase in the S&P 500 Index would cause a drawdown in the Fund of 5% or greater. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 290-91.)

**RESPONSE:** Disputed.  In the testimony cited by Plaintiff in support of Paragraph 185, Walczak states clearly that he does not recall how large a move he was seeing as a potential drawdown on February 1, 2017 in response to a putative 1% increase in the S&P 500 index value. PX 16 at 290:22-23 ("I don't remember the specific number….").  Also, Walczak was looking at different time horizons, and even if a 1% move up in the S&P 500 could lead to a 5% drop in Fund

85

value if the move arrived within a single day, a more realistic time period for such a rise stood to have a less "severe" impact on the Fund. *Id.* at 291:13-20. Walczak also disputes Paragraph 185 as it suggests that the movement in the Fund's value in response to a movement in the S&P 500 index level was knowable to anyone in advance, much less him individually, when in fact such movements in Fund value would also depend on changes in implied volatility to various strikes and expirations, the time it would take for such a move to transpire, and basic supply and demand for options and other financial instruments based on the S&P 500 index. *See* Plaintiff's Proposed Finding of Fact 46 (noting various inputs to option price aside from the price of the underlying instrument).

186.    The Stress Tests Described by Walczak applied to the Fund's portfolio as of February 1, 2017, result in projected losses greater than 8%. (PX-68, Pearson Expert Report at ¶¶ 45, 73 & Ex. 7.)

**RESPONSE:** Disputed. "The Stress Tests Described by Walczak" is ill-defined, as Walczak described different stress tests at different times, in response to market conditions. Walczak's stress tests also never resulted in "projected losses," as they made no assertion as to the direction the S&P 500 index or its volatility would take in the future.

187.    A stress test of a 5% increase in the S&P 500 index applied to the Fund's portfolio as of February 1, 2017 results in a loss greater than 20%, regardless of whether that stress test is analyzed over a time period of 0 days (*i.e.*, an immediate movement on 2/1/17), one week, two weeks, or three weeks. (PX-68, Pearson Expert Report at ¶¶ 45, 73 & Ex. 7.)

**RESPONSE:** Undisputed that "a" stress test of this kind may indicate such potential losses, but Walczak disputes that this is true for the stress tests he ran. Paragraph 187 does not

specify the changes in other market variables that were likely to occur in response to a 5% rise in S&P 500 index levels in the time periods indicated. Paragraph 187 also disregards Walczak's ability to conduct trading during the period over which the proposed move is hypothesized to arrive, so as to change the resulting losses or gains by the conclusion of such move. Walczak further disputes Paragraph 187 as failing to indicate which pricing model and other inputs the stress test used in reaching these numbers, and he notes that no assertion is made that Walczak made the same assumptions regarding pricing models or inputs when running his own stress tests.

188.    A stress test of a 5% increase in the S&P 500 index combined with a 10-point increase in volatilities applied to the Fund's portfolio as of February 1, 2017 results in a loss greater than 8%, regardless of whether that stress test is analyzed over a time period of 0 days (*i.e.*, an immediate movement on 2/1/17), one week, two weeks, or three weeks. (PX-68, PearsonExpert Report at ¶¶ 45, 48-49, 75 & Ex. 8 (at 5% stress test on S&P 500 index combined with 10-increase in volatilities, all time frames result in projected losses of between $500 million and $1 billion; applied to Fund's NAV of $4,012 million equals projected losses ranging from approximately 12.4% to approximately 24.9%.).)

**RESPONSE:** Undisputed that "a" stress test of this kind may indicate such potential losses, but Walczak disputes that this is true for the stress tests he ran. Paragraph 188 disregards Walczak's ability to conduct trading during the period over which the proposed move is hypothesized to arrive, so as to change the resulting losses or gains by the conclusion of such move. Walczak further disputes Paragraph 188 as failing to indicate which pricing model the stress test used in reaching these numbers, and he notes that no assertion is made that Walczak made the same assumptions regarding pricing models when running his own stress tests.

189.     Walczak did not enter any trades for the Fund on any day during the period February 1, 2017 through February 8, 2017. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 289; PX-20, Edward Walczak (Apr. 4, 2018 Test.) at 622; PX-68, Pearson Expert Report at ¶¶ 74, 113.)

**RESPONSE:** Undisputed.

190.     As of February 8, 2017, 91.5% of the Fund's options positions were in February 2017 expiries. (PX-68, Pearson Expert Report at ¶¶ 112-13 & Ex. 19 (*i.e.*, 46.8% in Feb. 2017 Week 3 call options, 41.8% in February 2017 end-of-month call options, and 2.9% in February 2017 end-of-month put options).)

**RESPONSE:** Undisputed.

191.     As of the close of trading on February 8, 2017, the Fund's positions still were heavily concentrated in February 2017 expiries. (PX-68, Pearson Expert Report at ¶¶ 112-13 &Ex. 19.)

**RESPONSE:** Disputed, as the source cited as support for Paragraph 191 does not take into account the Fund's non-option holdings.  *See* DX 77 at 13 (Short-Term Investments); DX 52 to DX 55 (futures positions mixed in with options positions).  Further disputed on the ground that the term "heavily concentrated" is inherently ambiguous and not susceptible of definitive proof as true or false.

192.     As of the close of trading on February 8, 2017, the Fund's positions were concentrated in a limited range of strike prices. This strike-price concentration along with the concentration in the February expirations, are reasons why the Fund was so risky during the half of February 2017. (PX-68, Pearson Expert Report at ¶ 114 & Ex. 20.)

**RESPONSE:** Disputed, as the source cited as support for Paragraph 191 does not take into account the Fund's non-option holdings.  *See* DX 77 at 13 (Short-Term Investments); DX 52 to DX 55 (futures positions mixed in with options positions).  Furthermore, the phrase "limited range" is inherently ambiguous and not susceptible of a well-defined test for truth or falsity, for which reason Walczak disputes that contention.  Walczak further disputes the allegation that "the Fund was so risky during the half of February 2017," both because it is unclear which half of February 2017 is meant and because Prof. Pearson measured risk only one way, thus falling short of an objective determination of whether the Fund was especially "risky" at that time.

193.    In February 2017, the Fund's per-share NAV dropped from more than $10.50 at the beginning of the month to less than $8.75 by the end of the month, with the most significant period of decline occurring from February 8th to 24th. (PX-68, Pearson Expert Report at ¶¶ 74, 111.)

**RESPONSE:** Undisputed.

194.    During the period of February 8, 2017 to February 24, 2017, Walczak did not make trades that reduced the Fund's risk until February 13th. (PX-68, Pearson Expert Report at ¶¶ 111, 136(c) & Ex. 18.)

**RESPONSE:** Disputed.  Exhibit 1 to Michael De Laval's expert report lays out risk-reducing trades that Walczak conducted on behalf of the Fund in 2017 on February 9 and 10, as well, and then February 11 and 12, 2017, were weekend days with no trading.  DX 43 (De Laval Report) ex. 1.

195.    Over the period running from February 1, 2017 to February 14, 2017, the Fund's

NAV declined from $10.63 per share on January 31, 2017 to $9.25 per share on February 14, 2017. (PX-68, Pearson Expert Report at ¶ 74.)

**RESPONSE:** Undisputed that the Fund's NAV per share declined from January 31, 2017 to February 14, 2017.  Disputed that the figures quoted in Paragraph 195 are accurate.  *See* DX 8 ($10.54 on January 31).  Also, to the extent that Paragraph 195 is written to indicate that $10.63 and $9.25 represented the full Net Asset Value of a fund that held billions of dollars' worth of assets at the time, Walczak disputes that claim.

196.     As of February 14, 2017, the Fund's NAV had declined 13% from the January 31, 2017 per-share NAV of $10.63. (PX-68, Pearson Expert Report at ¶ 74.)

**RESPONSE:** Undisputed that the Fund's NAV per share declined by 13% from January 31, 2017 to February 14, 2017.  Walczak disputes that the price quoted in Paragraph 196 for the Fund's NAV per share as of January 31 is correct.  *See* DX 8 ($10.54 on January 31).  Also, to the extent that Paragraph 196 alleges that the Fund's *total* NAV (AUM) declines by 13% over the same period, Walczak disputes this claim on the ground that the source cited as evidence does not address purchases or sales of Fund shares during the period in question.

197.     February 2017 Week 3 options expired shortly after the close of trading on Friday, February 17, 2017. (PX-68, Pearson Expert Report at ¶¶ 23, 42.)

**RESPONSE:** Undisputed.

198.     As of February 28, 2017, the Fund's NAV was $8.68 per share. (PX-68, Pearson Expert Report at ¶ 74.)

**RESPONSE:** Undisputed.

199.    As of February 28, 2017, the Fund's NAV had declined more than 18% from the January 31, 2017 per-share NAV of $10.63. (PX-68, Pearson Expert Report at ¶ 74.)

**RESPONSE:** Undisputed that the Fund's NAV per share declined by more than 18% from January 31, 2017 to February 28, 2017.  Walczak disputes that the price quoted in Paragraph 199 for the Fund's NAV per share as of January 31 is correct.  *See* DX 8 ($10.54 on January 31).

200.    The Fund's aggregate NAV was approximately $4.184 billion on November 1, 2016 and $3.064 billion on February 28, 2017. (PX-68, Pearson Expert Report at ¶ 11.)

**RESPONSE:** Undisputed.

201.    The Fund's high concentration in February expirations (both in terms of strike-price concentration and expiration-month concentration) was one of the factors that led to a much greater level of drawdown for the Fund in February 2017. (PX-48, 2/15/2017 Open House call Tr. at 10-12; audio file for 2/15/17 Open House Call (Catalyst_005_0200651) starting at approximately 11:40) (audio file authenticated by PX-34, Schoonover Declaration (dated 11/11/21) at ¶¶ 2-5); *see also* PX-20, Edward Walczak (Apr. 4, 2018 Test.) at 683-685; PX-25, Inv. Test. Ex. 67 ("February options expirations contained the Fund's largest concentration of positions…The sharp move higher over the last 3 days combined with the concentration of positions and sensitivity of short dated options lead to a dramatic move in Fund NAV"); PX-26,Inv. Test. Ex. 70 ("February options expirations contained the Fund's largest concentration of positions…The sharp move higher over the last 3 days combined with the concentration of positions and sensitivity of short-dated options lead to a dramatic move in the Fund's NAV").)

**RESPONSE:** Disputed on the ground that "high concentration" is inherently ambiguous and not susceptible of definitive proof as true or false.  Walczak also notes that the quote attributed to him from PX 25 at 67 is incomplete, so as to provide incomplete context for his statement. Except as indicated, Paragraph 201 is undisputed.

202.     Walczak participated in an Open House call on February 21, 2017 (the "2/21/2017 Open House call"). (PX-49, 2/21/2017 Open House call Tr. at 2-4; audio file for 2/21/17 Open House Call (SEC_04_0183093) starting at approximately 1:10 of audio file) (audiofile authenticated by PX-34, Schoonover Declaration (dated 11/11/21) at ¶¶ 2-5).)

**RESPONSE:** Undisputed.

203.     During the 2/21/2017 Open House call, Walczak and caller engaged in the following discussion:

> MR. HANKUS:  Yeah.  Hello, Ed.  This is Mike Hankus (phonetic) from LPL.  Can you hear me?
>
> MR. WALCZAK:  Hi, Mike, yes.
>
> MR. HANKUS: You know, hey, Ed, I started with this fund just several months ago, within the last six, seven months. **And when I first started on this fund, I asked you a question.  And that question was, what is your goal for limiting the drawdown of the fund.  And you said it was 8 percent on a monthly basis.  Now, if I rewind the clock to September 30, 2016, the fund entered the month of February in a 5 percent drawdown.  So, in other words, from September 30th, 2016 until the end of January, the fund was down 5 percent.  So, in my eyes, the way I looked at that was, okay, there's another 3 percent of drawdown to play with here.**
>
> **And I am absolutely furious that as of February 6th, you've allowed this fund to draw down another 15 percent in nine trading days.** Now, when it was February 6th, you knew you were loaded up on naked calls in the February expiration and you cannot tell me that you don't know what the delta is on this portfolio. **So, you chose to gamble with my money and my clients' money into that expiration, trying to recover that**

92

**drawdown and actually tripled it.**

So, to me, that means that you have absolutely no -- you have -- you have absolutely no -- I don't know what the word I'm looking for here, but, you know, **you've chosen to completely ignore your risk perimeters and that is absolutely inexcusable in my opinion. How can you market a fund where you say we're managing for an 8 percent drawdown, drop 15 percent in nine days and now, from September 2016, the fund is down 18 percent?**

So, you put me and my clients in an impossible position. The market's extremely overbought.  What are we supposed to do? Liquidate the fund here? And do what with the money? So, it's been a horrible experience and I want you to answer the question, **how did you come to the determination on February 6 to leave that much delta in this fund knowing damn well if the S&P 500 went up 2 percent, this fund was going to drop 12 to 13 percent?  How did that happen?**

MR. WALCZAK: So Mike, first of all, I completely understand your frustration and your anger, in fact.  I'm angry as well over the performance of the fund. I haven't checked specifically, I may be the fund's single largest shareholder. I do know I have nearly 50 percent of my investable assets in the fund personally. So, I certainly don't take a cavalier approach to managing the fund. I feel the pain personally as well as the pain of listening to folks like yourself and shareholders.

I will tell you when I entered this business, I entered it with a pool of my own capital and family capital and I managed it not to earn fees, I managed it to earn a return on capital to make a living. And I still view it that way. That's why there's so much of my money in the fund.  I think it's the best way to approach the markets that are out there.  Now, in terms of what happened on February 6th, I have to keep repeating that I did the same things I've done in past periods where the market had come up and gotten dramatically overbought.  Did the exact same things in the past. They didn't work as well this time, at least in the nearby short term as they have in the past. It's an understatement. But we didn't do anything different. I didn't suddenly decide to take an unusual gamble with the fund. The fund was positioned nearly identically to the way it has been positioned a million times in the past in the same scenario.

The market did something very unusual. We reacted to it in the same way we always have. The result was not what we expected. However, we're continuing to depend that this is not something that's going to be different from our 11 years of history. We're going to continue to do what we've done. We certainly are looking at that episode to say is there something different that we should put in place going forward to prevent this kind of severe drawdown. And I certainly expect the answer will be yes.  But at

that moment in time, we just proceeded -- I proceeded with same -- pulling the same levers and managing the same position sizing and adjustment techniques that we've done that's a part of the strategy for -- really for 11 years.

We just didn't have a good outcome.  Now, from here going forward, sure, we can experience some more pain, but at the same time, we also have the opportunity to recover. When you talk about what do you -- if you liquidate now and what do you do with the money, I understand what you're saying there. I'm in the same boat. I'm adding money to the fund right now, personally, because I think that's the best opportunity for my capital in this -- in these market conditions. And I think the reasons that you and others bought the fund are still in place.  And that is if we go into a serious correction or a severe downturn, we have high volatility conditions.

Those are the ideal conditions for the fund. And you have an opportunity to protect your portfolio in those conditions. And at the same time, when this market stops being overbought, you know, we expect to be able to participate in a recovery of that drawdown. So I know that none of these words are comforting as you look at a statement. And I would love to tell you about how certain you are to recover.  Obviously, I can't do that.  I can only tell you that we continue to do the same thing we've always done.  We have what I would consider to be an extremely [rare] event that has occurred. It caused us a lot of pain.  Extremely rare events tend to mean revert.  That's an important part of the strategy and we're sticking to it.

MR. HANKUS: **So, in other words, you're saying that you have positioned the fund historically in a position where it can lose 15 percent of the capital in a few short trading days, but just by happenstance, you know, the market reversed. And if that's the case, then how dare you come out and say that we're managing this for an 8 percent drawdown?**

**I don't mind if you're running a fund that has a 20 to 30 percent drawdown potential. That's absolutely fine with me. But I wouldn't participate in it and my clients wouldn't participate in it. You specifically said you're managing this for a drawdown of 8 percent. And I think that's -- you know, that's where the problem lies. You can't market something that you say we're going to manage this for an 8 percent drawdown and lose 15 percent in nine days. I mean on February 6th, if you knew you had that exposure and the delta in the fund was X, you should have taken off a large quantity of those short calls.**

**In the -- in the odd extreme that unusual events occur, as a portfolio manager, you should say I just can't take that risk because I'm**

**managing this portfolio for an 8 percent drawdown.** Do you have any comments on that?

MR. WALCZAK:  Mike, again, I can -- I can only say that I did the same thing that I've done under similar circumstances in the past. And we're not sitting here hoping. We have an analytical toolkit that looks at probabilities, that looks at market conditions, that does a lot of analysis. And as I look at that dashboard, I reacted to what I saw the same way I always have reacted. And never before has the market done, against my dashboard, what it did this last time.

And that's all I can tell you because, again, I believe in trusting a process. And you get -- you will get a one in 1,000 outcome from time-to-time, but you must trust your process. You have to examine a process to see if something's out-of-bounds, will it do that. But for now, we stick to the process that's worked. It didn't work this time. We do expect, from this point, that there's a great opportunity to recover. That's also been the case in the past.

We have had double-digit intermonth drawdowns in the past. In the past, we've recovered.  We trust to those same techniques that have led to those positive outcomes in the past.  There are no guarantees about the future, obviously, but we trust what has worked in the past and to continue to do it.  And that's -- I really don't know what else to tell you.

(PX-49, 2/21/2017 Open House call Tr. at 7-13; audio file for 2/21/17 Open House Call (SEC_04_0183093) starting at approximately 8:00) (audio file authenticated by PX-34, Schoonover Declaration (dated 11/11/21) at ¶¶ 2-5).)

**RESPONSE:** Undisputed that Walczak used the words quoted.


204.    Effective January 27, 2020, the Fund changed its name to the Catalyst/Warrington Strategic Program Fund, as reflected in a SEC-filed supplement to the Fund's prospectus. (PX-9, Mutual Fund Series Trust, SEC Form 497 (Jan. 27, 2020), available at https://www.sec.gov/Archives/edgar/data/1355064/000158064220000383/catalyst497.htm (last visited 11/15/2021).)

**RESPONSE:** Undisputed.

205.     On or about January 27, 2020, Walczak was terminated by Catalyst. (PX-15, Edward Walczak (July 27, 2021 Dep.) at 15.)

**RESPONSE:** Undisputed.

## X.     Walczak Did Not Stress Test the Fund or Otherwise Manage Risk as Represented.

<u>Walczak's Admissions</u>

206.     Walczak did not use OptionVue on a daily basis. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 220-23.)

**RESPONSE:** Disputed.  DX 36 (Oct. 27, 2017 Investigative Testimony of Edward Walczak ("Walczak Testimony I")) at 151:16-23 ("Q:  So in 2016, it was your practice to input your portfolio into Option View and have it calculate theta; is that correct? I'm sorry, and have it calculate vega; is that correct?  A:  Yes.  Q:  How often would you do that?  A:  Daily."); *id.* at 262:20-23 ("I use Option View, as I said, every day for lots of different purposes, so I don't have any way of recalling specifically what I did on those days."); PX 15, Walczak Testimony VI, at 55 ("I opened up OptionVue every day."); *id.* at 170 ("Q:  The stress testing that you describe over pages 17 and 18 of the transcript of this house call, how often did you do that?  A:  I did that on a daily basis."); *id.* at 199 ("I did on a daily basis, as I mentioned, several times now. How -- I apologize. I don't want to be impatient. It's getting late in the afternoon. On a daily basis, I opened up OptionVue. Sometimes there's a need to spend a lot of time on stress testing. Sometimes there was -- based on the portfolio composition and market conditions. But all or nothing could change. So it was a perfunctory sort of look, a quick look, and then on to other business related to the Fund. On a daily basis, I did some form of stress testing.").

207.     As of the end of November 2016, the Fund's portfolio had a reasonable number of

call ratio spreads. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 223.)

**RESPONSE:** Undisputed.

208.    It was not Walczak's practice to focus on what the Fund's portfolio would gain or lose given a potential market movement the next day. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 171-72.)

**RESPONSE:** Undisputed.

209.    Walczak did not stress test the Fund's portfolio on a daily basis for potential movements in price and volatility and across different time frames. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 171-72, 220-22.)

**RESPONSE:** Disputed.  Walczak conducted some sort of stress test on a daily basis.  PX 15, Walczak Testimony VI, at 170, 199.  When options were close to expiration, they were less responsive to changes in volatility, and Walczak sometimes analyzed his risk outside of OptionVue.  But this does not mean that he did not conduct stress tests on a daily basis. DX 36, Walczak Testimony I, at 222:10 to 223:4 ("A:  [W]e would take a look at portfolio positioning across different option expiration months and across really the whole portfolio and identify, again, you know, what does it look like.  Q:  You were pretty clear you didn't do that daily, though, if I recall your earlier testimony; is that right?  A:  We didn't use Option View daily.  Q:  So that's not another ne of the things you did to stress the fund for risk on a daily basis?  A:  Not on a daily basis, no.  On a daily basis, we relied on the risk parameters.").

210.    Walczak did not have a routine pursuant to which he used OptionVue on a daily or even weekly basis to assess potential changes in portfolio value. (PX-16, Edward Walczak (Oct.

27, 2017 Test.) at 173-78.)

**RESPONSE:** Disputed.  DX 36, Walczak Testimony I, at 151:16-23 ("Q:  So in 2016, it was your practice to input your portfolio into Option View and have it calculate theta; is that correct? I'm sorry, and have it calculate vega; is that correct?  A:  Yes.  Q:  How often would you do that?  A:  Daily."); *id.* at 262:20-23 ("I use Option View, as I said, every day for lots of different purposes, so I don't have any way of recalling specifically what I did on those days."); PX 15, Walczak Testimony VI, at 55 ("I opened up OptionVue every day."); *id.* at 170 ("Q:  The stress testing that you describe over pages 17 and 18 of the transcript of this house call, how often did you do that?  A:  I did that on a daily basis."); *id.* at 199 ("I did on a daily basis, as I mentioned, several times now. How -- I apologize. I don't want to be impatient. It's getting late in the afternoon. On a daily basis, I opened up OptionVue. Sometimes there's a need to spend a lot of time on stress testing. Sometimes there was -- based on the portfolio composition and market conditions. But all or nothing could change. So it was a perfunctory sort of look, a quick look, and then on to other business related to the Fund. On a daily basis, I did some form of stress testing.").

211.    Walczak used OptionVue "as needed" – which means between approximately once a week to a couple times a month. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 176-78.)

**RESPONSE:** Disputed.  For all the reasons recited in response to Paragraph 210, it is not true that Walczak used OptionVue only once per week or a couple times per month.  The testimony cited by Plaintiff in support of Paragraph 211 came in response to two questions:  "The specific question is, how often do you recall using Option View in 2016 for the purposes of evaluating potential gains and losses on a particular contract," and "[H]ow often would you use Option View to calculate the potential gains or losses of the portfolio's position on a particular contract month?"

DX 36, Walczak Testimony I, at 175:17-21, 177:15-18.  Walczak commonly used OptionVue to look at the Fund's portfolio as a whole, not a "particular contract" or "particular contract month" in isolation.  Accordingly, his frequency of using OptionVue in general is much higher than the language Plaintiff presents here suggests for those limited uses of OptionVue.

212.     Walczak turned off OptionVue within the two-week window surrounding an expiration. (PX-20, Edward Walczak (Apr. 4, 2018 Test.) at 627-28.)

**RESPONSE:**  Disputed.  On the pages Plaintiff cites here, Walczak explains:  "I suggested that essentially I turn OptionVue off as we come into roughly a two-week window around expiration period and by — excuse me — by turning it off, what I mean is the five and ten percent intervals tend not to be appropriate to evaluate very, very nearby options movement simply because they don't — they don't have time to experience a five or ten percent move."  PX 20 at 627:7-15. That is, whereas Walczak had testified that he would use OptionVue to stress the Fund's position for five- and ten-percent moves, *that particular use of OptionVue* was no longer relevant when the time until expiration was so short that there was no realistic chance of such a move, at which time Walczak would thus "turn OptionVue off" in the sense of no longer relying on *those risk slides*, with their extreme scenarios for the underlying price, as guidance for his trading.  That does *not* mean that he no longer looked at OptionVue; see all the discussion of Walczak's daily OptionVue use in Defendant's response to Paragraph 210.

213.     Walczak did not manage the Fund to an 8% drawdown threshold. (PX-20, Edward Walczak (Apr. 4, 2018 Test.) at 679-80; *see also* PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 174 ("I'm not managing the portfolio to say, you know, X gain or loss").)

**RESPONSE:** Disputed. Defendant has explained on numerous occasions that his risk

metrics were designed specifically to limit drawdowns to 8%, and that he in practice manages to

those risk metrics, thereby indirectly working to limit drawdowns to 8%. PX 20 at 680:11-14

("What I'm managing to is the process control parameters that over a very long period of time have

demonstrated their ability to control drawdowns to roughly eight percent.").

214.    Walczak did not use OptionVue (or any other tools) to evaluate the magnitude of

potential loss to the Fund's portfolio as a whole. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at

181-82.)

**RESPONSE:** Undisputed that Walczak did not use OptionVue to explicitly "evaluate the

magnitude of potential loss to the Fund's portfolio as a whole," but this statement is misleading:

Call ratio spreads, such as the Fund commonly held, inherently carry the risk of *unlimited* loss, and

hence Walczak knew implicitly that the "magnitude of potential loss to the Fund" was nearly

always limitless, without any need to verify the same in OptionVue.

215.    Walczak did not use any other tools to evaluate the potential magnitude of total loss

for the Fund's portfolio. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 182.)

**RESPONSE:** Undisputed that Walczak did not use other tools to explicitly "evaluate the

potential magnitude of total loss for the Fund's portfolio," but this statement is misleading:  Call

ratio spreads, such as the Fund commonly held, inherently carry the risk of *unlimited* loss, and

hence Walczak knew implicitly that the "potential magnitude of total loss for the Fund's portfolio"

was nearly always limitless, without any need to verify the same in a tool.

The Commission's Unchallenged Expert Reports

216.    The Commission has retained Professor Neil Pearson as an expert witness in this

matter. (PX-68, Pearson Expert Report at ¶¶ 11, 14-15.)

**RESPONSE:** Undisputed.

217.     Professor Pearson has a Ph.D. in Management (specializing in Finance) and teaches at the University of Illinois, where he is the Harry A. Brandt Distinguished Professor of Financial Markets and Options. His teaching, research, and consulting work involves derivative financial instruments (including options) and techniques to measure financial risks.  Professor Pearson has published more than 30 academic articles among other publications, including a book on risk measurement methods. (PX-68, Pearson Expert Report at ¶¶ 1-8.)

**RESPONSE:** Undisputed.

218.     In a recent SEC enforcement matter, he was recognized as an expert in the field of financial derivative instruments and testified at trial. *SEC v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 405-406 (S.D.N.Y. 2019) ("Pearson is an expert in the field of derivative financial instruments").

**RESPONSE:** Undisputed.

219.     Professor Pearson considered Walczak's representations about the stress tests he purportedly performed on the Fund's portfolio (hereinafter the "Stress Tests Described by Walczak"). (PX-68, Pearson Expert Report at ¶¶ 12-13, 52-68.)

**RESPONSE:** Disputed.  Prof. Pearson considered *some* of Walczak's representations about the stress tests he had performed, but his deposition made clear that he had ignored various aspects of those stress tests so as instead to analyze straw man stand-ins for the tests Walczak actually conducted.  *See, e.g.*, DX 78, Pearson Dep., at 135:20 to 136:17.

220.     Professor Pearson concluded that Stress Tests Described by Walczak included the following elements:

- Daily stress testing.

- 5% and 10% increases and decreases in the level of the S&P 500 index

- Five-point decreases and ten-point increases in options volatilities.

- Examination of the impact of these scenarios for several different time horizons up to two months in the future.

- For each scenario considered, Walczak represented that he used the OptionVue software to calculate whether the scenario resulted in a projected loss of more than 8% of the Fund's NAV.

- Walczak represented that, if any scenario involved a loss of more than 8% of the Fund's NAV, he would execute hedging transactions, that is buy or sell options, to eliminate the possibility of an 8% loss.

(PX-68, Pearson Expert Report at ¶¶ 67-68.)

**RESPONSE:** Undisputed that Prof. Pearson came to this conclusion.  Disputed that the conclusion was correct.  *See, e.g.*, DX 78, Pearson Dep., at 135:20 to 136:17.

221.     Professor Pearson considered Walczak's representations that he (Walczak) manages the Fund's portfolio such that the Fund's positions are diversified across expirationdates and strikes prices. (PX-68, Pearson Expert Report at ¶ 71.)

**RESPONSE:** Disputed.  Prof. Pearson made clear in his deposition that he had not looked at the Fund's holdings for the vast majority of its lifespan, instead cherry-picking test periods so as to present a misleading picture of Walczak's management of the Fund.  DX 78, Pearson Dep., at 177:23 to 178:1, 180:3 to 183:10.

222.     Professor Pearson calculated the Fund's projected losses in the specific stress

scenarios that Walczak represented he considered. (PX-68, Pearson Expert Report at ¶¶ 11-14,16, 39, 77-88.)

**RESPONSE:** Disputed.  Prof. Pearson never ignored how Walczak adjusted his stress tests to respond to market conditions, ignored how Walczaks considered different potential movements in the underlying price depending on the time to expiration, and never bothered to determine how Walczak set various parameters in OptionVue.  *See generally* DX 78, Pearson Dep.  Furthermore, Walczak disputes the contention that the values determined by Prof. Pearson were "projected losses," given the imperfect models on which they were based and Prof. Pearson's failure to take into account Walczak's ability to complete additional trades between the running of stress tests and option expiration.

223.     Professor Pearson used OptionVue to replicate the Stress Tests Described by Walczak for every trading day during the time period of November 1, 2016 to February 28, 2017 (excluding the week of December 12-16, 2016). (PX-68, Pearson Expert Report at ¶¶ 16(a), 77; *see also* PX-68, Pearson Report at ¶¶ 72-105.)

**RESPONSE:** Disputed.  For the reasons set forth in response to Paragraphs 219 and 222, the tests performed by Prof. Pearson did not match the stress tests described by Walczak.

224.     Professor Pearson used a separate computer program to replicate the Stress Tests Described by Walczak for the week of December 12-16, 2016. (PX-68, Pearson Expert Report at ¶¶ 16(a), 77 (including footnote 58).)

**RESPONSE:** Undisputed that Prof. Pearson relied on a program separate from OptionVue for his analysis.  But for the reasons set forth in response to Paragraphs 219 and 222, the tests

performed by Prof. Pearson did not match the stress tests described by Walczak, and Walczak accordingly disputes that Prof. Pearson "replicated" those tests with his computer program.

225.     Professor Pearson's replication of the Stress Tests Described by Walczak are more conservative than the stress testing described by Walczak because Professor Pearson measured projected losses from the Fund's then-current portfolio value rather than the Fund's historic high-water mark. (PX-68, Pearson Expert Report at ¶¶ 16(d), 86-88, 136(d).)

**RESPONSE:** For all the reasons set forth in response to Paragraphs 219 and 222, Walczak disputes that Prof. Pearson's formulation of "the Stress Tests Described by Walczak" actually match the tests he described or ran, so that comparison of Prof. Pearson's own tests to that straw man is not probative. Walczak further disputes the claim that one set of tests is more "conservative" than another, as the term is inherently ambiguous, potentially referring to either decreased likelihood of signaling a problem or decreased tolerance for problems.

226.     The time period November 1, 2016 through February 14, 2017 consists of 72 trading days). (PX-68, Pearson Expert Report at ¶ 107.)

**RESPONSE:** Undisputed.

227.     The Stress Tests Described by Walczak resulted in projected losses greater than 8% on every trading day (*i.e.*, all 72 trading days) during the time period of November 1, 2016 to February 14, 2017. (PX-68, Pearson Expert Report at ¶¶ 16(a), 105, 107, 136(a) & Ex. 17; *see also* PX-68, Pearson Report at ¶¶ 72-105.)

**RESPONSE:** For all the reasons set forth in response to Paragraphs 219 and 222, Walczak disputes that Prof. Pearson's formulation of "the Stress Tests Described by Walczak" actually

match the tests he described or ran, so that findings regarding Prof. Pearson's straw man are not probative. Walczak further disputes the characterization of stress tests as having pointed to "projected losses," as the tests by their nature ignore potential intervening trades and other movements in market variables, both of which could change the value of the portfolio by the end of the holding periods considered in the tests.

228.   On most of the 72 trading days referenced in Paragraph 227 above, there were scenarios in which the projected losses were far in excess of 8%. (PX-68, Pearson Expert Report at ¶¶ 16(a), 136(a).)

**RESPONSE:** Undisputed that "there were scenarios in which the projected losses were far in excess of 8%," as call ratio spreads inherently carry the risk of unlimited loss, so that for all of the days described in Paragraph 228, scenarios existed that would suggest arbitrarily large losses, all else equal. *See* PX 3 at 5-6 ("potentially unlimited losses in a sold call transaction").

229.   Of the 72 trading days referenced in Paragraph 226 above, Walczak did not enter a trade for the Fund on 22 of those days. (PX-68, Pearson Expert Report at ¶¶ 16(b), 107, 136(b).)

**RESPONSE:** Undisputed.

230.   On the majority of the days Walczak traded during the time period November 1, 2016 through February 14, 2017, his trades had little impact on the Fund's risk. (PX-68, Pearson Expert Report at ¶¶ 16(c), 108-09, 136(c).)

**RESPONSE:** Disputed. Prof. Pearson's analysis ignored many aspects of risk, looking only at the potential for loss under fixed and unrealistic proposed market conditions, for which reason his findings regarding the supposed impact of Walczak's trades on the Fund's risk are

flawed.  *See, e.g.*, PX 68 (Pearson Report) ¶ 108 & ex. 18.  Furthermore, Michael De Laval, in Exhibit 1 to his report, lays out multiple risk-reducing trades conducted by Walczak throughout the period discussed in Paragraph 230.  DX 43 (De Laval Report) ex. 1.

231.     The time period November 10, 2016 through February 14, 2017 consists of 65 trading days. (PX-68, Pearson Expert Report at ¶ 107.)

**RESPONSE:**  Undisputed.

232.     Of the 65 trading days referenced in Paragraph 231 above, Walczak did not enter a trade for the Fund on 20 of those days. (PX-68, Pearson Expert Report at ¶ 107.)

**RESPONSE:**  Undisputed.

233.     Of the 65 trading days referenced in Paragraph 231 above, Walczak made one or more trades for the Fund on 45 of those days. (PX-68, Pearson Expert Report at ¶ 107.)

**RESPONSE:**  Undisputed.

234.     Of the 45 days on which Walczak traded (referenced in Paragraph 233 above), Walczak traded in a way that reduced the Fund's risk on only 14 of those 45 days. (PX-68, Pearson Expert Report at ¶ 109.)

**RESPONSE:**  Disputed.  Prof. Pearson's analysis ignored many aspects of risk, looking only at the potential for loss under fixed and unrealistic proposed market conditions, for which reason his findings regarding the supposed impact of Walczak's trades on the Fund's risk are flawed.  *See, e.g.*, PX 68 (Pearson Report) ¶ 108 & ex. 18.  Furthermore, Michael De Laval, in Exhibit 1 to his report, lays out risk-reducing trades conducted by Walczak on many more than just

106

fourteen days during the period discussed in Paragraph 234.  DX 43 (De Laval Report) ex. 1.

235.     Even on the 14 days on which Walczak executed trades that reduced the Fund's risk, the trades on those 14 days were not large enough to bring the projected losses down below his stated threshold of 8%. (PX-68, Pearson Expert Report at ¶ 109.)

**RESPONSE:** Disputed.  Paragraph 235 does not specify which scenarios were considered, and as discussed above, *some* scenarios always existed for which potential losses exceeded 8%, based on the nature of call ratio spreads.  Thus, the term "projected losses" is ambiguous and not susceptible of measurement as stated.  For certain measures of "projected losses," Paragraph 235 is true, but not probative.

236.     Of the 45 days on which Walczak traded (referenced in Paragraph 233 above), Walczak traded in a way that either increased or did not change the Fund's risk on 31 of those 45 days. (PX-68, Pearson Expert Report at ¶¶ 108-09 & Ex. 18.)

**RESPONSE:** Disputed.  Prof. Pearson's analysis ignored many aspects of risk, looking only at the potential for loss under fixed and unrealistic proposed market conditions, for which reason his findings regarding the supposed impact of Walczak's trades on the Fund's risk are flawed.  *See, e.g.*, PX 68 (Pearson Report) ¶ 108 & ex. 18.  Furthermore, Michael De Laval, in Exhibit 1 to his report, lays out risk-reducing trades conducted by Walczak on many more than just fourteen days during the period discussed in Paragraph 236, so that there cannot have been 31 days in that period during which the Fund's risk (as measured by Mr. De Laval or others) increased or remained the same.  DX 43 (De Laval Report) ex. 1.

237.     In Professor Pearson's expert opinion, the risk management approach Walczak

*claimed* to follow would have made a loss greater than 8% highly unlikely, and had Walczak *actually* followed this approach, the Fund's investors would not have suffered the losses they did. (PX-68, Pearson Expert Report at ¶ 68.)

**RESPONSE:** Undisputed that Prof. Pearson has expressed this opinion.  Undisputed that the risk management approach described, and actually used, by Walczak made losses of greater than 8% highly unlikely.  Disputed that following that risk management approach stood to prevent the Fund's investors from suffering the losses they did, for (1) Walczak in fact *did* follow that approach, and yet losses occurred; (2) Prof. Pearson has not calculated the "losses" that the Fund's investors allegedly "suffered"; (3) Paragraph 237 does not specify the period over which such losses were to be measured; and (4) Prof. Pearson stated in his deposition that it would be impossible to determine how much better off Fund investors would have been given changes to the Fund's trading strategy such as Prof. Pearson was advocating.

238.     Professor Pearson considered Walczak's representations about the actions he would take if the Fund experienced a drawdown of 8%. (PX-68, Pearson Expert Report at ¶¶ 69-70.)

**RESPONSE:** Disputed.  Prof. Pearson considered *some but not all* of Walczak's statements about actions he would take if the Fund experienced a drawdown of 8%, and he acknowledged in his deposition that his interpretation of Walczak's statements implied a trading system that would be impossible to follow.  By implication, then, Prof. Pearson necessarily misinterpreted Walczak's statements.

239.     Walczak did not "flatten" or eliminate the Fund's risk when the Fund's drawdown reached 8% on February 9, 2017. (PX-68, Pearson Expert Report at ¶¶ 16(e), 92, 136(e).)

**RESPONSE:** Undisputed that Walczak did not *immediately eliminate* the Fund's risk when the Fund's drawdown reached 8% on February 9, 2017.  Disputed that he did not "flatten" the Fund's risk, as he did work to reduce the Fund's risk, and he succeeded in doing so.  One definition of "flatten" is "to stabilize especially at a lower level," and Walczak *did* stabilize the Fund's risk at a lower level after the February 2017 drawdown, as demonstrated by the fact that the Fund never again suffered such a drawdown.  *See generally* DX 8 (Fund NAV per share prices). Paragraph 239 posits no restriction on *how low* Walczak was to flatten the Fund's risk or *in what time frame*, and thus Prof. Pearson's study does not suffice to establish the contention set forth in Paragraph 239.

## XI.    Facts Regarding OptionVue

240.    OptionVue is the options modeling software referred to by Walczak on the Open House Calls.  (PX-15, Edward Walczak (7/27/21 Dep.) at 33-34, 41-42, 150-53.)

**RESPONSE:** Undisputed.

241.    Walczak used OptionVue for a "very long time," including throughout the August 2013 to February 2017 time period. (PX-15, Edward Walczak (7/27/21 Dep.) at 33-34; PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 45.)

**RESPONSE:** Undisputed.

242.    OptionVue has backtesting functionality. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 96-102; PX-68, Pearson Expert Report at ¶ 39.)

**RESPONSE:** Undisputed.

243.     As part of its backtesting functionality, OptionVue retains real-time option pricing that goes back years. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 96-102; PX-68, Pearson Expert Report at ¶¶ 16, 39-40.)

**RESPONSE:** Undisputed.

244.     Stress testing a portfolio is common in financial risk management. (PX-68, Pearson Expert Report at ¶ 52, fn. 27; *see also* PX-37, 3/18/15 Open House Call Tr. at 42 ("And the reason [options pricing modeling software] work[s] is because people that make mar -- everyone uses the same models. Black and Shoals won a Nobel Prize for modeling option pricing.  Everybody in the world uses some sort of variation of a Black Shoals model.  So, it's a self-fulfilling prophecy.  People use models to actually bid and offer options prices.  Hence, when you use models to predict what will happen to options pricing, they work. So, I model the entire fund's portfolio."); audio file for 3/18/15 Open House Call (KR 20210601 000012) starting at approximately 52:40) (audio file authenticated by PX-35, Rios Declaration (dated 9/20/21) at ¶¶ 2-3).)

**RESPONSE:**  Undisputed that stress testing a portfolio is common in financial risk management.  Disputed that the quotation ascribed to Walczak is complete or that it tends to support the primary allegation in Paragraph 244.

245.     Stress testing refers to the practice of considering a hypothetical scenario – for example, a 10% decline in the stock market – that might causes losses or gains to a particular investment, and examining the magnitude of the losses or gains projected to occur based on the market movement. (PX-68, Pearson Expert Report at ¶ 52, fn. 27.)

**RESPONSE:** Undisputed that this is one form of stress test.

246.     If he chose to do so, Walczak could use OptionVue to stress test the Fund – i.e., to project what the Fund would stand to gain or lose given potential market movements. (PX-16, Edward Walczak (Oct. 27, 2017 Test.) at 171-72; PX-68, Pearson Expert Report at ¶¶ 12, 37-38.)

**RESPONSE:** Undisputed that Walczak could (and did) use OptionVue to conduct certain forms of stress tests on the Fund's portfolio.  Disputed that OptionVue could accurately predict "what the Fund would stand to gain or lose given potential market movements," given among other things the imperfection of OptionVue's models and the unpredictable nature of the markets.

247.     OptionVue is the only tool Walczak was comfortable using to understand portfolio performance given an underlying move in the S&P. (PX-20, Edward Walczak (Apr. 4, 2018 Test.) at 664.)

**RESPONSE:** Disputed.  Walczak said that OptionVue was the only tool with which he was comfortable "that could have *evaluated* the portfolio performance relative to the performance of the underlying S&P."  PX 20 at 664:6-10.  Walczak was capable of *understanding* portfolio performance given an underlying move in the S&P using many other tools or none; he was just not comfortable using those other tools to place precise numbers on a portfolio's potential response to proposed movements in the underlying price.

248.     OptionVue was the only tool Walczak used to project what sort of circumstances might create a loss to the portfolio of greater than 8%. (PX-20, Edward Walczak (Apr. 4, 2018 Test.) at 639-40; 664.)

**RESPONSE:** Disputed.  The testimony cited by Plaintiff does not support the contention set forth in Paragraph 248, and Walczak accordingly disputes the same.

249.     OptionVue was the only options modeling software that Walczak used to stress test the Fund's portfolio. (PX-15, Edward Walczak (7/27/21 Dep.) at 33-34, 41-42, 150-53.)

**RESPONSE:** Undisputed.

250.     OptionVue allows the user to estimate how changes in the underlying futures prices (*i.e.*, the prices of the S&P 500 Futures Contract) and option volatilities will impact the value of the options positions across multiple time horizons, and thus allow the use to assess the potential gains and losses on the options positions. (PX-68, Pearson Expert Report at ¶ 51.)

**RESPONSE:** Undisputed.

## XII.   Once Walczak Represented That He Would Take Certain Steps to Manage Risk, He Was Obligated to Follow Those Steps Unless He Told People Otherwise.

251.     The Commission has retained Professor Arthur Laby as an expert witness in this matter. (PX-67, Laby Expert Report at 1.)

**RESPONSE:** Undisputed.

252.     Professor Laby is a Professor of Law at Rutgers Law School in Camden, New Jersey, where he is Co-Director of the Rutgers Center for Corporate Law and Governance. He has taught courses including Securities Regulation, Business Organizations, Fiduciary Law, and Regulation of Securities Intermediaries, which cover securities markets, investment advisers, fiduciary duties, and related topics. For more than 25 years, he has been teaching, researching, and practicing securities law, including the regulation of securities market professionals. (PX-67, Laby Expert Report at 1 and Appendix 1.)

**RESPONSE:** Undisputed.

112

253.    Professor Laby has published academic articles and other publications regarding fiduciary relationships and the regulation of securities market professionals, including *The Regulation of Money Managers: Mutual Funds and Advisers (4 Volumes)*, New York, New York: Wolters Kluwer (3d ed. 2021) (with Tamar Frankel), *Advisors as Fiduciaries*, 72 Florida Law Review 953 (2020), and *The Fiduciary Structure of Investment Management Regulation*, in John D. Morley & William Birdthistle, eds., *Research Handbook on Mutual Funds.* Northampton, MA: Edward Elgar Publishing (2018). (PX-67, Laby Expert Report at 1 and Appendix 1.)

**RESPONSE:**  Undisputed.

254.    Professor Laby reaches four opinions in his report, and notes that "[t]he crux of my opinions is that if an investment adviser makes claims that he will take particular steps to minimize risk in a fund, then the adviser must follow those steps unless he discloses otherwise." (PX-67, Laby Expert Report at 26.)

**RESPONSE:** Undisputed that Laby reaches these opinions. Dispute that any are valid opinions that will assist the trier of fact. Professor Laby will be the subject of a motion to exclude his opinions as legal opinions and not proper expert opinion testimony under Federal Rule of Evidence 702.

255.    The Fund's quarterly investor presentations stated that "[t]he Fund's trading instruments, strategy, and objectives, have remained the same before and after this conversion," and the Fund had been "[m]anaged by Edward Walczak since inception." (PX-27, Inv. Test. Ex.85 (Q2 2016 Investor Presentation) at 15; PX-23, Inv. Test. Ex. 22 (Q2 2015 Investor Presentation) at 15 (page 19 of 37 of the PDF).

**RESPONSE:** Undisputed that the indicated documents include the indicated language. Answering further, Walczak states that the Investor Presentations must be read in their entirety to provide appropriate context for assertions that Plaintiff presents here in isolation.

Dated: December 17, 2021                                        Respectfully submitted,


By: /s/ James L. Kopecky                        By: /s/ Zachary J. Ziliak
James L. Kopecky (ILBar#6225359)          Zachary J. Ziliak
KOPECKY SCHUMACHER ROSENBURG LLC     ZILIAK LAW LLC
120 N. LaSalle, Street, Suite 2000              141 W. Jackson Blvd., Suite 4048
Chicago, IL  60602                                Chicago, IL  60604
Tel. 312-380-6552                                 Tel. 312-462-3350
jkopecky@ksrlaw.com                            zachary@ziliak.com
*Counsel for Defendant*                           docket@ziliak.com
                                                  *Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 17, 2021, I served Defendant's Proposed Findings of Fact in Opposition to Plaintiff's Motion for Summary Judgment on counsel of record for this matter via e-mail and via the ECF system.

<u>/s/ Zachary J. Ziliak</u>
