UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

EDWARD S. WALCZAK,

Defendant.

Case No.  3:20-cv-00076 (WMC) (SLC)

ECF Case

## WALCZAK'S PROPOSED FINDINGS OF FACT
## IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant, Edward S. Walczak, in accordance with the Federal Rule of Civil Procedure,

submits the following Proposed Findings of Fact in Opposition to Plaintiff's Motion for

Summary Judgment:

### I.     Additional Relevant Persons

1.      Jerry Szilagyi ("Szilagyi") is the President and CEO of Catalyst. He founded

Catalyst in 2006 and launched its first fund that same year. He is responsible for the oversight

and strategic direction of Catalyst. Szilagyi has spent his entire career, beginning in 1983, in the

financial services industry, and currently holds Series 6, 7, 26, and 63 licenses. DX 33

(Investigative Testimony of Jerry Szilagyi, October 12, 2017 ("Szilagyi Testimony I")) at 10:9 to

17:25.

2.      Michael Schoonover ("Schoonover") started with Catalyst funds in 2011 as an

intern and joined full time before Edward S. Walczak ("Walczak") in 2013. DX 32 (April 12,

2021 Deposition of Michael Schoonover ("Schoonover Testimony II")) at 15-16. He became a

portfolio manager in December 2014 and took over as Chief Operating Officer in 2017. Schoonover Dep. at 138-39.

3.     David Miller ("Miller") is a co-founder of Catalyst, portfolio manager and Chief Investment Officer for Catalyst. DX 29 (July 9, 2021 Deposition of David Miller ("Miller Dep.")) at 15, 113-14.

4.     George Amrhein ("Amrhein") was Catalyst's Director of Business Development from March 2013 to December 2014. He then became the Director of Risk Management and Chief Risk Officer from January 2015 to June 2017. DX 27 (Investigative Testimony of George Amrhein, April 11, 2018 ("Amrhein Testimony")) at 187:3-11, 203:8-12.

5.     Larry Milder ("Milder") was the President and CEO of Alt Fund Distributors, which provided regulatory structure to Catalyst, and all the wholesalers who serviced Catalyst worked under Milder.  DX 28 (Investigative Testimony of Larry Milder, March 1, 2018 ("Milder Testimony")) at 18, 19:9-18.

6.     Rob Glass ("Glass") is the Chief Compliance Officer at Catalyst.  DX 33, Szilagyi Testimony I, at 80.

7.     Kimberly Rios, who holds Series 3, 63, and 65 licenses and is a Chartered Financial Analyst, joined Walczak's team at the Catalyst Hedged Futures Strategy Fund (the "Fund") in December 2014 and served as Co-Portfolio Manager for the Fund from shortly thereafter through February 2017.  DX 30 (Investigative Testimony of Kim Rios, February 23, 2018 ("Rios Testimony I")) at 45:13 to 46:5, 54:16-20.  She had the same fiduciary obligations to the investors as any portfolio manager. *See* DX 30, Rios Testimony I, at 66-67; *see also* DX 46 (Nov. 23, 2021 Deposition of Arthur Laby ("Laby Dep.")) at 178:1-21.

## II.     Harbor Financial - Harbor Asset Fund to Catalyst

8.      Edward S. Walczak graduated from Middlebury College in 1977 with a degree in physics and economics.  DX 36 (Oct. 27, 2017 Investigative Testimony of Edward Walczak ("Walczak Testimony I")) at 8:2-12.  He obtained a Master's in Business Administration from Harvard University's Graduate School of Business in 1983.  DX 36, Walczak Testimony I, at 8:5-17. He served in the Army Corps of Engineers for four years and rose to the rank of Captain. DX 39 (Deposition of Edward Walczak in *Walczak v. Catalyst Capital Advisors, LLC*, AAA Case No. 01-20-0003-8157 (Mar. 19, 2021) ("Walczak Testimony IV")) at 19:17-23.  Walczak built a career in supply chain management before he began trading professionally.  DX 39, Walczak Testimony IV, at 20:3 to 21:24.  In 2005, Walczak formed Harbor Financial, LLC ("Harbor Financial") and Harbor Assets, LLC ("Harbor Assets"), initially as a vehicle for his proprietary trading activities.  DX 2 (Disclosure Document of Harbor Financial, LLC (July 30, 2014) ("Harbor 2014 DDoc") at 1; DX 36, Walczak Testimony I, at 18:5 to 19:5.  Harbor Financial operated as a Commodity Trading Advisor and Commodity Pool Operator, advising Harbor Assets from 2005 through 2013.  DX 2, Harbor 2014 DDoc, at 1.  During that same period, Walczak served as the Managing Member of Harbor Financial and managed the trading for Harbor Assets.  DX 1 (Disclosure Document of Harbor Financial, LLC (Feb. 29, 2012) ("Harbor 2012 DDoc")) at 26-27.

9.      As Director of Business Development at Catalyst, Amrhein sourced prospective strategies that traded and invested in commodities and futures for the purposes of offering the strategies to investors via a mutual fund. DX 27, Amrhein Testimony at 33:13-37:12, 187:3-7.

10.     Amrhein discovered Walczak, Harbor Financial and Harbor Assets through screening and research. DX 27, Amrhein Testimony at 38:14-40:5. He contacted and recruited Walczak to Catalyst. DX 27, Amrhein Testimony at 44:17-45:12.

11.     Amrhein obtained from Walczak the private placement memorandum, marketing materials, and audited financials for Harbor Assets. *See* DX 27, Amrhein Testimony at 46-47.

12.     Catalyst was offering Walczak an opportunity to use his investment management expertise as a portfolio manager, with Catalyst to provide everything else. *See* DX 27, Amrhein Testimony at 53; DX 34 (Investigative Testimony of Jerry Szilagyi, April 9, 2018 ("Szilagyi Testimony II")) at 133:3-19. Catalyst understood that Walczak was not at all interested in putting himself in a situation where he was going to be taking on additional administrative and regulatory responsibilities. *See* DX 27, Amrhein Testimony at 55. Walczak would focus entirely on investment management. *Id*.

13.     At this time, Catalyst knew and understood the risk to Walczak's trading strategy for Harbor Assets lay to the upside, in particular a rapid increase in the market in a low or rising volatility environment, such that the portfolio's short strikes could get hit. *See* DX 27, Amrhein Testimony at 75:20-76:22; DX 34, Szilagyi Testimony II, at 299:20 to 300:6.

14.     In 2005 or 2006 Walczak had described the strategy to an attorney who drafted a Private Placement Memorandum for the Harbor Fund. *See* DX 37 (April 3, 2018 Investigative Testimony of Edward S. Walczak ("Walczak Testimony II") at 109-10.

15.     That Harbor Assets, LLC Confidential Private Placement Memorandum provided to Catalyst contained a paragraph stating:

> **Very Highly Leveraged Trading; Volatile Markets; "Zero-Sum" Trading.** In general, futures and options trading is aggressive and involves very highly leveraged Investment Instruments. In addition, the market prices of Investment Instruments are highly volatile and materially affected by unpredictable factors. While volatility creates profit potential, volatility also directly effects the risks associated with trading. The combination of these two factors (leverage and volatility) can subject the value of the Company's investment portfolio to sharp fluctuations, both positive and negative in direction. The profitability of the Company depends to a significant degree on

> the Manager's ability to forecast price movements correctly. If the Manager fails
> to correctly predict price movements, substantial losses could result.

*See* DX 27, Amrhein Testimony at 99:9-25; DX 37, Walczak Testimony II, at 117:11 to 119:1, 121:20 to 122:25; *see also* DX 47, Disclosure Document of Harbor Financial, LLC (April 30, 2013) at 37.

16. That paragraph Walczak provided is not in the prospectus created by Catalyst for the Fund. *See* PX 3 (Prospectus for Catalyst Hedged Futures Strategy Fund (Aug. 29, 2013) ("Fund 2013 Prospectus")) (evidencing no such language); DX 41 (Transcript, *Walczak v. Catalyst Capital Advisors, LLC*, AAA Case No. 01-20-0003-8157 (June 9, 2021) ("Arbitration Day 3")) at 73:4 to 76:8 (testimony of Walczak regarding process by which Catalyst drafted Fund 2013 Prospectus).

17. Walczak utilized the same trading strategy at the Fund while he was with Catalyst as he had utilized at Harbor Financial on behalf of Harbor Assets. DX 36, Walczak Testimony I, at 74:5-15; DX 37, Walczak Testimony II, at 40:19-25; 133:15 to 136:23; DX 45 (May 18, 2021 CFTC Deposition of Edward Walczak ("Walczak Testimony V")) at 21:22 to 22:5; DX 34, Szilagyi Testimony II, at 126:8-11; DX 33, Szilagyi Testimony I, at 95; PX 3, Fund 2013 Prospectus, at 5 ("The Fund's investment goals, policies and guidelines are, in all material respects, equivalent to the predecessor limited liability company's investment goals, policies and guidelines.").

### III.   Strategy and Holdings of the Fund

18. Walczak applied this strategy for the Fund consistently while at Catalyst. DX 37, Walczak Testimony II, at 163:2-22; DX 38 (April 4, 2018 Investigative Testimony of Edward S. Walczak ("Walczak Testimony III")) at 638:1 to 639:2; DX 43 (Expert Witness Report of Michael De Laval ("De Laval Report")) ¶ 32.

19.     Walczak operated his strategy for the Fund in keeping with the precepts of statistical process control, including their advice to study problems first rather than immediately acting. DX 38, Walczak Testimony III, at 638:1 to 639:2, 723:13 to 728:14, 728:15 to 730:23.

20.     From July 2016 through April 2018, Walczak placed an average of 215 option trades per month in the Fund, ranging from 70 in August 2016 to 532 in March 2017, with a median of 209.  *See* DX 48 through DX 69 (monthly trade logs for July 2016 through April 2018).

21.     Part of Walczak's strategy for the Fund relied on concepts of mean reversion, in terms of both the price of S&P 500 Futures contracts and the volatility of that price series. DX 37, Walczak Testimony I, at 24:25 to 25:13, 26, 240, 243, 320-21; DX 38, Walczak Testimony III, at 643:18 to 644:6.

22.     Walczak invested millions of dollars of his own money in the strategy he used at the Fund. DX 37, Walczak Testimony II, at 207:2-13, 209:9-11; DX 42 (Transcript, *Walczak v. Catalyst Capital Advisors, LLC*, AAA Case No. 01-20-0003-8157 (June 10, 2021) ("Arbitration Day 4")) at 112:4-17.

23.     Catalyst and Walczak consistently disclosed the strategy as investing primarily in long and short call and put options on the Standard & Poors 500 Index. *See* PX 3, Fund 2013 Prospectus, at 4.

24.     Moreover, the Fund was required to, and did, disclose its holdings in filings with the United States Securities and Exchange Commission ("SEC") when it filed Forms N-CSR and Form N-Q (the Quarterly Schedule of Portfolio Holdings of Registered Managed Investment Companies).  DX 40 (Transcript, *Walczak v. Catalyst Capital Advisors, LLC*, AAA Case No. 01-

20-0003-8157 (June 7, 2021) ("Arbitration Day 1")) at 122:8 to 123:14; DX 43, De Laval Report, ¶ 29.

25.     The Fund also invested in short term treasuries, money market funds, and other short-term, low-risk holdings. Such holdings typically made up over 90% of the Fund's net assets. *E.g.*, DX 77 (Catalyst Form N-Q of Sept. 30, 2015) at 13 (94.3% of Fund AUM held in Short-Term Investments).

26.     Walczak disclosed on house calls that his investment strategy was not designed to be directional. See DX 10 (Transcript, Jan. 17, 2014 Open House Call ("Jan. 17, 2014 Call")) at 4, 10; PX 37 (Transcript, Mar. 18, 2015 Open House Call ("Mar. 18, 2015 Call")) at 5; DX 12 (Transcript, Oct. 13, 2015 Open House Call ("Oct. 13, 2015 Call")) at 10-11; DX 14 (Transcript, Mar. 29, 2016 Open House Call ("Mar. 29, 2016 Call")) at 13; PX 45 (Transcript, July 12, 2016 Open House Call ("July 12, 2016 Call")) at 12; DX 18 (Transcript, Oct. 11, 2016 Open House Call ("Oct. 11, 2016 Call")) at 21. In particular, this meant that Walczak managed trading at the Fund in a fashion that was designed to be market-neutral, not delta-neutral, where "delta" indicated the rate at which the Fund's theoretical value under some pricing model indicated it would change as a function of small moves in the price of S&P 500 Futures contracts. DX 36, Walczak Testimony I, at 142:20 to 143:14, 144:18 to 145:24; PX 45, July 12, 2016 Call, at 26:1-17; *see also* DX 38, Walczak Testimony III, at 741:17 to 743:21 (incompleteness of delta metric); PX 15 (dkt. 29) (July 27, 2021 Deposition of Edward Walczak ("Walczak Testimony VI")) at 269:13 to 270:8; DX 39, Walczak Testimony IV, at 126:10-14; DX 41, Arbitration Day 3, at 224:16 to 226:3; DX 26 (July 10, 2019 E-mail from Walczak) (low predictive value of delta for the Fund's performance); PX 39 (Transcript, Oct. 6, 2015 Open House Call ("Oct. 6, 2015 Call")) at 10:5-9.

27.     Walczak disclosed on house calls that he used several technical indicators to help him identify market direction, support and resistance areas, as well as market price momentum, including chart patterns, stochastic analysis, Bollinger bands, and relative strength index. *See* DX 18, Oct. 11, 2016 Call, at 33; DX 42, Arbitration Day 4, at 274; DX 19 (Transcript, Nov. 15, 2016 Open House Call ("Nov. 15, 2016 Call")) at 30-31; DX 45, Walczak Testimony V, at 327; DX 36, Walczak Testimony I, at 88:20 to 90:23; DX 39, Walczak Testimony IV, at 32:6-18.

28.     Catalyst marketed the Fund in part using quarterly investor presentations. *See* DX 30, Rios Testimony I, at 177-78; PX 11 (dkt. 27) (April 20, 2021 Deposition of Kimberly Rios ("Rios Testimony II")) at 328. Rios testified that the process to prepare the investor presentations was that "Ed and I would go through the one from prior," on a quarterly basis, and then "when it needed to be updated or when we were asked to have it updated, we would go through it and update where it can be updated." DX 30, Rios Testimony I, at 177:19 to 178:10. Rios reported that the final approval process for investor presentations occurred in New York, but that she believed the materials she and Walczak went through were accurate; she would not have passed the materials she reviewed along to New York if she had not believed them to be accurate. *Id.* at 178:11-21. Overall, the investor presentation predated Rios's work with Walczak, and while parts of it were reviewed on a quarterly basis, it was updated less frequently than annually. PX 11, Rios Testimony II, at 328.

29.     Walczak believed the presentations to be a marketing piece but did not know who the audience was beyond registered investment professionals and did not know it was posted to Catalyst's website. DX 36, Walczak Testimony I, at83-83. He believes he provided some content and gave a presentation at an internal sales meeting in Vegas. DX 45, Walczak Testimony V, at 66-75.

30. Walczak testified regarding the presentations at a deposition taken by the CFTC on May 18, 2021. There, when asked by the CFTC whether "the information [in investor presentations] about risk management of the Fund could have only come from you," Walkzak replied, "I can't speculate on where Catalyst drew their information from." DX 45, Walczak Testimony V, at 68:1 to 69:16. The CFTC pressed him, asking, "[W]as there anyone else who the information about managing the risk of the fund could have come from, besides from you?" "Of course," he answered. *Id.* at 69:21 to 70:2. The CFTC then asked whether there was any "original" source of information about risk management in the Fund, and when Walczak asked what that meant, the CFTC simply moved on. *Id.* at 70:3-7.

### IV. Catalyst's Risk Committee and Its Risk Management of the Fund

31. Coming into 2015 when Amrhein transitioned to Chief Risk Officer, it was Amrhein's job to serve as another set of eyes watching over the portfolio manager's adherence to the risk parameters that had been deployed from the early days. *See* DX 27, Amrhein Testimony, at 137.

32. The day-to-day risk management with respect to the Fund resided with the Fund's advisors and other service providers to the Fund. See DX 4 (The Catalyst Funds Statement of Additional Information ("2013 SAI"), dated Aug. 29, 2013, as publicly filed with the SEC) at 57.

33. Catalyst disclosed to investors that "although the risk management policies of the advisor and the service provider are designed to be effective . . . there is no guarantee that they will be effective." DX 4, 2013 SAI, at 59; *see also* DX 36, Walczak Testimony I, at 204:7-10; DX 37, Walczak Testimony II, at 195:8-12; DX 38, Walczak Testimony III, at 520:24 to 521:1; DX 13 (Transcript, Mar. 1, 2016 Open House Call ("Mar. 1, 2016 Call")) at 28:11-12; DX 18, Oct. 11, 2016 Call, at 22:22 to 23:6.

34.     Throughout his time at Catalyst, Walczak relied on certain "risk metrics," initially developed while he was at Harbor Financial, to guide risk management of the Fund. DX 36, Walczak Testimony I, at 131:21 to 132:12.

35.     Beginning after Catalyst brought on the Fund, it formalized these risk metrics and tracked them on a daily basis, with the risk metrics becoming formalized in late 2014. *See* DX 27, Amrhein Testimony, at 139, 180. In 2015, Catalyst focused on monitoring adherence to the risk guidelines for the hedged futures strategy, and Amrhein received a daily email to monitor adherence. DX 27, Amrhein Testimony, at 184-85.

36.     In keeping with the concepts of statistical process control, Walczak developed these risk metrics to warn him of times when the Fund's holdings or the market conditions had moved into an uncommon situation for the fund, so as to warrant careful examination of how he should proceed.  DX 36, Walczak Testimony I, at 117:13-17, 120:11-20, 128:25 to 129:22, 169:13-22; DX 38, Walczak Testimony III, at 733:5-13; DX 43, De Laval Report, ¶ 39.  Per the design of the strategy, Walczak bore no obligation to reduce risk until one of the risk metrics was "triggered."  DX 45, Walczak Testimony V, at 196:2-6; DX 36, Walczak Testimony I, at 106:10-22, 170:25 to 171:11.

37.     One such risk metric watched for a 5% drawdown in a week or 8% drawdown in a month, which would require the Risk Committee to get together with the portfolio managers and make a plan regarding potential adjustments, if any.  *See* DX 27, Amrhein Testimony, at 206.

38.     In March 2016, Catalyst automated the daily production and calculation of risk metric reports with a firm that specializes in risk management, Model Alpha or Manamu Solutions.  *See* DX 27, Amrhein Testimony, at 210, 219. Amrhein accessed this information on a daily basis. *See* DX 27, Amrhein Testimony, at 256.

39. Amrhein and Jerry Szilagyi enforced compliance with the risk parameters. *See* DX 27, Amrhein Testimony, at 328.

40. Catalyst also held calls with the portfolio managers, meetings of a Risk Committee, and sometimes meetings with individuals from an introducing broker. *See* DX 27, Amrhein Testimony, at 226-29.

41. The Risk Committee consisted of David Miller, Jerry Szilagyi, George Amrhein, Kimberly Rios, and Michael Schoonover. *See* DX 28, Milder Testimony, at 90:10-14; *see also* DX 38, Walczak Testimony III, at 575-76.

42. Amrhein also had access to the underlying positions in the Fund and would check them time to time. *See* DX 27, Amrhein Testimony, at 235.

43. At all times, Catalyst CEO Jerry Szilagyi had the authority and the ability to enter trades in the Fund. *See* DX 29, Miller Dep., at 175-76.

V. **OptionVue and Stress Testing**

44. Walczak and his team frequently used an options pricing tool called OptionVue while managing trading at the Fund. DX 45, Walczak Testimony V, at 136:8-11; DX 36, Walczak Testimony I, at 151:16-23 ("Q: So in 2016, it was your practice to input your portfolio into Option View and have it calculate theta; is that correct? I'm sorry, and have it calculate vega; is that correct? A: Yes. Q: How often would you do that? A: Daily."); *id.* at 262:20-23 ("I use Option View, as I said, every day for lots of different purposes, so I don't have any way of recalling specifically what I did on those days."); PX 15, Walczak Testimony VI, at 55:20 ("I opened up OptionVue every day."); *id.* at 170 ("Q: The stress testing that you describe over pages 17 and 18 of the transcript of this house call, how often did you do that? A: I did that on a daily basis."); *id.* at 199 ("I did on a daily basis, as I mentioned, several times now. How -- I

apologize. I don't want to be impatient. It's getting late in the afternoon. On a daily basis, I opened up OptionVue. Sometimes there's a need to spend a lot of time on stress testing. Sometimes there was -- based on the portfolio composition and market conditions. But all or nothing could change. So it was a perfunctory sort of look, a quick look, and then on to other business related to the Fund. On a daily basis, I did some form of stress testing.").

45. OptionVue can display "spot slides," indicating theoretical values for the Fund's portfolio under OptionVue's pricing model and in keeping with various settings chosen by the user, but such spot slides do not provide reliable forecasts for the Fund's actual market value. DX 43, De Laval Report, ¶¶ 15-17, 23-24. A user can set OptionVue to any of several different volatility modes, changing how OptionVue assumes market volatility will respond to changes in the price of an underlying instrument (here, the S&P Futures contract). DX 45, Walczak Testimony V, at 165:17-20; PX 15, Walczak Testimony VI, at 34:21 to 35:5.

46. The way Walczak used OptionVue, the "profit/loss" or "P/L" display option for spot slides yielded incorrect calculations, as Walczak did not routinely record trade entry prices in OptionVue. DX 45, Walczak Testimony V, at 156:9-11.

47. OptionVue merely displayed the implications of its calculations for inputs chosen by the user; it did not forecast or predict future movements in the market. PX 15, Walczak Testimony VI, at 36:3 to 37:15.

48. The use of "Greek" metrics and the risk reports Catalyst used showed possibilities holding constant all other factors. DX 29, Miller Dep., at 107, 130.

49. Despite these shortcomings in the software, Walczak and his team used OptionVue as one element of the "stress tests" to which they subjected the Fund's portfolio as part of their trade selection process. DX 38, Walczak Testimony III, at 523-24.

50.     The stress-testing protocol began with the risk metrics. DX 36, Walczak Testimony I, at 221:4-16.

51.     Then he would choose a maximum time range for OptionVue to consider when displaying its spot slides.  He would typically choose the period running through the latest expiration in the Fund's portfolio. DX 45, Walczak Testimony V, at 164:2-6; 176:3-7; PX 15, Walczak Testimony VI, at 44:18-25.  But if the Fund's portfolio was concentrated in an earlier expiration, he would sometimes choose that earlier expiration instead.  DX 38, Walczak Testimony III, at 632:4-12; DX 45, Walczak Testimony V, at 176:8 to 177:8.  Either way, the tool then displayed spot slides for a range of dates, running from the time the calculations were run through the chosen end date. DX 38, Walczak Testimony III, at 523:17 to 524:12.

52.     Next, Walczak would determine the range of S&P 500 Futures contract ("spot") prices to consider in the spot slides.  The nature of ratio call spreads is such that he could effectively always find a point at which large losses were possible when the Fund carried short ratio call spreads, and so his task was to determine if the size move required was sufficiently likely to warrant action.  DX 45, Walczak Testimony V, at 183:19-21, 192:13-15; PX 15, Walczak Testimony VI, at 77:7-12, 83:5-11; DX 39, Walczak Testimony IV, at 112:5-16, 130:11-22; DX 41, Arbitration Day 3, at 277:19 to 278:4, 305:5-13; DX 42, Arbitration Day 4, at 185:22 to 186:21; DX 43, De Laval Report, ¶¶ 18-19.

53.     Walczak used descriptive statistics such as standard deviation of anticipated spot moves, for each future date in OptionVue's spot slides, to determine what moves were worth considering. DX 36, Walczak Testimony I, at 35:6 to 36:3; DX 38, Walczak Testimony III, at 631:12-19; PX 15, Walczak Testimony VI, at 85:10-25, 86:24 to 87:20; DX 43, De Laval Report, ¶¶ 18-19.  That size move varied by time, as the further ahead in the future OptionVue

looked, the more time there would be for spot to change, leading to larger expected moves. DX 36, Walczak Testimony I, at 291:13-20; DX 38, Walczak Testimony III, at 627:6-19, 630:10-14, 636:25 to 637:1, DX 45, Walczak Testimony V, at 182:2-12 (5% and 10% moves were based on last expiration); PX 15, Walczak Testimony VI, at 47:10-20, 55:3-14 (same); DX 43, De Laval Report, ¶¶ 18-19; *see also id.* ¶ 20 (Rios memo incomplete for not specifying a time frame for the proposed move). Similarly, predicted moves would be larger (smaller) if market volatility were higher (lower). DX 38, Walczak Testimony III, at 630:10-14; PX 15, Walczak Testimony VI, at 47:10-20, 58:6-24, 60:10 to 61:25, 92:7-10; DX 41, Arbitration Day 3, at 295:24 to 296:4; PX 38 (Transcript, Sept. 15, 2015 Open House Call ("Sept. 15, 2015 Call")) at 14:12-14 (explaining expanded spot slide as a result of heightened volatility); *see also* DX 43, De Laval Report, ¶¶ 14, 22 (low probability of 5% moves for shorter time periods).

54.     The range Walczak considered also took into account technical analysis. DX 45, Walczak Testimony V, at 200-02; DX 36, Walczak Testimony I, at 88:20 to 90:23; DX 39, Walczak Testimony IV, at 32:6-18; DX 43, De Laval Report, ¶ 36.

55.     Walczak also varied volatility in his stress tests, not just spot. DX 43, De Laval Report, ¶ 23; PX 38, Sept. 15, 2015 Call, at 14:15-20; PX 43 (Transcript, Feb. 2, 2016 Open House Call ("Feb. 2. 2016 Call")) at 20:21-25; DX 13, Mar. 1, 2016 Call, at 27:11 to 28:8; DX 14, Mar. 29, 2016 Call, at 19:2-6. In particular, he would commonly look at increases in volatility combined with drops in spot, and decreases in volatility combined with increases in spot. DX 36, Walczak Testimony I, at 24:4-9; DX 38. Walczak Testimony III, at 525:2-14; PX 44 (Transcript, June 28, 2016 Open House Call ("June 28, 2016 Call")) at 26:15-19.

56.     Walczak then examined whether OptionVue's spot slide exceeded 8% at such a "stress point," in which case he would analyze the best way forward. DX 38, Walczak Testimony

III, at 526, 733:5-13; PX 15, Walczak Testimony VI, at 77:19-22, 83:12-18, 173:7 to 175:17; DX 43, De Laval Report, ¶¶ 17, 21; DX 13, Mar. 1, 2016 Call, at 29:20 to 30:6; *see also* PX 12 (dkt. 28) (April 21, 2021 Deposition of Kimberly Rios ("Rios Testimony III")) at 137:8-21 (confirming that Rios worked with Walczak and believes that he operated the trading of the Fund so as to bring the Fund back in bounds and eliminate stress points that would result in drawdowns in excess of 8%). Sometimes, the best path forward was to make no explicit trades. DX 45, Walczak Testimony V, at 191:15-19; PX 15, Walczak Testimony VI, at 156:11-19; DX 41, Arbitration Day 3, at 295:5-8; DX 42, Arbitration Day 4, at 121:10 to 122:16; DX 43, De Laval Report, ¶ 38; PX 11, Rios Testimony II, at 174:17 to 179:15 ("[S]ometimes doing nothing is the right thing to do."); *see also* PX 40 (Transcript, Nov. 10, 2015 Call ("Nov. 10, 2015 Call")) at 18:3-14 (remove risk gradually if it is still some time off); PX 43, Feb. 2, 2016 Call, at 24:3-17 (same); DX 39, Walczak Testimony IV, at 150:5-18 (decision by Catalyst to reduce trading so as to avoid losses from a "gamma squeeze"); DX 41, Arbitration Day 3, at 107:23 to 108:7, 155:1 to 156:2 (same); DX 43, De Laval Report, ¶¶ 26, 34, 35; DX 17 (Transcript, Aug. 9, 2016 Open House Call ("Aug. 9, 2016 Call")) at 10:1 to 11:1 (trade less because of short gamma).

57. Rios stress tested the portfolio nearly daily, and OptionVue graphs were only one aspect of multiple pieces of information used to make trading decisions. *See* PX 11, Rios Testimony II, at 122, 240-41.

58. The OptionVue graphs used by Walczak and his team produced spot slides that, at best, indicated potential prices "all else being equal," and did not in and of themselves suffice to dictate the proper response to potential exposures they highlighted. *See* PX 11, Rios Testimony II, at 174-75 ("Q: So in your experience working with the Hedged Futures Fund, if Mr. Walczak were to look at an OptionVue graph and that OptionVue Graph showed that, all else being equal,

a 5 percent increase in the market was going to result in a greater than 8 percent loss, would he immediately hedge to remove that risk . . . ?  A: There's more to go into it than what you've presented.  You also need . . . time [to] expiration, volatility level, how fast it's decaying, and where the market has come from already, and if there's any external events.").

59.     Schoonover saw Walczak use OptionVue in person, and he used OptionVue to try to replicate what they were doing at some point at the end of February 2017. DX 32, Schoonover Testimony II, at 52.

## VI.     Walczak's House Calls and Other Disclosures

60.     Only investment professionals were invited to participate in the "Open House Calls" through which Catalyst passed along information on its funds to interested financial advisors. DX 36, Walczak Testimony I, at 200:22-23; PX 15, Walczak Testimony VI, at 183:8-17; DX 35 (Deposition of Jerry Szilagyi in *Walczak v. Catalyst Capital Advisors, LLC*, AAA Case No. 01-20-0003-8157 (Mar. 25, 2021) ("Szilagyi Testimony III")) at 157:19 to 158:17; DX 40, Arbitration Day 1, at 109:16-22; 111:3 to 112:4.

61.     Such investment professions bore a fiduciary obligation to conduct due diligence and read the prospectus before advising any of their clients to invest in the Fund.  DX 44 (Expert Witness Report of Norman Harrison ("Harrison Report")) ¶¶ 10, 21.

62.     Indeed, Professor Laby explained that prior to recommending an investment in the Fund, an advisor, such as Barton Evans, should obtain the underlying documents with respect to the Fund like the prospectus and SAI; a reasonable advisor might also look at other fund documents like the annual report and semi-annual report and any other documents that would provide information about the holdings of the fund, and would certainly look at Morningstar or other reports about the fund, examine the fund's history, and conduct due diligence on the

manager of the funds, such as in this case Mr. Walczak. DX 46, Laby Dep., at 112-22. In addition, an advisor should, in Prof. Laby's opinion, keep his or her eye out for other information available about the fund or the advisor. *Id.* Furthermore, Prof. Laby stated that he "would certainly recommend to Mr. Evans that he take advantage of sitting in on any and all of those open house calls," which Prof. Laby noted are "designed specifically for people like Mr. Evans." *Id.* at 122-23.

63.     When Walczak spoke to investment professionals, it was fair for him to consider his audience. DX 46, Laby Dep., at 134.

64.     In sum and substance, according to Prof. Laby, Mr. Evans (or any reasonable adviser) should find out as much as he possibly can about the Fund and its running before recommending that someone purchase it. DX 46, Laby Dep., at 123.

65.     Laby also explained that the Board and Chief Compliance Officer are typically part of a fund's risk management strategy, and that if the prospectus is true, they play such a role with respect to the Fund, as well. *See* DX 46, Laby Dep., at 155-63.

66.     Catalyst's Chief Risk Officer, Amrhein, listened in on some of the Open House Calls. *See* DX 27, Amrhein Testimony, at 331. Miller also listened in on some of the calls. DX 29, Miller Dep., at 138.

67.     Norman Harrison has concluded that these Open House Calls must be viewed in the context of the duty of the investment advisor and the total mix of information available to the adviser, along with the adviser's standard of care and understanding of the legal maxim that the written statements in prospectus disclosures outweigh oral statements made in "open house" calls.  DX 44, Harrison Report, ¶¶ 25, 31.

68.     On most Open House Calls, a Catalyst team member hosting the call would start by warning listeners about forward-looking statements and "important risk considerations investors should carefully consider" and advising them to read the Fund's prospectus and fact sheet for important risk disclosures. DX 38, Walczak Testimony III, at 518:5-13 (quoting June 7, 2016 Open House Call); DX 44, Harrison Report, ¶ 29; PX 46 (Transcript, Sept. 13, 2016 Open House Call ("Sept. 13, 2016 Call")) at 2:13-18; DX 16 (Transcript, June 7, 2016 Open House Call ("June 7, 2016 Call")), at 2:11-16; PX 38, Sept. 15, 2015 Call, at 2:15-19; DX 11 (Transcript, Sept, 29, 2015 Open House Call ("Sept. 29, 2015 Call") at 2:13-18.

69.     Catalyst also circulated recordings of some Open House Calls to some sophisticated financial advisors, without Walczak's advance knowledge or approval. PX 15, Walczak Testimony VI, at 132:1-19. During these calls, Walczak answered questions and described the Fund's strategy. *E.g.*, DX 14, Mar. 29, 2016 Call, at 21:2-4 ("focus on . . . how do you control your risk and still not eliminate the opportunity for a return"); PX 15, Walczak Testimony VI, at 135:11-17 ("a -- kind of a general overview of what our strategy -- where our strategy had led us at that point in time. And generally, to questions, which I think was the purpose of the call, was to just describe a little bit more about, well, how do you trade these types of calls. So that's the type of information that's typically provided.").

70.     Given the complexity of Walczak's trading strategy and the number of people asking questions, Walczak could not run through his entire strategy on every Open House Call; rather, he offered a "flavor" of his team's current thinking, based on the present market conditions and Fund holdings. PX 15, Walczak Testimony VI, at 159:5-17. But certain themes recurred in numerous calls. For instance, Walczak continually explained that the risk to the Fund was on the upside when it traded call ratio spreads. *E.g.*, PX 40, Nov. 10, 2015 Call, at 22:18-

24; DX 15 (Transcript, May 24, 2016 Open House Call ("May 24, 2016 Call")) at 28:19-21; PX 45, July 12, 2016 Call, at 6:13-17.

71.     Investment advisors understood this risk. DX 11, Sept. 29, 2015 Call, at 22:13-14 (Participant: "Yeah, absolutely, I get that. I live in this world 25 plus years. . . ."); PX 40, Nov. 10, 2015 Call, at 17:21-24 (Participant Investment Advisor: "So, if the S&P is up more than let's say roughly 5 percent through the end of the year, then the fund would lose value . . . .").

72.     Walczak explained that the Fund held "options positions into expiration" despite their volatility "because, in many cases, that's where we have our greatest opportunity." DX 15, May 24, 2016 Call, at 23:23-24:1; *see also* DX 17, Aug. 9, 2016 Call, at 10:5-17:25.

73.     In addition, Walczak described a variety of things he did to manage the upside risk of the Fund:

> CALLER: Hi, Ed. My question is, in a past call you'd mentioned that your maximum drawdown limit on your model is eight percent. And, obviously, as we move up in an environment like we've been, and your call position is, like you said, 100 percent exposed, my question is, as we continue to go up and you have to maintain that eight percent limit, do you -- do you buy back some calls if it (inaudible) that? Do you buy upside calls to butterfly the position? Or do you just buy some S&P Futures to get delta neutral? I just want to get a better sense of your risk mitigation procedure.
> MR. WALCZAK: Sure. So, you described four things. The first two we do and the last we two don't. And, more specifically, when I talk about the two, we don't pay attention to delta neutrality. It's not part of our strategy, and specifically going to my previous answer, we are -- we have upside capture opportunity and yet if you -- so, in other words, we want the market to go higher for these call positions. That's how we make money. However, if you look at the fund's exposure to the market on a delta basis, on any given day, you're going to be short the market. And so, what we're doing-- and that's why we don't pay a lot of attention to delta. We pay attention to volatility. We pay attention to time decay. But not delta, because, here you go, our whole strategy is built around a position that is short the market, but profits when the market goes hire. And so, were we to try to be delta neutral, nothing would work So, what do we do? Yes, we buy back calls. We sometimes take the whole position off. So, if we've got a one by two or a one by three out there, there's times when we can take it off at a profit and, at the same time, reduce our upside risk. So, we do buy calls back. We do (inaudible) calls. We buy them back, sell them further away. We take positions off. We do butterfly the positions. We do

that as a matter of force. We typically enter these positions as ratios and then, when opportunities arise, either on a pullback or even on day like today, we'll come in with what's called a backspread and sell one by two, sell one by three. And so, we do lots of different things to manage that upside risk. We don't go delta neutral and we don't use Futures.

PX 45, July 12, 2016 Call, at 25:12-27:7.

74.    In light of facts such as those set forth above, Mr. Harrison has further concluded that Walczak's statements on the Open House Calls were not misleading in the context of the attending advisors' fiduciary and regulatory obligations and the total mix of information available, and that the Fund adequately disclosed the many risks of loss that investors would bear if they purchased shares in the Fund.  DX 44, Harrison Report, ¶¶ 16-19, 31.

75.    Walczak had no role in drafting the 2013 prospectus for the Fund other than providing Catalyst with Harbor Assets' most recent private placement memorandum and other materials. *See* DX 37, Walczak Testimony II, at 117-19.

76.    Walczak received only parts of the prospectus to review and recalls only reviewing the principal trading strategy because he had no expertise in preparing prospectuses for '40 Act vehicles. DX 37, Walczak Testimony II, at 121-24.

77.    Walczak was not asked to approve any section of the prospectus. DX 37, Walczak Testimony II, at 123.

78.    Indeed, for example in May 2014, when Walczak suggested that because the Fund's risk is to the upside, Catalyst disclose that "if the market rises rapidly the Fund's strategy will attempt to mitigate the extent of the losses," Catalyst overruled him. *See* DX 20 (SEC Investigation Exhibit 162).

79.    The Registration for the Fund filed August 29, 2013 disclosed:

    a.    "Futures Risk. . . . This risk could cause the Fund to lose more than the principal amount invested";

b. "Management Risk. The portfolio manager's judgments about the attractiveness, value and potential appreciation of particular securities in which the Fund invests may prove to be incorrect and there is no guarantee that the portfolio manager's judgment will produce the desired results"; and

c. "Sold Options Risk. . . . The Fund's losses are potentially large in a sold put transaction and potentially unlimited in a sold call transaction."

PX 3 (Aug. 29, 2013 Registration for Catalyst Hedged Futures Strategy Fund) at 5-6.

80. The Fund's Statement of Additional Information filed with the Fund's Registration Statement further disclosed: "Successful use by a Fund of options on stock indices will be subject to the ability of the Adviser [Catalyst] to correctly predict movements in the directions of the stock market." DX 4, 2013 SAI, at 35. Likewise, the Statement of Additional Information from 2016 disclosed: "Risks of Options on Stock Indexes . . . . [S]uccessful use by a Fund of options on stock indexes is subject to the advisor's [Catalyst's] ability to correctly predict movements in the direction of the stock market generally or of a particular industry or market segment." DX 5 (The Catalyst Funds Statement of Additional Information dated Nov. 2, 2016 ("2016 SAI")) at p. 176 of 271.

81. Similarly, the November 2016 prospectus disclosed:

a. "Futures Risk. . . This risk could cause the Fund to lose more than the principal amount invested";

b. "Management Risk. The portfolio manager's judgments about the attractiveness, value and potential appreciation of particular securities in which the Fund invests may prove to be incorrect and there is no guarantee that the portfolio manager's judgment will produce the desired result"; and

c. "Hedging Risk. There can be no assurance that the Fund's hedging strategy will reduce the risk."

DX 3 (Catalyst Hedged Futures Strategy Fund Prospectus for Nov. 1, 2016 ("Nov. 2016 Prospectus")) at 3-4.

82.     Schoonover drafted the quarterly investor presentations, and the presentations are sent for comment to numerous individuals via a distribution list. *See* DX 28, Milder Testimony, at 147.

83.     Schoonover reviews and determines the accuracy of talking points and materials provided to wholesalers and advisors. *See* DX 28, Milder Testimony, at 254:11-15, 257:11-16.

84.     Schoonover knew and understood that the Fund faced risk from a significant rise in the S&P, as exemplified in 2013 because of the rise in the S&P. *See* DX 31 (Mar. 2, 2018 Investigative Testimony of Michael Schoonover ("Schoonover Testimony I")), at 118-19.

85.     In addition to OptionVue, Catalyst used Model Alpha and Bloomberg as risk management software. DX 32, Schoonover Testimony II, at 198.

**VII.     "8%" and other Drawdowns in the Fund**

86.     Walczak did not guarantee a maximum 8% loss. *See* DX 27, Amrhein Testimony, at 351. Eight percent was a trigger point and did not mean losses would be limited to 8%. It meant that Catalyst strove to limit losses going beyond 8% and did that by getting all hands on deck when it came close to that level. *See* DX 27, Amrhein Testimony, at 152.

87.     Walczak did not say 8% was a loss threshold, but that at 8% he became more conservative in the way he managed the Fund. *See* DX 28, Milder Testimony, at 104.  If there is an 8% drawdown, the strategy becomes more conservative. *See* DX 28, Milder Testimony, at 105.

88.     Advisors had opportunities to ask questions on and after the Open House Calls. *See* DX 25 (email dated January 25, 2017 – SEC Exhibit 56). One such advisor, for instance,

followed up with a Catalyst representative after a January 2017 Open House Call, indicating that he or she did not believe there was a guarantee or 8% threshold but rather understood that Walczak "tries to limit the strategy's risk to 8% downside." *Id.*

89.     Other advisors, too, understood 8% to be a goal, not a guarantee. *See, e.g.*, PX 38, Sept. 15, 2015 Call, at 24 (advisor says, "I know you shoot for not going over the 8% drawdown.").

90.     In fact, on February 17, 2017, Walczak and Szilagyi received an email from an investment advisor saying, "Thank you for your candid and immediate communication(s). . . . I have full confidence that you know what you're doing . . . . It's a cliché, but taking on the markets in a humbling phenomenon. There is no arguing that these are not (historically) 'normal' markets." DX 70 (e-mail dated Feb. 17, 2017 from Jason Waxler).

91.     Another advisor wrote the day before, "[A]s long as volatility moderates to a more reasonable level, I intend to maintain my positions as I do believe in [Walczak's] process and strategy." DX 71 (e-mail dated Feb. 16, 2017 from Briad Prichard).

92.     Similarly, Rios received an email on February 16, 2017 relaying a question regarding whether overzealous efforts to limit the Fund's potential losses in the event of *rises* in the market would undermine the Fund's ability to make profits if the market were to *fall*. The questioner (William Johnson) noted that he had his clients invest in the Fund "to protect his clients AND to benefits his clients in (and when) the event of a downturn."  DX 72 (e-mail dated Feb. 15, 2017 from Dan Jensen). Mr. Johnson therefore wanted to know whether the Fund would "continue to have the safeguards in place as well as the full potential to make money in down markets," with such profit potential "not . . . affected by the changes you may be making today to limit losses from this upward move in the market." *Id.*

93.     On February 16, 2017, another advisor wrote, "This is a valuable strategy for investors even though many of them have not seen or realized it lately with the markets headed so far north." DX 73 (e-mail dated Feb. 16, 2017 from Chad Edwards).

94.     It is urban legend that Ed actually said he protected the Fund from any more than an eight percent drawdown. *See* DX 28, Milder Testimony, at 430.

95.     The ongoing trading strategy was to be active to avoid a situation where a drawdown reached 8%, and when it got there it became all hands on deck; instead of one portfolio manager, a whole team of people tried to work out what to do. *See* PX 11, Rios Testimony II, at 50.

96.     Walczak consistently represented that there were no guarantees:

- "So ideally, you have a fund that if everything is working right -- and I have to stress there are no guarantees." PX 36 (Nov. 4, 2014 Open House Call ("Nov. 4, 2014 Call")) at 34:12-14.
- "But that's an important message, is that the fund is behaving exactly how it has behaved in the past.  And there's no guarantee that we'll be successful, obviously, but so far nothing new." *Id.* at 54:5-9.
- "Again, this does not mean there's a hard stop or a guarantee of an 8 percent loss containment."  DX 13, Mar. 1, 2016 Call, at 28:11-12.
- "There's no guarantees in the world, especially in markets, but that's our goal in everything we do is to keep our drawdown to 8 percent." DX 16, June 7, 2016 Call, at 18:10-12.
- "There's obviously no guarantees in the business." DX 18, Oct. 11, 2016 Call, at 18:20-23.
- "That is the thing that sets us apart from many investment vehicles, is that we are very aggressive about risk management.  But there are no guarantees." DX 19, Nov. 15, 2016 Call, at 23:3-6.

97.     Walczak also clearly disclosed the risk of upside moves when he stated:

- "But where we take our risk is in extreme upside moves." PX 40, Nov. 10, 2015 Call, at 22:18-19.
- "… we do have risk to the extreme upside movement." PX 38, Sept. 15, 2015 Call, at 4:14.
- "If the market goes too high we'll lose money on the calls we sold and that's where the risk in the fund is." PX 42 (Transcript, Jan. 19, 2016 Open House Call ("Jan. 19, 2016 Call")) at 31:9-11.

- "The risk -- the prime risk in the fund is a year like 2013 where the market just goes – not just relentlessly higher because we want to make money if the market goes higher, but if it goes relentlessly higher at an unusual rate -- 2013 was up 30 percent, that's an unusual rate . . . ." *Id.* at 32:9-14
- "The risk is that it goes up too far. The positions will make money if the market advances at a moderate rate. They'll lose money if the market advances at a very rapid rate both in time and in price." *See* DX 13, Mar. 1, 2016 Call, at 7:16-20.
- "But we also do have some risk that if the S&P ran up to 2250 or 2275 over the next month, we'd have to do some risk management, because we would blow through those profit ranges and be on that side of the equation that -- in which the fund struggles, too far, too fast." DX 17, Aug. 9, 2016 Call, at 9:9-14.
- "[W]e certainly aren't able to take all of that upside risk away; that's a part of our strategy." PX 40, Nov. 10, 2015 Call, at 6:13-14.
- "And in fact the market advanced at such a rapid rate that our upside risk, which as I mentioned is the risk in our upside exposure positions, that upside risk came into play and we did suffer a draw down." PX 38, Sept. 15, 2015 Call, at 12:24-13:3.

## VIII. Discretion

98.     Walczak also disclosed that he would exercise discretion in managing the Fund's trading, stating: "We do some further analytics to determine some price levels. And then *discretion* takes over and we start looking at individual options liquidity and pricing, and that's kind of the *discretionary* thing in terms of the actual execution. So that's where *discretion* comes in. The other important *discretionary* piece of what we do is what I described right at the beginning. . . .There's a lot of different things we can do. We use some *discretion* about taking off positions, adjusting positions, trying to capture a little bit of that unrealized gain. Still leaving some opportunity on the table if we get another pullback and volatility spike. So other *discretion* comes in around profit-taking and adjusting opportunity." PX 39, Oct. 6, 2015 Call, at 25:18-26:20 (emphases added).

## IX. Risk upside

99.     In September 2015, Walczak told advisors:

The fund suffered a really large draw down, in fact our risk limit in terms of our draw down in the fourth quarter of last year as a result of a pretty strong advance in fact a historically strong advance coming off a low. So we have seen a couple of questions about hey, what's going to happen to the fund if that occurs again coming out of this low?

. . . . And in fact, the market advanced at such a rapid rate that our upside risk, which as I mentioned is the risk in our upside exposure positions, that upside risk came into play and we did suffer a draw down.

PX 38, Sept. 15, 2015 Open House Call, at 12-13.

100. Walczak further stated:

What we do with the fund on a daily basis is we have lots and lots of diverse options positions on -- based on our strategy. We stress, we aggregate all those in the models we use to predict what will happen with the portfolio value under different scenarios. And the specific scenarios we stress the portfolio value against plus five percent, plus 10 percent price movement in the S&P, minus 5, minus 10 and minus 15. And in the current volatility environment I have added a minus 20 percent price excursion on the S&P to that stress. So we stress those price movements. And because options are so sensitive to volatility we also stress volatility movements.

With the VIX now already elevated, our normal stress is a 40 VIX and 45 VIX. When the VIX is at 40 we will stress VIX not only at 45 but all the way up to 60. So we stress those. We look across five different time frames and we [vary] those time frames looking for portfolio values that will exceed our eight percent draw down limit.

And when we find that that happens that they'll go in and make position adjustments to bring that potential draw down back into line with our 8 percent guideline which is what we try to hold a draw down to. We did those things for example last, in the portfolio last year, which is our most recent draw down. And we did all of those things, and although the draw down was luckily 8 percent, that's what was predicted, what was expected, what we controlled to. So the risk parameters that we used were effective and we expect them to continue to be effective going forward.

PX 38, Sept. 15, 2015 Call, at 14-15.

101. And at the end of 2015, Walczak disclosed that the Fund was positioned to lose value if the S&P rose roughly 5% through the end of the year. *See* PX 40, Nov. 10, 2015 Call, at p. 17.

102.     Walczak further explained:

And again, nothing is static in what we do. Both from an entry and adjusting standpoint we're doing that on a daily basis. So, should we see a continuation of the rise that's interrupted for the last couple days, we would at some point -- again, we stress the fund for risk every day. And so, I can't tell you at what point that might be. But as we do our risk stresses, at some point we would come into -- we would make adjustments to try and take some of that risk off the table.

But if -- from just a static snapshot position today, if we sit and do nothing, then the fund will make good money, up until about 2180ish, and then we'll start to have some upside risk from there; it will start to lose some money.

PX 40, Nov. 10, 2015 Call, at 18.

103.     Finally, the Fund and Harbor Assets, taken together, suffered drawdowns greater than 8% on three occasions prior to February 2017.  Harbor Assets suffered a 23.4% drawdown from January 2007 to July 2007.  Harbor Assets and the Fund suffered a combined drawdown of 11.1% from April 2013 under Harbor Assets to Oct. 29, 2013 under Catalyst, including a drawdown of 7.1% after launch of the Fund.  And the Fund suffered an additional drawdown of 8.7% from Oct. 14, 2014 to Nov. 26, 2014.  All of this was public information.  *See* DX 8 (price data for Harbor Assets and the Fund).

## X.     December 2016 and February 2017 Drawdowns and Collective Decision Making

104.     Catalyst had a number of discussions with Walczak over the course of 2016, and more following the 2016 summer drawdown. *See* DX 27, Amrhein Testimony, at 251.

105.     From July 2016 through the end of that year, Walczak actively reduced the exposure of the Fund's portfolio by significantly reducing the number of positions. *See* DX 27, Amrhein Testimony, at 251; DX 41, Arbitration Day 3, at 101:11 to 102:24; DX 42, Arbitration Day 4, at 63:17-22; 146:9-22.

106.     Catalyst's CEO, Jerry Szilagyi, was involved in these discussions. *See* DX 27, Amrhein Testimony, at 253.

107.    By December 2016, Miller, co-founder and Chief Investment Officer, had gained a further understanding of the strategy of the Fund and the frequent risk to the upside. DX 29, Miller Dep., at 21, 27.

108.    By November 2016, Schoonover was pulling daily position reports for Miller, and Miller began monitoring the Funds' Greek metrics. DX 29, Miller Dep., at 29, 31, 34. Miller would use the information in the ongoing meetings and talks with Catalyst's risk committee and people on the team at Catalyst. *Id*. at 32, 36.

109.    Schoonover's spreadsheets were designed not to show how the portfolio would respond to hypothetical moves in the underlying, but to show various metrics with all else being equal, limiting their utility and predictive value. DX 29, Miller Dep., at 69.  And "all else equal" is never supported in reality, given the Fund's nonzero gamma level, continuous changes in market volatility, and the simple passage of time. DX 29, Miller Dep., at 70.

110.    The ongoing meetings also involved individuals with RCM Risk Advisors. DX 29, Miller Dep., at 39.

111.    Walczak did not object to participating in these conversations or receiving comments. *See* DX 27, Amrhein Testimony, at 257. Rather, he was receptive and cooperative and had the same view that whatever thoughts and discussions could improve the strategy were worthwhile. *See* DX 27, Amrhein Testimony, at 257.

112.    In the summer of 2016, Walczak and Szilagyi collaborated on alternatives to reduce risk and decided how to achieve that goal, and Walczak executed it. *See* DX 37, Walczak Testimony II, at 229-30.

113.     Between the July 2016 drawdown and December 2016, there were at least three discussions with Walczak, Amrhein, Szilagyi, Schoonover, and Miller, with topics including ways of measuring risk in the portfolio. *See* DX 27, Amrhein Testimony, at 258-59.

114.     No risk metrics were triggered in the Fund until December 2016. *See* DX 27, Amrhein Testimony at 328; DX 43, De Laval Report, ex. 1.

115.     From July 2016 through February 2017, Walczak traded in response to risk metric triggers 29 out of 35 times, including 21 out of 23 of those that did not merely call for Walczak to submit an explanation of the Fund's position to Catalyst.  DX 43, De Laval Report, ¶¶ 36, 39 & ex.1.

116.     In July 2016, Miller and Szilagyi discussed reducing the exposure of the Fund. DX 29, Miller Dep., at 61. Miller was satisfied that positions were reduced in December 2016 despite his preference for more reduction. DX 29, Miller Dep., at 63.

117.     The Fund was up in 2016 through November 30, 2016, and up for the month of January 2017. DX 29, Miller Dep. at 41, 42; DX 8 (Price Data).

118.     No later than December 2016, Szilagyi and others at Catalyst became directly involved in determining what actions to take in managing the drawdown of the Fund. *See* PX 11, Rios Testimony II, at 138. Determining what action to take to manage the Fund's drawdown was determined by more than just Walczak.

119.     On December 9, 2016, Miller asked Schoonover to look at historical S&P 500 up moves and when they had occurred. *See* DX 31, Schoonover Testimony I, at 241-42; *see also* DX 6 (CFTC Schoonover Exhibit 7).

120.     As Schoonover explains, it is not accurate to interpret OptionVue graphs as establishing propositions akin to, "a two percent rise in the S&P will result in an eight percent

decline in the Fund," because such assertion improperly assumes the market moves up and does nothing else, while volatility remains constant, contrary to common market experience. *See* DX 31, Schoonover Testimony I, at 243-44. Such charts and graphs are not accurate portrayals of the real risk in the Fund but merely an indication of the particular market conditions at which the Fund has especial exposure. *Id.* at 245. They are meaningful to start the conversation and say, "What does this mean?" *Id.*

121. Such OptionVue charts often suggest that if the market goes up, the Fund will go down, but this only applies if all else is held equal, including an assumption that no trades occur and no market data change other than those expressly shifted per the user's instruction. *See* DX 31, Schoonover Testimony I, at 405-07. When you compare such OptionVue graphs to actual realized returns, discrepancies of 25% have been known to occur in some cases. *Id.*; *see also* DX 9 (Schoonover Dep., Exhibit 21).

122. On December 10, 2106, a team of Catalyst personnel had a call to address managing risk. *See* DX 22 (SEC Exhibit 47).

123. Schoonover described it as "all hands on deck situation". DX 31, Schoonover Testimony I, at 218.

124. Szilagyi invited Walczak to the call to discuss what could be done to immediately reduce risk in the Fund. *See* DX 23 (SEC Exhibit 45).

125. On Sunday, December 11, 2016, Milder directed that all sales-related communications regarding the Fund be directed to him because after calls with the portfolio trading and management team, they had put a plan in place to manage the risk of the Fund. *See* DX 24 (SEC exhibit 97).

126. In December 2016, for talking points, Walczak accurately stated:

- The Fund is short volatility above the market and long volatility below the market.
- The Fund's risk is to the upside.
- Volatility is more important than price. Yesterday the VIX was up over 3% and today the VIX is currently up nearly 7%.
- The PM's believe that the action of the S&P Index price up along with VIX up is a temporary phenomenon that will not persist. The "normal" correlation between the two is typically -.78.
- The Fund is currently in its price target zone for nearby expiring options. As seen in July and during the Fall months when this occurred, the Fund is expected to have more NAV volatility, some levels which may be uncomfortable compared to its normal routine of small, incremental changes.
- …[T]he Fund is in a target range zone which can potentially give the Fund an opportunity to come out of the position with good returns, if the positions are carefully managed. The PM's are closely monitoring and trading the positions as they see fit.
- The Fund has a greater amount of positions on in January and February than in December. Large price appreciation with corresponding upward VIX moves negatively affects these positions. Time is needed for these positions to mature.

DX 21 (SEC Exhibit 29).

127.    Szilagyi, Miller, Amrhein, and Schoonover were all aware of the Fund's exposure before February 2017. *See* DX 31, Schoonover Testimony I, at 404. Beginning in July 2016, Schoonover provided Szilagyi, Miller, and Amrhein a consolidated report of the Fund's positions and risk metrics. DX 29, Miller Dep., at 72, 73.

128.    The reports did not show a consistent pattern:  the Greek metrics would increase and decrease. DX 29, Miller Dep., at 75-76.

129.    From February 1, 2017 through February 8, 2017, no risk metrics were triggered. DX 42, Arbitration Day 4, at 146:22 to 166:17.

130.    As soon as risk metrics were triggered in February 2017, Walczak quickly began trading and eliminated the Fund's exposure to the expiration on the third Friday of February 2017 within days.  DX 41, Arbitration Day 3, at 124:1 to 126:5.

131. On February 2, 2017 and February 6, 2017, two of the seven days at the start of February 2017 on which no trades were executed in the Fund, the Fund's returns were positive. *See* PX 11, Rios Testimony II, at 24.

132. Most of the drawdown in February 2017 occurred *after* Walczak began trading. DX 38, Walczak Testimony III, at 634:11-19.

133. When Walczak did not trade on February 8, 2017, he was not betting that the market was going to go down; rather, he made a decision, monitoring his metrics as he had done in the past, not to lock in losses but to follow the same process as he had always followed. *See* DX 31, Schoonover Testimony I, at 428-29. His systems were telling him that there would be a day to roll his positions, and that just never happened. *Id.* at 430.

134. Walczak had explained that after suffering a loss he would ask, "Does some time have to pass?" PX 47 (Transcript, Oct. 25, 2016 Open House Call) at 34:16 to 35:1.

135. From January 31, 2017 through February 9, 2017, while in the group calls it had been suggested to Walczak that it could be a good idea to take risk down, it was not a direct request but a suggestion, and had he received a direct request, he would have done it. DX 29, Miller Dep., at 152-53.

136. In February 2017 there were discussions with Walczak about how to reduce risk, and Walczak started buying S&P 500 E-mini Futures contracts to start hedging out risk. DX 29, Miller Dep., at 160. Miller participated in those discussions. *Id.* It was an "all-hands-on-deck" situation between December 2016 and February 2017. *Id.* at 167.

137. The drawdown in 2017 was less extreme than the known drawdown from 2007 at Harbor Assets. *See* DX 31, Schoonover Testimony I, at 470.

138. The 2017 drawdown was a once in 100 years event. There had not been such low volatility for 450 days. *See* DX 28, Milder Testimony, at 353.

139. Schoonover's experience observing the Fund confirmed that it had gone through environments where it had performed well, and others in which it had not performed well, but it always had ultimately prevailed. DX 32, Schoonover Testimony II, at 150.

140. Walczak was heroic limiting the February 2017 drawdown to 22%. DX 28, Milder Testimony, at 354.

141. February 2017 evidenced highly unusual market conditions. DX 33, Szilagyi Testimony I, at 59:8-23, 184:23-25, 185:13-15. Volatility was uncommonly low. PX 15, Walczak Testimony VI, at 256:2-6. There was an atypical lack of mean reversion. DX 36, Walczak Testimony I, at 320:11-23. The traditional negative correlation between spot moves and volatility moves came uncoupled. DX 33, Szilagyi Testimony I, at 57:9-19. The market was approaching a record number of days in a row without having a one percent down day in the market. *Id.* at 57:5-9.

142. Bart Evans, an investment adviser, kept clients in the Fund for over two years after the February 2017 drawdown. DX 7 (table of holdings of interests in the Fund by clients of Bart Evans as of July 31, 2019).

143. When confronted, during a stress test of the portfolio, with an OptionVue graph that suggested a drawdown in excess of 8% at a stress point he was considering, Walczak would "dissect the portfolio to figure out which options were causing the strain and then make a decision on what to do about the portfolio." PX 11, Rios Testimony II, at 176:15 to 177:7 (confirming Walczak's process); *id.* at 173:3 to 174:3, 178:19 to 15 (indicating that Rios and Walczak would contemplate larger spot moves given more time to expiration while potentially

leaving exposures in place if too little time remained prior to expiration to make trading out of the exposure "realistic" or "logical").

144.    Walczak worked from offices in Fitchburg, Wisconsin, and from time to time San Francisco and Hawaii and maintained great responsiveness, with his location causing no challenges to his colleagues in Wisconsin. DX 30, Rios Testimony I, at 76-77.

145.    The investment strategy was to actively trade while attempting to avoid a drawdown of greater than 8%. PX 12, Rios Testimony III, at 46:14-16.

Dated: December 17, 2021                                              Respectfully submitted,

By: /s/ James L. Kopecky
James L. Kopecky (ILBar#6225359)
KOPECKY SCHUMACHER ROSENBURG LLC
120 N. LaSalle, Street, Suite 2000
Chicago, IL  60602
Tel. 312-380-6552
jkopecky@ksrlaw.com
*Counsel for Defendant*

By: /s/ Zachary J. Ziliak
Zachary J. Ziliak
ZILIAK LAW LLC
141 W. Jackson Blvd., Suite 4048
Chicago, IL  60604
Tel. 312-462-3350
zachary@ziliak.com
docket@ziliak.com
*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 17, 2021, I served Walczak's Proposed Findings of Fact in Opposition to Plaintiff's Motion for Summary Judgment on counsel of record for this matter via e-mail and via the ECF system.

<u>/s/ Zachary J. Ziliak</u>
