IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
---

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

          Plaintiff,                             OPINION AND ORDER

   v.

                                                   20-cv-076-wmc

EDWARD S. WALCZAK,

          Defendant.

---

In this lawsuit, the Securities and Exchange Commission ("SEC") is suing Edward Walczak for alleged violations of the Securities Exchange Act, 15 U.S.C. § 78a *et seq.*, and Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.*  The SEC now seeks partial summary judgment on three of its five claims under Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Exchange Act and Section 206(4) of the Investment Advisors Act.  (Dkt. #24.)  For the reasons discussed below, the court will grant that motion in part and deny it in part.

UNDISPUTED FACTS

Defendant Edward S. Walczak was the Senior Portfolio Manager for the Catalyst Hedged Futures Strategy Fund ("Fund"), which traded in options on Standard and Poor's ("S&P") 500 index futures contracts.  (Pl.'s Reply to Pl.'s PFOFs (dkt. #41) ¶¶ 2, 40.)  In that position, it is undisputed that Walczak acted as an "investment fiduciary" for the Fund.  (*Id.* ¶ 3.)  Futures contracts allow a party to buy or sell a particular investment vehicle at a specific price and time.  (*Id.* ¶ 42.)  An S&P futures contract is based on the underlying price of the S&P 500 index and changes with the value of that index.  (*Id.* ¶

44.) An options contract allows the party to buy or sell a futures contract at a fixed price on a specific date. (*Id*. ¶ 45.)

The Fund mainly held call options between November 2016 and February 2017, during which the holder could buy the underlying futures contract. (*Id*. ¶ 47.) Walczak often discussed the Fund on calls with investment advisors ("House Calls"). (*Id*. ¶ 80.) During those calls, he often spoke about the Fund's risk management procedures, noting that he tried to keep the Fund under an 8% drawdown. (*Id*. ¶ 92.) Walczak also described how he used OptionVue, a sophisticated market modeling software, to model changes in the Fund and ward off the impact of potential drawdowns. (*Id*.) Nevertheless, between January 31, 2017, and February 28, 2017, the Fund's price-per-share declined more than 18% as calculated using OptionVue software, contributing to significant losses for investors. (*Id*. ¶ 199.)

## OPINION

In moving for summary judgement as the party who bears the burden of proof, plaintiff "must lay out the elements of the claim, cite the facts [that] it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *see also Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 42 (7th Cir. 1992) ("[B]ecause Owens-Corning and CertainTeed also have the burden at trial of establishing good faith, they must establish affirmatively the lack of 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-

50 (1986))). "If the movant has failed to make this initial showing, the court is obligated to deny the motion." *Hotel 71*, 778 F.3d at 601; *see also Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011) ("A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance.").

This case presents much the same issues and conduct present in *Commodity Futures Trading Commission v. Walczak*, No. 20-cv-075-wmc (W.D. Wis. Jan. 27, 2020) ("*CFTC*"). Indeed, given the significant overlap in the facts and claims in these cases, consolidation for trial would appear justified by interests in judicial economy. Regardless, this opinion will draw from the court's summary judgement decision in that case, *CFTC*, No. 20-cv-075-wmc (W.D. Wis. Nov. 22, 2021) (dkt. #67), while providing a more thorough analysis with respect to evidence and arguments not made by the CFTC.

I. Existence of a Hard 8% Drawdown Limit

In similar fashion as the CFTC, the SEC claims Walczak misrepresented that he mitigated the risk to the Fund by trading and rebalancing its holdings whenever OptionVue models predicted more than an 8% loss. While the SEC does a better job of marshalling facts and making more nuanced arguments in support of its claim in this regard than did the CFTC, the underlying evidence and summary judgment standard are essentially the same. As such, the court's ruling at summary judgment in the *CFTC* case is largely applicable here.

In particular, contrary to the SEC's claim, Walczak's actual statements about maintaining an 8% drawdown limit retain some ambiguity. Thus, while strong, the SEC's

3

claim on this topic is not so "one-sided" as to compel entry of summary judgment on behalf of the plaintiff.  *Hotel 71*, 778 F.3d at 601.  Even more specifically, there remains a question as to what *exactly* the fund's investors were told *and* reasonably thought would occur when OptionVue modeling showed the risk of an 8% or greater drawdown, or given the immense complexity of the OptionVue software, even which model of volatility, time, or percentage changes needed to show an 8% drawdown for Walczak to act.  Thus, the SEC has not met its high burden of proof for entry of summary judgment on this claim.

## II. Promise of Daily OptionVue Modeling

The SEC's second argument regarding how often Walczak checked the OptionVue software is more compelling.  As the following evidence offered by the SEC establishes definitively, Walczak *repeatedly* told investors that he used his modeling software to stress test the Fund's portfolio *daily*:

- "In other words, we take a snapshot of our portfolio within our options modeling software and then we stress that portfolio against price, volatility and across time, because obviously time is an important element to a wasting asset like an option. So, we're on a *daily* basis, we'll -- the portfolio in aggregate is plugged into our options modeling software and we'll stress price moves."  (Pl.'s Rep. to Pl.'s PFOFs (dkt. #41) ¶ 101 (emphasis added).)

- "*Each day* I graphically view the stress points referred below in combination with volatility stresses of VIX = 20, 30 and 45."  (*Id*. ¶ 142 (emphasis added).)

- "[W]e'll stress the impact on a portfolio on a *daily* basis, for five, 10, 15, and sometimes 20 percent price moves."  (*Id*. ¶ 114 (emphasis added).)

- "I have very sophisticated options pricing models. I plug the portfolio into these models *each day*."  (*Id*. ¶ 92 (emphasis added).)

- "What we do with the fund on a *daily* basis is we have lots and lots of diverse options positions on -- based on our strategy. We stress, we aggregate all

4

those in the models we use to predict what will happen with the portfolio value under different scenarios." (*Id*. ¶ 96 (emphasis added).)

Additionally, Walczak explained to investors that when he spoke of stress testing, he was talking about his OptionVue modeling software. (*Id*. ¶ 94 ("when I talk about a stress test, what I will do is, I describe at some length lots of different options, positions, calls, puts, different strike prices, different months . . . all of these things are loaded in options pricing modeling software.").) Nor is there any indication in the record that Walczak ever used other modeling software other than OptionVue.

In contrast, in depositions in both 2017 and 2018, Walczak admitted *not* using the OptionVue modeling software daily. In an October 17, 2017, deposition, Walczak testified as follows:

> MS. ALOISI: You were pretty clear you didn't do that daily, though, if I recall your earlier testimony; is that right?
>
> THE WITNESS: We didn't use Option View daily.
>
> ALOISI: So that's not another one of the things you did to stress the fund for risk on a daily basis?
>
> THE WITNESS: Not on a daily basis, no.

(Pl.'s PFOFs, Ex. 16 (dkt. #26-16) 222.) Similarly, in an April 4, 2018, deposition, Walczak testified:

> Q: So were you not looking at OptionVue from February 1st to February 8?
>
> A: I looked at it, not every day, and I think that's also in my prior testimony because there's really no need to look.

(Pl.'s PFOFs, Ex. 20 (dkt. #26-20) 628.)

Defendant himself, in his response to plaintiff's proposed findings at summary

5

judgment, further admitted that "[w]hen options were close to expiration, they were less responsive to changes in volatility, and Walczak sometimes analyzed his risk outside of OptionVue." (Pl.'s Reply to Pl.'s PFOFs (dkt. #41) ¶ 209.) Even in briefing, Walczak only claims to have "stress-tested the portfolio *nearly* daily." (Def.'s Opp'n (dkt. #34) 10 (emphasis added).)

Thus, the SEC has established that Walczak misrepresented to investors that he used OptionVue daily, and the sum total of Walczak's response to this fact is that: (1) "OptionVue is only one element of the 'stress-testing' protocol Catalyst used for risk management" and (2) he used OptionVue "nearly daily." (*Id*.) Neither of these responses begins to rebut the SEC's contention that Walczak repeatedly told investors he used OptionVue modeling software daily when he did not.

Further, while Walczak fails to make this argument robustly in briefing, a generous reading of his responses to plaintiff's proposed findings of fact suggests that Walczak intends to rely on his later statements in his deposition testimony, which contradict his earlier testimony. For example, in his 2021 deposition, Walczak testified that:

> if I wanted to look at options related to any of the securities or instruments that were on that initial page [of OptionVue], I would click on it. I -- you can click on the particular instrument. In this case, it would be S&P futures.
>
> Q. Okay. But would you -- would you view the graph every day? Would you click on it every day?
>
> A. *Yes. Every day*."

(Walczak Depo. (dkt. #29) 69:10-17) (emphasis added).)

The question, then, is whether this later deposition testimony can create a genuine

6

dispute of material fact as to Walczak's actual conduct. The Seventh Circuit has explained that the sham affidavit rule:

> prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony. We also disregard an affidavit that contradicts a statement made under penalty of perjury, even if the statement was not made in the course of litigation. The organizing principle of our sham-affidavit practice is simply stated: a genuine issue of material fact cannot be conjured out of nothing.

*James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) (internal citations omitted). The Seventh Circuit has also applied this rule to sworn statements other than affidavits. *See Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1166 (7th Cir. 1996) (applying the sham affidavit rule to interrogatory answers that contradicted a previous deposition.)

Walczak's case is somewhat unique, as the long investigation into his conduct resulted in his being deposed on at least three, separate occasions. At each deposition, he was represented by counsel and provided sworn testimony. (Pl.'s PFOFs, Ex. 20 (dkt. #26-20) 2); Pl.'s PFOFs, Ex. 16 (dkt. #26-16) 328; Walczak Depo. (dkt. #29) 3:3-7.) The sham affidavit rule "must be applied with great care, though, because summary judgment is not a tool for deciding questions of credibility." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015). Instead, "an affidavit can be excluded as a sham only where the witness has given 'clear answers to unambiguous questions which negate the existence of any genuine issue of material fact.'" *Castro*, 786 F.3d at 572 (citing *Bank of Ill.*, 75 F.3d at 1170).

Certainly, Walczak's previous testimony that he did *not* look at OptionVue modeling every day appears to be an unambiguously broad assertion. (Pl.'s PFOFs, Ex. 20

7

(dkt. #26-20) 628 ("Q: So were you not looking at OptionVue from February 1st to February 8? A: I looked at it, not every day, and I think that's also in my prior testimony").) Still, his later testimony is narrower in scope, by asserting that he, at the very least, clicked on the graph available through OptionVue modeling daily. (Walczak Depo. (dkt. #29) 69:10-17 (Q. Okay. But would you -- would you view the graph every day? Would you click on it every day? A. Yes. Every day.").) Given Walczak's previous statements that he was not *using* OptionVue modeling each day, his later testimony that he viewed specific graphs created through OptionVue modeling daily appears contradictory, if not literally, then at least in spirit. Indeed, Walczak's earlier testimony gives little room for ambiguity, as he clarified in response to follow-up questions that during the period "from February 1st to February 8th" of 2017, he "looked at OptionVue at least once" and "[p]robably three times" but could not "recall exactly." (Pl.'s PFOF, Ex. 20 (dkt. #26-20) 628.)

Most importantly, even now, defendant does not claim that he checked OptionVue daily. (Def.'s Opp'n (dkt. #34) 10.) Thus, the court need not decide whether Walczak's 2021 deposition testimony directly contradicts or merely puts a gloss on his earlier testimony, nor whether the sham affidavit rule would apply for purposes of deciding plaintiff's pending motion for summary judgment. Instead, looking at Walczak's deposition testimony as a whole, as well as representations to this court, his representations of use of OptionVue modeling solftware daily to stress test the Fund's holdings constituted a falsehood for the purposes of the Securities Act and Advisors Act at summary judgment, as he admits these representations were demonstrably false.

The next disputed issue is whether this falsehood was *material*. A fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, (1976). Here, Walczak continuously touted his use of OptionVue modeling as *the* risk management strategy he used, consistently bringing up his daily use when clients asked about the fund's risk management. (Pl.'s Reply to Pl.'s PFOFs (dkt. #41) ¶¶ 92, 94, 96, 99, 101, 105, 110, 112, 114, 119, 120, 123, 125, 128, 130.) Further, as Walczak often noted, options futures are volatile and do not respond to market fluctuations in a straightforward manner: "even if you're an options guy, if you look at a portfolio statement, you have no chance whatsoever of understanding how that portfolio will behave under different market conditions unless you have fairly sophisticated options modeling software"; and he otherwise soothed investors by frequently repeating that his daily stress tests using OptionVue would allow him to protect the Fund from any serious downturns. (*Id*. ¶ 119.)

Notably, for summary judgment purposes at least, Walczak also conceded that looking at his software daily was the *only* way to understand the portfolio. Thus, summary judgment turns on whether a reasonable jury could find at trial that the difference between testing the fund "daily" and "nearly daily" are *de minimis*. Certainly, much of the evidence at summary judgment would suggest that it is *not*, beginning with Walczak's concession that he was selling an inherently risky investment product with "potentially unlimited losses." (*Id*. ¶ 228.) Transcripts of the House Calls also establish that the question of risk management was of considerable concern to potential investors and investment advisors.

(*Id.* ¶ 101.) Finally, the actual, historical performance of the Fund shows that a major loss of investor wealth could occur in a span of days. In a three-day period between December 6 and 9, 2019, for example, the Fund lost more than 6.25% of its value. (*Id.* ¶ 157.) Similarly, on January 25, 2017, alone, the Fund lost 4% of its value over the course of one day. (*Id.* ¶ 171.) With such dramatic swings in value possible, and emphasized to investors by Walczak, a reasonable jury would have to find that even one day's failure to use OptionVue modeling *could* have high impacts on investor income, and even more to the issue at hand, the lack of a daily check undoubtedly would be material to investors. As such, a reasonable jury would have to find Walczak's statements that he stress tested the Fund daily were material.

Last, Walczak's claimed state of mind is at issue in this case. The Supreme Court has held that "the language of § 17(a) requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3)." *Aaron v. Sec. & Exch. Comm'n*, 446 U.S. 680, 697 (1980). Even the necessary scienter for 17(a)(1) is merely "recklessness," not intentional misrepresentations, *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1039-40 (7th Cir. 1977), and "in civil cases at common law it is enough that the risk, besides being serious and eminently avoidable, is obvious; it need not be known to the defendant," *Slade v. Bd. of Sch. Directors of City of Milwaukee*, 702 F.3d 1027, 1029 (7th Cir. 2012). "While 'the term recklessness is not self-defining,' the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

Here, there is sufficient evidence that a reasonable jury *could* find that Walczak knew or should have known that his words were reckless (*i.e.*, had a high risk of harm). As already noted, options futures are an extraordinarily risky investment product, and various clients expressed regular concern about the risk mitigation measures used by the Fund. Additionally, Walczak had a great deal of personal control over the Fund and its message, during which he repeatedly assured investors that he personally used OptionVue modeling daily, while knowing that he was not, in fact, doing so at least as often as he was representing.

As a result, Walczak could not credibly argue that he did not know he was speaking falsely when he was *both* the speaker and the person failing to carry out his promise. Still, Walczak may argue that an ordinary securities trader could objectively believe that there was little risk of harm in not using OptionVue modeling daily, and thus, that the representation of daily stress testing was not recklessly made. However, the risk of the investment vehicle, the speed at which the Fund could experience drawdowns, and the apparent interest and expectation of strenuous risk mitigation from clients, *all* point to his misstatements representing a real risk of harm for investors and being reckless. Plus, his actions were easily avoided: Walczak could either check OptionVue daily, as he had represented, or simply decide not to represent falsely to investors that he used the software program more often than he did.

Despite this powerful evidence, the court will leave to the jury to decide whether Walczak's misrepresentations were recklessly made within the scienter requirement of 17(a)(1). Because section 206(4)-8 of the Investment Advisor Act and sections 17(a)(2) and 17(a)(3) of the Securities Exchange Act do not have a requirement of scienter, however, all the requirements of liability are met.[1]  *Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 195 (1963).

### III. Consolidation

As already expressed, the court's preference is to consolidate this case with *CFTC v. Walczak,* but understanding that Section 21(g) of the Securities Exchange Act prohibits consolidation without the SEC's consent, the court will first seek the SEC's position on consolidation. While the SEC had already suggested that the CFTC case involves, "a different party, different alleged statutory violations with different elements, and a different evidentiary record," the fundamental claims, conduct and evidence at issue is almost identical. (Pl.'s Reply (dkt. #43) 4.) Both the CFTC and the SEC rely on Walczak's representations about risk management on calls with investors, and the cornerstone of both cases is that Walczak did not manage the risk of an 8% drawdown level as represented. The biggest difference is that the SEC has presented a somewhat broader case, involving arguments about diversification and OptionVue usage, rather than relying solely on the 8% drawdown number. However, the CFTC case is currently

---

[1] The requirement under 206(4)-8 that Walczak be an investment advisor is also met, as he had almost sole control of the fund, was the main person in charge of trading and strategic decisions, conceptualized the fund, and was an investment fiduciary. (Pl.'s Reply to Pl.'s PFOFs (dkt. #41) ¶¶ 255, 80-89, 3.) Moreover, defendant has provided no material evidence to the contrary.

scheduled to go to trial before the SEC case, raising questions of how the conclusions drawn in the CFTC case may or may not affect the SEC's case. Thus, the SEC is encouraged to consider whether consolidation would be in the interest of all parties and this court's husbanding of its resources.

ORDER

IT IS ORDERED that:

1) Plaintiff Securities Exchange Commission motion for partial summary judgment (dkt. #24) is GRANTED IN PART AND DENIED IN PART. The motion is DENIED as to section 17(a)(1) the Securities Exchange Act. In all other respects, the motion is GRANTED.

2) Plaintiff SEC may have until February 11, 2022, to advise if it will consent to consolidation of these cases.

Entered this 4th day of February, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge